**IN THE UNITED STATES DISTRICT COURT**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DYWANNA BROADNAX | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: |
| | : | |
| THOMAS JEFFERSON | : | |
| UNIVERSITY HOSPITAL, INC. | : | |
| Defendant. | : | |

## COMPLAINT

1. Plaintiff Dywanna M. Broadnax (hereinafter "Plaintiff"), hereby files this Complaint against Defendant Thomas Jefferson University Hospitals, Inc. (hereinafter "Defendant"), alleging that her rights, pursuant to the Americans with Disabilities Act ("ADA"), and its 2008 amendments, 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA") have been violated, and avers as follows:

## PARTIES

2. The Plaintiff herein is Dywanna Broadnax, a 39-year-old black female with various disabilities who resides at 77 Memorial Drive New Castle, DE 19720.

3. The Defendant herein is Thomas Jefferson University Hospitals, Inc. located at 111 South 11th Street, Philadelphia, PA 19107. Defendant is an entity engaged in an industry or activity affecting commerce which employs 50 or more employees in all of its facilities for each working day during each of 20 or more calendar workweeks.

## JURISDICTION AND VENUE

4. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

5. Subject-Matter Jurisdiction is conferred upon this Honorable Court by 28 U.S.C. § 1337 relating to "any civil action or proceeding arising out of any act of Congress regulating commerce," 28 U.S.C. § 1343(4), and 28 U.S.C. § 1331, and under the Americans with Disability Act and its Amendments ("ADA") 42 U.S.C. § 12101 *et seq*. and Title VII of the Civil Rights Act.

6. This Court may properly maintain Personal Jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with the traditional notions of fair play and substantial justice, thus satisfying the standard set forth by the United States Supreme

Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

7. Venue is appropriately laid in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) inasmuch as all parties regularly conduct business within this District and the acts complained of by Plaintiff arose herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff hereby incorporates the prior paragraphs of this Complaint as though fully set forth at length.

9. Plaintiff exhausted her administrative remedies, as required under federal and state law.

10. Specifically, Plaintiff dual filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No, 17F-2020-60544, and the Pennsylvania Human Relations Commission ("PHRC") on May 18, 2020,.

11. The EEOC issued a Right to Sue in this matter on July 26, 2021. This Complaint is being filed within ninety (90) days of Plaintiff's receipt of a Right to Sue notice.

## FACTS

12. Plaintiff hereby incorporates the prior paragraphs of this Complaint as though fully set forth at length.

13. On or about March 15, 2005 Plaintiff was hired by Defendant for the position of Phlebotomist Clerk.

14. On or about June 2006, Plaintiff was diagnosed with lupus. Her diagnoses substantially impacted her ability to walk, think, concentrate, write, and hold objects. Plaintiff's lupus also caused her to develop Reynaud's syndrome, which reduces blood flow to limbs and other external body parts.

15. Plaintiff informed her supervisor, Joyce Zagacki ("Ms. Zagacki"), of her diagnosis and her accompanying limitations.

16. In or about Fall 2007, Plaintiff's job title was upgraded to Clinical Lab Assistant.

17. On or about October 7, 2008, Plaintiff was admitted to Defendant's emergency room for head pain and placed in a clinically induced coma while delivering her baby. Her pregnancy caused her to experience preeclampsia, which led to her developing pericarditis.

18. On or about October 15, 2008, Plaintiff received emergency heart surgery for pericarditis.

19. Following her heart surgery, Plaintiff attempted to commence a period of medical leave to recover, but was informed by Defendant that she had exhausted her FMLA time for serious health conditions.

20. Plaintiff was forced to resign from her position to avoid being terminated. Prior to her decision to resign, Ms. Zagacki told Plaintiff that she could be rehired for a position in

the future.

21. Plaintiff formally resigned on December 9, 2008.

22. On or about April 2009, Plaintiff attempted to be rehired to her position, but was told by Ms. Zagacki that Defendant was on a hiring freeze which prevented Plaintiff from being able to return to work at that time.

23. On or about March 10, 2011, Plaintiff filed a complaint with the PHRC against Defendant alleging discrimination on the basis of disability and race due to Defendant's failure to rehire her for nearly 2 ("two") years.

24. On or about August 18, 2011, Plaintiff and Defendant participated in a conference through the PHRC which resulted in Defendant agreeing to rehire Plaintiff into her lab assistant position.

