# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DYWANNA BROADNAX, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | CIVIL ACTION NO. 21-CV-04662-JMY |
| HOSPITAL, INC., | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS ABOUT WHICH THERE CAN BE NO GENUINE DISPUTE

In support of its motion for summary judgment, and in accordance with the Honorable John Milton Younge's Policies and Procedures, defendant, Thomas Jefferson University Hospital, Inc. ("Jefferson"), hereby submits its statement of material facts about which there can be no genuine dispute.[1]

---

[1] Summary judgment may be granted "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered "material" if it could alter the outcome of the case. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994). While, "[o]n a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party[, this is so] only if there is a 'genuine' dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted). A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-movant. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, a non-movant's speculation, conclusory assertions, or merely resting on the complaint or one's own testimony does not create that basis. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999); *Thomas v. Shaw,* 632 F. App'x. 716, 720 (3d Cir. 2015) (affirming summary judgment when plaintiff "relie[d] solely on his own testimony and speculation to support his claims."); *Becker v. Novipax LLC*, CA No. 19-cv-5126-JMY, 2022 WL 196286, at *4 (E.D. Pa. Jan. 21, 2022) (Younge, J.) (quoting *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010)) (explaining, the Court "need not credit [u]nsupported assertions, conclusory allegations, or mere suspicions"). If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson,* 477 U.S. at 249−50; *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992), *cert. denied,* 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is not required to "turn a blind eye" to the weight of the evidence). Jefferson presents the facts herein with the foregoing standard in mind and without waiver of its right to deny and defend any factual assertion taken as true for the purposes of this motion.

10156620.v2

**A.      Broadnax's First Period of Employment with Jefferson**

1.      From 2005 until in or about December 2008, plaintiff, Dywanna Broadnax, worked as a phlebotomist/lab assistant at the Methodist Hospital Division ("MHD") of Thomas Jefferson University Hospitals, Inc. ("Jefferson"). Exh. 3,[2] Complaint (ECF No. 1), ¶¶ 13, 16-20; Exh. 4, EEOC Complaint, EEOC No. 17F201161112 ("2011 Charge"), ¶ 4; Exh. 5, Deposition Transcript of Dywanna Broadnax ("Broadnax Dep."), 125:25-126:11.

2.      Starting in March 2007 and throughout the rest of Broadnax's employment with Jefferson, Broadnax reported to Joyce Zagacki, Laboratory Outpatient Supervisor. Exh. 6, Affidavit of Joyce Zagacki ("Zagacki Aff."), ¶¶ 3-4, 7-9; Exh. 5, Broadnax Dep.,125:25-126:5.

3.      Starting in or about 2011, Zagacki began reporting to George Marrone, who was Laboratory Manager and who, in 2017, became the Laboratory Operations Director. Exh. 5, Broadnax Dep., 12:25-13:2, 129:4-130:6; Exh. 6, Zagacki Aff., ¶¶ 5-6; Exh. 15, Affidavit of George Marrone ("Marrone Aff."), ¶¶ 3-4.

4.      When he became the Laboratory Operations Director, Marrone began reporting to Steven Gudowski, who is the Administrator for the Clinical Laboratories at Jefferson.  Exh. 19, Affidavit of Steven Gudowski ("Gudowski Aff."), ¶¶ 3-4; Exh. 15, Marrone Aff., ¶ 4.

5.      According to Broadnax, she was diagnosed with, among other things, Lupus and Raynaud's disease in 2006. Exh. 1, Plaintiff's Responses to First Set of Interrogatories ("Interrogatory Responses"), Interrogatory no. 9.

6.      In or about December 2008, Broadnax resigned from MHD because she "was in treatment for medical reasons" but had no more FMLA or other medical leave available to her.

---

[2]   All documents referenced herein shall be identified by their exhibit number attached hereto using the abbreviation "Exh.", as well as by a brief description of the document.

Exh. 4, 2011 Charge, ¶ 5; Exh. 20, Affidavit of Joyce Zagacki Dated March 1, 2018 ("2018 Zagacki Aff."), ¶ 4.

**B.      Broadnax Files a Complaint Alleging Discrimination**

7.      In or about March 2011, Broadnax filed the 2011 Charge, which was a Complaint with the Pennsylvania Human Relations Commission ("PHRC") and Equal Employment Opportunity Commission ("EEOC"), asserting Jefferson discriminated against her under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act ("Title VII") by not rehiring her because of her Lupus and her race (African American). Exh. 4, 2011 Charge.

8.      Broadnax and Jefferson settled the 2011 Charge pursuant to which Broadnax would withdraw the charge in exchange for Jefferson considering her for an open position. Exh. 21, Complaint, PHRC No. 201701645 ("2017 Charge"), ¶ 7; Exh. 20, 2018 Zagacki Aff., ¶ 12.

**C.      Jefferson Rehires Broadnax**

9.      In or about October 2011, Jefferson rehired Broadnax as a per diem Clinical Lab Assistant at MHD reporting again to Zagacki.[3] Exh. 22, New Hire Paperwork; Exh. 21, 2017 Charge, ¶ 7; Exh. 20, 2018 Zagacki Aff., ¶ 13; Exh. 5, Broadnax Dep., 126:12-14; Exh. 6, Zagacki Aff., ¶ 9.

10.     Throughout Broadnax's tenure as a per diem Lab Assistant, there were "many factors why [her] schedule would get altered," including to accommodate her schooling, to limit the number of hours and/or compensation she received to enable her to continue to be paid Social Security benefits, to accommodate her medical restrictions, and to care for her mother when she was terminally ill. Exh. 5, Broadnax Dep., 115:17-23, 116:8-118:14, 123:4-125:8, 172:4-25; *see*

---

[3]  A per diem position is similar to a zero-hour employee; the employee does not have a regular schedule but works when needed and available. Exh. 20, 2018 Zagacki Aff., ¶ 15.

10156620.v2

*also* Exh. 50, Handwritten notes from Broadnax to Zagacki concerning Broadnax's schedule restrictions; Exh. 1, Interrogatory Responses, Interrogatory no. 14.

11.    Zagacki altered Broadnax's schedule pursuant to Broadnax's requests. Exh. 5, Broadnax Dep., 116 :8-118:14, 124:18-125:8, 172:4-25; Exh. 8, Broadnax's November 26, 2019 PHRC Questionnaire ("PHRC Questionnaire"), TJUH0374.

12.    None of Broadnax's coworkers imposed as many restrictions on their schedules as Broadnax. Exh. 6, Zagacki Aff., ¶¶ 33-34; *accord* Exh. 5, Broadnax Dep., 170:16-23.

13.    As a Lab Assistant, Broadnax, among other things, collected specimens from patients for laboratory testing pursuant to scripts. Exh. 6, Zagacki Aff., ¶ 11.

14.    Also, Broadnax checked scripts against blood draws her coworkers performed to determine if they had missed any tests on the script. Broadnax would note any errors that her coworkers had made and "slid[e] them under [Zagacki's] door" so Zagacki could address them with the pertinent coworker. Exh. 5, Broadnax Dep., 95:12-16, 199:6-23.

15.    Broadnax felt she had "never been liked in [her] department by [her] phlebotomist coworkers." Broadnax acknowledges her coworkers would be annoyed or angry with her because she checked their scripts for errors they had made. *Id.* at 203:21-25; 275:19-278:20, 280:2-20.