25. On or about October 24, 2011, Plaintiff began working in her lab assistant position. Upon her return, Plaintiff's job areas were inexplicably limited.

26. Beginning in or about January 2012 Plaintiff began asking Ms. Zagacki if she could participate in trainings along with her coworkers so that she could go back to working in some of the expanded areas she was in prior to her resignation. These re-trainings would allow her to obtain more professional experience and be eligible for promotions. Ms. Zagacki informed Plaintiff that she did not think Plaintiff could keep up with trainings due to her disability and proceeded to actively preclude Plaintiff from training seminars and sessions with her peers.

27. Ms. Zagacki had no medical or evidentiary basis to deny Plaintiff the ability to participate in trainings along with her coworkers based on her disability.

28. In or about August 2016, Plaintiff began experiencing anxiety and depression due to the passing of her mother, which was exacerbated by workplace stress caused by what she believed to be repeated intentional efforts to exclude her from her peers.

29. Plaintiff's primary doctor recommended that her work hours be reduced. In response to this recommendation, Defendant placed Plaintiff on a reduced schedule in which Plaintiff did not work the same hours as any other lab assistant and was afforded minimal to no interactions at work. This scheduling decision by Defendant caused Plaintiff to miss out on staff meetings, additional training opportunities, and overall ability to advance and gain experience in her position.

30. In or about May 2017 Plaintiff's diagnosis of Raynaud's Syndrome was causing her hands to turn blue and numb. This made it difficult for Plaintiff to perform her primary job duty of drawing blood.

31. Plaintiff asked Ms. Zagacki for the reasonable accommodation of keeping a portable miniature heater in her workplace area. Ms. Zagacki informed Plaintiff that a portable heater was not necessary because it was May and the weather was hot outside. Defendant denied Plaintiff's accommodation request. Plaintiff was forced to adapt by repeatedly holding cups of hot water immediately before drawing blood in order to perform her job duties.

32. On or about September 2017 Plaintiff was cut on her leg by a metal keyboard slide that

was left under the work bench after a broken keyboard tray was removed.

33. Plaintiff's Lupus and Raynaud's Syndrome causes her skin to tear and bleed easily, and makes her prone to infections. For this reason, Plaintiff requested to have the metal keyboard trays removed from under these work areas Ms. Zagacki refused this request. All Ms. Zagacki did was cover the sharp edges with tape.

34. These metal slides cut Plaintiff's sensitive skin on two additional occasions between September and October 2017. During this time, Plaintiff repeatedly requested that the slides be removed.

35. On or about September 12, 2017, Plaintiff noticed that she was not seeing any retirement deductions on her pay statements. Defendant's HR department informed Plaintiff that she had not been registered for a retirement account when she was rehired.

36. Upon learning this news, Plaintiff asked Ms. Zagacki why she was not registered for a retirement account when she was rehired. Ms. Zagacki told her that this was the responsibility of Defendant's Human Resources. However, when Plaintiff contacted Defendant's Human Resources office again, they informed her that registering for retirement was in fact her supervisor's responsibility.

37. From October 24, 2011, to the present, Plaintiff has not been accruing retirement funds based on her employment with Defendant.

38. Since finding this out in 2017, Plaintiff has observed multiple new Lab Assistants attend a 30-day orientation session and receive new hire welcome packets which detail the retirement plan and how to register. Plaintiff did not receive a welcome packet upon being rehired, nor was she informed by Defendant that she needed to register for a retirement account again.

39. On or about December 20, 2017, Plaintiff dual-filed a new Complaint with the PHRC and EEOC, No. 17F201860232.  In this Complaint, Plaintiff alleged discrimination on the basis of disability due to Defendant's failure to provide reasonable accommodations for her disability, denying her the ability to participate in trainings on the basis of her disability, failing to inform her of the need to register for a retirement account again after being rehired after resigning for medical leave and retaliation for both her previous PHRC complaint and requests for reasonable accommodations.

40. On or about April 2, 2019, the EEOC informed Plaintiff they were dismissing her complaint.

41. On or about February 11, 2019, Plaintiff suffered from a mild stroke causing her to take medical leave until April 6, 2019.

42. Upon Plaintiff's return to work, she was informed that her coworker and friend, Naeemah Gadson ("Ms. Gadson"), had taken medical leave after being verbally assaulted by another coworker named Crystal Taylor ("Ms. Taylor").