16.    As Broadnax explained, Zagacki had a "tendency to go over whatever it [was] [Broadnax] slid under [Zagacki's] door" so "by the time [Broadnax] [came] in, [she was] the villain." Exh. 5, Broadnax Dep., 198:41-199:23.

**D.    Broadnax Works for Six Years and Files a Second Complaint of Discrimination in 2017**

17.    On or about December 20, 2017, Broadnax filed the 2017 Charge, which was the second complaint she had filed with the PHRC and EEOC against Jefferson.  This time, she alleged

4

disability discrimination and a failure to accommodate under the ADA and the PHRA and retaliation under the ADA, PHRA and Title VII for filing the 2011 Charge. Exh. 21, 2017 Charge.

18.     More specifically, in the 2017 Charge, Broadnax alleged: (a) Zagacki denied Broadnax the accommodation she requested in May 2017 to use a portable mini heater during her shift to help deal with her Raynaud's Syndrome; (b) Defendant denied her request for a reasonable accommodation to have a broken keyboard slide under one of the desks in Broadnax's work area removed because Broadnax had cut herself on the broken slide; (c) Zagacki refused to train Broadnax in "other areas such as Accessioning, Send Outs, Microbiology, and the Infusion Center" due to her disability (Lupus) and in retaliation for Broadnax filing the 2011 Charge; and (d) also in retaliation for filing the 2011 Charge, Defendant failed to inform Broadnax upon her rehire in 2011 that she needed to register for a retirement account. *Id.*

19.     Jefferson responded to the 2017 Charge by denying all of Broadnax's claims. *Id.*

20.     On or about April 2, 2019, the EEOC informed Broadnax that the agency was dismissing the 2017 Charge ("April 2019 RTS Letter"). Exh. 3, Complaint, ¶ 40; Exh. 24, Right to Sue Letter ("RTS Letter").

21.     There is no evidence Broadnax instituted litigation within 90 days of receiving the April 2019 RTS Letter to assert the claims in the 2017 Charge.

**E.     Jefferson's Employment Policies Applicable to Broadnax**

22.     At all pertinent times, Jefferson had a Code of Conduct that applied to all employees. Exh. 25, Code of Conduct, TJUH000644.

23.     Among other things, the Code of Conduct requires employees to "[p]romote a culture of fairness, trust, and respect;" "treat all members of the Jefferson community with respect and fairness;" "[b]ehave in a manner that encourages the spirit of cooperation, respect, and dignity

among all members of the community;" "promote and support an environment free from disruptive behavior and poor working relationships;" "[b]e professional and respectful in all communications," and "foster a safe and healthy environment." *Id.*; Exh. 26, Affidavit of Aaron Sniderman ("Sniderman Aff."), ¶¶ 10-11.

24.    "Violation of [the] Code may result in disciplinary action up to and including termination or dismissal." Exh. 25, Code of Conduct, TJUH000647; Exh. 26, Sniderman Aff., ¶ 11.

25.    Consistent with the foregoing, Jefferson's Employee Disruptive Conduct policy prohibits conduct that is "abusive" and "disrupts the smooth and efficient operations of Jefferson and negatively impacts the "morale and productivity of other employees." Exh. 27, Disruptive Conduct Policy; Exh. 26, Sniderman Aff., ¶ 12.

26.    Under that policy, disruptive conduct includes, but is not limited to, "engaging in offensive, intimidating, harassing or threatening conduct," and willfully violating . . . Jefferson's Code of Conduct." Exh. 27, Disruptive Conduct Policy; Exh. 26, Sniderman Aff., ¶ 13.

27.    The Disruptive Conduct policy is administered pursuant to the Employee Disciplinary Procedures policy, which states, among other things, "Some violations of Jefferson's guiding principles and policies will result in termination," and an example of such a violation is a willful violation of the Code of Conduct. Exh. 28, Disciplinary Procedures Policy.

28.    Further, Jefferson's Campus/Workplace Violence Policy states, among other things:

> Jefferson strictly prohibits campus violence. Acts of violence and/or threats of violence, whether expressed or implied toward any individual(s) at the Jefferson campuses, are prohibited and will not be tolerated. All reports of such incidents will be taken seriously and will be addressed appropriately . . . .  Campus violence is any conduct that is severe, offensive or intimidating enough to cause an

6

individual to reasonably fear for his/her personal safety or the safety of others or property . . . .  All Jefferson personnel . . . who commit campus violence will be subject to disciplinary action up to and including termination of employment or dismissal and will be directed to stay away from Jefferson . . . .  Jefferson will decide whether its campus violence policy has been violated and whether preventative or corrective action is appropriate.

Exh. 29, Campus/Workplace Violence Policy ("No Violence Policy"); Exh. 26, Sniderman Aff., ¶ 9.

**F.     Broadnax Instigates and Escalates a Verbal Altercation with a Coworker That Erupts into a Fistfight With the Coworker at Work During Work Hours**

29.     From February 2019 until April 6, 2019, Broadnax was out of work on medical leave. Exh. 3, Complaint, ¶ 41.

30.     Upon Broadnax's return to work in April 2019, she heard that a coworker, Naeemah Gadson, had taken FMLA leave after being "verbally assaulted" by another coworker, Crystal Taylor, in early April 2019. *Id.*; Exh. 5, Broadnax Dep., 59:5-20.

31.     Gadson and Taylor were Lab Assistants who, like Broadnax, reported to directly to Zagacki. Exh. 6, Zagacki Aff., ¶ 10.

32.     According to Broadnax, after she returned from leave, Taylor began directing "antagonistic" behavior towards Broadnax that she believes was prompted by the fact that she was friends with Gadson. Exh. 3, Complaint, ¶¶ 42-43.

33.     Broadnax and Taylor worked different shifts and would see each other only "in passing." Exh. 5, Broadnax Dep., 71:6-24.

34.     On November 18, 2019, Broadnax and Taylor had a fistfight in a Jefferson hospital hallway during work hours. *Id.* at 226:14-19.

35.     Broadnax, Taylor, a new employee named Tynesha Jenkins, and a student were in an employee room at the hospital together. *Id.* at 227:4-11.

7

36.     Broadnax heard what she thought was Taylor imitating Broadnax's demeanor and mocking Broadnax to Jenkins. Exh. 3, Complaint, ¶ 45; Exh. 5, Broadnax Dep., 227:21-228:21. Broadnax contends this was "piggybacking off of six months of [Taylor's] antagonistic behavior." Exh. 5, Broadnax Dep., 228:22-24.

37.     Broadnax said to Taylor, "[N]ot today, Crystal. You're too fucking old for that shit" and "I'm not for your shit today." Exh. 3, Complaint, ¶ 45.

38.     Taylor "jump[ed] up and said, 'You cursed?'" and she "threw her hand" and said to Broadnax, "You're done. And [Taylor] stormed out of the office." Exh. 5, Broadnax Dep., 230:8-18.

39.     Broadnax thought Taylor had left the office to report Broadnax's cursing to Zagacki. *Id.* at 263:2-22.

40.     Taylor came back into the office alone without Zagacki, looked at Broadnax "with an evil face," and "sat back down at the computer." *Id.* at 230:19-21, 260:22-25.

41.     Taylor did not speak to Broadnax. *Id.* at 260:21-261:5.

42.     Nevertheless, Broadnax, in front of Jenkins and the student, said to Taylor words to the effect, "[W]hy are you always showing off for the new hires? You do not work this area, but you're the main person making the mistakes." *Id.* at 230:21-231:5, 261:13-21.