43. Ms. Gadson and Ms. Taylor had not gotten along for years. With Ms. Gadson on medical leave, Ms. Taylor directed her antagonistic behavior towards Plaintiff, given that Plaintiff and Ms. Gadson were friends.

44. Plaintiff reported Ms. Taylor's antagonistic conduct towards her to Ms. Zagacki and

4

participated in meetings with both Ms. Zagcki and Ms. Taylor to address Ms. Taylor's hostility. However, Defendant failed to do anything to address this issue.

45. On or about November 18, 2019, Ms. Taylor began imitating Plaintiff's demeanor to another coworker and mocking Plaintiff. Plaintiff, who was in close proximity and observed this behavior, said "[N]ot today, Crystal. You're too fucking old for that shit."

46. Plaintiff's comment caused Ms. Taylor to become angry. Plaintiff asked Ms. Taylor why she had a problem with her and why she was showing off in front of other employees. In response, Ms. Taylor asked Plaintiff if she wanted "to talk about this outside."

47. Plaintiff complied with Ms. Taylor's offer, as Defendant encouraged employees to have conversations among themselves to work out differences amicably before reporting to management. Plaintiff honestly believed that she and Ms. Taylor could have a conversation to address why Ms. Taylor did not like her.

48. Once in the hallway, Ms. Taylor began raising her voice and told Plaintiff "I'm going to hurt you!" and bumped her chest.

49. Plaintiff, in defense, bumped Ms. Taylor away from her and told her to back up. She then turned around to try to locate Ms. Zagacki.

50. Once her back was turned, Ms. Taylor repeatedly poked Plaintiff in the back and continued to bump into her. Plaintiff tried to move away, but Ms. Taylor would not stop.

51. Eventually, Plaintiff poked Ms. Taylor back in self-defense. Ms. Taylor then grabbed a handful of Plaintiff's hair, pulled her to the floor, and repeatedly hit her on the head.

52. A certified nurse assistant eventually saw the altercation and broke it up. Plaintiff then went to Defendant's emergency room to be treated for injuries from the altercation.

53. Ms. Zagaki came to Plaintiff's emergency room and informed her that Ms. Taylor had been terminated. She also informed Plaintiff that she could not return to work until an investigation was conducted.

54. During this conversation, Ms. Zagacki also revealed that she was pretty sure Ms. Taylor attacked Plaintiff because Plaintiff had reported Ms. Taylor's script check errors, which Ms. Taylor had become upset about earlier that day. Despite this prior knowledge, and generally knowledge of Ms. Taylor's aggressive nature, Ms. Zagacki did not feel the need to try to calm Ms. Taylor down or inform Plaintiff that Ms. Taylor was upset prior to their altercation.

55. The physical effects of being assaulted by Ms. Taylor resulted in Plaintiff receiving a concussion, a gash on her left ankle, and caused severe exacerbation of Plaintiff's weak knees. Prior to this incident, Plaintiff had to routinely get fluid drained from her knee due to lupus, resulting in generally weak knees. The altercation with Ms. Taylor exacerbated her knee problems and caused permanent soft knee damage requiring continued physical therapy.

56. While in the emergency room, Plaintiff filed a police report against Ms. Taylor. Ms.

5

Taylor was subsequently arrested and charged with Simple Assault, 18 §2701 and Reckless Endangerment 18 §2705 under docket number MC-51-CR-0004502-2020. This matter is currently pending in the Municipal Court of Philadelphia after multiple continuances.

57. On or about November 21, 2019, Defendant's Human Resource office informed Plaintiff that she was being terminated because of Defendant's zero tolerance policy for fighting.

58. Plaintiff respondent that she was not the one who initiated the fight and was only trying to defend herself. She also questioned why she was not interviewed as part of Defendant's investigation. Defendant responded that Plaintiff's act of walking out to the hallway with Ms. Taylor constituted "participation" in a fight because she should have known that Ms. Taylor wanted to fight.

59. It should be noted that Ms. Taylor has a documented history of engaging in threats of violence, whether expressed or implied, which also violated Defendant's zero tolerance policy. Yet she was not terminated prior to this incident. If Defendant treated situations fairly, then Ms. Taylor should not have still been employed with Defendant, which would have avoided the incident with Plaintiff altogether.