43.     Taylor pushed back her chair, stood up, and approached Broadnax.  Taylor was "being aggressive" with Broadnax.  Taylor asked Broadnax, "You want to talk about this outside?" Broadnax said, "Sure." *Id.* at 231:6-9, 262:24-263:8.

44.     Broadnax contends she accepted Taylor's invitation to "talk about this outside" because Broadnax thought Taylor was asking Broadnax to have a civil side conversation about their dispute in accordance with Jefferson's policies. *Id.* at 231:7-233:24.

8

10156620.v2

45.     That said, Broadnax admits she had never heard of anyone at Jefferson asking a coworker to talk about a disagreement with the coworker "outside" and have that result in a civil conversation. *Id.*

46.     Taylor and Broadnax left the room and went into the hallway.  Taylor "started to become belligerent [and] loud."  Broadnax responded, "Wait a second, Crystal, not right here.  The physicians' offices are right here, and this is a unit."  Taylor replied, "Yeah, because I'm going to whup your ass." *Id.* at 234:3-236:4.

47.     Broadnax took a step back and said, "Crystal, you're not going to do anything to me."  Taylor said, "Why? What are you going to do about it?"  Taylor was bumping Broadnax in the chest as she said this.  Broadnax responded by bumping Taylor away and saying, "I'm going to get Joyce [Zagacki]." *Id.* at 236:2-12, 270:5-20.

48.     Broadnax turned her body to get Zagacki and Taylor poked Broadnax in the head while saying "Yeah, because you know better." *Id.* at 236:13-24.

49.     Broadnax did not continue to turn away from Taylor.  Instead, Broadnax said, "Don't put your hands on me," turned back towards Taylor, and poked Taylor back in the head. *Id.* at 236:20-237:14.

50.     Broadnax admits there was nothing obstructing her way that prevented her from walking away from Taylor after she poked Broadnax in the head. *Id.* at 237:8-238:2.

51.     After poking Taylor, Broadnax proceeded to turn away to get Zagacki when Taylor hit Broadnax in the back of the head causing her to fall to the floor.  This is "when the fight began." *Id.* at 238:3-11.

52.     Taylor was hitting Broadnax and Broadnax was "swinging and punching" Taylor "to defend" herself. *Id.* at 242:7-11.  Broadnax pulled Taylor to the floor and "hit her back," not

knowing where her "hits landed." *Id.* at 327:16-23, 331:11-332:17; Exh. 17, Criminal Hearing Testimony, 20:24-22:19, 23:6-8.[4]

53. Broadnax admits no one witnessed how the fistfight started. *Id.* at 243:12-14.

54. After Broadnax and Taylor were separated, Broadnax walked to Marrone's office and then to Zagacki's office, but neither were present. Security was speaking to Taylor and taking her statement. *Id.* at 268:9-19.

55. As more specifically explained below, Security then spoke to Broadnax during which conversation she handwrote a statement. *Id.* at 268:20-23, 298:2-15.

56. Broadnax eventually saw Zagacki and told her Taylor had attacked Broadnax. *Id.* at 274:4-275:18.

57. According to Broadnax, per a text she sent Taylor shortly after the fistfight, Taylor was an "ugly bitch," she "put her hands on the wrong one" and Broadnax "whupped [Taylor's] ass." *Id.* at 327:16-23, 334:11-336:21; Exh. 17, Criminal Hearing Testimony, 28:5-29:9.

58. Broadnax went to the emergency room and Zagacki came to see Broadnax one to two hours later. *Id.* at 294:3-9.

59. In the "nice soft-spoken" voice Zagacki always used, she asked Broadnax how she was doing and tried to comfort her. According to Broadnax, Zagacki said, "I think I know why this happened;" i.e., because she had a meeting that morning about the errors Broadnax had found the weekend before and Taylor was angry or upset. *Id.* at 294:3-295:3; Exh. 7, Amended Complaint, EEOC No. 17F202060544 ("2020 Charge"), ¶ 37.

---

[4] Shortly after her termination, Broadnax filed a criminal complaint against Taylor. Exh. 1, Interrogatory Responses, Interrogatory no. 8; Exh. 5, Broadnax Dep., 113:14-114:2. On March 3, 2022, Broadnax testified at the hearing on that complaint. Exh. 17, Criminal Hearing Testimony; Exh. 5, Broadnax Dep., 327:13-23.

10

10156620.v2

60.     Broadnax had left for Zagacki on Monday, November 18, 2019, what Broadnax believed to be errors made by her coworkers. Exh. 7, 2020 Charge, ¶ 37.

61.     Zagacki told Broadnax that Zagacki would have to take Broadnax's badge until the investigation into the fistfight was over. Exh. 5, Broadnax Dep., 294:25-295:2.

62.     By the time of this conversation between Zagacki and Broadnax, Zagacki had not read any security report or any statement from a witness about the fistfight. Exh. 6, Zagacki Aff., ¶¶ 14-15; *accord* Exh. 5, Broadnax Dep., 295:21-23.

**G.     Human Resources Investigates the Fistfight and Management, Senior Management and Human Resources Agree Both Taylor and Broadnax Should be Terminated For That Fistfight**

63.     The Security office at Jefferson created a Security Case Report about the fistfight. *See* Exh. 10, Security Case Report.

64.     In the Security Case Report, Security Officer Sergeant William White reported that he had spoken to Taylor about the altercation, and she reported that it was a "verbal dispute that turned physical after Ms. Broadnax invaded [Taylor's] personal space" and "pushed [Taylor] twice." Sergeant White further wrote that a witness, Loretta Ward, "saw two employees fighting in the hallway" and could not "break them up by yelling at them to stop." *Id.*

65.     Sergeant White also wrote in the Security Case Report that he spoke to Broadnax who said that Taylor "started a verbal confrontation in [the] lab." *Id.* Broadnax reportedly told Sergeant White that Taylor "then asked [Broadnax] to come out in [the] hallway where [Taylor] became physical by bumping [Broadnax], punching her, pulling her hair and pulled her to the ground." *Id.*

66.     Sergeant White accurately described his conversation with Broadnax. Exh. 5, Broadnax Dep., 256:7-16.

11

67.    Dennis Delisle (Vice President, Operations) with oversight responsibilities for the MHD campus, received a copy of the Security Case Report via email. Exh. 30, Affidavit of Dennis Delisle ("Delisle Aff."), ¶¶ 3-6.  He received the Security Care Report because, generally, given his position as Vice President of Operations, when more serious events occurred involving Security, that office would notify Delisle. *Id.*

68.    Delisle then emailed the Security Case Report about the fistfight to Broadnax's and Taylor's supervisors - Gudowski, Marrone and Zagacki – as well as to Aaron Sniderman, who was the HRBP who had taken over responsibility from Hamza for Broadnax's and Taylor's department in or about May 2019. Exh. 30, Delisle Aff. ¶ 7; Exh. 15, Marrone Aff., ¶ 7; Exh. 26, Sniderman Aff., ¶¶ 4-5, 7; Exh. 19, Gudowski Aff., ¶ 6; Exh. 6, Zagacki Aff., ¶ 18; Exh. 48, November 19, 2019 Delisle Email ("Nov. 19, 2019 Email").