60. Since her termination, Plaintiff has struggled to maintain financial stability. She was unable to find work with comparable salary for several months, due in part because Defendant listed her termination as due to fighting. Plaintiff has had to pay for out-of-pocket medical expenses related to her injuries from Ms. Taylor. Plaintiff also suffers from permanent knee damage that still requires regular physical therapy.

61. Defendant's actions also caused Plaintiff emotional harm. Following her incident with Ms. Taylor, Plaintiff had to begin mental health counseling sessions, which she also has to make co-pay payments for. Plaintiff has also been

62. While Plaintiff was eventually able to find a new job in April 2020, her treatment by Defendant has caused her to be too afraid to take on new leadership roles and promotions she has been offered that would cause her to have to interact more with other coworkers and potentially cause conflict.

63. Plaintiff prays that Defendant be required to provide all appropriate remedies available under Title VII of the Civil Rights Act.

### COUNT I
### RETALIATION IN VIOLATION OF THE of the AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et seq.*

64. Plaintiff incorporates the prior paragraphs of this Complaint as though fully set forth at length.

65. Plaintiff engaged in the protected activity of filing complaints with the EEOC and PHRC on March 2011 and December 2017 regarding discrimination on the basis of disability in violation of the ADA.

66. Defendant retaliated against Plaintiff for engaging in this protected activity by using a

physical altercation where Plaintiff was assaulted as an excuse to terminate her.

67. By terminating Plaintiff, Defendant treated Plaintiff in a disparate manner, given that other employees, namely the other employee who assaulted Plaintiff in a physical altercation, have documented previous incidents of violence or threats of violence that were in violation of Defendant's alleged zero tolerance policy, yet were not immediately terminated.

68. Plaintiff prays that Defendant be required to provide all appropriate remedies available under the ADA.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

69. Plaintiff incorporates the prior paragraphs of this Complaint as though fully set forth at length.

70. Plaintiff engaged in the protected activity of filing complaints with the EEOC and PHRC on March 2011 and December 2017 regarding discrimination on the basis of race in violation of the Civil Rights Act.

71. Defendant retaliated against Plaintiff for engaging in this protected activity by using a physical altercation where Plaintiff was assaulted as an excuse to terminate her.

72. By terminating Plaintiff, Defendant treated Plaintiff in a disparate manner, given that other employees, namely the other employee who assaulted Plaintiff in a physical altercation, have documented previous incidents of violence or threats of violence that were in violation of Defendant's alleged zero tolerance policy, yet were not immediately terminated.

73. Plaintiff prays that Defendant be required to provide all appropriate remedies available under Title VII.

## COUNT III

## RETALIATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

74. Plaintiff incorporates the prior paragraphs of this Complaint as though fully set forth at length

75. Plaintiff engaged in the protected activity of filing complaints with the EEOC and PHRC on March 2011 and December 2017 regarding discrimination on the basis of disability and race.

76. Defendant retaliated against Plaintiff for engaging in this protected activity by using a physical altercation where Plaintiff was assaulted as an excuse to terminate her.

77. By terminating Plaintiff, Defendant treated Plaintiff in a disparate manner, given that other employees, namely the other employee who assaulted Plaintiff in a physical altercation, have documented previous incidents of violence or threats of violence that were in violation of Defendant's alleged zero tolerance policy, yet were not immediately

terminated.

78. Plaintiff prays that Defendant be required to provide all appropriate remedies available under the PHRA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court grant her the following relief against Defendant:

(a)     Compensatory damages;

(b)     Punitive damages (where applicable);

(c)     Liquidated damages (where applicable);

(d)     Emotional pain and suffering;

(e)     Reasonable attorneys' fees;

(f)     Recoverable costs;

(g)     Pre and post judgment interest;

Respectfully submitted,

BY: /s/ Faye Riva Cohen, Esq.
LAW OFFICE OF FAYE RIVA COHEN, P. C.
FAYE RIVA COHEN, ESQUIRE
Attorney ID: 18839
2047 Locust Street
Philadelphia, PA 19103
Attorney for Plaintiff

Date: 10/22/2021

## **VERIFICATION**

I, Dywanna M. Broadnax, hereby verify that I am the Plaintiff in the within Complaint and that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

I understand that false statements are made to the penalties of 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

_____
Dywanna M. Broadnax
Plaintiff

Date: October 22, 2021