69.    Even though Delisle did not have any authority to determine the discipline that should be imposed for the altercation, he, after reading the Security Case Report, shared his opinion on that discipline, as this incident implicated the safety of the workplace.  Delisle informed Gudowski, Marrone, Zagacki, and Sniderman that Delisle recommended Taylor be terminated pursuant to the No Violence Policy because Delisle knew that Taylor already was on a final written warning and that Jefferson has a zero tolerance for violations of that policy. Exh. 30, Delisle Aff. ¶ 7; Exh. 26, Sniderman Aff., ¶ 8; Exh. 15, Marrone Aff., ¶ 7; Exh. 6, Zagacki Aff., ¶ 19; Exh. 48, Nov. 19, 2019 Email; Exh. 29, No Violence Policy.

70.    Taylor was on a final written warning because, on January 30, 2019, she told a patient that she "got [Taylor] in trouble for wearing perfume."  This statement made the patient "feel uneasy." Exh. 31, Taylor Final Written Warning.

12

10156620.v2

71.     In recommending Taylor's termination, Delisle understood the Security Case Report to include Taylor's admission that she was involved in a verbal dispute that resulted in a physical fight in a hospital hallway during work hours.  Because Taylor already was on a final written warning, Delisle felt she should be terminated for her involvement in this dispute if Sniderman verified the incident occurred and Taylor had any culpability for it.  Therefore, Delisle asked Sniderman to confirm that Delisle's recommendation was the right course of action for Taylor.  Delisle also asked Sniderman to follow-up with Security and Zagacki about Broadnax's role to determine her culpability so the appropriate action could be taken against her as well. Exh. 30, Delisle Aff. ¶ 9; Exh. 48, Nov. 19, 2019 Email.

72.     Zagacki emailed Security requesting a copy of any statements obtained so she could send them to Human Resources.  Zagacki received and emailed those statements to Sniderman, with a copy to Marrone, early in the morning on November 19, 2019. Exh. 32, November 18, 2019 Zagacki Email ("Nov. 18, 2019 Zagacki Email"); Exh. 49, Nov. 19, 2019 Zagacki Email; Exh. 6, Zagacki Aff., ¶¶ 13, 16-17.

73.     Broadnax's statement read as follows:

> I clocked in and walked in the O.P Lab.  After I put my things in my locker, I came near the other Phlebotomist. Crystal said to Tynesha 'Don't forget to add your mag & Phos' a subliminal comment. So I said 'Crystal I'm not for ya stuff today, yu too f'ing old for that.' She got up and got in my face and said 'did you just curse @ me?' Then she said 'Your Done!" She left O.P. lab, and when she came back I said why are you always so sarcastic, she said do you wanna talk about this outside, I said yes because we had students & pts. She got in front of the Lab door and proceeded to get loud. I said I'm not doing this right here in front of the Dr's office's and adminsitration. So she come on then turned the hall near the time clock, she said 'because I'm going to hurt you.' I said your not going to put your hands on me, she said 'Then why you come outside,' I said to talk, you not going to touch me. She then started bumping my chest all in my face. I said, I'm going to tell Joyce this is crazy, as I turned around she grabbed my hair on the right side, hit me, and pulled me

13

> to the floor. At that point I began defending myself. Dywanna Broadnax.

Exh. 11, Broadnax Statement; Exh. 5, Broadnax Dep., 258:3-260:8.

74.     Broadnax admits she said in her statement that she had used profanity when speaking to Taylor, Taylor left the room in response to that profanity, Broadnax was the first person to speak again when Taylor returned to the room and - in so doing - Broadnax asked Taylor "why are you always so sarcastic?", Taylor responded by asking Broadnax if she wanted to "talk about this outside," Broadnax accepted that invitation, and Broadnax "defend[ed] herself" in the hallway. Exh. 5, Broadnax Dep., 260:10-261:8, 264:15-265:3.

75.     Taylor's statement read as follows:

> On the day of Nov 18 2018 about 245 PM me and cowork putting in pt. I simply told my coworkers that if your putting in chem make sure you add mas & phos. Dywanna imed said to me out loud in front of pt. that I always Doing this and crusing in front of pt. So to take the excitement out of out pt. I said to her if she want to speak to me privately. So we went in the hallway where she became cursing and fighting. Crystal Taylor.

Exh. 12, Taylor's Statement.

76.     Ward's statement read:

> I, Loretta Ward, was walking down toward inpatient lab before getting to the lab I heard noise like punching and breathing heaving and I look to the corner by the time clock and there are two girls fist fighting and I said stop twice then I yelled Security and when Security tore them apart from each other, the short girl said out loud she put me in this corner to fight with me cause there no camera, the short girl has long hair. Tall girl with very short hair. Loretta Ward. CNA ACE Unit.

Exh. 13, Ward's Statement.[5]

---

[5]  Broadnax contends Ward did not witness the fistfight but, instead saw Broadnax and Taylor only after the fight was over. That said, Broadnax admits: (a) she was told that Ward witnessed the fight; (b) that Ward was sitting at her desk when Broadnax and Taylor first went into the hallway; (c) that it was possible Ward was standing close enough to see

10156620.v2

77.     The statements of Broadnax, Taylor and Ward shall hereinafter collectively be referred to as the "Statements."

78.     In response to Delisle asking Sniderman to determine Broadnax's role, Zagacki emailed Delisle separately to inform him that, after reading the witness statement from security that Broadnax and Taylor were "fist fighting," Zagacki was going to recommend that Broadnax also be terminated (along with Taylor).  Zagacki reported that she felt the incident was "wrong on so many levels."[6] Exh. 30, Delisle Aff. ¶ 10; Exh. 33, November 19, 2019 Zagacki Email to Delisle ("Zagacki Email to Delisle"); Exh. 6, Zagacki Aff., ¶ 20.

79.     Indeed, in addition to Ms. Ward's statement, Zagacki had read the Security Case Report and Taylor's and Broadnax's statements.  They showed, to Zagacki, that both employees were responsible for the fistfight.  Their conduct was just plain "wrong." Exh. 33, Zagacki Email to Delisle; Exh. 6, Zagacki Aff., ¶ 21.

80.     Delisle responded to Zagacki's email, "Thanks, I fully support that" based on the witness' statement that Taylor and Broadnax were "fist fighting." Exh. 33, Zagacki Email to Delisle; Exh. 30, Delisle Aff. ¶ 10.

81.     Marrone, like Zagacki, had reviewed the Security Case Report and Statements. Exh. 15, Marrone Aff., ¶ 8; Exh. 6, Zagacki Aff., ¶ 21.

82.     Based on the Security Case Report and the Statements, Marrone felt Broadnax and Taylor should be terminated for their mutual involvement in the altercation. Exh. 15, Marrone Aff., ¶ 8.

---

the fight; and (d) in any event, that Broadnax has no reason to believe Ward would have fabricated the information in her statement. Exh. 5, Broadnax Dep., 242:19-24, 247:20-248:9, 252:2-253:2, 332:22-333:13.

[6] Zagacki also told Delisle she was waiting to speak to Sniderman about the incident, but Zagacki and Sniderman never did not wind up speaking about it. Exh. 6, Zagacki Aff., ¶ 20, n.1.

83.	Marrone knew Taylor and Broadnax had violated Jefferson's policies and that fist fighting at work during working hours cannot be tolerated.  He felt the totality of the altercation was serious enough that it warranted both employees' terminations. Exh. 15, Marrone Aff., ¶ 10.

84.	As for Gudowski, he read the Security Case Report and noted that it stated Taylor and Broadnax were fighting in the hallway during work hours.  He expressed to Marrone, Zagacki, Delisle, and Sniderman that he Gudowski did not want Taylor or Broadnax back on campus.  He asked Sniderman about the protocol for termination and for the next steps. Exh. 34, November 19-20, 2019 Email String; Exh. 19, Gudowski Aff., ¶ 7; Exh. 26, Sniderman Aff., ¶ 14.

85.	Sniderman reviewed the Security Case Report, as well as the Statements.  From the Security Case Report, Sniderman concluded that Taylor and Broadnax blamed each other for starting the altercation and that the witness – Ward – reported that "two employees [were] fighting in the hallway" and did not stop when Ward yelled for them to do so. Exh. 26, Sniderman Aff., ¶¶ 15-16; Exh. 10, Security Case Report; Exhs. 11-13, Statements.

86.	From Broadnax's statement, Sniderman noted that: (a) Broadnax instigated a confrontation with Taylor by cursing at her; (b) Taylor responded to Broadnax in an obviously angry fashion (by getting in Broadnax's face, asking Broadnax if she had just sworn at Taylor, telling Broadnax she was "Done," and abruptly leaving the room); (c) Taylor came back into the room and Broadnax escalated the conflict between herself and Taylor by asking Taylor why she was always "sarcastic;" (d) Taylor responded to that comment by asking Broadnax if she wanted to "talk about this outside," which Sniderman understood as a commonly-used euphemism for asking someone to fight; (e) Broadnax accepted that invitation (to fight) and left the room with Taylor; (f) when Mr. Taylor "got loud" in the hallway, Ms. Broadnax responded, "I'm not doing this right here;" and (g) although Broadnax blamed Taylor for making the first physical contact,

16

Broadnax admitted to fighting – as Ward reported - when Broadnax wrote that she "defend[ed] herself." Exh. 26, Sniderman Aff., ¶ 17; *accord* Exh. 11, Broadnax Statement.

87.    In other words, to Sniderman, Broadnax's statement made it clear she was an active participant in the altercation with Taylor that resulted in a fistfight.  As such, Broadnax should be terminated along with Taylor. Exh. 26, Sniderman Aff., ¶ 18; *accord* Exh. 11, Broadnax Statement.

88.    Following his review of the Security Incident Report and the Statements, Sniderman informed Gudowski, Marrone, Zagacki, and Delisle, "We take a zero-tolerance approach to violence in the workplace. Due to the physical evidence that is known Crystal should definitely be terminated. Based off of Dywanna's statement my initial recommendation is to terminate her as well."  Sniderman asked Gudowski, Zagacki, Marrone, and Delisle if anyone had additional information or a different view of the proposed discipline.[7] Exh. 34, November 19-20, 2019 Email String; Exh. 26, Sniderman Aff., ¶ 19; Exh. 30, Delisle Aff. ¶¶ 11-12; Exh. 15, Marrone Aff., ¶ 10; Exh. 19, Gudowski Aff., ¶ 8; Exh. 6, Zagacki Aff., ¶ 22.

89.    None of these individuals added more information or expressed a different view than that Broadnax and Taylor should be terminated. Exh. 30, Delisle Aff. ¶ 12; Exh, 15, Marrone Aff., ¶ 11; Exh. 19, Gudowski Aff., ¶¶ 9-10; Exh. 26, Sniderman Aff., ¶ 20; Exh. 6, Zagacki Aff., ¶ 23.

90.    Sniderman also spoke to Security and Ward who confirmed the information in Security Incident Report and Ward's statement, respectively. Exh. 26, Sniderman Aff., ¶ 21.

91.    Further, when Sniderman spoke to Ward, Ward explained that she saw Broadnax and Taylor entangled with each other on the floor fighting. *Id.* at ¶ 22; *accord* Exh. 5, Broadnax Dep., 361:11-12 ("[W]e were fighting on the floor").

---

[7]    Sniderman also made a statement that has been redacted from his email because the statement is protected by the attorney-client privilege and work product doctrine. Exh. 26, Sniderman Aff., ¶ 19, n.1.

10156620.v2

92.    Finally, Sniderman consulted Jefferson's in-house counsel and thereafter informed Gudowski, Marrone and Zagacki that he intended to follow through on his recommendation to terminate both Broadnax and Taylor for violating Jefferson's policies. Exh. 35, Sniderman Email; Exh. 26, Sniderman Aff., ¶ 23; Exh. 15, Marrone Aff., ¶ 12; Exh. 6, Zagacki Aff., ¶ 24; Exh. 19, Gudowski Aff., ¶ 11.

93.    All three managers supported this action. Exh. 19, Gudowski Aff., ¶¶ 10, 12; Exh. 15, Marrone Aff., ¶ 13; Exh. 26, Sniderman Aff., ¶ 24; Exh. 6, Zagacki Aff., ¶ 25.

94.    On November 21, 2019, Broadnax spoke to Sniderman who told her she was terminated because she engaged in a fistfight with a coworker. Exh. 5, Broadnax Dep., 299:19-300:4, 9:12-14, 301:25-302:13; *accord* Exh. 8, TJUH0372 (Broadnax admitting she was told she was being terminated for her participation in a fist fight which violated the Code of Conduct).

95.    Broadnax asked Sniderman why she had not been asked to provide her side of the story. Exh. 5, Broadnax Dep., 299:19-300:4.[8]

96.    To Sniderman, Broadnax already had provided her side of the story in her handwritten statement. Exh. 26, Sniderman Aff., ¶¶ 25-26.

97.    Broadnax told Sniderman she was "the one assaulted and attacked," to which Sniderman responded with words to the effect that Broadnax should have known Taylor wanted to fight when Broadnax agreed to "talk outside." Exh. 5, Broadnax Dep., 299:19-302:19; Exh. 7, May 2020 Charge, ¶¶ 43-44.

98.    During the termination call, Broadnax referenced workplace violence health stream courses Jefferson requires its employees to take, including one called "Workplace and De-

---

[8]   In her testimony in the criminal matter against Taylor, Broadnax testified that it was her understanding an investigation into the fistfight had taken place at Jefferson. Exh. 5, Broadnax Dep., 333:14-334:10.

18

escalation Techniques" that Broadnax claimed she was following when she accepted Taylor's invitation to "talk about this outside." Exh. 5, Broadnax Dep., 301:12-25.

99.    Sniderman responded by saying "You participated in a fistfight." *Id.* at 301:25-302:2.

100.    Neither at the time of the decision to terminate Broadnax nor any other time has Sniderman been aware of any employee training Jefferson provides that suggests to employees that, during a heated discussion, they should speak about the discussion "outside." Exh. 26, Sniderman Aff., ¶¶ 27-28.

101.    In fact, although Broadnax may have taken "Workplace and De-escalation Techniques" training at Jefferson, the training does not instruct employees to accept an invitation from an employee during a contentious interaction to "talk about this outside." Exh. 36, Workplace Training.

102.    In any event, Sniderman was not and still is not aware of that or any other training with such an instruction to employees. Exh. 26, Sniderman Aff., ¶ 29.

### H.    Broadnax Apologizes for the Fistfight and Admits, Among Other Things, That She Violated Jefferson's Policies and Believes She Was Terminated for the Fistfight

103.    After her termination, Broadnax sent a text to Zagacki apologizing for "asham[ing] the lab" and asking Zagacki to "[p]lease tell George & Linda sorry as well." Exh. 16, Broadnax Text Apologizing; Exh. 5, Broadnax Dep., 304:3-24, 305:7-9; *see also* SOFs ¶ 57, *supra*.  Linda refers to Linda Dutch, chemistry supervisor. *Id.* at 87:17-19.

104.    Broadnax concedes the conduct for which Jefferson told her she was terminated violated Jefferson's Code of Conduct policy, its Employee Disruptive Conduct Policy and its No-Violence policy. Exh. 5, Broadnax Dep., 303:10-21.

105.    Broadnax admits she believes the fistfight was the real reason she was terminated. Exh. 5, Broadnax Dep., 10:11-11:2.

106.    Indeed, when Broadnax applied for unemployment, she stated the reason she was terminated was because she "assaulted at work and got into a fistfight." *Id.* at 114:23-115:7.

107.    Also, when her attorney asked Broadnax in her deposition why Broadnax sued Jefferson, Broadnax explained, "Although there is a code of conduct policy in place for every employee, I did not understand that the first time that I am in a situation that requires management leadership security, anything administration to be involved, and it came from a person who has a history of volatile behavior, that I got assaulted and defended myself after being there 14 years and nine months, got me fired, I just did not understand that." *Id.* at 343:19-344:4.

## I.    Broadnax Can Point to No True Comparator Evidence That Raises an Inference of Retaliatory Firing

108.    Along with Broadnax, Taylor was terminated for the same reason Broadnax was terminated, the fistfight. *Id.* at 14:25-15:9; Exh. 37, Termination Letters.

109.    There is no evidence Taylor ever complained of discrimination or retaliation. Exh. 5, Broadnax Dep., 15:10-13.

110.    Also, although Broadnax contends "Taylor has a documented history of engaging in threats of violence, whether express or implied, which . . . violated Defendant's zero tolerance policy," Exh. 3, Complaint, ¶ 59, there is no evidence Taylor had been in a physical altercation before the fistfight with Broadnax. Exh. 5, Broadnax Dep., 14:9-24; *accord* Exh. 5, Broadnax Dep., 72:16-73:8, 64:2-65:5; Exh. 6, Zagacki Aff., ¶ 28; Exh. 26, Sniderman Aff., ¶ 30.

111.    In fact, even when Broadnax complained about Taylor, Broadnax did not report Taylor was violent towards Broadnax.  She complained she was receiving "wrath from Taylor in that Taylor was "being antagonistic," imitating Broadnax's voice and/or making

20

sarcastic remarks and "[s]ubliminal references." Exh. 5, Broadnax Dep., 91:3-92:13, 94:2-97:24; *accord* Exh. 46, Email Regarding Broadnax and Taylor (Broadnax complaining Taylor was "ignoring" Broadnax).

112.    Similarly, although Broadnax contends Taylor should have been terminated for her confrontation with Gadson in April 2019, Broadnax concedes that confrontation did not result in a physical assault and, in that way, was "different" than the fistfight between Broadnax and Taylor. Exh. 5, Broadnax Dep. 58:5-59:4.

113.    Zagacki agrees the Gadson/Taylor incident in April 2019 was materially different than the Broadnax/Taylor fistfight on November 18, 2019. Exh. 6, Zagacki Aff., ¶ 30.

114.    Broadnax did not witness the alleged "verbal assault" between Gadson and Taylor, Exh. 5, Broadnax Dep. 58:5-11, but Zagacki did. Exh. 6, Zagacki Aff., ¶ 29.

115.    There is no evidence Zagacki or any other decisionmaker characterized Taylor's conduct towards Gadson in words or effect as an "assault" or thought Taylor should be disciplined for the altercation with Gadson. Exh. 5, Broadnax Dep., 64:2-65:5, 66:7-11.

116.    In fact, Zagacki reported to Marrone and Human Resources shortly after the confrontation between Gadson and Taylor that they both were "aggressive" and at fault.[9] Exh. 6, Zagacki Aff., ¶ 29.

117.    To Zagacki, the fistfight between Broadnax and Taylor was not the same as the argument between Gadson and Taylor.  Broadnax and Taylor had a heated argument that it appeared Broadnax primarily started and escalated.  Broadnax accepted Taylor's invitation to go outside and then both "girls were fist fighting."  In contrast, Gadson and Taylor had a heated

---

[9]    Indeed, according to Broadnax, Gadson told Broadnax that Gadson said she left the confrontation with Taylor "before [Gadson] walk[ed] out in handcuffs." Exh. 5, Broadnax Dep., 61:18-62:21.

21

disagreement during which both were verbally aggressive, but it did not result in them striking each other. *Id.* at ¶ 30.

**J.    Broadnax's Alleges Mistreatment That Does Not Show, Much Less Suggest, Retaliation**

118.    Broadnax claims Marrone, Zagacki and the HRBP who Sniderman replaced – Hamza - harbored retaliatory animus against Broadnax for filing the 2011 Charge and the 2017 Charge. Exh. 5, Broadnax Dep., 12:9-14:8.

119.    Broadnax contends Hamza and Marrone harbored retaliatory animus because they did not do anything in response to Broadnax's purported complaints about Zagacki. *Id.* at 13:22-14:8.

**1.  Broadnax Has No Evidence Hamza Harbored Retaliatory Animus or Had Any Role in the Termination Decision**

120.    Regarding Hamza, she was Broadnax's HRBP from 2017 until in or about May 2019. Exh. 38, Affidavit of Suzana Hamza ("Hamza Aff."), ¶ 2; Exh. 26, Sniderman Aff., ¶ 4.

121.    The record evidence during that time period includes only the following:

   a. an August 2017 email exchange between Hamza and Broadnax wherein Hamza timely addressed the questions and concerns Broadnax raised and welcomed Broadnax to meet with her about any other issues. Exh. 39, August 2017 Email String; and

   b. a June 20, 2019, email ("June 20, 2019 Email") that Broadnax sent to Hamza wherein Broadnax wrote to Zagacki, with a copy to Marrone, complaining about a number of issues with Broadnax's coworkers and Zagacki. Exh. 9, June 20, 2019 Email; *see also* SOFs 126-132.  Broadnax has no evidence Hamza – who was no

22

10156620.v2

longer Broadnax's HRBP - would have addressed Broadnax's complaints in the June 20, 2019, but for Broadnax filing the 2011 Charge and 2017 Charge.

122. In sum, Broadnax has insufficient evidence Hamza harbored retaliatory animus against Broadnax.

123. Regardless, there is zero evidence Hamza was involved in the investigation into the fistfight or in the decision to terminate Broadnax.

### 2. Broadnax Has Insufficient Evidence Marrone Harbored Retaliatory Animus

124. Broadnax has insufficient evidence Marrone harbored retaliatory animus against Broadnax.

125. Regarding complaints Broadnax allegedly made to Marrone, first, Broadnax emailed Marrone in August 2017 to inquire about her eligibility for a 5-year service certificate. Exh. 40, Broadnax Email to Marrone.  Marrone followed up on this inquiry and, as a result, Hamza addressed the issue with Broadnax shortly thereafter. *Id.*; Exh. 39, August 2017 Email String.

126. Second, Broadnax copied Marrone on the June 20, 2019 Email wherein Broadnax complained that: (a) she is a "5star employee" whose coworkers never complained about her and who was never recognized for her stellar performance throughout the year by her "department heads" or on her "yearly evaluations;" (b) she felt undermined by Zagacki because she does not side with or defend Broadnax when she corrects her coworkers' way of doing their job that differs from the way Broadnax was trained "many years" before; (c) Zagacki purportedly embarrassed Broadnax by confirming she understood a script; and (d) Zagacki allows Broadnax's coworkers to write on scripts. Exh. 9, June 20, 2019 Email; *see also* Exh. 41, Email from Broadnax re: Out patient. Broadnax griped further that her coworker had been told Broadnax's opinion "doesn't matter." Exh. 9, June 20, 2019 Email.

10156620.v2

127.    Broadnax neither has evidence regarding how and whether Marrone responded to Broadnax's complaints in the June 20, 2019 Email nor how that response differed from any comparable complaints any other employees may have made to Marrone.

128.    In any event, Zagacki responded to Broadnax's long list of complaints in the June 20, 2019 Email.  Zagacki asked Broadnax to meet with Zagacki.  Although Zagacki informed Broadnax that Zagacki felt Broadnax's email was "completely out of line," hurtful and insulting, Zagacki explained why she felt that way.  In the email, Zagacki explained that she, in fact, did speak to each employee about whom Broadnax complained, addressed the misunderstanding regarding the script Broadnax referenced, and provided her (Zagacki's) reasoning why she believes it is permissible to write on scripts. *Id.*

129.    Indeed, despite her statements in the June 20, 2019 Email, Broadnax admits: (a) Zagacki (and Marrone) gave Broadnax very favorable yearly evaluations throughout her employment, Exh. 5, Broadnax Dep., 348:17-349:12; (b) her coworkers, in fact, had complained about her, *id.* at 203:3-25, and (c) only assumed someone said Broadnax's "opinion doesn't matter." *Id.* at 213:17-214:8.

130.    Also, regarding Broadnax's view that Zagacki undermined Broadnax, Broadnax agrees: she was trained by a different supervisor than Zagacki; does not know what Zagacki was told when she was trained; and Zagacki had emailed Broadnax and her coworkers a few months before Broadnax's June 20, 2019 Email to explain that the Lab Assistants were permitted to write on the scripts because the originals are scanned in. *Id.* at 204:2-209:12, 215:21-218:7.

131.    Regardless, Broadnax concedes Zagacki was handling this situation the way she always did – i.e., by "smooth[ing] things over," "never correct[ing] things," and "tr[ying] to make things across the board easy." *Id.*

10156620.v2

132.    Broadnax does not even have any evidence to refute that Zagacki responded to Broadnax's complaints by speaking to the employees about whom Broadnax complained. Exh. 9, June 20, 2019 Email; Exh. 6, Zagacki Aff., ¶ 41.

133.    Third, Broadnax complained to Marrone in November 2014 that Broadnax's coworker – Lisa Hall – threatened Broadnax, but Marrone and Zagacki investigated that allegation and learned no witness could corroborate Broadnax's complaint. Exh. 42, Broadnax Email re Lisa Hall.

### 3.    Broadnax Has Insufficient Evidence Zagacki Harbored Retaliatory Animus

134.    Broadnax lists a number of ways she contends Zagacki evidenced retaliatory animus over Broadnax's eight years at Jefferson.

135.    First, Broadnax claims Zagacki created a "narrative" that Broadnax was a "troublemaker" and that she had sued her supervisor, which led to Broadnax's coworkers ostracizing her. Exh. 1, Interrogatory Responses, Interrogatory no. 11; Exh. 5, Broadnax Dep., 15:214-16:6.

136.    Broadnax concedes she never heard Zagacki or any decision maker here make any derogatory comments about Broadnax or anyone else for their disability, race, or complaining of discrimination or retaliation. Exh. 5, Broadnax Dep., 16:21-17:4, 45:21-46:12, 53:23-54:12, 162:18-163:14.

137.    Broadnax also admits she does not have personal knowledge of how her coworkers may have learned she had filed the 2011 Charge and concedes she is the one who told several coworkers about her 2017 Charge. *Id.* at 49:2-51:11.

138.    To try to support Broadnax's claim that Zagacki was responsible for a "narrative" about Broadnax, she relies on statements from three coworkers. Broadnax contends: (a) her

coworker – Lisa Hall - told Broadnax in 2015 that Zagacki told Hall in 2011 or 2012 that Broadnax was a "troublemaker" and had filed a complaint against Zagacki; (b) coworker Geniece Carroll told Broadnax in 2012, "No one likes you.  Why would you want to come back after you sued your supervisor?"; and (c) Lindsey D'Elia - the Phlebotomy Coordinator - told Broadnax that D'Elia was "limited with training [Broadnax] in certain areas because [Zagacki] prefers for [Broadnax] to be in the outpatient area, to keep [Broadnax] away from . . . other coworkers" and that, in 2011, Zagacki "referenced something about [Broadnax] suing [Zagacki]."  *Id.* at 16:15-20:23, 24:4-25:24, 30:6-12, 39:9-40:25.

139.    Broadnax did not report these conversations with Hall, Carroll and D'Elia to anyone at Jefferson. *Id.* at 22:17-23:14, 25:25-26:10, 41:8-42:4.

140.    Broadnax concedes Carroll made her comment to Broadnax immediately after she told Carroll she was doing something incorrectly. *Id.* at 40:5-10.

141.    <u>Second</u>, Broadnax asserts Zagacki did not train Broadnax in areas beyond phlebotomy, such as receiving and send-outs, despite Broadnax repeatedly asking Zagacki to provide that training after Broadnax returned to Jefferson in 2011. Exh. 1, Responses to Interrogatories, Interrogatory no. 10; Exh., 21, 2017 Charge, ¶ 36.

142.    Broadnax points to D'Elia's comments above and to her performance evaluations wherein Zagacki noted she would train Broadnax in "receiving," "microbiology," and "collection manager." Exh. 5, Broadnax Dep., 19:12-20:23; Exh. 21, 2017 Charge, ¶¶ 36-42.

143.    Many other coworkers of Broadnax's, like Broadnax, were not trained in areas other than phlebotomy.  Those individuals include Blondzell Skinner, Margarita Robles, Chryshenda Bradley, Janice Nasuti, Kyla Chau, Julia Laramore, Tracey Shavers, and Guadalupe Astimbay-Sasa. Exh. 6, Zagacki Aff., ¶ 31.

144. Zagacki is not aware of any of these employees complaining of discrimination or retaliation. *Id.*

145. In any event, Broadnax concedes neither her title, her compensation nor any opportunity for advancement at MHD would have been impacted if she were trained in other areas. Exh. 5, Broadnax Dep., 127:4-128:15, 338:15-340:9.

146. Third, Broadnax contends Zagacki placed Broadnax on a reduced schedule pursuant to which she did not work the same hours as other lab assistants, was afforded minimal to no interactions at work, and missed staff meetings. Exh. 3, Complaint, ¶ 29; Exh. 1, Interrogatory Responses, Interrogatory no. 11.

147. Broadnax's schedule was the way it was because she requested it. Exh. 6, Zagacki Aff., ¶¶ 32-33; *accord* Exh. 8, PHRC Questionnaire, TJUH0374 (admitting her request to not report to work early was granted); *see also* SOFs ¶ 11, *supra*.

148. Nevertheless, Broadnax was not the only employee who missed staff meetings due to his/her schedule and there is no evidence those employees who missed staff meetings also complained of discrimination/retaliation like Broadnax. *See* Exh. 43, Emails Regarding Staff Meetings; Exh. 6, Zagacki Aff., ¶ 35.

149. Zagacki also included Broadnax in employee events planned in the lab. Exh. 6, Zagacki Aff., ¶ 36; *see e.g.,* Exh. 44, Emails Regarding Lab Events.

150. Fourth, Broadnax asserts she was unaware she had not been registered automatically for a retirement account when she was rehired and that she did not learn of this until 2017. Broadnax blames this on the fact that she did not receive a "welcome packet" and was not otherwise informed "by Defendant" that she needed to register for an account again. Exh. 3, Complaint, ¶¶ 35-38.

27

10156620.v2

151.    There is no evidence Zagacki or anyone else who knew about Broadnax's 2011 Charge and/or was involved in the decision to terminate Broadnax was responsible for providing Broadnax with a "welcome packet" or otherwise ensuring she was informed about her eligibility to enroll for retirement savings. *Accord* Exh. 5, Broadnax Dep., 147:8-24, 161:2-15, 155:15-24. Indeed, Broadnax cannot identify the person responsible and, ultimately, contends she just does not think "it was handled correctly." *Id.* at 146:11-147:3.

152.    Fifth, Broadnax contends Zagacki denied her accommodations in the middle of 2017 by not allowing her to have a mini heater to warm her hands and by failing to remove a broken piece of metal under a work desk that had cut Broadnax's skin. Exh. 3, Complaint, ¶¶ 30-34; Exh. 5, Broadnax Dep., 187:13-18.

153.    As for the mini heater, Broadnax admits she was able to use an alternate accommodation that enabled Broadnax to perform her job, i.e., holding hot tea or cocoa. Exh. 21, 2017 Charge, ¶ 15-19; Exh. 5, Broadnax Dep., 180:3-181:4, 182:22-183:14, 185:21-185:10.

154.    Regarding the removal of the broken metal piece, it is undisputed that Zagacki: (a) instructed Broadnax to sit at another desk; (b) put tape over the metal piece; (c) called Facilities to remove the metal piece; and (d) when Facilities did not remove the piece, Zagacki removed it herself. Exh. 21, 2017 Charge, ¶¶ 26-27, 30; Exh. 5, Broadnax Dep., 187:19-188:18; Exh. 20, 2018 Zagacki Aff., ¶ 30.

155.    Sixth, Broadnax contends Zagacki retaliated against Broadnax by not addressing Broadnax's complaints about Taylor at some point between April 2019 and November 18, 2019. Ex. 3, Complaint, ¶ 43; Exh. 5, Broadnax Dep., 87:11-25.

156.    As an initial matter, regarding Broadnax's alleged complaints about Taylor, Broadnax admits Zagacki was a "nontraditional supervisor."  She responded in her typical way,

28

i.e., by having a side conversation with Broadnax to make her feel better and saying she (Zagacki) would "deal with it" and "talk to [Taylor]." Exh. 5, Broadnax Dep., 99:16-100:7. According to Broadnax, this was the way Zagacki dealt with conflict at work, i.e, by trying to "keep[] things smooth or just letting each one of us know she's going to deal with it separately." *Id.*; *accord* Exh. 6, Zagacki Aff., ¶¶ 37-41.[10]

157.    Similarly, when other employees complained about Broadnax, Zagacki acted consistently by trying to handle them with intervention, rather than discipline. Exh. 6, Zagacki Aff., ¶ 42; *see e.g.,* Exh. 45, Documents Concerning Complaints About/Issues with Broadnax; *accord* Exh. 5, Broadnax Dep., 225:20-23, 340:10-343:2, 348:12-16.

158.    Even if Zagacki's response to Broadnax's complaints about Taylor's behavior were lacking or ineffective, Broadnax listed several other employees who allegedly complained about Taylor's behavior towards them. There is no evidence any of these employees complained of discrimination or retaliation or that Zagacki responded to their complaints any differently than she responded to Broadnax's complaints. *See* Exh. 5, Broadnax Dep., 79:12-80:7, 110:4-19.

159.    Further, Broadnax complained about another coworker –Jenkins - around the same time Broadnax allegedly complained about Taylor (just a few months before Broadnax's termination). Exh. 5, Broadnax Dep., 193:13-197:2, 211:18-24.

160.    In response, Zagacki investigated Broadnax's complaint about Jenkins, met with Broadnax and Jenkins, and helped them resolve their differences. Exh. 5, Broadnax Dep., 193:13-

---

[10] Consistently, Linda Dutch informed Zagacki that, on June 7, 2019, Broadnax and Taylor "had words" during which: Broadnax expressed that she felt Taylor had been "ignoring" and not "talking" to Broadnax; Taylor asked Broadnax to "leave [Taylor] alone;" and, after Taylor left the room,  Broadnax told Dutch that, now that Broadnax saw the way Taylor acted, Broadnax would "just forget about it." *See* Exh. 46, Email Regarding Broadnax and Taylor; Exh. 6, Zagacki Aff., ¶ 38, n.2. Dutch handled that situation the way I believe I would have handled it; Dutch told both employees that they needed to act professional towards each other. *Id.*

10156620.v2

197:24, 223:10-224:8; Exhibit 45, Documents Concerning Complaints About/Issues with Broadnax, TJUH000638-000639; Exh. 6, Zagacki Aff., ¶¶ 39-40.

161.    Finally, Broadnax claims Zagacki chose to not warn Broadnax the day of the fistfight that Taylor was angry with Broadnax for the errors Broadnax noted Taylor made. Broadnax speculates Zagacki did this so Broadnax would "feel more of [Taylor's] wrath." Exh. 5, Broadnax Dep., 283:14-21, 284:12-285:4.

162.    Broadnax has no evidence Zagacki would have warned Broadnax but for her filing the 2011 Charge or 2017 Charge.

163.    There is no evidence Zagacki knew Broadnax had arrived to work before the fistfight such that Zagacki could have warned Broadnax that Taylor was angry.  In fact, Broadnax had reported to work more than an hour early. *Id.* at 285:6-25.

164.    Also, although Broadnax postulated Zagacki should have texted Broadnax before she arrived at work to warn Broadnax, *Id.* at 286:2-287:3, there is no evidence showing or from which a reasonable inference can be made that Zagacki would have texted Broadnax but for some retaliatory animus.  Zagacki would communicate with Broadnax via text on occasion, but the communications from Zagacki were about trivial matters such as the days Broadnax was working

10156620.v2

and when she would report to work, not about conflicts with coworkers. *Accord Id.*; *See e.g.*, Exh. 47, Texts Between Zagacki and Broadnax.

Respectfully submitted,

Dated:  September 2, 2022                    /s/ Lee D. Moylan
                                             Lee D. Moylan
                                             Stephanie D. Wolbransky
                                             KLEHR HARRISON HARVEY
                                             BRANZBURG LLP
                                             1835 Market Street, Suite 1400
                                             Philadelphia, PA 19103
                                             Telephone: (215) 569-2700
                                             lmoylan@klehr.com
                                             swolbransky@klehr.com

                                             *Attorneys for Defendants*

31

10156620.v2