*DYWANNA BROADNAX v. THOMAS JEFFERSON UNIVERSITY HOSPITAL, INC.*
**U.S. District Court, Eastern District Of Pennsylvania**
**21-CV-04662-JMY**

# EXHIBITS

# For Statement of Material Facts

# Set 1 of 2

# Exhibits 001-0025

# Exhibit 1



PLAINTIFF'S
EXHIBIT
D-1

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

DYWANNA BROADNAX,                    :
                                     :
        Plaintiff,                   :
                                     :      CIVIL ACTION NO.: 2:21-cv-04662-JMY
        v.                           :
                                     :
THOMAS JEFFERSON UNIVERSITY          :
HOSPITAL, INC.                       :
                                     :
        Defendant.                   :
                                     :

### PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Dywanna Broadnax (hereinafter "Plaintiff") hereby responds to Thomas Jefferson University Hospital's (hereinafter "Defendant") First Set of Interrogatories (hereinafter "Discovery").

In providing these responses, Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any and all of the responses herein at any time. By making the following responses, Plaintiff does not waive and hereby expressly reserve the right to assert any and all objections as to the admissibility of such responses into evidence at the hearing of this action, or in any other proceedings, on any and all grounds, including but not limited to, competency, relevancy, materiality, and privilege. Furthermore, Plaintiff makes the responses herein without in any manner implying or admitting that they consider the requests or the responses to be relevant to the subject matter at hand.

### I. GENERAL OBJECTIONS

A.      Plaintiff generally objects to the Discovery to the extent it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine and/or which constitutes or discloses the mental impressions, conclusions, opinions or legal theories of an attorney in the instant matter and/or which is protected from disclosure by any other privilege or immunity.

1

B.      Plaintiff generally objects to the Discovery to the extent it calls for information or documents not relevant to the subject matter of this action and are not reasonably calculated to lead to the discovery of admissible evidence.

C.      Plaintiff generally objects to the Discovery to the extent it seeks information that is otherwise protected from disclosure on the grounds of privilege or confidentiality.

D.      Plaintiff generally objects to the Discovery to the extent it seeks discovery that is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive.

E.      Plaintiff generally objects to the Discovery to the extent it seeks discovery, the burden or expense of which outweighs its likely benefit.

F.      Plaintiff generally objects to the Discovery to the extent it is overbroad, unduly and unreasonably burdensome and oppressive and to the extent that it calls for information already known by Defendant.

G.      Plaintiff generally objects to the Discovery to the extent it is so vague and ambiguous that it is not subject to a reasonable interpretation from which a response may be formulated.

H.      These General Objections shall be deemed applicable and continuing with respect to all of Defendant's Discovery.  Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any and all of the responses herein and by providing the instant responses, Plaintiff does not waive and hereby expressly reserve the right to assert any and all objections as to the admissibility of the instant responses into evidence at the hearing of this action, or in any other proceedings, on any and all grounds, including but not limited to, competency, relevancy, materiality and privilege.

I.      Plaintiff further reserves the right to supplement and/or amend the instant responses. Plaintiff's reservation of the right to supplement and/or amend these responses shall be continuing until the termination of the discovery period.

J.      None of the responses provided herein shall serve to waive any objection made above or below.

2

## II. PLAINTIFF'S ANSWERS

1. This interrogatory was interpreted as a request for the following information:
   a. Factual basis for alleged damages:
      i. Plaintiff refers Defendant to the Complaint.
   b. Documents concerning alleged damages:
      i. Health Summary from listing Plaintiff's health issues and office visits
      ii. Plaintiff's current medication list from Penn Medicine and the date of prescriptions
      iii. Referral Letter from Penn Medicine for Plaintiff to see a specialist for her injuries following the incident with Crystal Taylor, noting her head injuries
      iv. Documentation from Penn Medicine, for injuries associated with leg pain and lupus
      v. Photographs of injuries following the altercation with Crystal Taylor
      vi. Plaintiff's W-2's showing her income 2019- present
      vii. Hospital Bills from Methodist Hospital following the altercation with Crystal Taylor
      viii. Physical therapy records for Plaintiff regarding her legs injuries stemming from her altercation with Crystal Taylor
   c. Calculation of Damages
      i. Plaintiff will provide a calculation as a supplemental attachment.
   d. Individuals who have performed any function concerning calculation
      i. N/a

2. This interrogatory was interpreted as a request to identify the following individuals:
   a. Dr. David Ganetzsky, Penn Family Care 3737 Market Street, Philadelphia, PA 9th Floor. 215-662-8777.
      i. Plaintiff's primary care provider, 2016- present.
      ii. Dr. Ganetzky has been treating Plaintiff for behavioral health since the death of her mother in 2016. He diagnosed Plaintiff with anxiety and depression in 2016. In January 2022, he prescribed Zoloft to Plaintiff for lingering PTSD stemming from her incident with Crystal Taylor during her employment with Defendant.
   b. Dr. Chris Derk, Penn Rheumatology at Perelman Center. 215-662-4000.
      i. Dr. Derk is Plaintiff's Rheumatologist doctor who primarily treats her lupus and related health issues. He prescribed Xanax to Plaintiff in 2016 due to anxiety and depression. He also prescribed Plaintiff Lexapro in September 2016, which Plaintiff stopped taking in June 2018.

3

    c. Amanda Thompson, LCSW. Behavioral Health Therapist Penn Family Care. 3737 Market Street Philadelphia, PA. 325-823-4123.

        i. Thompson was Plaintiff's therapist from October 2016- April 2019 to assist with anxiety and depression after the loss of her mother. Then she had her stroke. Things go to be too much for her.

    d. Francis Yangello, PT DPT. Christiana Care Rehabilitation Services, 302-623-0390.

        i. Yangello has been Plaintiff's physical therapist from December 2019 – present. He assists with her leg injuries following the altercation with Crystal Taylor.

    e. Jefferson Hospital

        i. Plaintiff was admitted to Jefferson Hospital from 10/5/08 - 10/27/08. She was originally admitted for head pain, and developed severe hypertension while 22+week's pregnant with my daughter. The Hypertension caused her to developed Pre-Eclampsia resulting in her pregnancy being induced, and she delivered my daughter as a still born 10/12/08. On 10/15/08, Plaintiff received open heart surgery for Per-Carditis. Following these procedures, Plaintiff attended check-ins with Jefferson Cardiology Center for the entirety of 2009.

    f. Jefferson Hospital

        i. Plaintiff was admitted to Jefferson Hospital on November 18, 2019 for head and leg injuries after being assaulted by her former coworker Crystal Taylor.

3. The requested information is provided below:

    a. Aaron Sniderman

        i. Jefferson Human Resources Business Partner. Mr. Sniderman has knowledge of, among other things, Ms. Broadnax's periods of employment and periods of medical leave, her qualified disabilities, her pay and retirement deductions, and work performance.

    b. Joyce Zagacki

        i. Jefferson Lab Assistant Supervisor. Ms. Zagacki was Plaintiff's supervisor and possess knowledge of, among other things, Plaintiff's employment, her qualified disabilities, work performance, history with Crystal Taylor, and termination.

    c. Susan Hazma

        i. Jefferson Human Resources. Ms. Hazma possesses knowledge about Plaintiff's employment, disabilities, requests for accommodation, issue with retirement payment, and history with Crystal Taylor.

    d. Crystal Taylor

        i. Ms. Taylor is a former employee of Defendant. She was involved in and has knowledge of the work altercation that led to Ms. Broadnax's termination.

4

   e.  Naeemah Gadson
      i.  Former coworker with Defendant, possesses knowledge of Crystal Taylor's bullying and harassing behavior, and can attest to the unfavorable treatment of Plaintiff in the workplace.
   f.  Julia Laramore
      i.  Former coworker with Defendant, possess knowledge of Crystal Taylor's bullying and harassing behavior, and conversations with Plaintiff about her mental state due to her disparate treatment at the office.
   g.  Lindsey Dalia
      i.  Outpatient Phlebotomy Coordinator, possess knowledge of Plaintiff's employment, disabilities, and accommodation requests regarding her disabilities.

4.  This information will be provided as a supplement.

5.  This information is provided below:
   a.  Application for Lead Phlebotomist role at Labcorp, 2600 Glasgow Avenue Ste 214, Newark DE 19702
      i.  Applied December 2019. The interview was arranged by Lisa McCormick from LabCorp talent acquisition.
      ii.  Plaintiff's first interview was on January 14, 2020. Plaintiff informed Labcorp that she had been terminated from her previous position. She was not offered the role.
   b.  Temp Position with "Beautiful Gate Outreach Center, 604 N. Walnut Street Wilmington, DE 19801. January 16, 2020.
      i.  After being rejected by Lab Corp, Romona Dorsey, Plaintiff's interviewer at Labcorp, suggested that Plaintiff apply for a temporary position to provide phlebotomy services fir Beautiful Gate, HIV recovery program. Plaintiff interviewed and was given this role. Plaintiff worked here for about a week before determining that it was not feasible financially and health-wise. Plaintiff was paid $10 an hour, which was the lowest hourly rate of pay she'd had in a decade. Plaintiff was also scheduled to 2-3 8hour shifts a week; She had not worked an 8 hour shift in years, and it was mentally and physically challenging. Furthermore, Plaintiff was expected to start work at 8am during the wintertime; winter is the hardest time of year for her condition and it takes Plaintiff an extended period of time to get her body physically ready in the mornings. Plaintiff also was uncomfortable working around people with drug addictions, which is something she had never done before.
   c.  Application to Christina Care Hospital- 4755 Ogletown Stanton Road, Newark, DE 19718
      i.  Job ID – JR51797 Phlebotomy Tech Casual Day shift (CAND014829). Applied on March 1, 2020.
      ii.  Plaintiff applied and successfully went through two rounds of interviews. On the last question of the second interview, Plaintiff was asked why she left her last employer. Plaintiff answered honestly that she had been

5

terminated after being accused of fighting. Plaintiff was not offered the position. Plaintiff inquired as to why she had not received this role since both interviews had appeared to go well and was told it was due to her termination from Jefferson.

d. Employment with HUP Phlebotomy, 3400 Spruce Street, Phila, PA

    i. Plaintiff has been working here as a Phlebotomist since March 24, 2020. She makes $21.98 per hour plus a $3.64 per hour shift differential for overnight hours, working every other Saturday and Sunday from 9:30 pm-8:00 am.

    ii. HUP offered Plaintiff a more senior leadership position with higher pay, but Plaintiff declined due to fear of being placed in a position that could cause another employee to have a conflict with her. This fear stemmed from her altercation with Crystal Taylor

6. Plaintiff has received the following:

a. Social Security Disability from May 2019- present. Total amount: $53k

b. Unemployment Compensation from December 2008- December 2009; December 2019- April 2020; Total amount: $3,100.

c. Employment with Defendant, Clinical Lab Assistant:

    i. October 2011- December 2012: Saturday and Sunday 7am- 3:30 pm at $18 per hour.

    ii. January 2013- November 2019:

        1. Plaintiff received a .50 raise during this time, bringing her to $18.50 hourly.

        2. In 2014, Plaintiff's scheduled changed to M,W,F, 1pm − 7pm, and every other Saturday 7am- 12pm.

        3. In 2016: Plaintiff's schedule changed from 3pm- 7pm on M,W,F.

7. In December 2019, Plaintiff posted a picture to Facebook of Crystal Taylor and herself that had been taken at an office Christmas party. The caption on this post was "Did you ever take a picture with someone and later realize that's one ugly bitch." Plaintiff made this post during a moment of frustration regarding everything that had happened to her, and she deleted it within 48 hours. Plaintiff has no record of this post.

8. Plaintiff was involved in the criminal case of The Commonwealth of Pennsylvania vs. Crystal Taylor, #MC51CR-0004502-2020. Ms. Taylor was charged with Simple Assault and Reckless Endangerment from the November 18, 2019, altercation with Plaintiff during their employment with Defendant. Plaintiff provided testimony as the victim at trial on March 3, 2022. The trial has since been placed on hold to be continued on April 25, 2022.

9. Plaintiff suffered from the following during her employment at Jefferson:

a. Systemic Lupus Erythematosus (SLE)

    i. SLE is the most common form of Lupus. It causes Plaintiff to experience swelling and pain in her joints, limiting her ability to perform life activities such as walking prolonged distances, bending over, kneeling,

6

reaching, prolonged standing, ability to hold objects, and concentration. Plaintiff was diagnosed with SLE in June 2006 and reported her diagnosis to Defendant in 2006. Plaintiff has had multiple conversations with Joyce Zagacki and other members of Defendant's staff about her diagnosis, and cannot recall specific fates.

b. Raynaud's Disease

i. Plaintiff was diagnosed Raynaud's disease in 2006; it developed from her SLE. This disability causes Plaintiff's extremities to become blue, cold, and numb, limiting her ability to use them for daily life tasks and activities. Plaintiff reported this disability to Defendant in 2006. Plaintiff specifically mentioned it to Joyce Zagacki on multiple occasions, and Joyce was aware of Plaintiff's practice of using hot tea to keep her hands warm to assist with her symptoms.

c. Pericarditis and Pre-eclampsia:

i. Plaintiff was diagnosed with these in 2008. They lead Plaintiff to develop hypertension and lead to her receiving open heart surgery in 2008. Open heart surgery resulted in Plaintiff experiencing a miscarriage and losing her daughter. Plaintiff took medical leave from Defendant as a result of these disabilities. Plaintiff experienced physical side effects affecting her life activities including chest pain and shortness of breath which prevented her from walking or running for extended period of time for over a year following her surgery. She will have to take blood pressure medicine for the rest of her life. Plaintiff was also told she could no longer have children following this surgery.

d. Anxiety

i. Plaintiff was diagnosed with anxiety in 2016. Her symptoms include cold sweats, hyperventilation, shortness of breath, nervousness, and sadness. Plaintiff reported her diagnosis to Defendant immediately, and discussed the impacts of her diagnosis on her life and work performance. Plaintiff specifically expressed to Joyce Zagacki that being left out of staff meetings, watching new hires be given opportunities over her, and feeling excluded from her peers was triggering for her.

e. Depression

i. Plaintiff was diagnosed with depression in 2016. For further information, please see her response to answer 9D.

10. Plaintiff was a full-time phlebotomist/clinical lab assistant for Defendant prior to taking medical leave on October 5, 2008. Upon her return in 2011 after Defendant agreed to rehire her following her PHRC complaint, Joyce Zagacki informed Plaintiff that she had to be retrained in logging and preparing specimens for testing and shipping (also known

7

as "send-outs") because Defendant had a new computer system. Plaintiff was not allowed to perform these primary job duties until she was retrained in this area. Plaintiff asked Ms. Zagacki when she could be retrained, but Ms. Zagacki said that Plaintiff's accommodated afternoon/evening work schedule meant she arrived too late in the day to attend trainings. Plaintiff offered to come to work early or come in on one of her days off to receive this training. Ms. Zagacki repeatedly said she would schedule a training for Plaintiff but never did. Plaintiff learned that newly hired employees were receiving these trainings and thus gaining more experience than her in areas relevant and necessary for advancement and promotion. Ms. Zagacki's yearly evaluations of Plaintiff from 2012-2019 said that Plaintiff needed "to be trained in receiving and send-outs," yet Ms. Zagacki failed to provide Plaintiff with these opportunities.

11. Plaintiff refers to her to response to question #10. By way of further answer, Plaintiff was excluded from attending regular staff meetings along with all of her coworkers and supervisory staff when she returned to work in 2011. Plaintiff asked Ms. Zagacki if she could attend these meetings, but Ms. Zagacki again told Plaintiff that staff meetings were in the morning and Plaintiff's accommodated schedule which had been provided to Plaintiff for her disabilities meant that she arrived at work tool ate to attend. Plaintiff repeatedly offered to come in at times outside of her work schedule so she could attend staff meetings and trainings, as Plaintiff just wanted to be included and receive information to assist her job performance. Plaintiff was told by a coworker that Ms. Zagacki did not like her following her return to work in 2011. Multiple coworkers that were hired after Plaintiff's 2010 PHRC complaint all knew about the complaint despite Plaintiff never telling them. Plaintiff learned that Ms. Zagacki had created a narrative that Plaintiff was a "troublemaker," which lead to her being ostracized from her coworkers.

12. Plaintiff identifies the following individuals in correspondence to the subsections listed on the interrogatory request:
    a. Plaintiff's coworkers Alonda Saunders, Naeemah Gadson, and Erica Perry
    b. Lindsey Dalia
    c. Janet Bruno, phlebotomist, and Joyce Zagacki
    d. Joyce Zagacki, Susan Hazma, Crystal Taylor
    e. Lindsey Dalia and Joyce Zagacki
    f. Janet Bruno, Tynesha Jenkins, Joyce Zagacki, Linda Dutch
    g. Joyce Zagacki, Linda Dutch
    h. Tynesha Jenkins
    i. Aaron Sniderman
    j. Naeemah Gadson, Lauren McGraw, George Marron, Victoria Marino, Shannon Doak

    k.  Tanasia Jackson, Plaintiff's Victim Compensation worker in the matter of Commonwealth v. Crystal Taylor, #MC51CR-0004502-2020

    l.  Ebony McCleary, Plaintiff's best friend; Michelle Dickins, Plaintiff's Aunt; Marquise Broadnax, Plaintiff's son; Dr. Ganetzsky, Plaintiff's primary care doctor; Amanda Thompson, Plaintiff's therapist

13. Please refer to Plaintiff's answers to requests #10 and #11.

14. In 2016, Plaintiff's schedule was changed to M,W,F, from 3pm- 7pm so that she could spend time with her mother who was terminally ill. After her mother passed in August 2016, Plaintiff and Defendant decided she could stay on this 12 hour a week schedule, as Plaintiff was dealing with newly diagnosed depression and anxiety in addition to her existing symptoms. Plaintiff's doctor also recommended that she not work early in the mornings due to her symptoms from SLE and Raynaud's syndrome. Furthermore, Plaintiff's 12 hour a week schedule allowed her to stay on Social Security Disability. Defendant went out of their way to exclude Plaintiff through her modified schedule. By way of further answer, please refer to Plaintiff's answers to requests #10 and #11.

15. Plaintiff is generally aware of Crystal Taylor's reputation in the office based on observation and being informed by her coworkers. Plaintiffs possess knowledge of Ms. Taylor cursing at coworkers and name calling. Plaintiff has been told about multiple aggressive incidents where Ms. Taylor has intentionally bumped into coworkers and snatched things out of coworkers' hands. Plaintiff suggests that Defendant view their own employee file on Crystal Taylor, and speak with some of the individuals named in Plaintiff's response to request #12(k).

16. Plaintiff refers Defendant to her Complaint.

Respectfully submitted,

/s/ Faye Riva Cohen
_____
LAW OFFICE OF FAYE RIVA COHEN, P. C.
FAYE RIVA COHEN, ESQUIRE
2047 Locust Street
Philadelphia, PA 19103
(215) 563-7776
frc@fayerivacohen.com

*Attorney for Plaintiff*

Date: 3/29/2022

9

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I caused to be served a true and correct copy of Plaintiff's Answer to Defendant's First Set of Interrogatories via electronic mail to the following:

> Lee Moylan
> LMoylan@klehr.com
> *Counsel to Defendant*

BY:  */s/ Faye Riva Cohen*

LAW OFFICE OF FAYE RIVA COHEN, P. C.
FAYE RIVA COHEN, ESQUIRE
2047 Locust Street
Philadelphia, PA 19103

Date:  March 29, 2022

## INTERROGATORIES

1.      Please describe **in detail** the factual basis for your alleged damages, and identify the documents, if any, concerning your alleged damages, including but not limited to: your alleged demand for compensatory damages; emotional harm; punitive damages; liquidated damages; and provide the calculation for such damages by stating the method by which any claim for damages you have asserted has been calculated and including an itemization by category and amount of each element of alleged damage. Concerning your answer, identify each person (including any expert witness(es) or consultant(s)) who performed any function concerning the calculation or determination of that claim, and state what function was performed by him or her.

5

2.    Please identify any and all physicians, medical personnel, hospitals, medical facilities, psychologists, psychiatrists, mental health personnel, mental health facilities, chemical dependency treatment programs/facilities, or any other person or facility that treated, examined, or otherwise had contact with you concerning your serious health condition under the FMLA, your disability/disabilities alleged in your Complaint, and/or any other mental or physical health issue that concerns your claims.  For each identify:

    a.  dates of treatment;
    b.  nature of treatment;
    c.  diagnosis; and
    d.  recommendation for ongoing treatment, including any medications you currently are taking.

**For each individual and/or entity identified, complete and execute a separate Authorization for Release and Disclosure of Medical Information, a form of which is attached hereto.**

3.    Please identify all individuals who you believe possess knowledge or information concerning the claims or defenses in the above-captioned case and describe the knowledge or information you believe each possesses.

6

9839448.v1

4.    Please provide the information required under Rule 26(a)(2) of the Federal Rules of Civil Procedure regarding any person who you may use at trial to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence.

5.    Please describe in detail any efforts you have made from November 18, 2019, through the time of trial, to seek employment or other income-producing opportunities with any entities or persons, including:

    a.  the date of every one of your efforts in this regard;

    b.  a detailed description of everything you did in this regard;

    c.  the name, address, and telephone number of any person you contacted and the name of the business or organization with which that person is associated; and

    d.  a description of the position, if any, that you sought, were offered, and/or accepted or rejected (including, without limitation, the job title, job responsibilities, and detailed description of all compensation for such position), and, regarding each position, state whether you were offered the position and whether you accepted or rejected the offer.

7

9839448.v1

6.    Please state whether you have received any wages, commissions, earnings, or other compensation from any source, including employment, insurance payments, workers' compensation, unemployment compensation, social security disability benefits, short-term disability benefits, long-term disability benefits, or any other payments from December 1, 2008, through the time of trial, and for each such payment, state:

    a.    the source of this income or these payments;

    b.    the total amount received from each source;

    c.    the inclusive dates during which this income or these payments were received;

    d.    if applicable, the reason(s) why this income or these payments were terminated;

    e.    the identity of all persons who might have knowledge of the facts set forth in your response to this Interrogatory; and

    f.    the identity of all documents that contain, reflect, or relate to the facts set forth in your response to this Interrogatory.

7.    Identify any and all social media postings, including those on LinkedIn, Facebook, Twitter, TikTok, Whatsapp, Snapchat, or Myspace, or in any on-line chat rooms or elsewhere on the Internet, between you and anyone else or that you posted regarding: (a) Defendant; (b) the subject matter of this lawsuit; (c) the facts alleged in your Complaint; (d) any of your other now former co-workers or colleagues at Defendant; (e) your contention that Defendant acted unfairly or unlawfully regarding you; (f) Defendant's Answer and/or defenses in this lawsuit; (g) any emotion, feeling, or mental state you experienced between December 1, 2008, to the present regarding any of the foregoing topics; and (i) your mental or physical health at any time between December 1, 2008 and the present.

8

8.      Please state whether you have ever been involved in an administrative, civil, or criminal legal proceeding (whether as a party or as a witness), and, if so, specifically identify the proceeding (by title, case number, and venue) and describe in what capacity you were involved and the circumstances and outcome of such proceeding.

9.      Identify separately each and every "disability" (as that term is defined under the ADA), from which you suffered during your employment with Defendant and, in so doing, state in detail the way in which each disability substantially limited one or more of your major life activities, state the dates you were so affected, state the major life activity impacted on each occasion, and identify each and every communication you had with anyone from Defendant concerning your "disability."

10.      Please identify and describe in detail the trainings to which you refer in paragraph 26 of the Complaint.

9

11.    Please describe in detail the factual basis for and identify all evidence, including but not limited to documents, concerning your allegation in paragraph 28 of the Complaint that there was an intentional effort to exclude you from your peers.

12.    With respect to each separate allegation listed below, identify each and every individual who has knowledge or information concerning the following alleged facts:

(a)    your communications with Joyce Zagacki as alleged in paragraph 26 of the Complaint;

(b)    you holding cups of hot water before drawing blood as alleged in paragraph 31 of the Complaint;

(c)    you cutting your leg by the metal keyboard slide as alleged in paragraphs 32 and 34 of the Complaint;

(d)    Defendant's Human Resources informing you that your registering for retirement was your supervisor's responsibility as alleged in paragraph 36 of the Complaint;

(e)    other Lab Assistants attending 30-day orientation sessions and receiving new hire packets;

(f)    Crystal Taylor directing antagonistic behavior towards you as alleged in paragraph 43 of the Complaint;

(g)    you reporting to and/or meeting with Joyce Zagacki regarding Crystal Taylor's hostility towards you;

(h)    your interaction with Crystal Taylor on November 18, 2019;

(i)    your conversation with Joyce Zagacki on November 18, 2019;

(j)    your conversation with Defendant's Human Resources office on November 21, 2019;

(k)    Crystal Taylor's "documented history of engaging in threats of violence" as alleged in paragraph 59 of the Complaint;

(l)    your allegations in paragraph 60 of the Complaint; and

(m)    your allegations in paragraph 62 of the Complaint.

10

9839448.v1

13.    Please describe in detail the factual basis for and identify all evidence, including but not limited to documents, concerning your allegation in paragraph 25 of the Complaint that your job areas were inexplicably limited, including by identifying the "job areas" that were limited, in what way they were limited, by whom they were limited, and the span of time (by start and end date) when those "job areas" were limited.

14.    Please describe in detail the factual basis for and identify all evidence, including but not limited to documents, concerning your allegations in paragraphs 28 and 29 of the Complaint that Defendant made a "scheduling decision" that "intentional[ly] exclude[d] [you] from [your] peers," including but not limited to, the schedule Defendant had you work, your understanding of the basis for that decision to implement that schedule, the input (if any) you had into that schedule being implemented, whether there was some other schedule that you believe would have accommodated you pursuant to your doctor's recommendations and, if so, identify that schedule and the reason(s) you believe it could have been but was not provided.

11

9839448.v1

15.    Please describe in detail the factual basis for and identify all evidence, including but not limited to documents, concerning your allegation in paragraph 59 of the Complaint that Crystal Taylor had a "documented history of engaging in threats of violence," and, in so doing, among other things, with respect to each incident separately: describe the incident about which you are aware, the date when the incident occurred, the individuals who have knowledge of the incident, whether you or anyone to your knowledge complained about the incident and, if so, who complained to whom.

16.    Please describe in detail the factual basis for and identify all evidence, including but not limited to documents, concerning your allegations that Jefferson retaliated against you in violation of the ADA, Title VII and/or the PHRA.

Dated: January 13, 2022

/s/ Lee D. Moylan
Lee D. Moylan (No. 80915)
KLEHR, HARRISON, HARVEY
BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-4140
Fax: (215) 568-6603
lmoylan@klehr.com
*Attorney for Defendant*

12

9839448.v1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 13, 2022, the foregoing First Set of

Interrogatories was served on all counsel of record via email and, if requested, regular mail:

Faye Riva Cohen
Matt Smith
Law Office of Faye Riva Cohen, P.C.
2047 Locust Street
Philadelphia, PA 19103
*Attorneys for Plaintiff*

*/s/ Lee D. Moylan*
Lee D. Moylan

13

9839448.v1

**AUTHORIZATION FOR RELEASE AND DISCLOSURE OF HEALTH AND MEDICAL INFORMATION**

Name of Patient:    **Dywanna Broadnax**

DOB: _____    SSN: _____

ADDRESS: _____

TELEPHONE NUMBER: _____

I, DYWANNA BROADNAX, HEREBY AUTHORIZE the following:

(name of health professional) _____

(address of health professional) _____

_____

to furnish and release to KLEHR HARRISON HARVEY BRANZBURG LLP, 1835 Market Street, Suite 1400, Philadelphia, PA 19103, and/or its agents, representatives, employees, or attorneys, including, but not limited to LEE D. MOYLAN, ESQUIRE, my entire health and medical record, including but not limited to, admission summaries, abstracts, intake records, treatment records, charts, doctors' and nurses' orders and/or notes, correspondence, emergency room logs, operative reports, operating room logs, progress notes, laboratory records and reports, pathology records and reports, immunization records, x-ray films and reports, tests, committee reports, therapy records, out-patient records, discharge summaries, discharge instructions, psychological records, psychotherapy records, psychiatric records, chemical dependency records, chemical abuse records, communicable disease records, statements or charges, billing records, and any and all other records pertaining to my hospitalization, history, condition, treatment, diagnosis, prognosis, and etiology.

The disclosure of the medical information and records set forth above is authorized for the purpose of litigation in the action entitled <u>Dywanna Broadnax v. Thomas Jefferson University Hospitals, Inc.</u>, Court File No. 2:21-CV-04662-JMY, currently venued in the United States District Court, Eastern District of Pennsylvania. This authorization specifically includes records prepared prior to the date of this authorization and records prepared after the date of this authorization during the pendency of these proceedings (including claims and potential claims).

This authorization is voluntary. I understand that if the person or organization I authorize to receive the information is not a health plan or health care provider, the released information may no longer be protected by federal privacy regulations and could be re-disclosed. I further understand that my health care and payment for my health care will not be affected if I do not sign this form.

9839448.v1

This authorization may be revoked in writing at any time, except to the extent action has already been taken in reliance on it. This authorization will expire 12 months from the date of signing.

A photocopy or fax of this authorization will be treated in the same manner as the original.


_____        Date: _____
Signature of Patient / Guardian / Representative


_____
If not patient, state authority / relationship


9839448.v1

# Exhibit 2

09/22/2011 THU 15:28  FAX 2159521380 Healthmark Inc.    RECEIVED  09/22/2011 15:46    ☑001/001



**Jefferson** University Hospitals

Healthmark

Navy Yard Corporate Center
One Crescent Drive, Suite 100
Philadelphia, PA 19112

Phone: 215-952-9900
Fax: 215-952-9977

---

Date of Examination: _____

Patient name: Last _____

SS# _____

Broadnax, Dywanna
09/12/2011
SSN:  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    DOB: 11/30/1978
Case#:  71309    MRN:  HIPAA 8.8.5
Methodist Hospital

---

### MEDICAL ASSESSMENT REPORTING FORM

_____FIT FOR DUTY:  This individual has been judged to have the physical capacities needed to perform the job described.

_____Fit for Duty:  Contingent on completion of MMR and/or Varicella Series. Once the two part series is complete, Official "Fit for Duty Document" will be sent to Human Resources.

_____FIT FOR DUTY:  This individual <u>was not</u> subjected to a physical examination or a drug screen.

____X____FIT FOR DUTY WITH ACCOMODATIONS: This individual would be qualified to perform essential functions of the position only if below noted limitations/restrictions can be accommodated.

LIMITATIONS/RESTRICTIONS _pt may not work more_ _than 24 hours in 1week._

_____NOT FIT FOR DUTY:  This individual is not medically qualified to perform the essential functions of this position. Accommodations will not reduce the medical risk or restriction.

COMMENTS:_____

*(Any non-work related medical abnormalities will be forwarded directly to the patient).*

---

_Susan Mots PA_
Provider name (printed)

_[signature]_
Provider Signature

BROADNAX
EXHIBIT
D-2
PENGAD 800-631-6989

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DYWANNA BROADNAX | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: |
| | : | |
| THOMAS JEFFERSON | : | |
| UNIVERSITY HOSPITAL, INC. | : | |
| Defendant. | : | |

## **COMPLAINT**

1. Plaintiff Dywanna M. Broadnax (hereinafter "Plaintiff"), hereby files this Complaint against Defendant Thomas Jefferson University Hospitals, Inc. (hereinafter "Defendant"), alleging that her rights, pursuant to the Americans with Disabilities Act ("ADA"), and its 2008 amendments, 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA") have been violated, and avers as follows:

## **PARTIES**

2. The Plaintiff herein is Dywanna Broadnax, a 39-year-old black female with various disabilities who resides at 77 Memorial Drive New Castle, DE 19720.

3. The Defendant herein is Thomas Jefferson University Hospitals, Inc. located at 111 South 11th Street, Philadelphia, PA 19107. Defendant is an entity engaged in an industry or activity affecting commerce which employs 50 or more employees in all of its facilities for each working day during each of 20 or more calendar workweeks.

## **JURISDICTION AND VENUE**

4. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

5. Subject-Matter Jurisdiction is conferred upon this Honorable Court by 28 U.S.C. § 1337 relating to "any civil action or proceeding arising out of any act of Congress regulating commerce," 28 U.S.C. § 1343(4), and 28 U.S.C. § 1331, and under the Americans with Disability Act and its Amendments ("ADA") 42 U.S.C. § 12101 *et seq*. and Title VII of the Civil Rights Act.

6. This Court may properly maintain Personal Jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with the traditional notions of fair play and substantial justice, thus satisfying the standard set forth by the United States Supreme

Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

7.  Venue is appropriately laid in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) inasmuch as all parties regularly conduct business within this District and the acts complained of by Plaintiff arose herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.  Plaintiff hereby incorporates the prior paragraphs of this Complaint as though fully set forth at length.

9.  Plaintiff exhausted her administrative remedies, as required under federal and state law.

10. Specifically, Plaintiff dual filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No, 17F-2020-60544, and the Pennsylvania Human Relations Commission ("PHRC") on May 18, 2020,.

11. The EEOC issued a Right to Sue in this matter on July 26, 2021. This Complaint is being filed within ninety (90) days of Plaintiff's receipt of a Right to Sue notice.

## FACTS

12. Plaintiff hereby incorporates the prior paragraphs of this Complaint as though fully set forth at length.

13. On or about March 15, 2005 Plaintiff was hired by Defendant for the position of Phlebotomist Clerk.

14. On or about June 2006, Plaintiff was diagnosed with lupus. Her diagnoses substantially impacted her ability to walk, think, concentrate, write, and hold objects. Plaintiff's lupus also caused her to develop Reynaud's syndrome, which reduces blood flow to limbs and other external body parts.

15. Plaintiff informed her supervisor, Joyce Zagacki ("Ms. Zagacki"), of her diagnosis and her accompanying limitations.

16. In or about Fall 2007, Plaintiff's job title was upgraded to Clinical Lab Assistant.

17. On or about October 7, 2008, Plaintiff was admitted to Defendant's emergency room for head pain and placed in a clinically induced coma while delivering her baby. Her pregnancy caused her to experience preeclampsia, which led to her developing pericarditis.

18. On or about October 15, 2008, Plaintiff received emergency heart surgery for pericarditis.

19. Following her heart surgery, Plaintiff attempted to commence a period of medical leave to recover, but was informed by Defendant that she had exhausted her FMLA time for serious health conditions.

20. Plaintiff was forced to resign from her position to avoid being terminated. Prior to her decision to resign, Ms. Zagacki told Plaintiff that she could be rehired for a position in

2

the future.

21. Plaintiff formally resigned on December 9, 2008.

22. On or about April 2009, Plaintiff attempted to be rehired to her position, but was told by Ms. Zagacki that Defendant was on a hiring freeze which prevented Plaintiff from being able to return to work at that time.

23. On or about March 10, 2011, Plaintiff filed a complaint with the PHRC against Defendant alleging discrimination on the basis of disability and race due to Defendant's failure to rehire her for nearly 2 ("two") years.

24. On or about August 18, 2011, Plaintiff and Defendant participated in a conference through the PHRC which resulted in Defendant agreeing to rehire Plaintiff into her lab assistant position.

25. On or about October 24, 2011, Plaintiff began working in her lab assistant position. Upon her return, Plaintiff's job areas were inexplicably limited.

26. Beginning in or about January 2012 Plaintiff began asking Ms. Zagacki if she could participate in trainings along with her coworkers so that she could go back to working in some of the expanded areas she was in prior to her resignation. These re-trainings would allow her to obtain more professional experience and be eligible for promotions. Ms. Zagacki informed Plaintiff that she did not think Plaintiff could keep up with trainings due to her disability and proceeded to actively preclude Plaintiff from training seminars and sessions with her peers.

27. Ms. Zagacki had no medical or evidentiary basis to deny Plaintiff the ability to participate in trainings along with her coworkers based on her disability.

28. In or about August 2016, Plaintiff began experiencing anxiety and depression due to the passing of her mother, which was exacerbated by workplace stress caused by what she believed to be repeated intentional efforts to exclude her from her peers.

29. Plaintiff's primary doctor recommended that her work hours be reduced. In response to this recommendation, Defendant placed Plaintiff on a reduced schedule in which Plaintiff did not work the same hours as any other lab assistant and was afforded minimal to no interactions at work. This scheduling decision by Defendant caused Plaintiff to miss out on staff meetings, additional training opportunities, and overall ability to advance and gain experience in her position.

30. In or about May 2017 Plaintiff's diagnosis of Raynaud's Syndrome was causing her hands to turn blue and numb. This made it difficult for Plaintiff to perform her primary job duty of drawing blood.

31. Plaintiff asked Ms. Zagacki for the reasonable accommodation of keeping a portable miniature heater in her workplace area. Ms. Zagacki informed Plaintiff that a portable heater was not necessary because it was May and the weather was hot outside. Defendant denied Plaintiff's accommodation request. Plaintiff was forced to adapt by repeatedly holding cups of hot water immediately before drawing blood in order to perform her job duties.

32. On or about September 2017 Plaintiff was cut on her leg by a metal keyboard slide that

3

was left under the work bench after a broken keyboard tray was removed.

33. Plaintiff's Lupus and Raynaud's Syndrome causes her skin to tear and bleed easily, and makes her prone to infections. For this reason, Plaintiff requested to have the metal keyboard trays removed from under these work areas Ms. Zagacki refused this request. All Ms. Zagacki did was cover the sharp edges with tape.

34. These metal slides cut Plaintiff's sensitive skin on two additional occasions between September and October 2017. During this time, Plaintiff repeatedly requested that the slides be removed.

35. On or about September 12, 2017, Plaintiff noticed that she was not seeing any retirement deductions on her pay statements. Defendant's HR department informed Plaintiff that she had not been registered for a retirement account when she was rehired.

36. Upon learning this news, Plaintiff asked Ms. Zagacki why she was not registered for a retirement account when she was rehired. Ms. Zagacki told her that this was the responsibility of Defendant's Human Resources. However, when Plaintiff contacted Defendant's Human Resources office again, they informed her that registering for retirement was in fact her supervisor's responsibility.

37. From October 24, 2011, to the present, Plaintiff has not been accruing retirement funds based on her employment with Defendant.

38. Since finding this out in 2017, Plaintiff has observed multiple new Lab Assistants attend a 30-day orientation session and receive new hire welcome packets which detail the retirement plan and how to register. Plaintiff did not receive a welcome packet upon being rehired, nor was she informed by Defendant that she needed to register for a retirement account again.

39. On or about December 20, 2017, Plaintiff dual-filed a new Complaint with the PHRC and EEOC, No. 17F201860232. In this Complaint, Plaintiff alleged discrimination on the basis of disability due to Defendant's failure to provide reasonable accommodations for her disability, denying her the ability to participate in trainings on the basis of her disability, failing to inform her of the need to register for a retirement account again after being rehired after resigning for medical leave and retaliation for both her previous PHRC complaint and requests for reasonable accommodations.

40. On or about April 2, 2019, the EEOC informed Plaintiff they were dismissing her complaint.

41. On or about February 11, 2019, Plaintiff suffered from a mild stroke causing her to take medical leave until April 6, 2019.

42. Upon Plaintiff's return to work, she was informed that her coworker and friend, Naeemah Gadson ("Ms. Gadson"), had taken medical leave after being verbally assaulted by another coworker named Crystal Taylor ("Ms. Taylor").

43. Ms. Gadson and Ms. Taylor had not gotten along for years. With Ms. Gadson on medical leave, Ms. Taylor directed her antagonistic behavior towards Plaintiff, given that Plaintiff and Ms. Gadson were friends.

44. Plaintiff reported Ms. Taylor's antagonistic conduct towards her to Ms. Zagacki and

4

participated in meetings with both Ms. Zagcki and Ms. Taylor to address Ms. Taylor's hostility. However, Defendant failed to do anything to address this issue.

45. On or about November 18, 2019, Ms. Taylor began imitating Plaintiff's demeanor to another coworker and mocking Plaintiff. Plaintiff, who was in close proximity and observed this behavior, said "[N]ot today, Crystal. You're too fucking old for that shit."

46. Plaintiff's comment caused Ms. Taylor to become angry. Plaintiff asked Ms. Taylor why she had a problem with her and why she was showing off in front of other employees. In response, Ms. Taylor asked Plaintiff if she wanted "to talk about this outside."

47. Plaintiff complied with Ms. Taylor's offer, as Defendant encouraged employees to have conversations among themselves to work out differences amicably before reporting to management. Plaintiff honestly believed that she and Ms. Taylor could have a conversation to address why Ms. Taylor did not like her.

48. Once in the hallway, Ms. Taylor began raising her voice and told Plaintiff "I'm going to hurt you!" and bumped her chest.

49. Plaintiff, in defense, bumped Ms. Taylor away from her and told her to back up. She then turned around to try to locate Ms. Zagacki.

50. Once her back was turned, Ms. Taylor repeatedly poked Plaintiff in the back and continued to bump into her. Plaintiff tried to move away, but Ms. Taylor would not stop.

51. Eventually, Plaintiff poked Ms. Taylor back in self-defense. Ms. Taylor then grabbed a handful of Plaintiff's hair, pulled her to the floor, and repeatedly hit her on the head.

52. A certified nurse assistant eventually saw the altercation and broke it up. Plaintiff then went to Defendant's emergency room to be treated for injuries from the altercation.

53. Ms. Zagaki came to Plaintiff's emergency room and informed her that Ms. Taylor had been terminated. She also informed Plaintiff that she could not return to work until an investigation was conducted.

54. During this conversation, Ms. Zagacki also revealed that she was pretty sure Ms. Taylor attacked Plaintiff because Plaintiff had reported Ms. Taylor's script check errors, which Ms. Taylor had become upset about earlier that day. Despite this prior knowledge, and generally knowledge of Ms. Taylor's aggressive nature, Ms. Zagacki did not feel the need to try to calm Ms. Taylor down or inform Plaintiff that Ms. Taylor was upset prior to their altercation.

55. The physical effects of being assaulted by Ms. Taylor resulted in Plaintiff receiving a concussion, a gash on her left ankle, and caused severe exacerbation of Plaintiff's weak knees. Prior to this incident, Plaintiff had to routinely get fluid drained from her knee due to lupus, resulting in generally weak knees. The altercation with Ms. Taylor exacerbated her knee problems and caused permanent soft knee damage requiring continued physical therapy.

56. While in the emergency room, Plaintiff filed a police report against Ms. Taylor. Ms.

Taylor was subsequently arrested and charged with Simple Assault, 18 §2701 and Reckless Endangerment 18 §2705 under docket number MC-51-CR-0004502-2020. This matter is currently pending in the Municipal Court of Philadelphia after multiple continuances.

57. On or about November 21, 2019, Defendant's Human Resource office informed Plaintiff that she was being terminated because of Defendant's zero tolerance policy for fighting.

58. Plaintiff respondent that she was not the one who initiated the fight and was only trying to defend herself. She also questioned why she was not interviewed as part of Defendant's investigation. Defendant responded that Plaintiff's act of walking out to the hallway with Ms. Taylor constituted "participation" in a fight because she should have known that Ms. Taylor wanted to fight.

59. It should be noted that Ms. Taylor has a documented history of engaging in threats of violence, whether expressed or implied, which also violated Defendant's zero tolerance policy. Yet she was not terminated prior to this incident. If Defendant treated situations fairly, then Ms. Taylor should not have still been employed with Defendant, which would have avoided the incident with Plaintiff altogether.

60. Since her termination, Plaintiff has struggled to maintain financial stability. She was unable to find work with comparable salary for several months, due in part because Defendant listed her termination as due to fighting. Plaintiff has had to pay for out-of-pocket medical expenses related to her injuries from Ms. Taylor. Plaintiff also suffers from permanent knee damage that still requires regular physical therapy.

61. Defendant's actions also caused Plaintiff emotional harm. Following her incident with Ms. Taylor, Plaintiff had to begin mental health counseling sessions, which she also has to make co-pay payments for. Plaintiff has also been

62. While Plaintiff was eventually able to find a new job in April 2020, her treatment by Defendant has caused her to be too afraid to take on new leadership roles and promotions she has been offered that would cause her to have to interact more with other coworkers and potentially cause conflict.

63. Plaintiff prays that Defendant be required to provide all appropriate remedies available under Title VII of the Civil Rights Act.

## COUNT I
## RETALIATION IN VIOLATION OF THE of the AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et seq.*

64. Plaintiff incorporates the prior paragraphs of this Complaint as though fully set forth at length.

65. Plaintiff engaged in the protected activity of filing complaints with the EEOC and PHRC on March 2011 and December 2017 regarding discrimination on the basis of disability in violation of the ADA.

66. Defendant retaliated against Plaintiff for engaging in this protected activity by using a

physical altercation where Plaintiff was assaulted as an excuse to terminate her.

67. By terminating Plaintiff, Defendant treated Plaintiff in a disparate manner, given that other employees, namely the other employee who assaulted Plaintiff in a physical altercation, have documented previous incidents of violence or threats of violence that were in violation of Defendant's alleged zero tolerance policy, yet were not immediately terminated.

68. Plaintiff prays that Defendant be required to provide all appropriate remedies available under the ADA.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

69. Plaintiff incorporates the prior paragraphs of this Complaint as though fully set forth at length.

70. Plaintiff engaged in the protected activity of filing complaints with the EEOC and PHRC on March 2011 and December 2017 regarding discrimination on the basis of race in violation of the Civil Rights Act.

71. Defendant retaliated against Plaintiff for engaging in this protected activity by using a physical altercation where Plaintiff was assaulted as an excuse to terminate her.

72. By terminating Plaintiff, Defendant treated Plaintiff in a disparate manner, given that other employees, namely the other employee who assaulted Plaintiff in a physical altercation, have documented previous incidents of violence or threats of violence that were in violation of Defendant's alleged zero tolerance policy, yet were not immediately terminated.

73. Plaintiff prays that Defendant be required to provide all appropriate remedies available under Title VII.

## COUNT III

## RETALIATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

74. Plaintiff incorporates the prior paragraphs of this Complaint as though fully set forth at length

75. Plaintiff engaged in the protected activity of filing complaints with the EEOC and PHRC on March 2011 and December 2017 regarding discrimination on the basis of disability and race.

76. Defendant retaliated against Plaintiff for engaging in this protected activity by using a physical altercation where Plaintiff was assaulted as an excuse to terminate her.

77. By terminating Plaintiff, Defendant treated Plaintiff in a disparate manner, given that other employees, namely the other employee who assaulted Plaintiff in a physical altercation, have documented previous incidents of violence or threats of violence that were in violation of Defendant's alleged zero tolerance policy, yet were not immediately

terminated.

78. Plaintiff prays that Defendant be required to provide all appropriate remedies available under the PHRA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court grant her the following relief against Defendant:

(a)     Compensatory damages;

(b)     Punitive damages (where applicable);

(c)     Liquidated damages (where applicable);

(d)     Emotional pain and suffering;

(e)     Reasonable attorneys' fees;

(f)     Recoverable costs;

(g)     Pre and post judgment interest;

Respectfully submitted,

BY: /s/ Faye Riva Cohen, Esq.
LAW OFFICE OF FAYE RIVA COHEN, P. C.
FAYE RIVA COHEN, ESQUIRE
Attorney ID: 18839
2047 Locust Street
Philadelphia, PA 19103
Attorney for Plaintiff

Date: 10/22/2021

**VERIFICATION**

I, Dywanna M. Broadnax, hereby verify that I am the Plaintiff in the within
Complaint and that the statements made in the foregoing Complaint are true and correct to the best of my
knowledge, information and belief.

I understand that false statements are made to the penalties of 18 Pa. C.S.A. §4904, relating to
unsworn falsification to authorities.

_____
Dywanna M. Broadnax
Plaintiff

Date: October 22, 2021

# Exhibit 4

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

| | |
|---|---|
| Dywanna Michelle Broadmax,<br>    Complainant | : |
| | : |
| | : |
| v. | : PHRC Case No. 201003477 |
| | : EEOC No. 17F201161112 |
| Thomas Jefferson University Hospital/Methodist<br>    Division,<br>    Respondent | : |
| | : |
| | : |

## COMPLAINT

### JURISDICTION

1. Jurisdiction is pursuant to the Pennsylvania Human Relations Act 43 P.S. §§951-963.

### PARTIES

2. The Complainant herein is:

   Dywanna Michelle Broadmax
   2540 S. Millick Street
   Philadelphia PA 19142

3. The Respondent herein is:

   Thomas Jefferson University Hospital/Methodist Division
   2301 South Broad Street
   Philadelphia PA 19148

TJUH001796

## UNDERLYING FACTS

4. I was previously employed by the Respondent as a Phlebotomist from March 15, 2005, to December 15, 2008.

5. I resigned because I was in treatment for medical reasons.

6. The Respondent promised that I would be rehired when I recovered.

### Count 1

**Hire (refusal to)**　　　　　**Disability - Has a Disability - Discrimination**

7. Paragraphs 1 through 6 are incorporated herein by reference as though set forth in full.

8. My protected class is disability, Lupus.

9. I was diagnosed with Lupus in June 2006.

10. I am presently in remission. However, when a flare is active I suffer from joint pain, but my duties don't become limited.

11. The Respondent is aware that I have this disability because I used FMLA during my previous employment.

12. I do not need any reasonable accommodations.

13. Beginning June 2009, and continuing to the present I have attempted to be re-hired by the Respondent.

14. I was in constant contact with Joyce Zagacki, Phlebotomy supervisor. Ms. Zagacki reassured me that I would be rehired when the Respondent lifted a job freeze.

2

TJUH001797

15. The positions were not posted therefore I did not get an opportunity to formally apply.

16. In October 2010, I became aware that Victoria Dejesse a former employee who resigned was rehired.

17. The requirements were primarily to perform In Patient and Out Patient blood tests and other duties.

18. I was qualified because my work performance was always above average. I have work experience in various areas with the Respondent.

19. When I telephoned Ms. Zagacki and asked her how did Ms. DeJesse get rehired before me she said she did not know.

20. I understand that Ms. Zagacki publicly announced that I would be rehired to an open position on November 9, 2010.

21. I am not aware of all of Ms. Dejesse's qualifications but Ms. Dejesse previously resigned twice.

22. Ms. DeJesse resigned on one occasion because she and her previous supervisor had disagreements.

23. Ms. DeJesse never worked in the Send Out Lab area because she did not want to and was not required to work in this area.

24. I received my credentials as a Phlebotomist numerous years before Ms. DeJesse received her credentials.

25. I also have more work experience than Ms. Dejesse.

26. I believe that I was denied hire in part because of my disability.

27. Additionally, Ms. Zagacki told me that I could no longer work 17 hours daily as I used to because of my disability.

28. Based upon the foregoing, I allege that the respondent violated Section 5(a) of the Pennsylvania Human Relations Act 43 P.S. 951-963.

29. The Complainant prays that the respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

3

TJUH001798

## Count 2

### Hire (refusal to)                           Race - Discrimination

30. Paragraphs 1 through 29 are incorporated herein by reference as though set forth in full.

31. My protected class is race, African American.

32. Victoria Dejesse, the successful candidate is Caucasian.

33. Based upon the foregoing, I allege that the respondent violated Section 5(a) of the Pennsylvania Human Relations Act 43 P.S. 951-963.

34. The Complainant prays that the respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

## DUAL FILING

35. This charge has been filed with the U.S. Equal Employment Opportunity Commission.

4

TJUH001799

# VERIFICATION

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. § 4904, relating to unsworn falsification to authorities.

_3-10-2011_
(Date Signed)

_Dywanna Michelle Broadmax_
Dywanna Michelle Broadmax

5

TJUH001800

Dywanna Michelle Broadmax  vs  Thomas Jefferson University Hospital/Methodist Division

PHRC Case No.201003477

EEOC No. 17F201161112

Certificate of Service

Pursuant to the requirements of 1 Pa. Code § 33.31, I hereby certify that I have this day served the foregoing Complaint by first class mail, postage prepaid, as follows:

Dywanna Michelle Broadmax
2540 S. Millick Street
Philadelphia PA 19142

Thomas Jefferson
University Hospital/Methodist Division
2301 South Broad Street
Philadelphia PA 19148

**Dated 18th day of March, 2011**

Sokun Nov

Cert of Service

TJUH001801

# Exhibit 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 2:2-CV-04662-JMY

-----------------------------------------x

DYWANNA BROADNAX

              Plaintiff

    v.

THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.

          Defendant

-----------------------------------------x

                 1835 Market Street

                 Philadelphia, Pennsylvania

                 May 10, 2022

                 10:10 a.m.

       VIDEOTAPED DEPOSITION of DYWANNA BROADNAX, the Plaintiff, held at the above-entitled time and place, taken before Carolyn Crescio, a Professional Shorthand Reporter and Notary Public of the state of Pennsylvania.

              *      *      *

Page 2

A P P E A R A N C E S:


LAW OFFICE OF FAYE RIVA COHEN, PC
Attorneys for Plaintiff
    2047 Locust Street
    Philadelphia, Pennsylvania 19103
BY: FAYE RIVA COHEN, ESQ.
and
    MATTHEW SMITH, ESQ.


KLEHR HARRISON HARVEY BRANZBURG, LLP
Attorneys for Defendant
    1835 Market Street
    Suite 1400
    Philadelphia, Pennsylvania 19103
BY: LEE MOYLAN, ESQ.
and
    STEPHANIE WOLBRANSKY, ESQ.



ALSO PRESENT:
Philip Leaf, Videographer

Page 9

D. BROADNAX

Q.    Is there anything about those medications that you feel would impact your ability to concentrate?

A.    No.

Q.    Do you understand that you're here for your deposition, that you've taken an oath, and that the import of that oath is the same as if you were in a court of law, sworn to testify truthfully?

A.    Yes.

Q.    Jefferson terminated you on November 21, 2019, correct?

A.    Yes.

Q.    And Jefferson told you that you were being terminated because you violated its policies?

A.    No.

Q.    What were you told as to why you were being terminated?

A.    Because I should have known the person that assaulted me wanted to fight.

Q.    Jefferson told you you were being terminated because you were engaged in a fistfight with a coworker, right?

D. BROADNAX

A.   Yes.

Q.   And that coworker was Crystal Taylor?

A.   Yes.

Q.   Do you understand that in this case you're contending that the reason that Jefferson stated for your termination is not the real reason?

A.   I don't understand the question.

Q.   Okay.  Do you understand that in this lawsuit you're alleging that even though Jefferson told you that they were terminating you for engaging in the fistfight with your coworker, that was not the real reason?

A.   Are you asking me, do I believe that -- do I believe that was not the reason? Or are you telling me that that's not the reason, according to Jefferson?

Q.   Okay.  Do you believe that that was the real reason why you were terminated?

A.   Yes.

Q.   Okay.  So you believe that the reason why you were terminated is because you were engaged in a fistfight with a coworker?

D. BROADNAX

A.    Yes.

Q.    Do you contend that anyone from Jefferson harbored retaliatory animus against you?

A.    Yes.

Q.    And the retaliatory animus was for what?

A.    I had to go out sick in 2008, and when I tried to get my job back, I was told repeatedly, for over a year, that there was a hiring freeze.

During that time when I was waiting to come back to work, I decided to take a claim with the PHRC to say why I was feeling discriminated against for my disability.  Why was I not able to return to work?

I had found out that a phlebotomy team had been created while I was told that Jefferson was on a hiring freeze.  And when I had to resign, my paperwork said, "Can be rehired."

Q.    Let me stop you for a second, if you don't mind, okay?

A.    Sure.

Q.    Because we are going to get into a

Page 12

D. BROADNAX

lot of this, if not everything.  But I'm asking you -- well, let me ask you a more pointed question:  Do you understand that in this lawsuit you have contended that Jefferson retaliated against you for filing a complaint with the PHRC and EEOC in 2011 and in 2017?

A.    Yes, ma'am.

Q.    Who do you believe harbored that retaliatory animus against you?

A.    Particularly my immediate supervisor, Joyce Zagacki.

Q.    And you said "particularly."  Is there anyone else who you believe harbored retaliatory animus against you for filing those charges in 2011 and 2017?

A.    Whenever I would go to my immediate supervisor with issues, they were never resolved.  Once I started to go to her manager, which was the department lab manager, and HR, it was never help for me and my situation.  So I began to feel they were aware of what I went through with my immediate supervisor, so my help was minimal, if none at all.

Q.    And who was the department manager?

Page 13

D. BROADNAX

A.    George Morrone.

MS. MOYLAN:  Morrone is

M-O-R-R-O-N-E.

Q.    And who from HR?  Did you --

A.    At the time --

Q.    Sorry.  Let me just finish my --

A.    Okay.

Q.    Who from HR did you go to about
Joyce Zagacki?

A.    Suzana Hamza.

MS. MOYLAN:  Hamza is H-A-M-Z-A.

Q.    Anyone else?

A.    Verbatim, I can't say, because I
don't have access to my Jefferson email to see
who I reached out to in HR.  So those two for
sure.

Q.    Okay.  So, as of now, you believe
that Joyce Zagacki, Morrone, and Suzana Hamza
harbored retaliatory animus against you for
filing the 2011 charge and the 2017 charge?

A.    Until you brought it to my
attention, I never looked at George or Suzana as
being a part of harboring retaliatory feelings
towards me, because they are her management, and

Page 14

D. BROADNAX

I reported it to them because I wasn't getting results from Joyce.  I don't want to have my words mixed up, saying that I too believe that they were part of my discrimination complaint. But if I go to management, and nothing is being done about the things I'm complaining about, I did begin to feel that way.

Q.    Okay.  Are you aware of anyone else being involved in a fistfight with a coworker at work during working hours at Jefferson --

A.    No.

Q.    -- who --

MS. COHEN:  Let her finish the question.

THE WITNESS:  I'm sorry.

Q.    Okay.  Are you aware of anyone else at Jefferson engaging in a fistfight with a coworker at work?

A.    No.

Q.    So, likewise, you're not aware of anyone else who was engaged in a fistfight with a coworker at work, who was not terminated?

A.    No, I'm not privy to that.

Q.    And Crystal Taylor, the person with

Page 15

D. BROADNAX

whom you were engaged in a fistfight, was a lab assistant like you; is that right?

A.    Yes.

Q.    Would you say she was your peer?

A.    She was, yes.

Q.    And are you aware that she was terminated as well as a result of the fistfight?

A.    Yes.

Q.    Do you know if Ms. Taylor ever filed a charge or complaint of discrimination against Jefferson?

A.    I don't know that.

Q.    At any point in time after you filed the 2011 charge, did anyone from Jefferson make any derogatory comments about that charge?

A.    Other than -- I mean, not the supervisor, but coworkers, yes.

Q.    And when you say "the supervisor," you mean Joyce Zagacki, right?

A.    Yes.

Q.    Okay.  So after you filed the 2011 charge, you're not aware of Joyce Zagacki making any derogatory comments about you filing that charge?

Page 16

D. BROADNAX

A.    I was an employee since 2008.  And when I returned to work, other coworkers knew my story.  I didn't even know the new coworkers.  So it would only lead me to believe it had to come from Joyce.

Q.    Do you have any personal knowledge of Joyce Zagacki making any derogatory comments about you filing the 2011 charge?

A.    I can't recollect conversations verbatim, but I do know that she has discussed my situation with coworkers.

Q.    Did you personally hear that?

A.    Yes.

Q.    You personally heard Joyce Zagacki talking about your 2011 charge?

A.    No, ma'am.  I personally heard it from a coworker.

Q.    Okay.  And I'll get to that.  But let me just make sure the record is clear.

You never personally heard Joyce Zagacki saying anything derogatory about you filing the 2011 charge?

A.    No.

Q.    The 2017 charge, did you personally

Page 17

D. BROADNAX

hear Joyce Zagacki say anything derogatory about you filing the 2017 charge?

A.    No.

Q.    Okay.  Who told you that Joyce Zagacki said something about you filing the 2011 charge?

A.    Lisa Hall; Lindsey D'Elia, who was the outpatient coordinator at the time; Blondzell Skinner.

Q.    Can you spell that "Blondzell"?

A.    Yes.  B-L-O-N-D-Z-E-L-L-E [sic], Skinner.  Geniece Carroll, G-E-N-I-C-E C-A-R-R-O-L [sic].  Those are people I had conversations with about my situation when I had returned back to work.

Q.    Okay.  So were they multiple conversations?  Was it one conversation?

A.    I would call them sarcastic comments.

Q.    Okay.  So tell me, Lisa Hall, what are you referring to?

A.    When she told me that Joyce told me -- told her that I was a troublemaker, that I filed a complaint against her because I got sick

Page 18

D. BROADNAX

and didn't come back to work.  It just stood out that, here, Joyce called me a troublemaker.

Q.   Okay.  You said it stood out that Joyce called you a troublemaker.  But you also said that Lisa Hall told you that Joyce said you are a troublemaker and that you filed a complaint?

A.   Against her.

Q.   Okay.  Was anyone privy to that conversation?  In other words --

A.   No.

Q.   -- do you believe that anyone heard that conversation between you and Lisa Hall?

A.   It was private.

Q.   When did that take place?

A.   The year 2015, I would say.

Q.   Did Lisa Hall tell you when Joyce said that supposedly to Lisa?

A.   When I first returned back to the job.

Q.   So Lisa Hall told you that Joyce Zagacki said that you were a troublemaker and that you filed a complaint against her shortly after you returned to Jefferson?

Page 19

D. BROADNAX

A.    Yes.  When I returned to Jefferson, it was already alliance against me, and Lisa was the primary person.  But as years went on and she got to know me, she started to have her own issues with Joyce.  She opened up about a lot of things that Joyce felt about me, that she never told me.

Q.    Did Lisa Hall tell you anything else about Joyce Zagacki and that 2011 charge?

A.    No.

Q.    Lindsey D'Elia, what did Lindsey D'Elia tell you about the 2011 charge?

A.    That she was limited with training me in certain areas because Joyce prefers for me to be in the outpatient area, to keep me away from -- to keep me away from other coworkers. So the conversation I had with Lindsey was really disheartening, because she let me know that Joyce didn't want me engaging with the other coworkers; that because she was the coordinator at the time, she was unable to override Joyce's decisions about cross-training me in different locations, which kept me in one department.  And it resulted because -- her

Page 20

D. BROADNAX

exact words, like, something about you sued her. And I was just shocked because I have never -- I didn't -- I didn't know Lindsey prior to me taking my leave.

Q.    So Lindsey said to you that -- she just referenced something about you suing her?

A.    That was her exact words.

Q.    When was that conversation with Lindsey?

A.    I returned in October of 2011.  So it had to be between October and December of 2011 when I first returned.

Q.    Was anyone else around when that conversation between you and Lindsey occurred?

A.    No.

Q.    So, as far as you know, there are no witnesses to that?

A.    No.

Q.    And, as far as you know, there's no witnesses to Lisa Hall's conversation with you about Joyce Zagacki and your 2011 complaint?

A.    No.

Q.    Any other communications with Lindsey about Joyce Zagacki and your 2011

Page 22

D. BROADNAX

telling you that Joyce Zagacki told Lisa that you were a troublemaker and that you filed a complaint against her?

A.    After being the outsider for so many years, I would just listen to what people say. I really didn't have too much transferring [sic]conversations, so my words don't get mixed up.  So I had a reaction of heartbreak, being called a troublemaker, and I didn't do anything but get sick and have to take time off.  So in that conversation, I was probably more sad that Joyce would say that about me.

Q.    Okay.  Did you say anything in response to Lisa Hall saying that?

A.    No, I didn't.

Q.    Did you tell anyone about this conversation that you had with Lisa Hall wherein she told you that Joyce Zagacki said you were a troublemaker?

A.    No.

Q.    So you never told anyone in Jefferson that Lisa Hall told you that Joyce Zagacki said you were a troublemaker?

A.    There was an alliance to get me --

Page 23

D. BROADNAX

against me in my department, so I didn't have friendly conversations if it was not work-related.  I couldn't control what people wanted to say to me, but I didn't engage in transferring conversation because I was such an outsider for so many years.

Q.    Okay.  Just "yes" or "no," and then you can explain if the answer is yes.

Did you tell anyone at Jefferson that Lisa Hall told you that Joyce Zagacki said you were a troublemaker and that you filed a complaint against her?

A.    No.

Q.    The conversation with Lindsey D'Elia, what did you say, if anything, in response to her saying that Joyce Zagacki preferred to keep you in the outpatient area and something about you suing her?

A.    Well, I explained to her what happened, that I didn't sue her.  That I tried to come back for my job in six months, and I was misled into believing there was a hiring freeze. And I let her know that I was happy with just having my job back.  And I didn't -- at that

Page 25

D. BROADNAX

didn't want you engaging with other coworkers, or to cross train, right?

A.    Yes.  That's out of her own mouth, yes.

Q.    Okay.  And -- but what you're saying now is that you also had conversations with Lindsey at various times during your employment, wherein you would point out that new employees were coming in and doing things that you already knew how to do?

A.    Yes, but I didn't have multiple conversation about the 2011 claim.

Q.    Okay.  Okay.  We will talk about your allegations that you were not trained in areas you wanted to be trained in.  So let's focus on this conversation that you had with Lindsey about the 2011 charge.

Have you told me everything that you recall -- you can recall being said during that conversation, what Lindsey said to you and what you said in response?

A.    Yes.  I can recall that's how it went, yes.

Q.    Okay.  Did you report to anyone or

Page 26

D. BROADNAX

inform anyone at Jefferson that Lindsey had this

conversation with you?

A.    No, because I looked at Lindsey as

the coordinator, which means she's in a position

of management, so she's the one I'm supposed to

report to.  And, again, I'm walking on

eggshells, coming back with a bull's-eye on my

back just for conversation.  So I kind of stayed

to myself.  It was really uncomfortable.

Q.    Okay.  So you did not report to

anyone, including HR, about this conversation

that you had with Lindsey D'Elia in October,

November of 2011?

A.    No, I did not.

Q.    Blondzell Skinner, she asks you, you

know, why did you come back to work without

getting any kind of monetary compensation,

right?

A.    Yes.  And that's not her exact

words, but, yes, that was the basis of the

conversation.

Q.    Okay.  What were her exact words?

A.    I don't remember her exact words,

but I do remember her saying, Why would you come

Page 27

D. BROADNAX

back without allowing them to pay you?  That's what she said.  And at the time, again, like I told everybody else, I was just happy to have my job back.

Q.    And did you report that conversation to anyone at Jefferson?

A.    No.

Q.    When was that conversation?

A.    Again, it would have to be in the three months of my return between October of 2011 and December of 2011.

Q.    What did you say in response to Blondzell's comments?

A.    I was just happy to have my job back.

Q.    As far as you know, did anyone overhear that conversation?

A.    No.

Q.    Did you have any other conversations with Blondzell Skinner about the 2011 charge?

A.    Later she came to me to ask me for the information, because at some point she started to feel her own reasons why she wanted to reach out to the PHRC, so I gave her the

Page 30

D. BROADNAX

A.    She was also a lab assistant.

Q.    Can you try to keep your voice up, just --

A.    She was a lab assistant.

Q.    Okay.  And Lindsey D'Elia, what position was she when she had the conversation with you?

A.    She was the phlebotomy coordinator.

Q.    And Lisa Hall, what was her position?

A.    Lab assistant.

Q.    Okay.  You said she -- "she" meaning Blondzell -- told you, during this conversation, they were between 2011 and 2016, where she asked you for information about the PHRC, she told you about the issues she was having, right?

A.    Yes.

Q.    What were her issues as she described them?

A.    She would say that certain technicians, not phlebotomists, would always accuse her of making mistakes.  They would make her feel small.  Ms. Blondzell is an older woman in her late 60s, and she just felt inferior, and

Page 39

D. BROADNAX

Q.    You did not.  And we will talk about the other comments that you have referenced that Joyce Zagacki has made over the years.  But let me ask you this:  Have you ever complained to anyone at Jefferson about the comments that Joyce Zagacki made?

A.    No.

Q.    All right.  Let's go back.  Have we talked about all the conversation thus far that you had with Lisa Hall, Lindsey D'Elia, and Blondzell Skinner, about the 2011 charge?

A.    I mentioned the name Geniece Carroll.

Q.    Right, I haven't gotten to her yet.

A.    Okay.

Q.    I'm just closing out this area with Lisa Hall, Lindsey D'Elia, and Blondzell Skinner.

A.    Yes.

Q.    Okay.  So there's nothing else that you can recall talking about with those three individuals regarding the 2011 charge?

A.    No.

Q.    All right.  Geniece Carroll, let's

Page 40

D. BROADNAX

talk about her.  Tell me about the communications you had with Geniece Carroll about the 2011 charge.

A.    Okay.  So it was a day where Geniece and I were working together.  She was doing something incorrectly, and I said something about her, and her reaction to me was:  No one likes you.  Why would you even want to come back after you sued your supervisor?

Q.    When was that conversation?

A.    I would say the year 2012.  It wasn't within my first three months.

Q.    It was not within your first three months?

A.    No.  So it had to be after the year 2012.

Q.    What did you say in response?

A.    I'm not here for people to like me.

Q.    Anything else?

A.    And Geniece walked out of the office.

Q.    So that was the totality of the communication that you had with Geniece?

A.    Referencing my 2011 complaint.

Page 41

D. BROADNAX

Q.    Right.  Okay.  And was anyone, as far as you know, privy to that conversation?

A.    It was Geniece and I in the outpatient lab.

Q.    In the outpatient lab?

A.    Yes.

Q.    Did you tell anyone about that conversation you had with Geniece?

A.    No.  I was instructed by the PHRC to go back to work and do my job and if I feel at any time I don't feel right, to contact them. So when I was running across these little comments about why I left, I didn't do anything for a few years.

Q.    Well, you filed another charge in 2017, right?

A.    Yes.

Q.    Is that what you're referring to, is doing something?

A.    Yes.

Q.    Okay.  So between the 2011 charge and the 2017 charge, you didn't complain to anyone about this -- these -- this conversation with Geniece Carroll?

Page 42

D. BROADNAX

A.    No.

Q.    What position was Geniece Carroll?

A.    Lab assistant.

Q.    Any other conversations that you had with Geniece Carroll about the 2011 charge?

A.    No.  But she did reference me not being cross-trained.

Q.    When was that?

A.    Between 2012 and 2013, I would say. I can't quote because she ended up leaving.

Q.    When did she leave?

A.    I don't remember.

Q.    And what was her comment about -- or what was the statement she made referencing you being cross-trained?

A.    That's why you have to sit in the office all day.  This came after her and Lisa came into the outpatient area, and they ordered breakfast pizza without inviting me or asking me did I want to have pizza -- I mean, breakfast. So I asked them, Why do you guys always order breakfast like I'm not sitting right here?

And that's when Geniece said, Because you just in a little office and you are not around

Page 45

D. BROADNAX

a long, big corridor.

Q.    Long hallway and big corridor?

A.    So you would go down a long hallway and make a right.  Down the corridor was, like, at the end of the hallway is the inpatient lab. The outpatient lab is on the first floor all the way down the hallway in a different location.

Q.    And before you left Jefferson in 2008, you worked in the inpatient lab?

A.    Yes.  Full time.

Q.    Full time.

Okay.  At any time after you filed the 2017 charge, did you ever hear Joyce Zagacki say anything derogatory about that?

A.    Other than the conversations she had with me personally, telling me that it was HR's responsibility to get me reregistered, it wasn't any derogatory comment.  It was just her reflecting it back to Human Resources.

Q.    Okay.  So after the 2017 charge that you filed, you never heard Joyce Zagacki say anything derogatory about that charge?

A.    No.

Q.    And did you personally hear Joyce

Page 46

D. BROADNAX

Zagacki say anything derogatory about the allegations that you made in that charge?

A.    No.

Q.    And just to make sure that I've closed this out, have you ever heard Joyce Zagacki say anything derogatory about the allegations that you made in the 2011 charge?

A.    Have I with my own ears heard her say it out of her mouth?

Q.    Correct.

A.    No.

Q.    Have you heard from anyone that Joyce Zagacki said something derogatory about the allegations that you made in the 2011 charge?

A.    Other than Lisa telling me she said that I was a troublemaker.  That's derogatory in my eyes.

Ms. Blondzell asking me for my personal business, referencing my situation without me knowing her previously, that was like a shock to me.

I can't really say -- no, I can't say I heard anyone else tell me about it.  I don't

Page 49

D. BROADNAX

Q.    Can you tell me, do you have any personal knowledge of how any of these people supposedly found out that you filed a 2011 charge?

A.    I have no personal knowledge how they found out.

Q.    Did any of them tell you how they knew that you filed a 2011 charge?

A.    No.

Q.    So what is your basis for believing that someone from Jefferson told them that you filed a 2011 charge?

A.    Because I swore to keep it a secret. It would ruin my life and my job, and I never mentioned it to none of these new hires.  So how did they know my business?

Q.    Sitting here today, you don't know whether Joyce Zagacki told any of these individuals that you filed a 2011 charge, right?

A.    No.

Q.    The 2017 charge, who do you believe knew that you filed the 2017 charge?

A.    Crystal and Lisa and Julia.

Q.    I'm sorry.  Would you mind Crystal.

Page 53

D. BROADNAX

Q.    At any point in time, did anyone from Jefferson make any derogatory comments about you for complaining about discrimination or retaliation, aside from filing the charges?

A.    No one ever discussed it with me, no.

Q.    At any point in time, did you hear or learn of anyone from Jefferson making derogatory comments about anyone else complaining about discrimination or retaliation?

A.    Can you repeat the question?

Q.    Sure.  At any point in time, did you hear or learn of anyone else from Jefferson making derogatory comments about somebody else complaining about discrimination or retaliation?

A.    When you reference discrimination and retaliation, are you talking about my situation?  Or their own -- them feeling retaliated against or discriminated against?

Q.    Okay.  I appreciate you asking for clarity.

I originally asked you if, at any point in time, you heard of anyone from Jefferson making derogatory comments about you complaining about

Page 54

D. BROADNAX

discrimination and retaliation.

A.    And I said no.

Q.    And you said no.

So now I'm just asking about anyone else complaining about discrimination and retaliation.  So here is the question:  At any point in time, did you learn of anyone from Jefferson making derogatory comments about anyone else complaining about discrimination or retaliation?

A.    Derogatory comments, no.  Supportive comments, yes.

Q.    What do you mean by "supportive comments"?

A.    When Ms. Blondzell started to talk about what she was facing and dealing, she was encouraged to go ahead and follow through, not just from me.  Later down the line, Shannon also came to me for the PHRC information.

Q.    Who encouraged Blondzell to follow through, as you said?

A.    Lisa, Ms. Janet, Julia.

Q.    Were you privy to those conversations, to any of those conversations

D. BROADNAX

with the EEOC in 2020, after you were terminated, correct?

A.    Yes.

Q.    And in that charge you allege that Crystal Taylor verbally assaulted Naeemah Gadson, right?

A.    Yes.

Q.    And you allege that it almost resulted in a physical assault, right?

A.    Yes.

Q.    So, first of all, you were not present for the verbal assault that you're alleging took place between Naeemah Gadson and Crystal Taylor, right?

A.    No, I was not.

Q.    And as far as you know, that encounter did not result in a physical assault, correct?

A.    Correct.

Q.    So in that way, it was different from what happened with you and Crystal Taylor, right?

A.    Yes.

Q.    Yes.  Because what happened with you

Page 59

D. BROADNAX

and Crystal Taylor in November of 2019 was a physical assault, correct?

A.    Yes.

Q.    Do you know when Crystal Taylor's purported verbal assault of Naeemah Gadson occurred?

A.    I want to say maybe like the first week of April.

Q.    2019?

A.    Yes.

Q.    What is your basis for believing that it occurred in April 2019?

A.    I was on my -- I was on leave, and when I returned to work, it was, like, April the 6th when I returned, and that's when I learned about everything that had transpired a few days prior.  I could have my dates mixed up.  But it definitely was in, like, the first week of April.

Q.    Okay.  And where did -- from whom did you learn about everything, as you put it?

A.    The first person that told me was Victoria.

Q.    Victoria Morino?

Page 61

D. BROADNAX

Naeemah's words, she said that Crystal was extremely aggressive.  She felt threatened.  She felt that she was in fear that she was going to have to fistfight, and she almost felt, like, the supervisor was afraid at the time, because she couldn't calm Crystal down.

Q.    When you refer to the supervisor --

A.    Joyce Zagacki.

Q.    Right.  And so I'll ask you -- you can testify however you feel comfortable, but to the extent you can remember, I would appreciate it if you would, for the clarity in the record, as opposed to referring to Joyce Zagacki as the supervisor, if you would try to refer to her by her name, it would be easier.

A.    Okay.

Q.    And you said Naeemah Gadson told you that Crystal was extremely aggressive and that Naeemah Gadson felt that she would have to fistfight?

A.    She felt like she was about to get into a fistfight.  Crystal was in her face, really closely, you know, arguing with her, basically, in front of the supervisor.  And it

Page 62

D. BROADNAX

was nothing that Ms. Joyce could do to calm Crystal down.

Q.    Is that all that Naeemah Gadson told you about the interaction she had with Crystal, wherein --

A.    She told me --

Q.    -- wherein there was a verbal assault?

MS. COHEN:  Wait, wait, you both can't talk at the same time.

A.    She told me how she got out of the office, because she said:  I'm going to leave before I walk out in handcuffs.

MS. COHEN:  Who said that?

THE WITNESS:  Naeemah.

Q.    Naeemah told you that she said she left before --

A.    Yes.

Q.    -- before she leaves in handcuffs?

A.    Yes.

Q.    Did Naeemah Gadson tell you that that's what she said at the time?

A.    I can't tell you if that's what she said or that's how she felt, but I know when she

Page 64

D. BROADNAX

Q.   Do you know whether Joyce Zagacki ever communicated that she thought Crystal Taylor verbally assaulted Naeemah Gadson?

A.   I don't have any knowledge of what she thought about that situation.

Q.   Okay.  And do you know whether Joyce Zagacki ever communicated that she thought Crystal Taylor did something during that incident that should have prompted discipline?

A.   I'm not aware of that coming from Joyce, no.

Q.   And do you know whether Joyce Zagacki ever communicated that she thought Naeemah Gadson's conduct almost resulted in a physical assault?

A.   No, I'm not aware of that.

Q.   And do you know whether Joyce Zagacki ever communicated to anyone that she thought Naeemah Gadson's conduct required discipline, or should prompt discipline?

A.   No.

Q.   Has Joyce Zagacki communicated to you in any form, at all, about what her impressions were of what she observed between

Page 65

D. BROADNAX

Naeemah Gadson and Crystal Taylor in April of 2019?

A.    I never talked to Ms. Joyce about that situation.

Q.    Have you ever heard from anyone else about what Joyce Zagacki's impressions were about that interaction between Naeemah Gadson and Crystal Taylor in April 2019?

A.    Yes.

Q.    Okay.  Tell me about that.

A.    Erica Perry, when I returned and we discussed the situation, she felt -- she felt strongly at that moment that Crystal should have been terminated.  She let me know during this conversation that she felt that Crystal should have been terminated.

Q.    Who is Erica Perry?

A.    Erica Perry is a lead lab assistant who works the central lab.

Q.    As far as you know, was Erica Perry present for the interaction between Naeemah Gadson and Crystal Taylor?

A.    No.  Because Erica comes in after those girls leave.

Page 66

D. BROADNAX

Q.    Okay.  So you told me that Erica Perry told you that she felt that Crystal Taylor should have been terminated for her interaction with Naeemah Gadson in April 2019?

A.    Yes.

Q.    And my question to you was, have you heard from anyone that Joyce Zagacki communicated what she, Joyce Zagacki, saw between Naeemah Gadson and Crystal Taylor?

A.    And I told you, no.

Q.    Okay.  We are going to mark your interrogatory responses as D-1.

(Answers are received and marked as Exhibit D-1 for identification, as of this date.)

MS. MOYLAN:  All right.  There should have been three copies in here, but there aren't.  So I can get -- oh, they are right here.  I was wondering why my paralegal didn't do that.  There you go.

Okay.  We'll mark your interrogatory responses as D-1.

Q.    And what I will tell you, and take

Page 71

D. BROADNAX

Those were things that I personally witnessed. But then there were things that I would hear about her, not just from my department, but just throughout the hospital.

Q. Okay. Let me stop you there because I just -- before I get into that, my question to you -- and I appreciate the elaboration, I do, but my question to you was: How often had you observed, personally, Crystal Taylor being mean, short, and aggressive?

A. And I said -- I would have to say, from her day of hire -- because my initial interaction with Crystal was aggressive the first day she started.

Q. Right. But I asked you on how many occasions.

A. I can't tell you that.

Q. Was it less than 10?

A. Again, we work separate shifts so I will only see her in passing. I didn't work on a shift with her to witness, on the day-to-day basis, how she was. But I would see her in passing.

Q. I understand. You know, I don't

Page 72

D. BROADNAX

want to keep you -- you for hours on end.

Just -- if you would just answer my question.

A.    Okay.

Q.    How many -- you said you can't tell me how many times you've seen Crystal Taylor be mean, short, and aggressive.  And then I asked you, do you think it's less than 10?

A.    I would say about 10.

Q.    And that's from the time she started until the time you were terminated?

A.    Yes.

Q.    And does that 10 -- included within that 10 is the fistfight that you had with her?

A.    Yes.

Q.    Okay.  And you also said, being informed by coworkers, you were generally aware of Crystal Taylor's reputation.  Who informed you of Crystal Taylor's reputation in the office?  Who are those coworkers you're referring to?

A.    Julia, Margarita, Shannon, Hugh, Ms. Alma, Lauren, Victoria.

Q.    Did any of them tell you that they observed Crystal Taylor physically assaulting

Page 73

D. BROADNAX

anyone?

A.    No.

Q.    And other than the fistfight that you had with her in November of 2019, are you aware of Crystal Taylor physically assaulting anyone?

A.    No.

Q.    And what did your coworkers tell you about Crystal Taylor, her reputation in the office?

A.    Well, they don't recite her reputation.  They may tell me an incident.  So is that the same thing, to answer your question?

Q.    Sure.

A.    Okay.  I know particularly, she had been known -- and I didn't find this out until after my altercation -- but she was known to ask people to meet them outside after work, or say things, I'll meet you in the parking lot after work.  I know there was an exchange with a nurse and a patient, because I'm friends with the nurse, over Crystal's perfume on the floor.  The patient happened to be a family member of somebody in the administration in the hospital.

Page 79

D. BROADNAX

Q.    When you say you told them the reason why, what do you mean by that?

A.    There was a reason why the altercation began between Crystal and I.  And there was an underlying tension that I was unaware of that day.  And I just explained to them what the reason was.

Q.    Did any of them have a response; Hugh, Erica, Julia, Margarita, or Naeemah?

A.    Yes.  They all had a response.

Q.    What was each of their responses?

A.    Collectively they all agreed that she should have been fired a long time ago.  And three -- two of them let me know that they left because of Crystal and how many times they went to complaints on Crystal.  That would be Hugh and Margarita.

Q.    Hugh and Margarita told you that they complained about Crystal?

A.    Yes.  And Julia also let me know that Crystal actually told her, You can meet me outside after work.

Q.    When you say "complained about Crystal," did they tell you who they complained

Page 80

D. BROADNAX

to?

A.    Joyce.

Q.    Okay.  So Hugh and Margarita told you that they complained to Joyce Zagacki about Crystal Taylor?

A.    Yes.

Q.    Did they tell you they complained about anybody else?  I'm sorry.  That they complained to anyone else about Crystal Taylor?

A.    No.  I know Shannon went to HR on Crystal multiple times.

Q.    How do you know that Shannon complained to HR about Crystal?

A.    Shannon would tell me.

Q.    As far as you know, was anything done when Shannon went to HR to complain about Crystal?

A.    No.  Shannon ultimately quit.

Q.    Did any of these individuals tell you that they complained about Crystal Taylor trying to fight them?

A.    I wouldn't say they told me that she tried to fight them, but her behavior is so antagonistic, it made people want to fight,

Page 84

D. BROADNAX

A.    Yeah.

Q.    Did you overhear Crystal saying these things?

A.    No.

Q.    So you would overhear other people talking about Crystal using choice words about Hugh?

A.    Yes.

Q.    Did any of the things that you overheard -- I'm sorry.  Did any of the things that those individuals told you, did they specify what the choice words were?

A.    I mean, referenced words in terms of his sexuality.

Q.    I need you to be specific if you can.

A.    Calling him a faggot.

Q.    So you overheard coworkers of yours talking about the fact that Crystal called Hugh a faggot?

A.    Yes.

Q.    Do you know whether any of those coworkers who you overheard, ever personally heard Crystal call Hugh a faggot?

Page 85

D. BROADNAX

A.    I can't tell you which coworker heard it.

Q.    And you don't know whether any coworker heard it?

A.    I would assume a coworker heard it if I heard it from a coworker who said it was said.  And then Hugh confirmed that she has done things and said things, and he reported it to Joyce.

Q.    Right.  But you're just assuming that someone other than Hugh and Crystal heard Crystal call Hugh a faggot?

A.    Our setting, we are never alone. And this is like a Saturday afternoon.  The setting is created to have four to five people in the area at once.

Q.    Did anyone tell you they actually heard Crystal call Hugh a faggot?

A.    No.

Q.    Is there any other knowledge that you have of Ms. Taylor name-calling?

A.    Calling Victoria fat A-S-S.

Q.    Anything else?

A.    No.

Page 86

D. BROADNAX

Q.    Did you ever hear Crystal call Victoria a fat ass?

A.    Yes.

Q.    When did you personally hear Crystal call Victoria a fat ass?

A.    In 2019.

Q.    You returned to work on or about April 6, 2019, and you were terminated on November 21st, 2019.  So where in that span of time did you hear Crystal Taylor call Victoria Martino a fat ass?

A.    I would say June or July. Particularly, Victoria did not do a blood test correctly on a pregnant patient.  And it resulted in a patient having to come back and redo her testing.  And Crystal opinionated -- gave her opinion on a situation, and not only called her dumb, but she called her a dumb fat ass.

Q.    Did you report that comment to anyone at Jefferson?

A.    No, I didn't.

Q.    And did you report to anyone at Jefferson that you overheard that Crystal used

Page 87

D. BROADNAX

choice words regarding Hugh?

A.   No, I didn't.  I never reported it to Jefferson.

Q.   Did you report to anyone at Jefferson your general awareness, your observations, your being -- the facts that you were informed by coworkers about Crystal Taylor's reputation in the office?

A.   No.

Q.   Did you complain to anyone at Jefferson, before your termination, about Crystal Taylor?

A.   Yes.

Q.   And who did you complain to?

A.   Joyce Zagacki, George Morrone, and Suzana Hamza.  One meeting, Linda Dutch was the chemistry supervisor.  She sat in the meeting with Crystal, myself, and Joyce.

Q.   How many times did you complain about Crystal Taylor to Jefferson?

A.   From the time that I returned to the time that I was terminated, I remember two personal meetings with us two and the supervisor.  I remember going to George

Page 88

D. BROADNAX

personally, sitting in his office, telling him about it.  I remember writing Suzana -- Suzana Hamza about it through email.  So that's four times that I know I can recollect.  It could be more, but I don't have access to my Jefferson email anymore.

Q.   And you focused on the time that you were back at Jefferson in 2019.  Is that because you had not complained about Crystal Taylor before you came back in April of 2019?

A.   I never ever ever, never ever had a problem with Crystal until November -- until I returned in 2019, after her altercation with Naeemah.

Q.   Has Crystal said anything derogatory about your having filed a charge in 2017?

A.   It was Crystal who was my peer, my coworker, who I had never had a problem with, who helped me figure out that I was not receiving my retirement fund.

Q.   Right.  But Crystal Taylor, has she ever said anything derogatory about you about filing the 2017 charge?

A.   Crystal was supportive of me filing

Page 89

D. BROADNAX

the 2017 charge.

Q.   Let's go back to the times when you say you complained about Crystal Taylor.

A.   Yes.

Q.   You had two personal meetings with Joyce Zagacki.  That's what you said.

A.   And one --

Q.   Right.  Let me just ask you about the two personal meetings with Joyce Zagacki.

A.   Linda Dutch also sat in one of those meetings.

Q.   Where was the meeting with Linda Dutch and Joyce Zagacki?

A.   They share an office, so it was in their office.  And Linda asked me permission if it would be okay if she sat in on a meeting.

Q.   All right.  So you went into Joyce Zagacki's office?

A.   Yes, I did.

Q.   Was it a scheduled meeting?

A.   It was more of a schedule that day. I went to Joyce earlier that day to let her know I'm having problems, and can we talk.  And I just wanted to have a meeting before the day was

Page 90

D. BROADNAX

over.

Q.    Okay.  So Joyce said, "Okay"?

A.    Yes.

Q.    Come by later?

A.    Yes.

Q.    When was this meeting that you're referring to that Linda Dutch was there?

A.    I'm sorry.  I can't tell you the date.  It was post my recovery and my return.

Q.    Was it your first complaint as far as you know?

A.    It wasn't the first one.  It was the one that I needed to have clarity because her behavior had started to become tormenting.  But -- it could have been the first one, but I know I had complaints and emails prior.  But this was probably the first formal meeting.

Q.    Did you say because it became torment; is that you said?

A.    Her behavior towards me, after I returned in -- after April -- I mean, April 6 became tormenting, yes.

Q.    Okay.  So tell me about the -- what was said during that meeting with Joyce Zagacki

Page 91

D. BROADNAX

and Linda Dutch.

A.   It was really brief.  We all sat down, and I said, I'm just here because I would like to know why am I receiving so much wrath from Crystal.

Linda Dutch interjected and said, Crystal, are you giving Dywanna any problems?

Crystal said, No.

Then Ms. Joyce said, Crystal, why is Dywanna complaining?

And she said, I can't tell you why.  Crystal was actually about to clock out.  She said, I can't tell you why.  And I really don't want to be here.

And then I said, It seems like ever since you got into it with Naeemah -- and the minute that I said the name, Naeemah, Crystal just blew up.  She just blew up and said, Don't say that name to me.  You don't know anything.  And blew up and said, I'm leaving this meeting.  And she walked out of the office.  So it didn't last that long.

Q.   Okay.  So I didn't understand until you mentioned that Crystal was actually there.

Page 92

D. BROADNAX

So this meeting, this personnel meeting was between Joyce Zagacki, Linda Dutch, you, and Crystal Taylor?

A.    Yes.

Q.    Was anyone else there?

A.    No.

Q.    As far as you know, did anybody overhear the conversation?

A.    No.  The door was closed.

Q.    Was anything else said during that conversation?

A.    No.  Crystal left the meeting.

Q.    And then what did you do after Crystal left?

A.    I was just like in -- I was shocked. I mean, these are the supervisors.  How can she just get like that with the supervisors and exit the meeting?

Q.    But did you say anything?

A.    I'm under my management right now, and I was just like -- I can't verbatim tell you what Ms. Joyce said, but I know Linda witnessed it.  And Ms. Joyce could have said something like, I'll follow up, or I'll deal with it

Page 93

D. BROADNAX

tomorrow.  I can't remember.

Q.    Okay.  So you don't remember what anybody said, if anything, after Crystal Taylor left the room?

A.    No, I don't.

Q.    Was there any follow-up meetings or communications after that meeting about what happened?

A.    No.  No follow-up in reference to that meeting.

Q.    And you referenced another personal meeting with Joyce Zagacki?

A.    Yes.  That's when I personally went to her to let her know what I was experiencing with Crystal.

Q.    And you're not sure whether that meeting happened before or after the one with Linda Dutch?

A.    I think it probably came after, because when Linda worded the question to Crystal, she said, Crystal, are you giving Dywanna a problem?  Do you not like Dywanna?  So it sounds like that would be the initial meeting.

Page 94

D. BROADNAX

Q.    Okay.  Tell me about that conversation.  So it was just you -- let me take one step -- it was just you and Joyce Zagacki during the second personal meeting?

A.    Yes.  When I went to let her know that I'm still experiencing the torment from Crystal.

Q.    Tell me about what was said.

A.    I pretty much just let her know that Crystal was being antagonistic.  She gets off at 1:30 or one o'clock, and I come in at 2.  She would sit in the outpatient area just to antagonize me for the first 30 minutes of my shift.  I let Ms. Joyce know that she was doing that.  I let her know that -- she started to make me feel uncomfortable.  And, you know, can she have a talk with her.  When Crystal would do that, I would stand at the nurses' station for 30 minutes so I didn't have to be in the same office with her.  That's how bad it had gotten.

Q.    Did anyone tell you that Crystal Taylor would wait around for half an hour just to antagonize you?

A.    No.  But when I clocked in, she

Page 95

D. BROADNAX

would be in my area where she didn't work that day and do antagonistic behaviors.

Q.    Like what?

A.    Sarcastic remarks.  Subliminal references.

Q.    Tell me specifically what you heard Crystal Taylor say to you that you considered subliminal comments or sarcastic remarks.

A.    Yeah.  Sure.  The day of the incident, when I arrived to work, Crystal was there.  It was a Monday.  Part of my job was to check errors, and I checked errors Saturday morning, and I slid them under my supervisor's door for correct -- to let her know that I corrected almost 30 errors.

That Monday, Ms. Joyce called a meeting that I was unaware of, because I don't come in until the afternoon, and Ms. Joyce addressed the errors.

Q.    Ms. Broadnax, if you don't mind me jumping in --

A.    Yeah.

Q.    -- are you referring to now November 18, 2019?

Page 96

D. BROADNAX

A.    Yes, ma'am.

Q.    Okay.  We'll talk about that.

A.    Okay.

Q.    Before -- before that, were there any other -- any sarcastic remarks or subliminal comments that Crystal made?

A.    Would do to me while she would be in a space that --

Q.    Yes.

A.    -- led up to that?

Q.    Yes.

A.    Oh, yes.  She will say things -- she will imitate my voice.  That was one subliminal thing that she would do, imitate the tone of my voice, speaking to whoever else was in the room.

Q.    And how would she do that?

A.    Talk in a high-pitched soft tone.

Q.    Okay.

A.    Which is very antagonistic because you know that she's speaking to another coworker, but she's imitating my voice.

She would mimic things that I do when I arrived to work, as in sterilizing the outpatient area with bleach, and opening the

Page 97

D. BROADNAX

windows and just making sure things are ready for the second shift. She would do those things in my voice, and I would call it sarcasm, for the other employees. Again, in a way to get me to respond to her. So I started standing outside of the office so she would leave, at the nurse's station right beside us.

Q.   Did you ever respond?

A.   The day of the altercation, yes.

Q.   So is it accurate to say that before November 18, 2019, the day of the altercation, there were several incidents when Crystal Taylor -- that you observed Crystal Taylor was mimicking you or being sarcastic --

A.   Yes.

Q.   -- at your expense?

A.   Yes. It was always reported to Joyce.

Q.   So each time you heard a sarcastic remark or a subliminal comment by Crystal Taylor at your expense, you reported it to Joyce Zagacki?

A.   Yes.

Q.   So you had two meetings with Joyce

Page 98

D. BROADNAX

Zagacki, one in George Morrone's office and you wrote Suzana Hamza an email, you said?

A.    Yes.

Q.    So were there other communications with Joyce Zagacki other than those things?

A.    I would verbalize things to her, let her know -- walk over to her office:  Ms. Joyce, this is what's going on.  Ms. Joyce, this is what's happening.  This and this happened. Everything that -- what I felt was important, that needed to be in writing, I would put in writing, only because verbalizing it to my supervisor, nothing was happening.  So to protect myself, I have to put it in writing.  So I can't tell you specifically when I emailed or when I went to Joyce's office to tell her, like, okay, I'm feeling this kind of way because Crystal is doing X, Y, and Z.  I'm sorry.  I can't tell you that.

Q.    Can you tell me how many times you complained to Joyce Zagacki, either in writing or orally, about Crystal Taylor -- Crystal Taylor's behavior towards you?

A.    Within that seven-months?  It was

Page 99

D. BROADNAX

more than I've ever had to put a complaint about anything since I have been there in 14 years. So I can't tell you -- I apologize, but I can't tell you, because it was repeated. It was repeated. It was all new. I was already dealing with my own anxieties. I just had a stroke.

So the things that she was doing to me were new, post Naeemah's altercation, so I'm kind of being pulled in and I'm receiving the wrath of somebody else that I had nothing to do with or had no knowledge of. So I'm reporting it because it's increasing my own anxiety. And Crystal and I were always friendly. So that -- you know...

Q. Did you complain to Joyce Zagacki less than 10 times, more than 10 times?

A. I would say probably about between five to 10, yes.

(Whereupon, an off-the-record discussion was held.)

Q. And what was Joyce Zagacki's response?

A. So Ms. Joyce was a nontraditional supervisor. Her way, she would always say --

D. BROADNAX

have side conversation with you to make you feel better.  So she would always say things like, I'll deal with it, I'll talk to her.  Never -- never an appointment for a formal meeting with George or anything like that.  I'll deal with it, I'll talk to her.  And that was her way of, like, keeping things smooth or just letting each one of us know she's going to deal with it separately.  So I -- that's the best I can say about that.

Q.    Are you aware of Joyce Zagacki having any different form of response when someone else complained about Crystal Taylor?

A.    Yes.  She handled Shannon's situation differently than she handled mine.  She made sure she had meetings, and Crystal had gotten written up for a situation.  I can't remember the situation with Shannon, but I know she was written up for something with Shannon.  Shannon went as far as -- went as far as filing harassment charges with HR, with Crystal.

Q.    Okay.  You referenced Geniece.  What is your -- the basis of your knowledge about Joyce handling Geniece's situation differently?

D. BROADNAX

A.   I never said Ms. Geniece.  I never mentioned Ms. Geniece's name this entire time.

Q.   Oh, I'm sorry.  I though I heard "Geniece."

A.   No.

Q.   Who did you say Ms. Zagacki -- whose situation did you say Ms. Zagacki treated differently than yours?

A.   I said Shannon.

Q.   Shannon.  Okay.

A.   Because we do have a Geniece that had problems with Ms. Joyce, but I didn't mention her in this complaint.

Q.   Okay.  So, Shannon.

Do you know whether Joyce handled Shannon's complaints about Crystal Taylor differently than yours before Shannon went to HR?

A.   I don't know Crystal's reprimands. I don't know any of her business in that way, and I don't know Shannon's, either, but I do know Shannon filed complaints, went to Joyce, went as far as the HR over Crystal.  I can't tell you what Crystal's punishments or

Page 102

D. BROADNAX

reprimands were in reference to that.

Q.    But is it your understanding that Joyce Zagacki treated the situation with Shannon and Crystal differently after Shannon went to HR?

A.    Yes.  I would say so.

Q.    Okay.  Do you know whether Ms. Zagacki treated the situation between Shannon and Crystal differently before Shannon went to HR?

A.    I can't answer that.

Q.    And it's your understanding that Joyce Zagacki had a meeting with Shannon relating to Shannon's complaints about Crystal Taylor?

A.    Yes.

Q.    Okay.  And how is that different from the way Joyce handled your complaints about Crystal, given that she met with you, as well?

A.    Crystal got reprimanded, a write-up, like, you know, write-ups and suspensions.  I don't know Crystal's reprimands.  I can't speak on it, but I know Crystal would get written up. At times she would sign a write-up and address

Page 103

D. BROADNAX

it, and at times she would not.  I can't tell you that.  But I know situations that I had with Crystal, there were no reprimands or no write-ups.

Q.   Okay.  So you do not know whether or not Crystal got written up for her interactions with Shannon?

A.   She did.

Q.   Okay.  What is your basis for saying she did?

A.   Because I remember the conversation that -- Shannon is Italian and Filipino.  She went to the highest height to complain to HR. Her complaints got adhered to.  Mine didn't.  In terms of how Crystal treated her, I can't tell you if Crystal was written up, nor suspended.  I don't have that information.

Q.   Right.  So you don't know whether Crystal got written up for her interactions with Shannon?

A.   I know that there was something -- I know that she was reprimanded in some type of way.

Q.   Okay.  So it could have been orally,

Page 104

D. BROADNAX

not in writing?

A.    I can't answer that.  But I do know that it went to the highest level of human resources with Shannon's complaints.

Q.    And who told you that?

A.    Shannon.

Q.    And when did -- when did this happen, that Shannon went to HR to complain about Crystal?

A.    Shannon ultimately left.  I cannot tell you the years.  It's a blur.  Once I had the stroke in 2019, I don't remember a lot of things verbatim.  So I can't tell you when Shannon went to HR on Crystal, but I know that she did.

Q.    Do you know whether --

THE VIDEOGRAPHER:  The time is now 12:06.  This completes media unit number 1.

(A break was taken.)

THE VIDEOGRAPHER:  The time is now 12:24.  This begins media unit number 2.

Q.    Okay.  Before the break,

Page 105

D. BROADNAX

Ms. Broadnax, we were talking about Shannon, your coworker, complaining to HR about Crystal Taylor.  Do you remember that?

A.   Yes.

Q.   Do you know whether Shannon complained to HR before you filed the 2017 charge?

A.   Yes.

Q.   Okay.  So the incident wherein you're saying that you felt that Joyce Zagacki responded differently to Shannon's complaints about Crystal than Joyce Zagacki responded to yours about Crystal Taylor, that was all before your 2017 charge?

A.   Yes.

Q.   Do you know what the content of -- well, scratch that.

Do you know if Shannon complained to HR that Crystal Taylor was discriminating against her or retaliating against her?

A.   I want to say retaliating or discriminating.  But, again, I won't know what Shannon put in her complaint to HR.  It was more of a harassment.

Page 106

D. BROADNAX

Q.    What race is Shannon, as far as you know?

A.    She's mixed.  She's Filipino and Italian.

Q.    And Crystal is?

A.    Jamaican.

Q.    Jamaican?  And what is your race?

A.    African-American.

Q.    Do you know if Shannon had any other complaints about Crystal Taylor, other than what you talked about that occurred before your 2017 charge?

A.    No.

Q.    Did anyone else complain -- well, you said you thought it might be discrimination or retaliation, so -- but you don't know.

As far as you know, did anyone actually complain to Jefferson about discrimination or retaliation during your employment with Jefferson, other than you?

A.    I'm not sure.

Q.    Do you know whether Blondzell Skinner ever complained to anyone about discrimination or retaliation?

Page 107

D. BROADNAX

A.    I don't know anything about Ms. Blondzell complaining about retaliation, but I do know that she complained about discrimination.

Q.    To Jefferson?

A.    In terms of Joyce and George, yes. How far she went with her complaint, I'm not aware of.

Q.    And as far as you understood it from Blondzell, her allegation was that she -- there were personal issues with other coworkers who were not African-American?

A.    She worked in an area that was predominantly non-African-American. And she would feel as though they would blame her for mistakes that she didn't make, or blame her -- just put the blame on her often. These were not phlebotomists. These were like -- more like technicians. She would complain about the schedule to Ms. Joyce. What type of schedule was she in search for, I'm not sure, but I know it was particularly -- her and I, we spoke about the schedule. And whatever the basis is about her scheduling is the reason why she left.

Page 108

D. BROADNAX

Q.    Did she -- meaning Blondzell -- tell you who she thought was discriminating against her?

A.    Joyce.

Q.    Did she tell you why she thought Joyce was discriminating against her?

A.    It was in reference to the schedule. Ms. Blondzell is an older woman, so I think, like, maybe the rounding was too much for her. I'm guesstimating at this moment because I don't know what he put in her complaint.  But I know she did definitely talk to me about feeling discriminated against.

Q.    Based on her age?

A.    Age and race, I would say.  Because I know it was a problem with her early-morning schedule, 4 a.m. schedule.

Q.    And that conversation that you had with Blondzell, was in the first few months when you started in 2011?

A.    The -- remember, it was two conversations with Ms. Blondzell.  The one that I said that I had with her when I first returned in 2011, was her referencing my complaint from

Page 109

D. BROADNAX

2011, and why did I not get financial compensation.  Years later is when she came to me for the information for the PHRC, when she too started to feel discriminated again.

Q.    Right.  Thank you.  I didn't mean to try to trip you there.  I missed my notes.

So, yeah, you said between 2015 and 2016 was the second conversation?

A.    Yes.

Q.    Yeah.  Any other conversations with Blondzell about her feeling discriminated against?

A.    No.

Q.    Did Blondzell have any complaints about Crystal Taylor, as far as you know?

A.    The regular:  She get on my nerves, and she's so mean, and she hard to work with.  I don't want to go around there.  I rather stay in outpatients, the regular...

Q.    Do you know whether she ever articulated her complaints about Crystal Taylor to Joyce Zagacki?

A.    I don't know that.

Q.    Are you aware of anyone else, other

Page 110

D. BROADNAX

than you, complaining about Crystal Taylor's treatment of them?

A.    Am I aware of anyone else?

Q.    Complaining about Crystal Taylor's treatment of the complainer?

A.    Yes.

Q.    Who else complained?

A.    Shannon.  Hugh.  Victoria. Margarita.  Ms. Alma.  Julia.

Q.    And, as far as you know, did each of those individuals complain to Joyce Zagacki?

A.    Yes, ma'am.  As well as Naeemah, of course.

Q.    And are you aware of Joyce Zagacki -- excuse me -- are you aware of Joyce Zagacki's responses to any of the complaints about Crystal Taylor?

A.    I'm not, no.

Q.    I'm going to ask some background information about you.  We got into the facts of the case, but I want to -- where is your current residence?

A.    New Castle, Delaware.

Q.    Have you ever been married?

Page 111

D. BROADNAX

A.    No, ma'am.

Q.    Do you have children?

A.    Yes.

Q.    How many?

A.    One.

Q.    What gender?

A.    Male.

Q.    And how old is he?

A.    Twenty-five.

Q.    Does he live with you?

A.    Not at the moment.

Q.    When was the last time he lived with you?

MS. COHEN:  Do you want to ask me a question?

THE WITNESS:  I mean, is that relevant?

MR. SMITH:  Just give the time.

MS. COHEN:  For a deposition, yes.

A.    Okay.  2019.  I'm sorry.  2018.  I apologize.

Q.    When in 2018?

A.    February 2018.

Page 112

D. BROADNAX

Q.   Did you grow up in Philadelphia?

A.   Yes.

Q.   Have you ever been deposed before?

A.   Yes.

Q.   When?

A.   I was in a car accident in 2013.

Q.   You were in a car accident in 2013?

A.   Yes.  I was hit by a car.

Q.   And you were deposed in connection with that?

A.   I'm almost positive it was a deposition, yes.

Q.   Were you represented by an attorney?

A.   Yes, I was.

Q.   Who were you represented by?

A.   What is his name?  He's all over TV.

          MS. COHEN:  If you think of it, you can mention it.

A.   Yeah, I can't think of his name right now, but he's all over TV.

Q.   Okay.  But we're not going to hear you if you --

A.   He's all over TV.  I can't think of his name at the moment.  I apologize.

Page 113

D. BROADNAX

Q.    Okay.  Did that lawsuit -- did you institute a lawsuit?

A.    Yes, ma'am.

MS. COHEN:  Does he have funny-looking hair?

THE WITNESS:  The tall guy.

MS. MOYLAN:  That's okay.  It's fine.

Q.    Did that lawsuit resolve?

A.    Yes, ma'am.

Q.    And did it go to trial?

A.    It was settled.

Q.    And you filed a criminal complaint arising from the fistfight you had with Ms. Taylor, right?

A.    Yes, ma'am.

Q.    And what were the charges that were ultimately brought against Ms. Taylor, as far as you know?

A.    Simple assault, as far as I know.

Q.    And you've given sworn testimony in that matter?

A.    Yes, I did.

Q.    On how many occasions?

Page 114

D. BROADNAX

A.    One.

Q.    And the court ruled on those charges on April 25, 2022, right?

A.    I was not there for her sentencing. I was there for when we went to court.

Q.    When you say "her sentencing," do you know that Ms. Taylor was found not guilty?

A.    No, I didn't know that.

Q.    She was.  She was found not guilty.

Okay.  So you were not present when the judge said she was not guilty?

A.    No, I was not.

Q.    Other than the criminal complaint in which you were involved against Ms. Taylor, arising from the fistfight you had with her, have you ever been party to any other action or lawsuit, obviously other than this one and the 2011 and 2017 charges?

A.    No.

Q.    And your motor vehicle accident. Okay.

After your termination from Jefferson in November of 2019, did you file for unemployment?

A.    Yes, I did.

Page 115

D. BROADNAX

Q.    Were you granted unemployment?

A.    Yes, I was.

Q.    What did you state as to the reason why you were terminated from Jefferson?

A.    I let them know that I was assaulted at work and got into a fistfight.

Q.    Are you aware of Jefferson providing a reason to the Unemployment Compensation Board as to why you were terminated?

A.    Am I aware of the reason?  I'm not -- I don't think I ever got their reason, what they said to Unemployment.

Q.    Were you represented by an attorney in that process?

A.    No, I wasn't.

Q.    And at some point in the past you filed for Social Security benefits, right?

A.    Prior to the altercation, yes.

Q.    When was the first time you began to receive Social Security benefits?

A.    Shortly after my heart surgery in 2009.

Q.    In connection with receiving Social Security benefits, was your ability to work

Page 116

D. BROADNAX

limited?

A.   Yes.

Q.   In what way?

A.   You're asking me, was my ability to work limited from Social Security or from my diagnosis?

Q.   Let's start with Social Security.

A.   So from the time that you begin receiving benefits, your -- and what they call a trial work period, where they allow you to work as many hours as you are entitled for a certain amount of time, and that's called your trial work period.

Q.   What do you mean "as many hours as you're entitled"?

A.   So it's called a trial work period, meaning, like, you can work up to 40 hours a week like a normal full-time job.  If they see that you're not able to do 40 hours a week, based off your diagnosis, they will have you document it as -- I don't know the terminology for it --

Q.   Yeah, I'm just asking for your understanding.

Page 117

D. BROADNAX

A.    -- unable to sustain work.  I don't know the -- how they word it, but -- and you get this evaluation maybe every year or two.  They follow you to see if you are able to do substantial work.  And if not, they allow you to work, but you can't go over a certain amount of money a month.  And that's where I fell.

Q.    Okay.  The certain amount of money after the trial work period -- well, let me take a step back.

How long do you recall the trial work period being?

A.    I want to say three years.  It could be.  It could go on -- but it can be intermittent.  It doesn't have to be, like, a straight three years.  It can be intermittent.  You may take time off, but it's still counted as the three years.  When they see that you're not able to do substantial work, up to full-time job, they will allow you to work a certain amount of hours as long as you don't exceed whatever the amount that was agreed upon.

Q.    Okay.  And the amount, you mean compensation.  You are limited in the amount of

Page 118

D. BROADNAX

compensation you can earn?

A.   I was limited in the compensation that I'm able to earn, based off of the Social Security that I receive monthly, and the fact that I was unable to do substantial work up to 40 hours a week.

Q.   And did that limit in compensation change at any time during your employment at Jefferson?

A.   Did it change?

Q.   Yes.

A.   No.  I always had to stay within the realm of what I was told to stay in.

Q.   And what was that?

A.   Each year Social Security goes up a few -- like a few dollars.  So I will get a new -- when I left Jefferson, I think I couldn't make more than 1080 biweekly.  I wasn't able to make more than that.

Q.   And you had communications with Joyce Zagacki about your -- the amount of money that you were able to earn and still get Social Security, right?

A.   Yes.

Page 119

D. BROADNAX

Q.    And Ms. Zagacki accommodated your need to keep the compensation below a certain level, right?

A.    So I want to say she accommodated it for that reason.  But my shift was accommodated at some point, yes.

Q.    So you can't say why Ms. Zagacki accommodated you?

A.    No.

Q.    But do you agree that Ms. Zagacki did accommodate you and give you the schedule -- the -- give you a schedule that would keep you under -- earning under the amount that you were allowed to earn for Social Security benefits?

A.    So, number one, I never disclosed my financial information outside of Jefferson, with Ms. Zagacki, so, no, she did not accommodate me to fall in a realm of me -- financially through Social Security.

She accommodated me for my limited conditions with my diagnosis.  I've learned -- I had to learn over the years not to share too much private information, and me disclosing Social Security benefits, which is my live -- a

Page 120

D. BROADNAX

portion of my livelihood to Joyce would have just ostracized me even more.  And so, no, I never let her know I'm only allowed to make this amount of money a month.

Q.    Did you communicate with Ms. Zagacki that you were only able to work a certain number of hours?

A.    Yes.

Q.    Okay.  And Ms. Zagacki accommodated your request to only work a certain number of hours a week?

A.    During the 81 days that my mother was terminally ill, she did accommodate me towards the end, yes.

Q.    Were there times when you asked Ms. Zagacki to work only up to a certain number of hours in a week, and Ms. Zagacki did not accommodate you?

A.    No.  She always accommodated me in any event that I needed to reduce my hours, whether it's health reasons or family reasons. My schedule was only accommodated one time.

Q.    What do you mean by that?

A.    So if you're referencing the most

Page 121

D. BROADNAX

recent schedule I had at the time of my termination, I was doing maybe 12 to 16 hours a week, three days a week, and that came post the passing of my mother, and I stuck with it because I started to develop other type of anxieties, work-related, before the altercation with Crystal.

And if I can just touch base on why. When I lost my mother, having had been an employee there for 10-plus years, I didn't feel supported, which led to me having anxiety being around the coworkers that already caused me anxiety, but now I'm dealing with the death of my mom. And in that moment, I went to Joyce to explain to her my anxiety, and she said that, you know -- her exact words to me is: I'm not your mother, and I can't direct you on how to handle this. Which I took offensively.

Q. When was this conversation?

A. It was before the claim in September of 2017, and after I lost my mom in 2016. So within a year.

Q. What were the 81 days that you referenced? When was that in 2016?

Page 122

D. BROADNAX

A.    June 6th to August 31st.

Q.    Okay.  So I'm not sure I understand. You said Joyce Zagacki always accommodated you when you requested to work a certain number of hours, so you would get Social Security.  But then you said there was only one accommodation request?

A.    Because I came back as a part-time employee, as it is.  So this particular request that I made towards the end of my mother's illness, was that -- because I worked all the way through, was that I can come in three to seven versus one to seven, to avoid the day shift that was causing the anxieties.  That was accommodated, and that was 12 hours a week. Some weeks it would be 14 -- I mean, 16 because the opposite Saturday I would work four hours.

Q.    Okay.  When -- that was when you first came back that you wanted the three-to-seven shift, instead of the one-to-seven shift to avoid the day shift?

A.    No, ma'am.

Q.    When was that?

A.    During the time that I was losing my

Page 123

D. BROADNAX

mother.

Q.   Okay.  So there was more than --

Okay.  So you came back part-time in 2011.
What was your schedule then?

A.   When I returned back part-time, I
was still in community college, so the first
schedule that was given to me was every weekend,
meaning I come in every Friday, every Saturday,
and every Sunday.  And I did that for about two
years.

Q.   And that was to accommodate your --

A.   School schedule.

Q.   -- schooling?  Uh-huh.

A.   And that was also what was available
because like I said, when I returned, she had a
phlebotomy team of ten phlebotomists already
that she was rotating, so I kind of got fit in
because of the lawsuit.

Q.   Okay.  How long did you have that
schedule, Friday, Saturday, Sunday?

A.   That went on for about two years
straight.  And then I switched the schedule to
Monday, Wednesday, Friday, because my classes
were on Tuesdays and Thursdays.

Page 124

D. BROADNAX

Q.    Okay.  So -- and how long did that Monday, Wednesday, Friday schedule go?

A.    Until I was fired, but at times it altered over the years.  I have a -- I submitted a Social Security payment over the last 10 years, I guess, or more.  And if you look at 2005, when I was hired, to 2019, and if you look at the years of 2011 to 2019 when I came, you'll see the difference in yearly annual income, which would indicate how many hours I was working at the time.  And they reduced all the way to 2019.

So my first two years was like 35 hours a week.  Then it went to 30 hours a week.  Then it went to 25 hours.  Then it went to 20.  It ultimately went down to 12.

And a lot of this had to do with I experienced health crisis during those years.  The problems I was having with staff.  I would make -- I would have conversations with my primary doctor, and maybe I would take time off.  It was so many factors why my schedule would get altered.

Q.    Okay.  But it's not your contention

Page 125

D. BROADNAX

that your schedule was altered because of some retaliatory animus against you?

A.   My schedules were altered by my request.

Q.   And it was Joyce Zagacki who fulfilled your request?

A.   Yes.

Q.   Have you ever been arrested?

A.   No, ma'am.

Q.   I've seen the term "phlebotomy clerk," and I've seen the term "laboratory assistant."

A.   Yes.

Q.   Do you -- is there some difference between the two, as far as you consider them?

A.   Yes.

Q.   I'm sorry?

A.   Yes.  A phlebotomy clerk is a front-office phlebotomist who greets patients and collects specimens on outpatients.  A lab assistant is a phlebotomist who can work the outpatient area but also go to the central receiving lab and process specimens.

When I began in 2005, our title, even

D. BROADNAX

Joyce Zagacki's title, was a phlebotomy clerk. It wasn't until our current supervisor, Carol Delaney resigned and put Joyce without training into the supervisor position.

Q.   That what?

A.   What I'm saying is that we switched -- once Joyce got into the position as supervisor, we got a new lab manager, Diane Schrader, and she gave us the respectful title of lab assistant, with more duties.

Q.   So what was your title when you returned in 2011?

A.   I was a clinical lab assistant.

Q.   And that's different from a lab assistant or --

A.   It's the same thing.

Q.   And you said a phlebotomy clerk was a front-desk phlebotomist who greets patients. Anything else?

A.   You greet the outpatients as they come in for outpatient testing.  As a phlebotomy clerk, we were cross-trained to do -- send out and receiving.  The title changed when we got new management.  The responsibilities, the

Page 127

D. BROADNAX

skills set and everything remained the same.  It was just the title that was changed.

Q.    You've claimed that, in this lawsuit, that you are not trained in certain areas, right?

A.    Correct.

Q.    If you were trained in those areas, would it have been your expectation that your title would have changed?

A.    No, ma'am.

Can I clarify?

Q.    Sure.

A.    So prior to me leaving and taking my leave in 2008, I did perform all functions and duties of both areas, outpatient and central receiving, as a phlebotomy clerk.  It wasn't until we got new management, who gave us the title of clinical lab assistants.  So although the titles are different, they were categorized as -- they call it the STAT lab, and they call it the front office.  So I guess because we had the greeting factor, is where the clerk came in.  But the duties that we were responsible for doing, Ms. Schrader felt as though she wanted to

Page 128

D. BROADNAX

change our title to lab assistants.

Q.   Okay.  So does your answer change if I ask you -- again, you claim that you were not trained in certain areas.  Is it your expectation that your title would have changed had you been trained in those areas?

A.   Well, just to answer your question, I was trained prior to leaving.

Q.   Right.

A.   When I returned in 2011, I was not retrained.

Q.   Right.

A.   No, the title would not have changed.

Q.   Okay.  And it's your contention that you needed to be retrained?

A.   Yes, ma'am.

Q.   And did somebody tell you that you needed to be retrained to do those responsibilities?

A.   Yes, ma'am.

Q.   Who told you that?

A.   Lindsey D'Elia, the coordinator, and Joyce Zagacki, the supervisor.

Page 129

D. BROADNAX

Q.    All right.  We will get into the training more in a little bit.

Do you know where Diane Schrader was in the hierarchy as far as Joyce Zagacki?  Did Joyce -- in other words, did Joyce report to her?  Were they peers?

A.    Yes.  Diane Schrader was the lab manager, the same way George Morrone is the lab manager right now.  That would be Joyce's immediate supervisor.

Q.    And did George Morrone then replace Diane Schrader?

A.    No.  There was a -- Joe Rasinski, he replaced Diane Schrader -- Schrager.  And he was very lucrative in making sure that I got hired.

Q.    And did Morrone replace Joe?

A.    Yes.

Q.    When did George Morrone replace Joe, as far as you know?

A.    I know the day that we went to the hearing for the PHRC, Joe and Joyce was there, and Joe said, I'm happy to bring you on.  He made sure I got my job back.  And he said, But you won't see me because today is my last day.

Page 130

D. BROADNAX

So whatever date that was is when Joe left.  I can't tell you.

We had one small supervisor between.  Her name was Maggie.  She didn't stay long, about six months, and that's when George came.

Q.   Okay.  Let's get back to what you were talking about.  I realize I didn't ask you about the other meetings that you had with -- well, the other meetings that you had with Jefferson about Crystal Taylor.

So you had two meetings with Joyce Zagacki, one of which was attended by Linda Dutch.  You had one with Joyce Zagacki alone. And then you referenced a meeting in George Morrone's office about Crystal Taylor.

A.   Yes.

Q.   Tell me about that.

A.   I went to George.  At this point I think I was being insubordinate by going over my supervisor's head, but I had to convey to George what I was experiencing.  He didn't give me too much feedback, but I know that he said he would look into it with Joyce, and that's where it was left.  But -- and it got to a point where I felt

Page 131

D. BROADNAX

like I needed to verbalize it to management higher than Joyce.  That's what made me go to George's office.

Q.    Okay.  When was this?

A.    It was the year of 2019, I'm pretty sure.

Q.    Okay.  But you can't place it any --

A.    I'm sorry.

Q.    -- better than that?

A.    No, ma'am.

Q.    And you had no concept of how close it was to your termination that you complained to George Morrone?

A.    It was warm outside when I complained to George and I got fired in the winter.  So months before.

Q.    And this meeting with George Morrone was after the two meetings you had with Joyce Zagacki?

A.    This was in the complaining stage, when I would tell Ms. Joyce what Crystal was doing to me, and things weren't getting done or handled, or in my eyes they were still happening.  And I went to George.  So I would

Page 132

D. BROADNAX

think -- it definitely was before the meeting with Ms. Joyce and Linda, because I would have been able to reference to George that we already had a meeting before.  So it was before that.

Q.    The two meetings with Joyce Zagacki, one was attended by Linda Dutch, and then you had the meeting with George Morrone?

A.    Yes.

Q.    Tell me the order that you think those happened.

A.    I went to George to complain first, because I had verbalized complaints to Joyce about Crystal's behavior towards me that were going unanswered.

Then I had the formal meeting with Linda, Joyce, and Crystal, where Crystal walked out of the meeting.  After I returned from my recovery.

And then it was another time that I sat -- I actually sat with Ms. Joyce before Crystal, Linda, and I had the meeting.  It wasn't news to Ms. Joyce, that's why I think Ms. Joyce didn't oppose Linda sitting in on a meeting as a witness to what my complaints were and how the meeting would go.

Page 133

D. BROADNAX

Q.    And you don't know when those two meetings with Joyce Zagacki happened?

A.    No, ma'am.  I'm sorry, I can't.  But it was the year 2019.  This all happened in that return time to termination.

Q.    Right.  Do you know if it was warm outside when you met with Ms. Joyce?

A.    Well, I kind of returned in the spring, so I would say it was warm, yes.

Q.    Okay.  And what do you -- what do you recall saying to George Morrone when you met with him?

A.    I'm having problems with Crystal, and they are causing me anxiety.  She's creating a hostile work environment.

I let them know that I never had problems with Crystal in the past, and, you know, I don't know what to do.

I even talked to him about transferring me to a different location, if he had any help involved with helping me get to the main hospital instead of the Methodist location.  I voiced that to him in the meeting, as well.

Q.    And what did he say in response?

Page 134

D. BROADNAX

A.   He's going to talk it over with Joyce.  He was unaware that these things were going on.

Can I say something?  Can I add something?

When I had my hearing at the PHRC, which the lab manager and Joyce was a part of, Joe Rasinski said, on record at the meeting, he had no idea that I was trying to get my job back for over a year.  So that meant all the calling and popping up to the hospital, trying to get my job back through Joyce, she never let the lab manager know.  And Joe let me know that at the hearing.

Q.   And those calls and everything to the hospital, they were before you filed the 2011 charge, right?

A.   Yes, ma'am.  It was the whole year, 2009 and 2010.

Q.   Was anything else said between you and George Morrone during this conversation that you were just referencing, wherein you complained about Crystal?

A.   No.

Q.   And no one else was a witness to

Page 135

D. BROADNAX

that?

A.   No.

Q.   Did you have any conversations or communications, even email, with George Morrone about Crystal Taylor?

A.   I'm pretty sure I definitely attached George on all the emails that I sent to Joyce.

Q.   Okay.  All the emails that you sent to Joyce, how many emails do you believe you sent to Joyce complaining about Crystal?

A.   I'm sorry.  I can't answer that.

Q.   Any estimate?

A.   I don't want to give an estimate on record and be wrong, but I know that I was instructed by the PHRC to complain of anything that I felt was retaliatory or discriminatory. And I always expressed it to Joyce when things started getting too hot for me to handle.  I would attach George in the emails just because of what Joe said at the hearing, when Joe said, Dywanna, I was unaware that you were trying to get your job back.  So that let me know that Joyce doesn't always report to management.

Page 136

D. BROADNAX

Q.    Right.  But I'm talking about your complaints about Crystal Taylor.

A.    And I said that I can't tell you how many times I emailed Joyce about it.  That's my honest answer.

Q.    Right.  Do you think it's less than five, more than five?

A.    It would fall in the ballpark between, I would say, one and six.  Because let's not forget, I would always verbalize things to Ms. Joyce as well.

Q.    Did you ever complain to Ms. Joyce that you felt that you were being retaliated against for filing the charge in 2017?

A.    I never had the heart to talk to her face-to-face about it, because we had the face-to-face hearing, but to tell her face-to-face I'm feeling retaliated against -- I did let Ms. Joyce know about the alliances that were against me, and she told me she can't engage into employee situations, we have to work that out amongst ourselves, which, to me, I thought that she would protect me in that way and allow them -- speak to them -- allow them to

Page 137

D. BROADNAX

start including me, but instead she would -- it was almost like she would encourage how they treated me and not reprimand them in that way to tell them to be inclusive.

So in my mind it was always, like, okay for them to do what they do, and I reported it, and because what her and I had personally, I didn't even want to put a complaint in against her.

Another employee told me at my son's school, Why aren't you back in? I said, She said it's a hiring freeze. She said, No, Dywanna, they have a whole phlebotomy team. And that hurt my feelings really bad. That's why my sociology professor gave me the information for the PHRC. But it was almost like Joyce encouraged them to be the way they would be to me, because it was just wrong. And I would tell her. And I got a response, I'm not your mother. I can't control what kind of birthday parties they have. If they don't want to invite you, that's not my fault. But as a supervisor, you're supposed to make us all feel equal.

So those are things that I would feel from her, that I felt like she was okay with me being

Page 138

D. BROADNAX

ostracized and isolated and separated from the narrative that she put out against me, until each one of those people who were against me started having their own problems and coming to me for the same reasons and ultimately quit, left, and got new jobs just to get away from what I was experiencing.

Q.    And you're saying problems with Crystal Taylor?

A.    And Joyce Zagacki as well.

Q.    Okay.  What were the complaints that people had about Joyce Zagacki that you say they left?

A.    She's unfair, she's, you know, racist.  None of the Italian coworkers never experienced anything that me, Ms. Blondzell, Lisa, who was Joyce's puppet -- Lisa is a wrong leader, and that's what made Lisa start confiding about me about the first couple of years that I was there, what was going on.  And it was being controlled by Lindsey and Joyce, but it wasn't until Lisa started having her own problems with Joyce, then she would confide in me and let me know those things, and allow Lisa to think she's being a good worker to her new

Page 139

D. BROADNAX

supervisor, to act out on isolating me or keeping me separated.  It makes no reason or sense.  If I'm here -- been here, when I'm not a part of employee meetings and her ask you for -- you know everything, Dywanna, this doesn't apply to you, well, still allow me to feel included with my peers, because I always felt like the conversations about me would go on at the meetings.

Q.   Did you, other than filing the charge in 2011 and the charge in 2017, did you ever complain about discrimination to someone at Jefferson?

A.   I never complained about anything. I just had to learn the culture that was blatant racism and that it was okay before I got sick in 2008 and had to take a leave.  I had to learn the culture at Methodist Hospital, and once I learned it, I had to -- this is just how these people are.  And that was just how I felt.

Q.   Okay.  So I just want to make sure. So you, other than the 2011 charge and the 2017 charge, you did not complain about discrimination at Jefferson?

Page 140

D. BROADNAX

A.    No.

Q.    Did you ever complain about retaliation, other than filing the 2011 and 2017 charge?

A.    The 2011 complaint was not about retaliation.

Q.    Okay.  So 2017, the charge was about retaliation, right?

A.    Yes.

Q.    Did you complain to Jefferson about retaliation, other than filing that 2017 charge?

A.    No -- I'm confused.  When I filed my complaint in 2011, I felt discriminated against. My lupus condition -- I was diagnosed with lupus a year after I started working there.  So I felt discriminated against my condition, because I felt like Joyce didn't want to give me my job back because I was going to keep -- have to take FMLA leaves.  So that was a way I felt discriminated.  I felt retaliated against because she was angry with me for making the complaint.  So that's why discrimination and retaliation was a part of my 2011 complaint.

2017, when I found out I wasn't paid into

Page 141

D. BROADNAX

my retirement fund, I completely felt like it was retaliatory because how is it that the new hires who don't even have nearly the amount of experience as me, how are they paying into their retirement fund?  How is it that I'm working 20 hours a week, and I went to Joyce to ask her, Joyce, I'm allowed benefits.  You know, I need some benefits.  I need my benefits.

Well, you don't qualify.

Well, Joyce, you qualify at 20 hours. When I first came back I was doing 35, then I went down to 30, then I went down to 25, and now I'm at 20.  And she works -- she has three kids. She told me to apply for Obamacare -- when it's clear that my coworker is doing the same amount of hours that I was denied, health coverage.

(Whereupon, an off-the-record discussion was held.)

A.    So the answer to those questions, that's how I came up with retaliatory --

Q.    Right.

A.    -- and discrimination.

Q.    And I do understand that you have -- have feelings that you were discriminated

Page 142

D. BROADNAX

against and retaliated against, as you just articulated.

My question was: Did you complain to Jefferson about retaliation, other than filing the 2017 charge?

A.    In those years that I came back from 2011 to 2017, I can't be sure if I sent an email about how I was being treated, but I know I did reach out to the PHRC to tell them how I was being treated, and she told me to keep track of it, and if I needed to make another complaint, come back and make it.

Q.    Okay.  And was that when you complained -- what -- you're talking about you can't remember when it happened.  Did you actually complain and articulate that you felt you were being retaliated against for filing -- for complaining about discrimination?

A.    Yes.

Q.    Okay.  And there was some email that you said you sent, wherein you complained that you felt like you were being retaliated against for complaining about discrimination?

A.    I can't recollect when, but within

Page 143

D. BROADNAX

those five years.  When we turned in the second complaint, I'm pretty sure I sent an email. Yes, I did.

Q.   Okay.  So let me make sure I -- just make sure I understand.

So you believe that you sent an email between 2011 and 2017?

A.   Yes.

Q.   To whom?

A.   It would be HR.

Q.   Okay.  To Suzana Hamza?

A.   Yes.

Q.   And you believe that you sent an email to Suzana Hamza sometime between 2011 and 2017, complaining that you felt you were being retaliated against for filing the 2011 charge?

A.   Yes, ma'am.

Q.   Okay.  And your recollection is that you actually said, I feel like I was being retaliated against for filing the charge?

A.   I definitely said that.

Q.   Okay.  What was the outcome of that?

A.   There was never an outcome to any

Page 144

D. BROADNAX

email I ever sent.  I never had a meeting with HR.  Nobody never called me to ask me questions ever.

Q.    Other than that email -- during your employment with Jefferson, other than the email and the December 2017 charge, did you claim about retaliation to Jefferson?

A.    After the 2017 complaint?

Q.    Yeah, I'm talking -- you alleged retaliation against Jefferson in 2017 in that charge, and in the complaint.  And you also said you believe that you sent an email to Suzana Hamza complaining about retaliation between 2011 and 2017?

A.    Yes.  At some point, yes.

Q.    Is there any other time that you believed that you complained about retaliation to Jefferson, during your employment?

A.    Possibly when I found out that I wasn't receiving my retirement fund, after I spoke with HR billing department, and my supervisor, I'm pretty sure I may have sent an email about it, because I was really upset about it.

Page 145

D. BROADNAX

Q.   Okay.  And that was in September or so of 2017, right?

A.   Yes.

Q.   And who do you believe you complained to --

A.   HR.

Q.   -- that you -- okay.  Let me just finish the question.

A.   Sorry.

Q.   You believe that you complained to Suzana Hamza via email, that you were not signed up for retirement because of some retaliatory animus for you filing the 2011 charge?

A.   I can't tell you if that's how I worded it, but I know I'm sure I sent an email about it because not just the lab coordinator, Lindsey, Joyce, payroll, and HR were all pointing a finger at each other, saying it was her job to take you, her job, her job.  But either way, I still was without it, and I didn't know.

Q.   Right.  Okay.  But you believe, however you phrased it, you believe that you said to Suzana Hamza in an email:  I think I

Page 146

D. BROADNAX

wasn't told about my retirement because I filed the 2011 charge?  Or were you just complaining about not -- you know, that you weren't told about --

A.    I'm pretty sure I gave the reason. I'm pretty sure I gave the reason.

Q.    And your only communication was via email?

A.    Yes.

Q.    So a whole bunch of people were pointing the finger at each other, that the other person should know, right?

A.    Lindsey should have taken me to do my new-hire packet.  Joyce is in charge of doing your new-hire packet.  HR is supposed to do your new-hire packet.  Rehire, new hire, whatever they considered me at the time.

Q.    Do you believe that each of those people were telling you different things about who was responsible for telling you how to enroll in retirement or that you could enroll in retirement, do you believe that each of those people had retaliatory animus against you for filing a complaint?

Page 147

D. BROADNAX

A.    No.  I just don't think that it was handled correctly.  Because I did my own investigation where I went and asked each new employee how did they get enrolled into their retirement fund, and they said, Oh, because I went to orientation.

When I came back in 2011, there was no orientation for me, no new-hire packet or rehire packet.  They just put me straight back to work.

Q.    Do you know who made the decision, if there was a decision, as to whether or not you should be given a new-hire packet?

A.    I had been gone almost three years.  I would assume that I would get a rehire packet.

Q.    No.  My question is:  Do you know who is responsible for ensuring that you get a new-hire packet when you came back in 2011?

A.    I would assume it would be Joyce, but we had a lady in a new position, which was the coordinator, which was Lindsey.  And Lindsey had became responsible in that position for a lot of things.  Apparently, it just didn't happen with me.

Q.    Do you know whose responsibility it

Page 148

D. BROADNAX

is at Jefferson to inform you about your eligibility to enroll in retirement accounts?

A.    It would be my supervisor or the coordinator.

Q.    Joyce Zagacki?

A.    Yes, ma'am.

Q.    Or Lindsey?

A.    Or Lindsey, yes.

Q.    And what is the basis for your knowledge or your belief that it was either Joyce or Lindsey's responsibility to tell you if you were eligible for retirement package?

A.    Typically, when you get a new job or you start a job, you're always instructed by management or leadership on how to navigate employee benefits.

Q.    Okay.  But -- okay.  So that's the basis for your knowledge, that your belief that, typically, it's management that tells you that?

A.    Leadership, management, yes.

Q.    Okay.  But at Jefferson, do you have any idea, based on something somebody told you at Jefferson, what you observed with other people at Jefferson, as to who was responsible

D. BROADNAX

for telling you as to whether or not you are eligible to enroll in a retirement account?

A.    Well, I can read the eligibility requirements myself --

Q.    Right.

A.    -- so I knew I was eligible.

And then, like I said, the new hires that would come in, they all had the benefits.  And that's how I found out that Joyce blatantly denied me health coverage for the first four years of my return, and told me I wasn't eligible, when we got a -- hired a person who had three children, only working 20 hours a week, she pulled it up on her benefit query and she showed me that anything over 20 hours makes you eligible.  And I have an email where I sent to Joyce, because after she told me to apply for Obamacare, I sent her an email and told her that I thought it was offensive for her to say that to me.  But at the time, I didn't know my work hours that I was working at the time, that I was eligible.

Q.    Okay.  But there were -- there was information available to you during your

Page 150

D. BROADNAX

employment with Jefferson that told you whether or not you met the eligibility requirements for -- to enroll in a retirement account, right?

A.   We would get a new enrollment packet each year.  So at the end of the year, to change your benefits in whatever kind of way.  I never knew that I was not enrolled for me to engage or even investigate the new benefits.  I knew that I received Social Security and I'm covered by Medicare for my health benefits.  However, I do know I wanted sick time and personal time to accrue; that's why my main concern was I wanted to be -- start receiving benefits from Methodist again.  And I was denied that.  But I found out that wasn't true.

Q.   Okay.  There's a whole lot in your answer there.

So you would receive a new enrollment packet every year when you were at Jefferson; is that right?

A.   But I never received it.  Once I -- once you get information, whether they send it to you at home, in the mail, or whether it comes through in an email, or you may see Post-its

Page 151

D. BROADNAX

around the hospital, Benefit Enrollment, Benefit Enrollment.  Because I was denied initially, when I first came back, when I inquired about it, if they were applied to me to go investigate my 401k because I thought that it was something automatically done when you are hired, not that it's done during orientation, not that you have to specifically go down and change everything.  I thought this was just a part of the hiring process.  They automatically put you into -- I don't know what it's called -- a retirement fund.  And you have to choose what it is that you want to match.

I did all of that in my beginning years before my leave.  So when they brought me back, I assumed that it was just -- I'll put in, like, administration, not by me physically having to detail it myself and do it.  And if I did, I thought I would be instructed by my manager, my supervisor, or the coordinator.  That wasn't done, but it was done for everybody else who came after me.

Q.   Everybody else who came after you, they had not been employed by Jefferson before

Page 152

D. BROADNAX

they came, right?

A.     No.  No.

Q.     And --

A.     One person.  I'm sorry to cut you off.  Victoria Dejesse resigned before I went on my leave, and when I came back, she was there with full benefits.

Q.     Did you ever ask anyone, when you came back, as to whether or not you needed to enroll again?

A.     No, I didn't.  It wasn't until 2017 that it was a topic of discussion, and I asked Crystal to look at my pay stub.  And the people -- Janet, Crystal, everybody was looking at my pay stub and saying, You're not paying into your retirement fund.  And then I dug a little bit deeper, and I found out, since I returned, I had not paid into the retirement fund.

Q.     Right.  So Crystal and whoever else you were referring to, looked at your pay stub, and they could tell from your pay stub that you were not --

A.     Right.

Page 153

D. BROADNAX

Q.   -- contributing to a retirement account, right?

A.   Yes.

Q.   And that information was available to you on your pay stub, as well, correct?

A.   But if I don't know what I'm looking for, I won't know what to look for to see if it's there or if it's not.

Q.   Okay.  So when you come back in 2011, you assumed that everything would be reinstated the way it was before, without you doing everything else?

A.   Pretty much, yes.

Q.   And no one from Jefferson told you that it would be automatically reinstated, correct?

A.   No.

Q.   Victoria Dejesse --

A.   Dejesse.

Q.   Dejesse.

A.   D-E-J-E-S-S-E.

Q.   Okay.  And what is the basis for your statement that she received full benefits?

A.   Before I left in 2008, Vicky

Page 154

D. BROADNAX

resigned and went to Orlando.  While I was out, Vicky returned.  Vicky was the only person that was a friend to me before she left again.  And she let me know, you know, the ins and outs of what she can help me with, because she was my only resourceful person I could talk to on my shift.  And Vicky let me know she was back full time.  She told me what she was making.  And she was -- you know, she had full benefits.  Now, how she obtained them when she returned, did she go through new orientation, reorientation, I don't know all of that.

Q.   And when you said while you were out, Victoria returned.  So that was between the 2008 and 2011 time period?

A.   Yes.

Q.   Okay.

A.   And when I called Joyce one time inquiring about my position, you know what she whispered on the phone?  She said, You know who wants to come back, don't you?

I said, who?

Victoria.

I said, okay.

Page 155

D. BROADNAX

I don't know, you know.  She left us and went to Orlando.

I'm on leave, I'm not even working there, and she's sharing this information with me about Vicky wanting to come back.

Q.   Okay.  All right.  Oh, let's see. Okay.

So you don't know whether Victoria received a new-hire packet when she came back?

A.   No, ma'am.

Q.   And you don't know whether she went through any kind of orientation.

A.   No, I don't.

Q.   And nobody ever told you from Jefferson that it was Joyce Zagacki's responsibility to inform you about your eligibility to enroll in retirement, right?

A.   No.

Q.   And no one ever told you that it was Lindsey's responsibility to tell you whether or not you were eligible to enroll in retirement, correct?

A.   No.  Nobody told me.

Q.   Nobody told you.  Okay.

Page 156

D. BROADNAX

Did anybody from Jefferson tell you whose responsibility it was to tell you whether or not you were eligible to enroll in benefits and retirement?

A.    So nobody told me that I was eligible.  I found out myself that I was eligible once I realized that I wasn't paying into it.  And then I also found out that I was eligible for health insurance, which I was denied.

Q.    Okay.  And you found out the information about your eligibility for retirement on Jefferson's employee portal, or where?

A.    I mean, as an employee, you're entitled to retirement.  You know, there's not a basis of eligibility for retirement fund.  Being an employee, that's my understanding, being an employee automatically makes you eligible for retirement fund.

Q.    Did anybody tell you that from Jefferson, that just by being an employee, regardless of the number of hours that you work, that you're eligible for a retirement fund?

Page 157

D. BROADNAX

A.    No.  I was never told that. However, my first four years that I returned, I was doing over 30 hours a week, so I fulfilled the eligibility requirements for full benefits.

Q.    Was there information available to you to determine your eligibility for retirement benefits?

A.    The only thing that I would ever see about benefits is new-enrollment signs at the end of the year.  And because I don't get health benefits or any type of medical or vision or dental or personal time, sick time, vacation, it never prompted to me, let me go down to this fair that they are having downstairs about benefits, because I don't get anything.  That's how I looked at it.

So when I would see these new-enrollment signs coming up for the end of the year, I didn't get medical, I didn't get vision, I didn't get dental, I don't sick, personal vacation time.  So I felt that those fairs didn't apply to me.  However, a 401(k) is, from my understanding, is the savings created by you and your institution that you work for, because when I do remember doing it, they did

Page 158

D. BROADNAX

something like they matched every dollar that you contributed.  I could be saying it wrong because it was so long ago.

So when I returned, and I went through the interview process, like I was supposed to, anything that was administrative, it didn't even dawn on me to ask, because I thought it was automatically just done.

Q.   Okay.  Do you know whether Joyce Zagacki informed any of your coworkers about whether or not they were eligible for -- to enroll in retirement?

A.   I can't tell you if she informed them, but she definitely sent them to new-hire orientation, and rehire.

Q.   Okay.  It's your understanding that Joyce Zagacki personally sent new hires to some orientation program?

A.   Yes.  That's the only person -- you can't start the job without your orientation.

Q.   Did anyone tell you -- did Joyce ever communicate to you that she was the one who decided whether or not a new hire would go to an orientation session?

Page 159

D. BROADNAX

A.   It's just new-hire policy, before you start your position, you have to go to an orientation.

Q.   Right.  But what I'm asking you is, you're -- respectfully you are blaming, it seems to me, and correct me if I'm wrong, but it sounds like you are blaming Joyce Zagacki for the fact that you weren't sent to an orientation session; is that right?  You are blaming Joyce Zagacki for that?

A.   I am blaming Joyce Zagacki for not sending me to an orientation after being gone for almost three years, and being reoriented to the new institution, to the new computer systems, whatever it is.  I am blaming her for that, yes.

Q.   And did anyone tell you that it was Joyce's responsibility to decide whether or not a new hire or a rehire would go to the orientation session?

A.   She never communicated that to me, but from my own experience as a new hire I came from being a temp for eight months, until they brought me on as a new hire.  I went through the

Page 160

D. BROADNAX

entire process.  Orientation --

Q.    Right.  But I'm asking about Joyce
Zagacki.  You don't know whether or not it's
Joyce Zagacki's responsibility to decide --

A.    You didn't let me finish.

Q.    I know, and I apologize for that,
but I'm just -- I'm really trying to get an
answer to the question I'm asking.

Do you have any personal knowledge as to
whether or not it's Joyce Zagacki's
responsibility to decide who goes to a new-hire
orientation session?

A.    Yes, I do.

Q.    Okay.  What is your personal
knowledge about that?

A.    When I was hired as a temp,
March 15, 2005, I was under the supervision
of Carol Delaney, who was the immediate
supervisor at the time.  Carol Delaney made
sure, when she was ready to bring me on as a new
employee, she sent me to new-employee
orientation.  Everything was fine --

Q.    Okay.

A.    -- my first four years.

Page 161

D. BROADNAX

Q.    Okay.  But nobody from Jefferson has told you that it's Joyce Zagacki's responsibility to decide who gets to go to a new-hire orientation?

A.    So Joyce took over Carol's spot. Carol is who hired me and brought me into the position, sent me to orientation.  So I will only assume the acting supervisor at the time that hires me would do the same.

Q.    Do you know whether HR decides who -- either a new hire or rehire should go to an orientation session?

A.    Do I know if HR?  No, I don't know if HR are the ones who makes that decision.

Q.    Have you ever heard anyone from Jefferson make any derogatory statements about you or anyone else for having a disability?

A.    At the Christmas party in 2016 -- no, 2017 Christmas party, it was on a Thursday afternoon.  I didn't work Thursdays.  I came to the Christmas party, and Crystal said to me -- it had to be 2015 or 2016 -- Crystal said to me, Why did you call out yesterday?  You can't call out.

Page 162

D. BROADNAX

And I said, Crystal, I have lupus.  If I call out, I don't get paid.  So that's letting, you know that something is really wrong.

Your lupus is not the reason that you called out.

And this is at the job Christmas party.

Your lupus is not the reason that you called out.  You make that excuse all the time.

I said, Okay, you have your opinion.  Just always know, if I don't come to work, I don't get paid.  So if I need to be out, it's really necessary.

That was at the job Christmas party.  And a year later, Crystal was diagnosed with lupus. I was the first person that she came to, to tell me about her new-found diagnosis.

Q.   Other than that, what you just testified to, the comment that Crystal made to you at the Christmas party in 2015 or 2016, about your lupus, did anyone else from Jefferson make any other derogatory statements about you, or anyone else, for having a disability?

A.   Not that I'm aware of.

Q.   Did you complain to anyone at

Page 163

D. BROADNAX

Jefferson about Crystal's statement to you
about -- or statements to you about your lupus?

A.    My therapist.  Not at Jefferson.

Q.    I missed the first thing that you
said.

A.    I talked to my therapist about it.
Not anybody at Jefferson.

Q.    No one from Jefferson.

At any time, have you heard anyone from
Jefferson make any derogatory statements about
you or anyone else based on your -- or that
person's race?

A.    No.

Q.    All right.  I just have a few more
questions, and then we'll take a break for
lunch, if that's okay with you.

A.    Sure.

Q.    In your 2011 charge of
discrimination, do you recall that you allege
that you were discriminated against because of
your disability and because of your race?

A.    Yes.

Q.    And in your 2011 charge, you
contended that you were not hired because of

Page 164

D. BROADNAX

your disability or race, and as facts to support that, you alleged that Ms. Dejesse -- Dejesse -- was rehired?

A.    Yes.

Q.    Right?

A.    Yes.

Q.    Other than Ms. Dejesse being rehired when you felt like you should have been rehired, right --

A.    Yes.

Q.    -- are you aware of any other facts that support your allegation that you were not rehired because of your disability or race?

A.    She kept telling me it was a hiring freeze.  I called every month.  Sometimes I would go up there after school and show them that I'm walking better and I'm healthy and I'm strong.  And she would say, It's a hiring freeze.  Well, how did you hire 12 on your phlebotomy team?

Q.    Okay.  So just the fact that Joyce Zagacki was telling you there was a hiring freeze when she was -- it's your understanding she was actually hiring other people?

Page 165

D. BROADNAX

A.    Yes, ma'am.

Q.    And it's your understanding that she hired 12 people during the time --

(Multiple voices speaking at once.)

A.    -- yes, ma'am, when I returned, she had a 12-people staff.

Q.    Those are all new people that she rehired -- or hired?

A.    Other than Victoria, yes.  Victoria was a rehire.

Q.    Anything else, other than the fact that Joyce Zagacki told you there was a hiring freeze when she hired other people, including Ms. Dejesse, right?  Other than those facts, do you have any other facts to support or suggest that you were not rehired because of your disability or race?

A.    That was the main one.  That's it.

Q.    That's it?  That's all you know?

A.    Yes.

Q.    Okay.  Were any of the 12 people who Ms. Zagacki hired also African-American?

A.    Ms. Blondzell was African-American.

Page 166

D. BROADNAX

Alonda is African-American.  Naeemah is African-American.  Lisa is African-American.  That was it.

Q.   Okay.  So she hired four African-Americans during the time when she told you there was a hiring freeze?

A.   Yes, but the other ones were Italian.

Q.   And before you were -- before you filed your 2011 charge, did you actually apply -- did you formally apply for any positions at Jefferson?

A.   When I left, when I had to stop my FMLA and my doctor wouldn't approve me to come back, the paperwork that I received from HR said at the bottom, gives two lines:  Can be rehired.  Can't be rehired.

Mine was signed off for "can be rehired."  I started calling in January.  My surgery was in October.  That's when it started.  I just kept calling and popping up, like, I'm ready to come back to work.  I'm ready to come back to work.

Q.   Can you keep your voice up?  You don't have to repeat anything.

Page 167

D. BROADNAX

A.    Okay.

Q.    Just keep your voice up.  I think I heard what you said.

A.    Okay.

Q.    You said you kept calling and calling.

A.    And popping up.

Q.    Okay.  Did you ever formally submit an application at Jefferson?

A.    No, ma'am.  I never was instructed to.  Again, I'm thinking that I took a leave, and, you know, okay, Dywanna, we are ready. Whatever you have to do, you know, the position is ready.  I didn't think that I needed to apply until we had the formal thing at the PHRC, and Joe Rasinski said, Dywanna, we are live now. Meaning, applications are now on line.  He said, Go home and apply and, you know, go from there. That was the only time I applied.  I never even applied for the initial position.  I was hired off of a temp job.

Q.    Right.  But you applied for the temp job?

A.    I applied for the temp job, and I

Page 168

D. BROADNAX

was sent there as a temp.  But to apply to

Jefferson as an employee, it didn't happen that

way for me.

Q.    Right.  And you called who?

A.    Joyce.

Q.    Did you only call Joyce?

A.    That's it.

Q.    Did you ever call HR?

A.    No.

Q.    And you said you kept popping up?

A.    Yeah.

Q.    Did you ever go to HR?

A.    No. I would just go to the office,

see my fellow coworkers and Ms. Joyce and ask

about, you know, when are things going to speed

up so I can come back to work.

Q.    Okay.  So when you would go to the

office, and you would see your coworkers, you

were seeing new people then, right?

A.    No.  I didn't see -- when I would

go, I would go in the evening, which is --

Erica's shift is 2 to 10:30, so when I would get

out of school, it would be in that time frame.

I would go talk to Ms. Erica, who has a

Page 169

D. BROADNAX

office -- Ms. Joyce has a office right across the hall.  And then I would see more technicians than actual phlebotomists, because there was no reason for me to go to the outpatient lab.  I would go to, like, the main lab where Ms. Joyce's office is, and I would speak to the technicians and everybody like that.

Q.   Are you aware of Jefferson hiring anybody during this time period between 2008 and 2011 that had the schedule that you needed to have, the afternoon schedule after your schooling?

A.   So my afternoon schedule was -- remember, when I first came back, I was only doing weekends.

Q.   Okay.  Let me ask you this:  Are you aware of, before you came back, Jefferson hiring anyone who had the restrictions that you had concerning your schedule?

A.   Right, and I think you're saying it wrong, because when I came back in 2011, there were no restrictions.  That's how I was able to work 35 hours one year and 30 hours the next year, and it kept going down over the years.

Page 170

D. BROADNAX

But when I first came back, there were no restrictions.

Q.    So you didn't have any restrictions as far as Social Security, your illnesses, your schooling?

A.    No, ma'am.  The Social Security give you a trial work period.  And when I first returned in 2011, I was in my trial work period, where you're allowed to work full-time hours so they can determine if you fall in a category of substantial work or nonsubstantial work.  So that's why I was allowed the first year to do 35 hours a week; the second year, 30 hours a week. And it would go down.

So to answer your question, do I know if Ms. Joyce hired anybody with a similar schedule of mine when I first returned, I don't know that, because I don't know who was part-time.  I just know that it was a 12-person staff of all new people.  I was aware of Naeemah because Naeemah was my replacement, who came through another coworker that we knew.

MS. MOYLAN:  Okay.  Why don't we take a break for lunch.

Page 171

D. BROADNAX

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  The time is now 1:37.  This completes media unit 2.

(A lunch break was taken.)

THE VIDEOGRAPHER:  The time is now 2:35.  This begins media unit Number 3.

FURTHER EXAMINATION

BY MS. MOYLAN:

Q.    Okay.  We are going to mark a document as D-2.

(Medical Assessment Reporting Form is received and marked as Exhibit D-2 for identification, as of this date.)

Q.    Okay.  Before you -- before I ask you about D-2, do you recall that before the lunch break you said that when you came back to work in 2011, for Jefferson, that there were no restrictions on your -- the time that you could work and the hours that you could work?

A.    When I first returned in 2011?

Q.    Yes.

Page 172

D. BROADNAX

A.   I don't remember being on restrictions, no.

Q.   Okay.  Would you look at D-2, please?  Have you ever seen D-2 before?

A.   Yes.

Q.   Okay.  And is it a medical assessment reporting form from Jefferson?

A.   Yes.

Q.   And this reflects that you are fit for duty with accommodations, and the accommodation was that you may not work more than 24 hours in one week, right?

A.   Okay.

Q.   Okay?  It says that?

A.   Yes, it does.

Q.   Does that refresh your recollection that when you came back to Jefferson you actually did have a restriction on the amount of hours you could work in a week?

A.   Okay.

Q.   Is that correct, that when you came back, you had this restriction that you couldn't work more than 24 hours in a week?

A.   Yes.

Page 173

D. BROADNAX

Q. And did Jefferson comply with this restriction?

A. Yes.

Q. You can put that aside for now. I'm marking this document as D-3.

(Employee Disciplinary Action is received and marked as Exhibit D-3 for identification, as of this date.)

Q. Take the time you need, but my question, when you've had the chance to look at it, is: Do you recognize this document that's been marked as D-3?

A. No.

Q. Okay. Do you see that D-3 says: Employee Disciplinary Action?

A. I do.

Q. And the employee is Dywanna Broadnax?

A. Yes.

Q. And it says: Date of incident, 12/12/2014.

Do you see that?

A. I do.

Page 174

D. BROADNAX

Q.    And it says:  Specifics pertinent to incident, language used that is not appropriate in workplace.  Please see attached.

Do you see that?

A.    I do.

Q.    And listed witnesses, Victoria Martino [sic] and Lisa Hall?

A.    I do.

Q.    And then on the attachment, which is the third page of D-3, there's a paragraph dated 12/12/2014.  Please read it to yourself and let me know when you're done reading it to yourself.

(Pause.)

A.    I'm finished.

Q.    Okay.  Do you recall calling Lisa Hall "a raggedy bitch"?

A.    I don't recall this incident, but it's in writing, but I just question it because I didn't sign it.  Because I pride myself on no write-ups or suspensions, this is kind of taking me back.  I can't verbatim remember this.

Q.    Okay.  Do you have any reason to doubt that you were written up on December 12th, 2014, for calling Lisa a raggedy bitch?

Page 175

D. BROADNAX

A.    I don't remember this incident.

Q.    You don't remember calling Lisa a raggedy bitch?

A.    Not where patients was around or being written up and refusing to sign a write-up, no, I don't.

Q.    Okay.  Do you remember calling Lisa a raggedy bitch when patients weren't around?

A.    I don't remember calling Lisa a raggedy anything.

Q.    Do you recall calling Lisa Hall any name?

A.    No, ma'am.

Q.    Okay.  So you have no memory of the incident for which you were written up, or the write-up?

A.    No, ma'am.  I didn't sign it, so it's kind of questionable.

Q.    What do you mean "questionable"?

A.    Questionable in terms of if this was generated post my termination, because I didn't sign it.  I'm really professional with all of my documents and keeping track of everything I do, and I don't remember this incident, because,

Page 176

D. BROADNAX

again, I pride myself on never being written up or suspended at Methodist.  I'm not an insubordinate employee.  If I was told to sign something -- in this, she said that I admitted it.  So if I admitted it, why didn't I sign it?

Q.    I don't know that.  My question to you is:  Do you have any recollection of anything related to what's in this disciplinary action form, either the underlying allegations of your behavior, communications with Joyce Zagacki, or anyone, or, you know, the disciplinary action form and meeting about it?

A.    No, ma'am.

Q.    Is it possible that you called Lisa Hall a raggedy bitch, and you just don't remember?

MS. COHEN:  Objection to form.

Q.    You can answer.

MS. COHEN:  And it calls for speculation.

A.    Is it true that I called Lisa a raggedy bitch in any form?

MS. COHEN:  That wasn't the question.

Page 177

D. BROADNAX

Q.   I asked you:  Is it possible that you called Lisa a raggedy bitch, and you just don't remember?

A.   And I just don't remember?  I think I will remember a verbal situation like that with Lisa, because Lisa tends to raise her voice and get -- can get a little bit loud.  I would have remembered that.  This, I don't remember.

Q.   Do you recall that Joyce Zagacki honored you for graduating from CCP?

A.   No, I don't.

Q.   You don't remember writing an email to Ms. Joyce Zagacki saying:  Wanted to tell you thank you for giving me an honor for my graduation.  I never knew you sent me that. That made me happy.  Thank you.

A.   I had a stroke in 2019.  I don't remember that, no, I don't.

Q.   Okay.  Is it possible that you did thank her for honoring you for your graduation, and you just don't remember?

                MS. COHEN:  Calls for speculation again.

A.   Is that my email?

Page 178

D. BROADNAX

Q.    I can show it to you if you would like to see it.

A.    Yes, please.

MS. MOYLAN:  And, Faye, I'd ask you to just say "objection to form," otherwise, I'm going to consider it a speaking objection.

MS. COHEN:  Okay.

MS. MOYLAN:  Thank you.

We are going to mark that as D-4, Carolyn.

(Email dated 12/15/14 is received and marked as Exhibit D-4 for identification, as of this date.)

A.    Okay.  So I think you read this incorrectly.  Ms. Joyce didn't honor me.  This is an employee who would come to me regularly for her blood draws, and she honored me.

Q.    Okay.  But do you see in the second sentence it says:  And I also wanted to tell you thank you for giving me an honor for my graduation.  I never knew you sent me that. That made me happy.  Thank you.

A.    So honor is a badge.  It's like a

D. BROADNAX

little badge on the computer.  Unless you go and see your -- I guess into your email account, you wouldn't know.  But I do remember Kim writing in about me as an employee and talking highly about me to my supervisor.  If Ms. Joyce did send me a badge, like I said, I probably didn't see it, because you have to go into your settings to view it.  So I probably didn't see it.  But it does say that I thanked her.

Q.   Right.  So do you have any reason to believe that Joyce Zagacki did not honor you for your graduation?

A.   I thanked her, so I do believe she honored me, yes.

Q.   And she didn't have to honor you. There was to responsibility or duty that she had to honor you for that, right?

MS. COHEN:  Objection.

A.   No.

Q.   Do you agree that there was a policy at Jefferson, as articulated by Joyce Zagacki, that you were not permitted to have food or drinks in the outpatient area?

A.   This is true.  I also implemented

Page 180

D. BROADNAX

that policy.

Q.   Okay.  And you have contended in your charge that you had to hold hot tea or coffee to warm your hands, right?

A.   This is true.

Q.   Did that violate the policy against food and drink in the outpatient area?

A.   Okay.  So this policy didn't take in effect until I left, and during the time that I was gone on my leave, and it was something instituted, not by Joyce, but by Lindsey, I was there from a few years prior to my leave, and the policy was always fine.  Once I got my Raynaud's diagnosis, Joyce never had a problem. She even okayed it.

And when I returned, Lindsey -- it was Lindsey who was the new coordinator, who implemented no food or drinks.  However, Janet Bruno, who is Italian, drank coffee every morning.  Lindsey walked around with coffee all day, every day.  In terms of food, I'm in total agreeance of that because we see patients there, and the aroma of old food can make people nauseous or whatever the case.  So I was in

Page 181

D. BROADNAX

support of that, and I never brought food into the outpatient lab.  But I did have my hot tea, as I do today.

MS. MOYLAN:  I'll give you D-5 and D-6.

(Email dated 2/6/17 is received and marked as Exhibit D-5 for identification, as of this date.)

(Email dated 8/3/17 is received and marked as Exhibit D-6 for identification, as of this date.)

MS. COHEN:  Which is D-5?

MS. MOYLAN:  D-5 is the February 6, 2017 email.  And D-6 is the August 3rd, 2017 email.

Q.   Do you see on D-5, it says -- Joyce Zagacki writes:  Hi, all.  The time has come to discipline the person who does not comply with the no-food-or-drink policy in the outpatient area.

Do you see that?

A.   I do.

Q.   So -- and this is dated February 6, 2017?

Page 182

D. BROADNAX

A.   Okay.

Q.   Okay.  So do you agree that there was a policy that Joyce Zagacki implemented, at least as of February 6, 2017, that you couldn't have food or drink in the outpatient area?

A.   I see that.

Q.   Okay.  And then if you look at D-6, do you see August 3rd, 2017, email from Joyce Zagacki to the group:  A few reminders in the outpatient area.  And then the third is:  No food or drink in the area.

You see that?

A.   Yes, ma'am, I do.

Q.   Okay.  So as of August 3rd, 2017, this is Joyce Zagacki reiterating the policy that you can't have food or drink in the outpatient area, right?

A.   I do.

Q.   Yes?

A.   Yes, ma'am.

Q.   Okay.  So at least as of February 2017 and August 2017, Joyce Zagacki had a policy that you couldn't have food or drink in the outpatient area, right?

Page 183

D. BROADNAX

A.    According to this email, yes.

Q.    Right.  Okay.  So if you had had --
if you had to -- if you were holding hot coffee
or hot tea while you were working, you would
have been violating this policy, right?

A.    According to this email, yes.

However, as I stated earlier, Joyce tends
to have side conversation, and when things go --
like this go out, it didn't apply to me because
I cannot draw blood with blue, numb fingertips.
So the hot tea was to help my internal blood
flow.  And she was aware of that, and she never
gave me a problem about it.

Q.    Okay.  So -- and holding the hot tea
or the hot coffee helped you with your blood
flow, right?

A.    Yes, ma'am.

Q.    And Joyce Zagacki, you're saying,
was okay with that?

A.    Well aware of it, when I was first
diagnosed, prior to leaving, yes.

Q.    Okay.  So -- so you have said that
you wanted a mini heater?

A.    Yes, ma'am.

Page 184

D. BROADNAX

Q.   You have contended that Joyce Zagacki said you could not have a mini heater?

A.   Because it was the month of May, I didn't need it.

Q.   Joyce Zagacki said you could not have a mini heater, right?

A.   Yes.

Q.   That's what you're contending.  And you're saying you found an alternate accommodation for yourself.  You held hot tea or coffee, right?

A.   So it wasn't an accommodation because I was doing that before I asked for a heater.  I started dong that in my -- early in my diagnosis, about 2006, when I started to learn about Raynaud's.  And I didn't ask for a heater until years later.  The problem with that is we have a coworker named Denise who works in the microbiology lab who has a heater this tall.

Q.   My question to you is:  When you held the hot coffee and hot tea, that enabled you to do your job, right?

A.   Yes, ma'am.

Q.   Okay.

Page 185

D. BROADNAX

A.    And it wasn't for a long period of time.  Like, I walk in with it or I'll put it in my locker and I'll go back to my locker and I'll sip it, just to give me the warmth through me to help to get to my fingertips, so I get -- my Raynaud's will stop flaring.

Q.    Right.  But you were able to do your job when you did that?

A.    Yes, ma'am.

Q.    Do you recall contending or asking for a service certificate because you had been working for Jefferson for five years?

A.    So when you say "service certificate," is that the one -- the award that they give you for being an employee for five years and each fifth year you get a new one?

Q.    Let's see.  You produced an email string about a five-year recognition certificate.

A.    Correct.

Q.    Okay.  That's what I'm referring to.

A.    Yes, ma'am.

Q.    Okay.  Do you have any knowledge as to whether or not, given the schedule that you

Page 186

D. BROADNAX

had when you were at Jefferson between 2011 and your termination, whether or not you were eligible to receive the five-year recognition certificate?

A.    So I didn't know there were no specific eligibility requirements other than being employed by the hospital for that duration.

Q.    Right.  But do you know whether or not you were eligible, even though you had a reduced schedule between 2009 and -- 2011 and two thousand --

A.    My understanding, that I would be eligible just by being an employee for an extended amount of time.  That's all I know.

Q.    Right.  But did anybody from Jefferson tell you that you were eligible for that five-year certificate?

A.    The readings on our portal indicate, after five years you will be eligible.  And I would see other people get them and redeem them, and I didn't know there were any other eligible requirements that needed for you to get that certificate.

Page 187

D. BROADNAX

Q.   Any of the people who received the certificate did they have less than full-time hours like, you?

A.   The one person that did receive it would be Ms. Erica Perry, and Ms. Erica has been full time since she started.

Q.   Okay.  So I want to make sure I heard you.

The one person who you know received it was Erica Perry, and she was full time?

A.   Yes, ma'am.

Q.   Okay.  You have contended in the past that Joyce Zagacki denied you an accommodation related to a broken metal slide that was under a desk in the outpatient area, right?

A.   Yes, ma'am.

Q.   Do you know whether or not Joyce Zagacki called the facilities' employees at Jefferson to come and remove the slides?

A.   I don't know if she called, but she put tape over it.

Q.   Right.  Okay.  After you complained, she put tape over it?

Page 188

D. BROADNAX

A.    Uh-huh.

Q.    Yes?

A.    Yes, ma'am.

Q.    But you don't know whether or not she called facilities to come and move the slides?

A.    I don't know that, no.

Q.    Do you know -- were the slides actually eventually removed?

A.    Months later.

Q.    And do you know who removed them?

A.    I don't know.

Q.    So you wouldn't know if Joyce Zagacki was the one who removed them, would you?

A.    No.  I wouldn't know.  I just know that it cut me through my skin and caused me to go on antibiotics.

            MS. MOYLAN:  Let's mark this as D-7.

            (Amended Complaint is received and marked as Exhibit D-7 for identification, as of this date.)

Q.    Take the time you need, Ms. Broadnax.  But I'm going to ask you if you

Page 189

D. BROADNAX

recognize what has been marked as D-7.

A.    Yes, I do recognize it.

Q.    Okay.  Is this the complaint that you filed with the Pennsylvania Human Relations Commission, on or about May 19, 2020?

A.    Okay.  So I actually did this November 20th, but I had to do it again on this May date because they switched workers or something, and everything got pushed back and missing.  So this is actually my second time, but I did apply immediately after my termination.  So, yes, I do recognize this.

Q.    Okay.  So this is your amended complaint that you filed with the Pennsylvania Human Relations Commission on or about May 19, 2020?

A.    Yes.

Q.    And if you look at the last page of D-7, is that your signature on the verification page?

A.    Yes, it is.

Q.    Okay.  And I'd like you to look at -- and if you need to look through the document, you may, of course, but my question

Page 190

D. BROADNAX

is, on page 3, says Underlying Facts, and then -- are you there?

A.    I am.

Q.    Page 3.  Okay.  Underlying Facts, and in paragraphs four through nine, you have some background information about the parties and facts leading up to when you were rehired by Jefferson, right?

A.    Yes.

Q.    And then under count 1, you have: Retaliation, discrimination, discharge.  And paragraphs 10 through -- 10 through 13 -- okay, 10, you incorporate the facts above; 11, you talk about the fact that you filed the charge in 2017.  Paragraph 12, you talk about when the 2017 charge was served on Jefferson, right?

A.    Yes.

Q.    And then paragraph 13, you explain that you had a mild stroke and you remained out of work until April 6, 2019, right?

A.    Yes.

Q.    And then anywhere in this charge, do you have any allegations of retaliatory conduct after you filed the 2017 charge, except for the

Page 191

D. BROADNAX

way Crystal Taylor treated you and Tynesha

Jenkins treated you?

A.    No.  It was just those two.

Q.    Okay.  So then you allege that after

you filed the -- you filed the charge on

December 20, 2017, and then in this charge, the

2020 charge, you articulate allegations about

time period April 2019 to November 2019 and the

way that Crystal Taylor and Tynesha Jenkins

treated you, right?

A.    Correct.

Q.    And you alleged that -- here, let me

give you your -- let me give you the benefit of

your Pennsylvania Human Relations Commission

Employment Discrimination questionnaire, as

well.

(Pennsylvania Human Relations

Commission Questionnaire is received

and marked as Exhibit D-8 for

identification, as of this date.)

Q.    I'll mark that as D-8.

Do you recognize D-8 as a form that you

completed for the Pennsylvania Human Relations

Commission in November of 2019?

Page 192

D. BROADNAX

A.    Yes.

Q.    Did you have -- did anyone assist you in completing this questionnaire?

A.    No.

Q.    And on page 7, that's your signature and the date?

A.    Yes.

Q.    And on page 6 of this form, you allege that -- it says:  Did you consider any of the above acts of harassment to be especially severe and/or offensive?  And you checked the box "yes."

Do you see that?

A.    Yes.

MS. COHEN:  Excuse me one minute.

D-7 is the 5/19/20 complaint.

MS. MOYLAN:  Right.

MS. COHEN:  What was D-8?

MS. MOYLAN:  The questionnaire that you have in your hand right there.

MS. COHEN:  Oh.  Okay.  All right.  Thank you.

MS. MOYLAN:  Yep.

Page 193

D. BROADNAX

Q.    And we are looking at page 6.  She says -- she checks the box "yes."

Did you consider any of the above acts of harassment to be especially severe and/or offensive?  If so, explain why.

And you said:  Tynesha -- and that's Tynesha Jenkins, right?

A.    Correct.

Q.    -- asked me outside to a fight back in June.  I told Joyce she didn't do anything. I attach proof.

Okay.  So you had a conflict with Tynesha Jenkins in June of 2019?

A.    Correct.

Q.    Tell me about what happened with Tynesha in June of 2019.

A.    This particular situation, I don't remember in detail.  I just know that Tynesha was a new employee.  I know that she was a new employee, and she was being trained by different lab assistants, even myself.  And she just -- she just didn't -- she told me out her own mouth that she didn't like me, that she had never met anyone like me before.  And that was in front of

Page 194

D. BROADNAX

Janet Bruno when she said that.

Prior to her -- prior to this comment that she asked me to come outside, I was unaware that she was aware that I dated someone that she was currently dating. Which kind of made sense to why a new employee would tell me, I don't like you, and I don't like people like you.

So, in this situation, she -- and then she wasn't aggressive in what she said. She was just blatant, and she said it. And I told her that I don't fight. And then I went and I told Joyce. Joyce came back and told me that she asked Tynesha, and Tynesha said no. Then she asked Ms. Janet, and Ms. Janet said she didn't hear it.

As long as I worked with Ms. Joyce, she's never known me to be violent, and she told me this. She said, This isn't like you, you know. Just try to be cordial, whatever you can. It was Ms. Joyce that said to me, something about a guy, do you know anything about a guy, a guy that maybe both of you know? That's how I found out? And I investigated a little bit more, because somebody called me prior and said, I

Page 195

D. BROADNAX

know a girl that may be coming to your job.  But he didn't specify my department.  And it was Ms. Joyce that let me know that she was alluding to a potential underlying issue with this coworker.

So when she asked me outside -- one, remember, I didn't know Crystal said this to people before.  I didn't find that out, until after my fight, that Crystal was always inviting people outside to fight.  So when Tynesha said this to me, in front of Ms. Janet, I took offense to it.  You know, I was taken back, because we are talking about work at the hospital.  Jefferson, they pride us on professionalism and stuff like that.  So I went and told Joyce, and the way she handled it, she said, I asked Tynesha, and Tynesha said no.  Then I asked Janet, and Janet said she didn't hear it.  So nothing was done.  And --

Q.    Right.  Okay.  So when Tynesha asked you to go outside, you took offense to that?

A.    I mean, absolutely.  She's asking me out to a fight.

Q.    And you complained about that to

Page 196

D. BROADNAX

Joyce Zagacki, right?

A.   Yes.

Q.   And Joyce investigated it by asking Tynesha what she said, right?

A.   Uh-huh.  Yes.

Q.   Yes.  And she investigated it by asking the witness --

A.   Janet.

Q.   -- if she heard it, right?

A.   Yes.

Q.   And you don't have any reason to think that Tynesha admitted to asking you to go outside, right?

A.   Well, I was told that she didn't admit it.

Q.   You were told what?

A.   She did not admit it.

Q.   Right, right.  Okay.

So as far as you were aware, Joyce didn't know what was true because the witness says, I didn't hear it.

You say she said -- you say Tynesha said, Let's go outside, which you took as a threat to fight.  And Tynesha denied it, right?

D. BROADNAX

A.    Correct.

Q.    Okay.  Are you aware that some of your coworkers complained that they didn't want to work with you because you were constantly questioning how they did their jobs?

A.    I was aware of that.

Q.    When did you become aware that coworkers didn't want to work with you?

A.    When I first returned in 2011.

Q.    Did you ever hear that your coworkers didn't like working with you because they felt like you were questioning or calling out mistakes that they made?

MS. COHEN:  Objection.

A.    That was part of my job.

Q.    Right.  Going over scrips and --

A.    Errors.

Q.    -- and comparing what was actually submitted as a test, right?  You were looking to see if there were errors made --

A.    Correct.

Q.    -- with respect to that?

A.    Yes.

Q.    And then you would --

Page 198

D. BROADNAX

A.    Report them to my supervisor, never bring them to the person who made the error.

Q.    Right.  So you would report to Joyce Zagacki if a coworker of yours made a mistake and missed submitting a test?

A.    Yes.  Because most of the time it called for the patient to be called back to be drawn again.

Q.    Right.  And you were aware that coworkers would be annoyed or angry with you because you were catching those mistakes and reporting them to the supervisor?

A.    I can't say that I was aware, because nothing was ever expressed to me.  But part of my evening job was to go over the scrips for that day or the day before, because -- to avoid that, I was not a supervisor, nor was I coordinator.  Any errors that I found, I would correct them and slide them under my supervisor's door.  Because they come in early the next morning, Joyce has a tendency to go over whatever it is I slid under her door.  So by the time I come in, I'm the villain, but I never ever -- unless I saw someone doing

Page 199

D. BROADNAX

something incorrectly, I'll try to redirect them or show them the right way.  But me personally saying, Hey, you made this mistake, I never ever did that.

Q.   Right.  That's not what I'm talking about.  I'm not talking about you going to somebody and telling them, you know, you made a mistake.  You would check the scrips, and if you found errors, you would slide the -- you know, the -- whatever information showing the errors, right?

A.   And the corrections that I made.

Q.   Right.  Okay -- under Joyce Zagacki's door?

A.   Yes, ma'am.

Q.   And that's what you would typically do?

A.   Yes.

Q.   And then Ms. Zagacki would inform the phlebotomist or lab assistant the next day of the errors, right?

A.   Yes, ma'am.

Q.   And you were aware of Joyce Zagacki informing the phlebotomist and the lab

Page 200

D. BROADNAX

assistants of errors that you found, right?

A.    It never kind of circled back to me once I turned the errors in, which kind of alludes back to I was never included in staff meeting to know that the errors are being discussed, or who she highlighting that's making most errors.  I was never privy to none of those meetings to know.  So I can't say that Ms. Joyce -- I mean, the errors that I was correcting was causing the coworkers to get angry, because it was never expressed to me, beyond behavior-wise, in terms of not wanting to work with me.  It could be one person and everybody followed suit.  It could be everybody, but everybody did not make errors.

That behavior of mine came from my four years there prior to my leave, where I was trained by the department head, Carol Delaney, prior to Ms. Joyce taking the supervisor position.  So I don't want to say I was trained by the best, but I was trained by somebody who was there for about 40 years when I first started, and it was just, you know, corrective criticism to avoid patient error, which is huge

Page 201

D. BROADNAX

because patient error can result in death,

calling a patient back to be drawn again.

Anything.  I have seen all types of things

happen, so yes, I was a stickler about that.

Q.   And so is it your understanding that

coworkers did not want to work with you because

they had negative feelings about you because you

were catching their mistakes and reporting them

to Joyce?

A.   I can't say that I knew -- again, I

can't say that I knew that, because it was never

expressed to me.  But what I do know is how they

treated me.  I can't say they treated me this

way because they knew I was correcting their

errors.  Because correcting errors wasn't always

a delegated duty of mine.  That didn't come

later into my return.

MS. MOYLAN:  Okay.  I'm going to

mark this document D-9.

(Email dated 6/24/19 is received

and marked as Exhibit D-9 for

identification, as of this date.)

Q.   Take the time you need, but I would

like you to read the document that's been marked

Page 202

D. BROADNAX

as D-9, and I'll direct your attention to the first page. There's an email that starts in the middle, from you to Joyce Zagacki, with a cc to George Morrone, dated June 20th, 2019, subject, outpatients.

Read that to yourself. And then there's a response from Joyce Zagacki above that, and then read that. Let me know when you're done.

(Pause.)

A.    Okay.

Q.    All right. I'm going to talk about your email to Joyce Zagacki, with a cc to George Morrone first.

Do you see, about four or five lines down, four lines down of the first paragraph, it says up to the right: If this job went on seniority --

Do you see that?

A.    Yes.

Q.    -- I would be the lead phlebotomist here because I am considered a Five Star employee, even if I'm not -- never recognized for it.

Do you see that?

Page 203

D. BROADNAX

A.    Yes, ma'am.

Q.    Who told you that you're a Five Star employee?

A.    I said it.

Q.    Okay.  But nobody from Jefferson told you you were a Five Star employee?

A.    No.

Q.    Then you go on to say, after that sentence -- it starts with:  There has never been a complaint about me --

Do you see that?

A.    Yes.

Q.    -- from Methodist staff, nor patients, in 14 years, other than my coworkers. And my coworkers complain about me because I do my job accurately, efficiently, and professionally at all times.

Do you see that?

A.    Yes.

Q.    Okay.  So now do you recall that as of June 20th, 2019, you believed that your coworkers complained about you because you were correcting their work?

A.    Yes.

Page 204

D. BROADNAX

Q. And then the last sentence of that paragraph, you say: I say that to give an understanding why my work ethics and skills may differ from my coworkers'.

A. Yes.

Q. And then you say: In the most recent months, I felt undermined many times by both my supervisor and coworkers. I come in work during second shift, which means the ladies on first shift have different methods than I do in terms of how they run the outpatient area. So when I come in and I see a coworker doing something, in quotes, different than the way I was trained many years ago, I try to show them the right way, and there was always a problem. I take it to my supervisor, and instead of telling them I am doing it correctly, she will give us an option of doing it how we feel comfortable. I would like to share some examples that bothered me very bad recently.

Do you see that?

A. Yes, ma'am.

Q. Okay. So going back to what you said, so here you're agreeing that your

Page 205

D. BROADNAX

coworkers on the first shift had different methods than you had, right?

A. Yes.

Q. And you have already testified that you were trained by a different supervisor than Joyce Zagacki --

A. Correct?

Q. -- correct?

A. Yes.

Q. And so is it possible that Joyce Zagacki has a different way of doing things than the woman who trained you?

A. So what you're referring to in this particular email is collection after blood draw. The entire department was trained April 1st on the Epic system by the company of Epic.

I -- Joyce didn't learn this on her own. She too was trained. So first shift decided to shorten the patient contact by doing it completely different than what Epic trained us to do, which is a sign of falsifying time on the specimen.

Q. Did anyone tell you that that constituted falsifying time?

Page 206

D. BROADNAX

A.    Yes.  In the training with the Epic trainers, yes.

Q.    And the Epic trainer told you that if you don't follow the -- well, what did the Epic trainer tell you?

A.    Okay.  So the process is, you put the patient's test in.  You print the label. You go draw the patient, you label your specimen you come back to the computer and hit "collect." Which will guarantee the time of collection, the accurate time of collection.

These ladies were ordering a test, printing a label, and hitting "collect" before you stick the patient.  You already hit "collect" so what if it takes you 25 minutes to get the patient?  But in the system you collected it 25 minutes prior.  That's falsifying time on the specimen.

Q.    Did someone from Epic say to you that if you don't follow the steps the way you were trained, that it's falsifying time?

A.    They put an emphasis on falsifying time and the importance of coming back to the computer to collect, because we all thought it

D. BROADNAX

was a hassle to go stick and walk back and collect.

Q. Okay. Did anybody from Epic -- you're saying "the emphasis." Does that mean they actually said, If you don't follow this procedure, it's falsifying time?

A. Yes. I didn't make that up.

Q. I'm trying to understand your testimony.

A. Yes, ma'am.

Q. Okay. Was Joyce Zagacki present when you heard someone from Epic saying, If you don't do it like this, it's falsifying time?

A. Each employee has separate Epic training at a different location for three days, so we all were a part of different classes with different instructors. So I can't tell you what they were taught. I can only go by what I was told when I was training.

Q. Right. Okay. So you don't know what Joyce Zagacki was told?

A. I would assume it was universal, because it was in the computer system.

Q. Okay. But you don't know what she

Page 208

D. BROADNAX

was told?

A.   I do not.

Q.   Okay.  So do you know if she was told by anyone that there's really no difference if it's a matter of minutes between when you say that it was collected and when you actually collected it?

A.   Joyce said that, but then when it -- what happens when you have a patient you can't get for 30 minutes?

Q.   Right.  But that's your question, right?  Nobody ever said to you that the way Joyce instructed everyone to do it was falsifying time?

A.   So Joyce never instructed them to do it that way.  It became a thing of the phlebs, themselves in outpatient.  That's why you see in my email it says:  Joyce allowed them to do it, whatever their own way.  But Joyce was -- never instructed them to hit collect before drawing the patient.  She would never instruct them to do something wrong that was instituted by the company -- of the program --

Q.   Well, didn't Joyce send an email to

Page 209

D. BROADNAX

everyone saying, it's a matter of minutes, so it doesn't matter whether you hit "collected" and then go collect it, or if you collect it and then come back and hit "collected"?

A.    This is true, and that -- and it goes back to what I said earlier.  She smooths things over.  She never corrects things.  She tries to make things across the board easy.  And that's the time when I felt undermined, because this isn't Joyce's training.  This is Epic's training.

Q.    Then in the next paragraph, you talk about:  We have a new employee.  She had not been signed off on an order entry.  I tried to help her and let her know she was ordering the test incorrectly.

That's Tynesha Jenkins, right?

A.    Yes, ma'am.

Q.    And just -- did anybody ask you to show the phlebotomists or the lab assistants the right way to do things?

A.    As I stated, I was the senior phleb because I was there the longest, so most of the time, if not all the time, whenever we had new

Page 210

D. BROADNAX

hires that was on my shift, it was my job to train them.

Q.    Did anybody ask you to show phlebotomists or lab assistants the right way to do things, as you call them?

A.    If Ms. Joyce sits me with a new employee, it's understood that I'm there to train them.

Q.    I'm just trying to -- I don't want to be here until midnight.  Please answer my question.

Did anyone ask you to show your colleagues, phlebotomist or lab assistants, the right way to do things, as you described in this email?

A.    Yes.  I will say my supervisor.  I had permission from my supervisor to train new employees and students.

Q.    Did Joyce Zagacki -- that's who your supervisor is, right?

A.    Yes.

Q.    Joyce Zagacki said to you words to the effect, or exactly, Dywanna, when you see someone, a lab assistant or phlebotomist, not

Page 211

D. BROADNAX

doing something the right way, you should tell them how to do it the right way?

A.    I'm sure she didn't say it in that context; however, she did give me permission to train.

Q.    Okay.  Train when people come on?

A.    When people come on, when people are -- during their -- during their probationary period, yes, if they were working on my shift.

Q.    Then in this full paragraph on page -- on the second page of the email, you talk about Tynesha.  You said you:  Tried to help her.  Her reaction to me was very defensive.

You see that?

A.    I do.

Q.    And then you go on to say:  I let her know that was wrong, and she argued with me so bad, she told me to meet her outside when she clocks out.  That was a threat for me to meet her outside to fight.

Do you see that?

A.    I do.

Q.    Okay.  At the bottom of the second

Page 212

D. BROADNAX

page, the last paragraph that starts with:

Another new girl.

Do you see that?

A.    Yes.

Q.    Do you know who that is, another new
girl who started a few months ago?  Who is the
"other new girl"?

A.    I'm not sure who that is.

Q.    Okay.  And in the middle of that
page, you're talking about -- in the second full
paragraph that starts with another time -- the
new employee had a scrip.

Do you see that?

A.    Yes.

Q.    And you reference Janet, right?

A.    Yes.

Q.    What is Janet's last name; do you
know?

A.    Bruno.

Q.    Okay.  That's Janet Bruno.

And the last sentence of that paragraph,
it says:  Had the new girl not been told that my
opinion doesn't matter?

Do you see that?

Page 213

D. BROADNAX

A. Yes.

Q. And the new girl who you're referring to is Janet?

A. Janet is not the new girl.

Q. Okay. So who is the new girl?

A. I think this might have been Dixie at the time.

Q. And who told Dixie that your opinion didn't matter?

A. It would have to have been Ms. Janet.

Q. You don't remember?

A. It would have to have been Ms. Janet, because I remember the situation with the blood cultures.

Q. So it's your testimony that Janet told Dixie that your opinion didn't matter?

A. Yes. If that's what I put in the email. Yes, it was Janet.

Q. Did you personally hear Janet tell Dixie that your opinion didn't matter?

A. I can't tell you because I didn't write it in the email, but Dixie was really close to me, because she appreciated my

Page 214

D. BROADNAX

training.  She shared with me a lot of things.
And I'm sure it was Ms. Janet that said that to
Dixie.  I can't say I'm sure, because I didn't
hear her say it myself.  I apologize.

Q.    Right.  Okay.  So that's just your
assumption?

A.    My assumption.

Q.    On the third page of this email that
you wrote, you start -- the first full paragraph
on the third page:  Now to my most recent
concerns.

Do you see that?

A.    Yes.

Q.    And what you're talking about here
is that you are checking scrips.  You decided to
start checking them because you felt it was
necessary, right?

A.    Yes.

Q.    Okay.  Did anyone ask you to start
checking scrips again?

A.    Joyce.

Q.    So when you say:  I decided to start
checking scrips again, that's not accurate?

A.    Lindsey left, who was the original

Page 215

D. BROADNAX

responsible person for this job.  When I would come in, they would be backed up five and seven days.  And Ms. Joyce was saying, Do what you can.

When I had my scare, it tells you that I had stopped because I was out, and part of my rehabilitation was to scan.  So I didn't feel comfortable at that time.  But as they continued to pile, and we're getting calls about errors, I went back to checking it.  So, yes, it was Ms. Joyce.  She will say, D, do whatever you can.  If you can't get to it, if you don't have enough patients, just, you know -- because, like I said, that was Lindsey's primary job, but when she left, it kind of just got undone.

Q.   And there was nothing wrong with Ms. Zagacki asking you to check the scrips, right?

A.   No, ma'am.

Q.   And then you say that:  The phlebotomists are also writing on the scrips --

A.   Yes.

Q.   -- correct?

Do you recall that Joyce emailed the

Page 216

D. BROADNAX

phlebotomists and the lab assistants just a few months before that, saying that she told the phlebotomists that it was okay if they wrote on the scrips?

A.    I do remember that.  That's why in this email I said I felt undermined.  Because you're taught in school, never write on profession -- I mean, medical documents unless you're using your initial and a date with a circle.  These girls started writing on the scrips with red markers, just to be spiteful to me, to show me they were checking the scrips. And they were highlighted.  This is not a Joyce rule or a Jefferson rule.  This is a rule in the medical world.  You don't write on prescriptions.  You don't write on orders.

Q.    So you concluded that the phlebotomists and lab assistants were writing on the scrips to spite you?

A.    Because I will always say you're -- like, You guys can't write on the scrips.  They would write the actual error on the scrip.  Or they will write in big highlighted marker and destroy the scrip.  I would use a sticky pad and

Page 217

D. BROADNAX

attach it to the scrip with the correction.

Q.    Right.  But your conclusion was that they wrote on the scrips to spite you?

MS. COHEN:  Objection.

Q.    That's what you testified, right?

A.    That's what I testified because that's what I was taught in school, that's what I have been doing for a long time.  And once again, no different than Joyce telling them they are collecting a specimen before you draw the specimen, is no different than this moment right here, with her saying that it's okay to write on scrips, when anybody in the medical profession knows that it's not.

Q.    And do you recall that Joyce Zagacki said to you that she told the phlebotomists and the lab assistants that they could write on the scrip because the scrips are scanned, so there's an electronic version of the scrip, before there's writing on them?

A.    The scrips were not always scanned.  That was something implemented within maybe my last year and a half at Methodist.  We stored scrips in the file cabinet.

Page 218

D. BROADNAX

Q.    Well, that's what you're talking about, right, a period here right before your termination in 2019?

A.    So, yes.  They were scanned in.  By then they were being scanned in.  But for years prior, they weren't always scanned in.

Q.    In the last page of your email, you see you write, just three lines up from the bottom:  And here I am still abiding --

Do you see that?

A.    Yes.

Q.    And here I am still abiding by the service excellence standards but creating enemies with my coworkers and being continuously undermined by my supervisor for doing so.  I have been feeling this way for years.

Do you see that?

A.    Yes, ma'am.

Q.    Okay.  So as of June 2019, you felt like you were creating enemies with your coworkers because you were following certain ways of doing things and correcting them, and they didn't like it?

A.    Correct.

Page 219

D. BROADNAX

Q.    Then at the top of this email string, going back to the first page, Joyce responds to your email:  We need to meet and talk.  This email is completely out of line.  I have addressed any concern that you've had and have spoken to each employee individually.  As far as the student is concerned, I did have a conversation with her, and she was very upset at the accusations and denied them.

Do you know what the accusations are that she's referring to?

A.    In terms of a student, I don't know.

Q.    The scrip did say only one blood culture.  It did not say times two.

So now, do you know what the accusation was?

A.    So -- so when the doctor writes an order for blood cultures, if he writes "blood cultures" with an S, it means times two.  If he writes blood culture without an S, that means one collection.  Blood cultures are done in a collection of two sets.  It's a very rarity that they only ask for one.  The only time they ask for one is because they got the second one from

D. BROADNAX

a port, and they want us to collect the peripheral.

So, I do remember this.  We called the physician.  The physician's office let us know that he did write for two blood cultures, orders, as I said.  And the humiliation that I felt behind that, no apology, none of that.  It was just -- I'm like, why am I --

Q.    Why were you humiliated?

A.    Because I'm trying to show somebody the correct way to order a test for a patient. I was negotiated [sic] with a more older white woman who had been there not long, and the student believed her over me.  And so I had to call the doctor to get it proven or verified of the correct way of ordering it, and Ms. Joyce knows I know every test, and how it needs to be ordered.  And just for her questioning me, trying to side with Janet, that just made me feel humiliated.  Like, why does she keep undermining the things that I know that I'm doing correctly?

So it turned into a humiliation factor because if you ever came into this department,

Page 221

D. BROADNAX

we have awards on the walls of service

excellence.  And for a certain amount of years,

it was called the Daisy Award.  We had

percentages in the high 90s.  And that was

always attributed to me being in -- being a

phlebotomist in the lab.  So I will pride myself

with new employees, current employees, old

employees, other staff that were coming for

blood work -- these are -- these awards are

because of me.

Q.   Who told you that the awards were

because of you?

A.   Ms. Joyce verified it many times.

These awards were given out in 2007, 2008, 2009.

I wasn't there in 2009 and 2010.  By the time I

returned in 2011, they had stopped it.  But I

was happy to know that our percentages were so

high, just based off of my service excellence

that is expected of just -- as a Jefferson

employee.  It was --

Q.   Ms. Zagacki told you that you were

responsible for the awards?

A.   At the time when I was hired before

my leave, we only had three phlebotomists;

Page 222

D. BROADNAX

myself, Victoria, and Kendra, three of us who did enough for which she hired 12 people for. And it wasn't Kendra, and it wasn't Victoria doing the service excellence to have our scores up high like that. And Joyce knew that. And we had many conversations about it.

Q.   Did Ms. Zagacki tell you that you were solely responsible for the excellence awards?

A.   Whenever I would boast about it to another employee, she would verify it, yes.

Q.   Do you know whether she told the other two phlebotomists that they were responsible for the excellence awards?

A.   No, she didn't.

Q.   You weren't there for every conversation she ever had with them, right?

A.   I wasn't there for every conversation she had with them, but I know what type of employees they were.

Q.   Right. But you don't know whether Joyce Zagacki told them that they were responsible for the --

A.   I don't.

Page 223

D. BROADNAX

Q.    -- the awards.  Okay.

Okay.  So you have this confrontation with Tynesha Jenkins when Tynesha asked you to go outside --

MS. COHEN:  Objection as to form.

MS. MOYLAN:  I was not done with the question.

BY MS. MOYLAN:

Q.    You had a confrontation with Tynesha Jenkins in June of 2019, right?

A.    Yes.

Q.    You had a confrontation with Tynesha Jenkins in 2019 when she tells you to meet her outside?

A.    Correct.

Q.    And you saw that as a threat?

A.    Yes, ma'am.

Q.    Joyce Zagacki met with you and Tynesha about that incident, right?

A.    Yes.

Q.    And as a result of the meeting with Ms. Zagacki, you have contended to the EEOC and the PHRC that Tynesha let up --

A.    She did.

Page 224

D. BROADNAX

Q.   -- right?  So she was nicer to you after that?

A.   She apologized in the meeting, and she let up.

Q.   Right.  But as far as you know, she never admitted to asking you to go outside?

A.   No, she never admitted it.

Q.   Do you know a phlebotomist named Kyla?

A.   Yes.  I know Kyla.

Q.   What's Kyla's last name?

A.   Kyla actually is the new employee who I couldn't think of, that went over to Infusion Center that sent me the patient with the blood cultures.  I forgot about her.

                (Court reporter asks for
                clarification.)

A.   I'm sorry.  You just made me remember who the employee was.  Kyla.  I don't know her last name.  But referring to what you said earlier, she was the employee who was sent to the Infusion Center that sent me the patient with the blood culture order.

Q.   Do you know Kyla's last name?

Page 225

D. BROADNAX

A.    I don't.

Q.    How long, as far as you know, was Kyla working at Jefferson?

A.    She didn't stay long.  If she stayed a year, I would say a year, but this is not -- if it was more than a year, I would say maybe a year and a half.

Q.    Do you know whether or not Kyla resigned in part because of you?

A.    I wouldn't think so.

Q.    Do you know whether Kyla resigned because she didn't like working with you?

A.    I didn't work with Kyla that much. She was day shift.  She wasn't second shift.

Q.    Okay.  So you don't know whether Kyla resigned because she didn't like working with you?

A.    No, ma'am.

Q.    Do you know whether any of your workers complained to Joyce Zagacki about working with you?

A.    I'm pretty sure.  I don't know.

Q.    And that's because you were correcting their errors?

Page 226

D. BROADNAX

A.    Correcting their errors, the narrative about me about whatever was spread about me prior to me returning.  My personality. I'm not sure, but it was just -- I always felt like there was an alliance against me.

Q.    In this email that we marked as D-9, the June 20, 2019, email that you sent to Joyce Zagacki and George Morrone, you did not complain of discrimination or retaliation anywhere in this email, correct?

A.    No.  This was about work.  This wasn't about what I was experiencing personally.

Q.    Right.  Okay.  Let's get to November 18, 2019.

A.    Sure.

Q.    You had a -- you were involved in a fistfight with Crystal Taylor on that day?

A.    Yes, ma'am.

Q.    Tell me about how that started. Tell me about the incident.

A.    Would you like for me to tell you in detail?

Q.    Yes.

A.    Because that's the only way I know

Page 227

D. BROADNAX

how to explain it.

Q.   Yes, please.

A.   So it's Monday, November 18, 2019. I get there a little early before 2:00. And Tynesha and Crystal are both at the desk -- both computers at the desk. There's a student sitting in a stool behind Crystal. And I come in as I do every day. I bleach down. I sterilize the lab. I stock up and I prepare for my shift for the rest of the evening.

Q.   And you compare it to your -- what was that?

A.   I prepare --

Q.   Oh.

A.   -- the lab for my shift because everybody -- I'm about to work alone.

Q.   Okay.

A.   So I sterilize, I ventilate, I do all of these things.

So as I'm at the sink washing my hands, Crystal turns to Tynesha and imitates my voice and says, Don't forget to order your BMPs and magnesium. But she's saying it like, Don't forget to order -- and then she hit -- she did

Page 228

D. BROADNAX

this little body language that she assumes that I carry.

Q. How do you know that she assumes you carry that body language?

A. Because that's not her behavior, that's not her body language, that's not her voice. She was imitating and mimicking me.

Q. Do you move your hand back and forth like that when you're talking?

A. I'm very feminine, I'm very girly-girl, so a lot of people say I prance or -- you know, I'm just -- I can't --

Q. You prance? Is that what you said? I'm sorry --

A. If people try to describe me, they will describe me in a very feminine way, whereas, though, you may think that I prance around or -- you know, I don't purposefully do it. I walk on my toes.

Q. Okay.

A. So she did the body language, and then she did the voice. This is piggybacking off of six months of her antagonistic behavior. I was at the sink, and when she did that, I

Page 229

D. BROADNAX

said, Crystal, I'm not for your shit today.

Q.    You said, Crystal, I'm not for your shit today?

A.    Yes, I did.

MS. COHEN:  Turn the air down.

A.    So at that moment --

Q.    I'm sorry.  Do you mind if I interrupt you?

A.    Sure.

Q.    How far away were you from Crystal when you said that?

A.    Where he is, about this amount of distance, because I was at the sink, and she was at the computers.

Q.    Okay.  So would you say about 15 feet, 20 feet?

A.    I wouldn't say 20.

Q.    Okay.

A.    I would say, 6 to 10.

Q.    Oh, 6 to 10.  Okay, 6 to 10 feet. Okay.

And you leaned in when you said, I said, Crystal, I'm not for your shit today.

Did you lean in when you said it?

Page 230

D. BROADNAX

A.    No, I said -- because I just didn't want to use profanity, but earlier you said the word after I tried not to, so I just said that.

Q.    Yeah, you should just say it.  You should just say it.  I know it's embarrassing, but --

A.    So I said, Crystal, I'm not for your shit today.  Because I am the only employee who don't -- who doesn't demonstrate that type of vulgar behavior in the workplace, soon as I said the word S-H-I-T, she jumps up and said, You cursed?  And she threw her hand this way, and she said, You're done.  And she stormed out of the office.

As she stormed out of the office, I continued at the sink.  I didn't say anything to Tynesha.  I didn't say anything to the student.

Crystal came back inside the office.  No supervisor.  Just her.  She sat back down at the computer.  I said to Crystal, Crystal, why are you always showing off for the new hires?  You do not work this area, but you're the main person making the mistakes.  That's what I said to her.

Page 231

D. BROADNAX

Q.    And you said that in front of --

A.    Tynesha --

Q.    -- Tynesha and the student?

A.    -- and the student, yes, ma'am.

At that moment, Crystal was in her chair, and she pushed it back this way.  She said, You want to talk about this outside?

I said, Sure.

Why did I say, Sure?  She wasn't -- it wasn't the type of meet me outside after work that Tynesha said that I immediately took a threat to a fight, because she said just, Do you want to talk about this outside?

We have a new employee and we have a student.  We have to respect both.

So we had been having a problem for six months.  Crystal knows the policy.  She's been there for years.  I honestly thought we were going to diffuse whatever the problem was.  I said, yes.

Q.    Okay.  May I stop you for a moment?

A.    Sure.

Q.    Have you ever heard of anyone who you worked with saying to someone, Do you want

Page 232

D. BROADNAX

to talk about this outside, they actually go outside, and they have a civil conversation?

A.    All of the time.  When people --

Q.    All the time?

A.    When people have disagreements, it doesn't always result into getting Joyce involved, getting a meeting.  You have -- you talk it out yourself.  They actually expect us to do that.

Q.    I asked you if you've ever -- if you're aware of anyone, any of your coworkers saying to another coworker, You want to talk about this outside?  And the two people go outside, and they have a civil conversation.

A.    I've never heard anybody say, You want to talk about this outside, but I'm aware of people having side conversations, clearing their differences before leadership, yes.

Q.    Right. Side conversations.  I'm talking about going outside.  But you already -- tell me if you think of something else.

A.    So don't think, I mean, outside. When I mean "outside," outside the office.

Q.    I'm asking --

Page 233

D. BROADNAX

MS. COHEN:  I'm going to object for relevance, because you have asked this two or three times.

MS. MOYLAN:  Okay.

MS. COHEN:  And it's been answered two or three times.

MS. MOYLAN:  It's highly relevant.  It's highly relevant.

MS. COHEN:  You don't like the answer, but it's been answered.

MS. MOYLAN:  No, that's a silly thing to say.

Q.    You said that she said, You want to talk about this outside?

A.    Yes, ma'am.

Q.    So my question is very specific.

A.    Okay.

Q.    Are you aware of anyone saying to another coworker, Do you want to talk about this outside?  And then they actually go outside and have a conversation that's civil?

A.    I am not aware of anything like that.

Q.    Okay.  So -- so you said, Sure.

Page 234

D. BROADNAX

A.    Yes.

Q.    Okay.  Now, what happened?

A.    So we proceed to walk out the door. She was ahead of me, closer to the door, so she walked first.  I followed behind her.  The minute the door closed behind me, she started to become belligerent, loud, and right here in our door space.

And I said, Wait a second, Crystal, not right here.  The physicians' offices are right here, and this is a unit.  Right?

At that moment, two feet to the side is a small -- like we are here aside, right, two, three feet.  There's a time clock on the sidewall, and it's blocked by two walls.  So she took about three steps right in this area, and as I'm walking behind her she said, Yeah, because I'm going to whup your ass.

Q.    Okay.  Let me stop you.

So she was not -- she didn't take steps to go outside?  She took steps to go into a --

A.    Hallway.

Q.    -- corner?  Right?

A.    She took steps to walk out of the

D. BROADNAX

office in front of the student.

Q. No, I'm talking about you said she -- you were trying to describe a little cubby, right?

A. A small hallway, yes.

Q. Right. Okay. So was that the way to outside?

A. I tried -- this is what I was trying to explain to you. The fact that she used the word "outside," I don't want you to think she meant outside.

Q. That's how -- that's how you -- you didn't interpret her saying outside the hospital --

A. No.

Q. -- is what you're saying?

A. Absolutely not.

Q. Okay. All right.

So she takes three steps off to the side in a small hallway?

A. Yes.

Q. You followed her?

A. Yes.

Q. Okay.

Page 236

D. BROADNAX

A.    And as she's walking into this hallway, she's saying, Yeah, because I'm going to whup your ass.

So I took a step back, and I said, Crystal, you're not going to do anything to me.

She said, Why?  What are you going to do about it?

So now she's taking her chest, and she's bumping me in my chest, and she's saying, What are you going to do about it?

I said, Crystal, I'm going to get Joyce. I'm not Naeemah.  And I proceeded to go get -- I go to turn my body this way to go get Joyce.

She takes these two fingers and she said, Yeah, because you know better.

So this is after the chest bump, this is after she says she's going to whup my ass, then she says, Yeah, because you know better.

Q.    And that's as you're turning to walk away from her to go to get Joyce?

A.    Yes.  This is as I'm turning, because like I see the direction that it's going in.

After she did this to me, I said, Don't

Page 237

D. BROADNAX

put your hands on me.  I turned around again --

Q.    Okay.  Let me stop you.  You said, I said, Don't put your hand on me, and you gestured that you --

A.    I did the same thing to her that she just did to me.

Q.    Okay.  So you -- after she poked you in the head, you turned towards her and poked her in the head?

A.    Yeah.  Because I didn't do a full turn.  As I was walking away to go get the supervisor, she had time enough to -- Yeah, because you know better.

Q.    And you could have -- there was nothing obstructing your way from continuing -- after she poked you in the head, you could have continued to turn and go get Joyce, right?

A.    At that moment I felt the need to defend myself.

Q.    Right.  I understand.  But I'm asking, was there anything that obstructed your way to prevent you from walking away from her after she poked you in the head.

A.    There was nothing obstructing my

Page 238

D. BROADNAX

way.

Q.    Okay.  So then you turned towards her and you poke her in the head, and you said?

A.    Don't put your hands on me.

Q.    Okay.  And then what?

A.    I proceeded again to turn my back to go get Joyce now, really, and as I'm turning is when I just got hit in the back of my head really hard and fell to the floor.  And that's when the fight began.

Q.    Okay.  Tell me about the fight.

A.    She hit me in the back of my head. The way that I fell on the floor were on my hands directly onto my knees.  By the time I'm on my hands and knees this way, because I'm out of my shoes, she's on top of me, and she's punching and she's punching and she's punching.

I'm on the floor.  Mind you, the way she attacked me when she punched me, this whole right side of my hair -- my hair was almost similar to what it is now -- she grabbed it to get me on the ground to punch me.  I lost the whole portion of my hair here when she did this. She ripped it from my scalp.

Page 239

D. BROADNAX

Q.    Do you have a picture of that?

A.    I do.

Q.    Okay.  Have you produced it?

A.    I did.  Would you like to see it?

Q.    I'll look at the pictures that you produced.  I don't recall there being a bald spot.  Does it look like a bald spot in the picture?  Just making sure that I have it.

A.    I would have to look at it again, but I have it.

Q.    Okay.  Would you please look at the pictures that your attorney has produced and just make sure that you -- no, no, not now.

A.    Okay.

Q.    Yeah, thank you.  After the deposition.  Just look at the -- make sure you have produced every picture of your -- of what you're referring to.  Okay?

A.    So the pictures I sent to my attorney were directly the day of the fight.  I didn't realize that Crystal destroyed my hair until I had to go to the hair salon to have my hair done.  I saw the damage that was done.  So that's when I took the picture.  So that picture

Page 240

D. BROADNAX

I may have not submitted, because it came like a week and a half after -- for my birthday, which is November 30th.

Q.    Okay.  Will you submit that to your attorney so then she can produce it to me?

A.    Yes.

Q.    Okay.  Thank you.  Okay.  So go ahead.  Continue.

A.    I'm on -- I'm crashed on the floor, on both palms.  I have severe problems with my wrist and on both knees.  And I'm out of my [unintelligible], so I'm in my socks.  And she's just beating me in my head and beating me in my head, so I got the strength enough to pull her to the floor as well.

And when I was able -- because Crystal wears her hair like a guy, like a bowl cut, so it's not like I could grab her hair to pull her down like she did me.  I had to literally, like, fight my way from the floor to try to get her down, to stop hitting me on the back of my head and punching me from the back, the way she was.

So we continued to fight.  The first person that I recall running up is an RN named

Page 241

D. BROADNAX

Igidia.

Q.   Do you know how to spell that?

A.   Yeah.  Igidia is I-G-I-D-I-A.

Q.   Okay.  Before we get to Igidia, when you -- you're referring to fighting.

A.   Yes.

Q.   Were you punching her?

A.   Again, she had control over me because I had hair on my head.  I can't grab her hair.  All I can do is try to get myself off the floor.  So, yes, I'm swinging back.  I'm doing what I can to defend myself, because I'm getting hit in the head like crazy.

Q.   Was anything being said during this conversa -- or, I mean, during this fistfight?

A.   I can't tell what was -- I can't tell you.

Q.   Okay.  Did you say anything?  You don't recall saying anything?

A.   Get off of me.  It was a bunch of: Get off of me.  Stop.  Get off of me.  Like that type of thing.  Get off -- she was on top of me.  It was like -- I was defenseless in socks.  There was nothing that I could do, and I had on

Page 242

D. BROADNAX

a lab coat.  She had on sneakers and no lab coat.  So the advantages that she had over me, from being a sneak attack, wasn't much that I could do but try to fight my way back to get off the floor.

Q.    Okay.  So -- but when you were fighting -- when this fight was going on, you were swinging and punching Crystal?

A.    I was doing what I needed to do to defend myself, yes.

Q.    Okay.  And -- okay, so Igidia -- you have a memory of Igidia running up?

A.    I have a memory of Igidia peeking by the wall, Girls, stop, stop.  And then at the same minute Igidia is staying "Stop," a patient transporter -- it was a guy, he walked up and said, Dywanna, what happened?

At this point, Crystal releases me.  And as I said, She attacked me, Loretta who was -- Loretta was a nurse that was sitting at the desk when Crystal first walked outside the office, and I stopped her from yelling.  Because it's a patient unit right there.

So then Loretta appeared.  But the only

Page 243

D. BROADNAX

people that saw us actually physically on the floor was Igidia. And then James, who was the patient transport.

By the time Loretta came over, and then Tynesha ran out of the office because I guess she heard the commotion, Crystal and I were already separated.

Q. What is James's last name?

A. He's patient transport. I don't know.

Q. Okay. And so did anyone witness the way the fistfight started?

A. No, ma'am.

Q. And is it your understanding that Loretta Ward -- right, that's her name, Loretta Ward?

A. Possibly. I don't know her last name.

Q. Okay. That the nurse, Loretta, is it your understanding that she witnessed the two of you fighting on the floor?

A. No. Loretta did not witness us fighting on the floor. Loretta came after Igidia, after we were separated.

Page 244

D. BROADNAX

Q. So you're fistfighting with Crystal Taylor on the floor, and it's your testimony that you would have known when Loretta Ward saw what was happening?

A. The minute Igidia walked up, she started yelling for us to stop. If Loretta walked up and saw us fighting, that means she stood there and watched the fight. You don't think that she would have tried to break it up or say, "Stop"?

Q. How do you know that Loretta Ward didn't yell "Stop"?

A. Because I was already separated from Crystal, so I saw her just standing there in awe.

Q. That's when you saw her, right?

A. Yes.

Q. Okay. And you're on the floor --

A. I seen everything.

Q. Right.

A. I was --

Q. Okay. So you saw all around you when you were on the floor --

A. Yes, ma'am, because I was -- as I'm

Page 245

D. BROADNAX

getting attacked, I'm thinking, like, it's lunchtime.  Why is nobody walking past to break this up?  Where is the help?  We're right under the time clock.  There's a big mirror.  Where is security that's right there that can see us?  I found out there's no camera there.

So, yes, I was aware of who was walking up, because I'm waiting for somebody to break up this fight from this girl attacking me.

Q.    So are you saying that it's not possible that Loretta Ward saw you from her desk, fighting, and yelled "Stop"?

A.    Do you know -- I explained it originally, Loretta was at her desk.  Her desk is to the left of our outpatient door.  I told you that Crystal took three steps and walked around another wall.  How can she see us around the wall?  It was a wall separating.  She walked into a blind spot.  That's like if I -- he's sitting there, and I go stand over here.  He's not going to see anything.

Q.    So if Loretta gave a statement to security that she saw the two of you fighting and yelled for you to stop, is Loretta lying, as

Page 246

D. BROADNAX

far as you're concerned?

A.    I remember Ms. Igidia yelling to stop.  Ms. Igidia is older, so she's not going to get in between two women and try to stop them from fighting.  Loretta is a little older than me, so she -- and she's strong enough to stop two women from fighting.

I can a hundred percent say, Loretta didn't see the fight.  She saw the end, once we got up, and I was disheveled, and she was yelling and everything like that.  But in terms of her actually seeing the first hit or whatever -- because Loretta was sitting there when we walked out.  Loretta should have been the first one that arrived.  She didn't.  It was Igidia.  She might have told Igidia, Oh, I think they are fighting over there, and then came after Igidia, but Loretta didn't come up.  And then Loretta didn't even come in the corridor where we were fighting.  She was standing by, like, the elevator, once I got off the floor.  She didn't see it.

I don't know what statement she gave, but I know for a fact, because I was the one getting

Page 247

D. BROADNAX

assaulted.  I was wondering where -- it's lunchtime, where are the people at to break this fight up?

Q.   Is it possible that when you heard "Stop," that you thought that Igidia was saying it, and it was actually Loretta?

A.   Loretta wears royal blue.  Igidia wears navy.  She wears glasses.  Loretta has red hair.  Igidia doesn't.  Igidia is close to 60-something.  Loretta is in her late 40s, maybe early 50s --

Q.   How about their voices?

A.   I didn't need to hear their voices because I could see their faces.  I saw them. It's not like I'm just imagining somebody, or I'm just hearing people say "stop."  I saw how Igidia was holding the wall this way, peeking at us, telling us to stop.

Q.   Do you have any reason to believe that Loretta harbors any kind of animus against you?

A.   I was -- I told you earlier that I would go stand at the nurse's station while Crystal will leave.  I was standing with

Page 248

D. BROADNAX

Loretta.

Q.   Do you have any reason to believe that Loretta has --

A.   No.

Q.   -- retaliatory animus against you?

A.   No, she doesn't.  I don't have any reason to believe, let me say that.

Q.   Right.  That's what I asked you.

MS. MOYLAN:  Okay.  Let's mark that as D-10.

(Thomas Jefferson Report is received and marked as Exhibit D-10 for identification, as of this date.)

Q.   Take the time you need, but my question to you is:  Have you ever seen this document before?

A.   No.

Q.   Okay.  I will represent to you that this is a report that Security created regarding the fistfight that you had with Crystal Taylor. And do you see that it's reported by William White, on the first page; you see that?

A.   Yes, I do.

Page 249

D. BROADNAX

Q.    And it's -- the specific location was the east-west hallway between outpatient lab and old surgical waiting area.

Do you see that?

A.    That's not the location, but, yes.

Q.    Okay.  In what way is that not the location?

A.    Because we weren't near the old surg -- I mean, the surgical waiting room.  We were near the outpatient lab and closer to the B1 unit.  But if he wants to call it that, that's how he described it.

Q.    Okay.  So that could be just the way he --

A.    Described it.

Q.    -- described it.  Okay.

And the incident is November 18, 2019 at 1:51 p.m.  Right?

A.    Yes.

Q.    Is that accurate?  About that time?

A.    Yes, ma'am.

Q.    And then it says:  Contact Number 1, Crystal Hunter.  Contact Number 2, Dywanna Michelle Broadnax.

Page 250

D. BROADNAX

Do you see that?

A.    I'm not sure what page you are on.

Q.    I was on the first page.

A.    Okay.  Yes, I do.

Q.    Contact Number 1, Crystal Hunter. Contact Number 2, Dywanna Broadnax.

And then on the second page, page 2 of 3, it has:  Witness, Loretta Ward.  Witness, Marquan Trippett.  Other responder, Benjamin Seabreeze.

You see that?

A.    I'm not even sure who Marquan Trippet is, unless that's James's real birth name.

Q.    No.

A.    The patient transporter.

Q.    Right.  Okay.

A.    I'm not even sure of an employee by this name.

Q.    Okay.  All right.  But on here, there is no witness named Igidia, right?

A.    I don't see Igidia's name.

Q.    Okay.  Was Igidia still there when Security came?

Page 251

D. BROADNAX

A.    I was a little irate.  I can't tell you who was there.  A lot of people was in the hallway at that point.

Q.    So do you know whether or not anyone from Security learned that Igidia yelled for you to stop?

A.    I can't answer that.  Nobody came and talked to me.

Q.    Okay.  But you didn't ever articulate to Jefferson that there was some woman named Igidia who saw the fight, right?

A.    Igidia did not see the fight.

Q.    Okay.

A.    Igidia arrived during the altercation -- well -- oh, my God.  When I looked up and saw Igidia hugging the wall, telling us to stop, we were already -- I was already on the floor, and Crystal was already punching me.  She didn't stop at that moment.

When James walked up, he said, Dywanna, what's going on?  Crystal released me, and I -- and then, at that moment, I saw Loretta standing near the elevator.  I know the difference between Igidia and Loretta.

Page 252

D. BROADNAX

Q.   Yeah, no, I'm not saying you don't know the difference between Loretta and Igidia. I'm just trying to understand.

So, as far as you know, did you tell anyone from Jefferson that Igidia saw the two of you in the altercation?

A.   When I wrote my report in pencil five minutes after the altercation, I had a concussion and everything going on, I can't tell you what I -- what I said I saw, but I know what I wrote down verbatim what happened.

It didn't click until later, the three people who I physically saw with my eyes, that I know saw portions of, or the ending.  Granted, my glasses were knocked off my face, and my glasses are for near and farsighted, so I can take them off, and I won't even be able to read anything on that little board right there.  So could Igidia -- I mean, could Loretta have been standing closer?  No -- I mean, possibly, because I didn't have on my glasses.  However, when I was able to look around clearly, because I was waiting for help, the only person I saw that was telling us to stop was Igidia.  And Loretta was just standing in awe,

Page 253

D. BROADNAX

behind the corridor, near the elevator.

Q.   Okay.  All right.  And I don't mean -- I'm not suggesting that you don't know what Igidia looks like or that Igidia wasn't there.

A.   Okay.

Q.   I'm just asking you, if -- and I'm not sure you answered it directly.  Did you ever tell anyone from Jefferson that Igidia witnessed something related to the altercation with Crystal?

A.   I would need to reference my security report that I wrote immediately following the fight.  I can't recall.  But I did -- I do remember -- maybe I mentioned it to my lawyer -- that Igidia was there.

Q.   Right.  Okay.  And did you -- when Aaron Sniderman from Jefferson called you and terminated you --

A.   Jefferson -- Aaron Snider [sic] never called me ever in his life.  I called him.

Q.   Okay.  Thank you for correcting me.

When you spoke to Aaron Sniderman on the phone, and Aaron Sniderman terminated you for

Page 254

D. BROADNAX

the fistfight, did you tell him that Igidia witnessed something related to the fistfight?

A.   I can't recollect that conversation, but I was just too emotional to know that I was being terminated.

Q.   Okay.  I'm really just trying to get an answer to whether or not you recall ever telling Jefferson that Igidia saw something related to the fight.  And you don't recall that, other than if it's in your statement, which I'll show you in a moment.

A.   Yes.

Q.   And then on page 3 of 3, let's look at the narrative text of, what is it, D-10.

Sergeant White responded to radio call from Post 102 for assistance in B1 hallway:  I arrived on scene to find multiple staff members, including SOJ Moffitt, SOB Seabreeze and nursing assistant, Loretta Ward, in hallway outside of outpatient lab.

Ms. Dywanna Broadnax was in hallway outside of outpatient lab.  I asked SO Seabreeze to escort her to hallway -- let's see -- to escort her to hallway outside of outpatient

Page 255

D. BROADNAX

lab -- oh, wait, sorry, I'm reading this wrong.

Ms. Dywanna Broadnax was in hallway outside patient lab. I asked SO Seabreeze to escort her to seating area outside of pharmacy and remain with her.

I entered the lab area and spoke to Ms. Hunter. Ms. Hunter stated that this was a verbal dispute that turned physical after Ms. Broadnax invaded her personal space. Ms. Hunter stated that Ms. Broadnax pushed her twice. I then took Ms. Hunter to inpatient physical therapy to write a statement.

Do you see that?

A.    Yes, I do.

Q.    Okay. Were you present, or did you overhear the conversation between Sergeant white and Ms. Hunter?

A.    So when I got off the floor, I immediately walked to my supervisor's office.

Q.    Is that a "no"? Is that a "no," you didn't -- could you just answer my question?

A.    No, I wasn't there, no.

Q.    Yeah. I really want you to tell your story, and I want to know it. Let's just

Page 256

D. BROADNAX

answer my question.

So you were not -- you did not hear what Ms. Hunter told Sergeant White about the confrontation, right?

A.   No, ma'am.

Q.   Then it says:  I then spoke to Ms. Broadnax in main lab, and she stated that Ms. Hunter started a verbal confrontation in lab and then asked her to come out in the hallway, where she became physical by bumping her.

Right?

A.   Okay.

Q.   Ms. Hunter did not -- is that what you told Sergeant White, as you recall?

A.   Yes, that's correct.

Q.   Then it says:  Punching her, pulling her hair, and pulled her to the ground. Ms. Ward stated that she saw two employees fighting in hallway and tried to break them up by yelling at them to stop, before calling for security.  I took both staff members' IDs and gave them to their manager, along with their keys.

And were you present for Ms. Ward talking

Page 257

D. BROADNAX

to Sergeant White?

A.    No.

Q.    And is that accurate that Sergeant White took your ID, along with your keys?

A.    That's incorrect.  Joyce got my ID from the ER.

Q.    Okay.  I also had statements written by Ms. Hunter, Ms. Broadnax, Ms. Ward, and Mr. Trippett.  Ms. Broadnax wanted to press charges against Ms. Hunter, and I informed her that she would need to file a private criminal complaint with Philadelphia Police Department, Third District.  She was given an address to police station while she was escorted to ED to be checked out for possible injury.

Does that accurately reflect the conversation you had with the sergeant?

A.    Yes, but he just left out the -- he told me he will call the police, himself, to the hospital.

Q.    He said what?

A.    He left out that he was the person that called the police to the hospital for me to give my statement.

Page 258

D. BROADNAX

Q.    Okay.

MS. MOYLAN:  All right.  Let's mark this as D-11.

(Handwritten statement is received and marked as Exhibit D-11 for identification, as of this date.)

Q.    Do you recognize D-11 as a handwritten statement that you wrote?

A.    Yes, ma'am.

Q.    And did you write this right after the fistfight that you had with Crystal Taylor?

A.    I believe so, yes.

Q.    And is that your signature?

A.    Yes.  It is.

Q.    And that's your handwriting?

A.    Yes, ma'am.

Q.    Okay.  For the record, would you please read your statement out loud?

A.    I clocked in and walked in the outpatient lab.  After I put my things in my locker, I came near the other phlebotomist. Crystal said to Tynesha, Don't forget to add your mag and phos, a subliminal comment.  So I

Page 259

D. BROADNAX

said, Crystal, I'm not -- I put "stuff" in the comment.  I didn't say the word.  But, I'm not for your stuff today.  You too F'ing old for that.  She got up and got in my face and said, Did you just curse at me?  Then she said, You're done.

She left outpatient lab, and when she came back, I said, Why are you always so sarcastic?

She said, Do you want to talk about this outside?

I said, yes, because we had students and patients.

She got in front of the lab door and proceeded to get loud.  I said, I'm not doing this right here in front of the doctors' offices and administration.

So she came on -- so she come on the turn the hall -- I can't -- I don't know what this is -- come turn on the hall near the time clock.  She said, Because I'm going to hurt you.

I said, You're not going to put your hands on me.

She said, Then why you come outside?

I said, To talk.  You not getting to touch

Page 260

D. BROADNAX

me.  No, you're not going to touch me.

She then started bumping my chest, all in my face.  I said, I'm not -- I'm going to tell Joyce.  This is crazy.

As I turned around, she grabbed my hair on the right side, hit me, and pulled me to the floor.  At that point I began defending myself.

Q.    Okay.  Thank you.

So in this statement you admitted to using profanity when speaking to Ms. Taylor, right?

A.    At that moment, yes.

Q.    And you admitted that Ms. Taylor left the room after responding to your profanity?

A.    Yes.

Q.    And you admitted to keeping the confrontation going when Ms. Taylor returned, by you saying, Why are you always so sarcastic?

MS. COHEN:  Objection.  Go ahead.

Q.    Let me ask it this way.

When Ms. Taylor returned, did she say anything to you?

A.    No.  She just looked at me with an evil face.

Page 261

D. BROADNAX

Q.    And so the first person who said something between the two of you, after she returned to the room, was you.  Right?

A.    Yes.

Q.    And you said, Why are you always so sarcastic.  Right?

A.    Yes.

Q.    But, also, during this testimony, during this deposition, you testified that you told her that she's the one who makes the mistakes, right?

A.    I remember specifically saying, Why are you always showing off on the new hires?  You don't know this area -- because Crystal works the other area.  And I said, And you're the primary person that's making the mistakes.  That was the first time I did two things; curse and let the employee know that I know that she's the one that's making the mistakes.  So, yes, I did say that in that moment.

Q.    And when you said that, you knew that she was -- or you concluded that she was angry at you, right, because before she left the room, she came -- well, she said to you --

Page 262

D. BROADNAX

A.   You're done.

Q.   -- You're done.

A.   I took her saying that I'm done is because, finally, I cursed.  I cursed, and she had something to tell on me about.  That's how I took that moment.  What she meant by it, I don't know, but me personally, since it was said to me, when she said, You're done, that's because, Finally, I can finally say Dywanna did something that she can get in trouble for.  That's how I took it.

When she returned -- keep in mind, we have a work relationship.  Even though she may be doing antagonistic things, I'll still talk to her about work.  I have to.  I can't -- we can't -- I can't not just talk to her.  And we did have a friendly situation for years.  So when she returned, I said Crystal, you know, whatever it is that I said to her when she returned --

Q.   Right.  When she returned.

A.   I wasn't being controversial --

Q.   Was it your -- was it your impression that she was happy with you?

Page 263

D. BROADNAX

A.    It was my impression she was showing off in front of Tynesha, the new hire, and just being aggressive with me because she knew I was friends with Naeemah.

Q.    Right.  She was being aggressive with you?

A.    Yes.

Q.    And she was going to report you to the supervisor.

MS. COHEN:  Objection.

MS. MOYLAN:  That's what she said.

MS. COHEN:  No.  Let me get my objection done first.  You can ask it again.

MS. MOYLAN:  I don't know what you're saying.

Q.    But it was your understanding that Crystal Taylor left the room to go report your cursing to Joyce Zagacki?

A.    That's what I assumed, yes.

Q.    And then after you say what you said to her, which is, Why are you always so sarcastic?  And this was in front of a student

Page 264

D. BROADNAX

and Tynesha, and you told her, You are the one making mistakes, or you make mistakes --

A.    Well, I said:  You don't know this area, and you're the primary person making the mistakes.

Q.    And then her response to you was --

A.    Pushing her chair back --

Q.    You want to talk -- yeah, go ahead.

A.    Pushing her chair back, asking me, do I want to talk about this outside.

Q.    Okay.  And her pushing your chair back?

A.    Yes.

Q.    Did that indicate to you that she was upset with you, frustrated with you?

A.    I mean, no, what I mean, pushing the chair back, pushing it back to stand up.  That's what I mean.  Not aggressively slamming herself away, but just, You-want-to-talk-about-this-outside-type of thing.

Q.    And in your statement you admitted to saying yes in response to that question?

A.    Yes.

Q.    And you also admitted to defending

Page 265

D. BROADNAX

yourself in this statement?

A.   Yes.  Yes.

Q.   Let's mark this as D-12.

(Handwritten statement is received and marked as Exhibit D-12 for identification, as of this date.)

Q.   Have you ever seen this document before that we have marked as D-12?

A.   No.

Q.   This is the statement that Crystal Taylor wrote on November 18, 2019, when she was with security.  Says:  On the day of November 18, 2019, about 2:40 p.m., we -- me and coworker putting in patient.  I simply told my coworker that if you're putting in chem, make sure you add mos and phos.  Dywanna -- I can't read that word -- said, Do me, out loud in front of patients.  That is always being this and cursing.

MS. COHEN:  I'm going to object to you reading this because I don't think it says a lot of that.  Do you have a better copy?  Is there a

Page 266

D. BROADNAX

better copy somewhere?

MS. MOYLAN:  Possibly, but --

Q.    Okay.  She says -- do you see the
very -- the last sentence:  She began cursing
and fighting.

MS. COHEN:  It
doesn't say "began."  It says she
became -- cursing and something.

MS. MOYLAN:  Okay.

MS. COHEN:  I don't mind you
reading it.  I'm just not going to
agree --

MS. MOYLAN:  That's fine.  That's
fine.  What matters is what
Jefferson read.

A.    I don't even see this -- I can't
even understand the center of this.  No.

Q.    Yeah, you've never seen this
statement before.  Okay.

Let's look at D-13.

(Handwritten statement is
received and marked as Exhibit D-13
for identification, as of this
date.)

Page 267

D. BROADNAX

Q.    Have you ever seen what we have marked as D-13 before?

A.    No, ma'am.

Q.    Okay.  This is a handwritten statement that Loretta Ward wrote on November 18, 2019.  I'm going to read it, and you let me know if you don't agree that that's what it says:  I, Loretta Ward, was walking down toward inpatient lab -- I can't read that word -- getting to the lab, I heard noise like punching and breathing, heaving, and I looked to the corner by the time clock, and there are two girls fistfighting.  And I said, Stop, twice, then I yelled, Security.  And when security tore them apart from each other, the short girl said out loud, She put me in this corner to fight with me, because there is no camera.  The short girl has long hair.  The tall girl, with very short hair.

You see that?

A.    Yes, ma'am.

Q.    And so, sitting here today, do you -- do you know whether or not Loretta Ward falsified anything in that statement?

Page 268

D. BROADNAX

A.    So, number one, Security didn't break us up.  When Security arrived, I was already in the main lab with my supervisors. All of the technicians telling them I was just attacked by Crystal.

Remember, James, Igidia, and Loretta were the three people in the vicinity when we were separated.  Immediately upon my separation, I walked slowly to Joyce's office.  First I stopped at George.  He wasn't there.  Joyce wasn't inside.  I walked to the main lab with the tech.  They seen me and they all started screaming because I was so disheveled.  And I broke out and start crying, saying, Crystal just attacked me.  And then pandemonium.

At that point, that's when Security was with Crystal around there at the outpatient lab and physical therapy, taking her statement.

Then they came to me in the main lab and said they wanted to talk to me and give a statement, and we went back to the outpatient lab.  Crystal was still in there getting her things out of her locker, and Security were trying keep us separated inside the outpatient

Page 269

D. BROADNAX

lab.

So her statement about security breaking us up, that didn't happen.  What she saw, she saw -- I can't say what she saw or what she even may have heard, but her saying she witnessed Security pulling us apart, Security even didn't say they pulled us apart.  That didn't happen.

Q.   Well, in your presence, Security did not say they pulled you apart.

A.   In their statement, Security said -- didn't say they pulled me apart.

Q.   Oh, that's what you meant.  Okay.

Okay.  Let's look back at your amended complaint you filed on May -- on or about May 19th, 2020.  And that was D-7.

THE VIDEOGRAPHER:  The time is now 4:17.  This completes media unit Number 3.

(A break was taken.)

THE VIDEOGRAPHER:  The time is now 4:30 p.m.  This begins media unit Number 4.

Q.   Okay, Ms. Broadnax, before the break, I wanted you to put D-7 in front of you,

Page 270

D. BROADNAX

what is your amended complaint filed on May 19, 2020.

A.    Yes.

Q.    Okay.  And I just want to direct your attention to paragraph 30 of the complaint.

A.    Yes.

Q.    Okay.  So you say, in paragraph 30: Ms. Taylor began bumping my chest and said, Then what you come around here for?  I bumped her away from me and told her to back up, that I was not Naeemah.  I turned around and said I was going to get Ms. Zagacki because this was crazy.

Do you see that?

A.    Yes, ma'am.

Q.    Okay.  So is that accurate that you bumped Ms. Taylor away from you.

A.    When she was chest bumping me in my chest, yes, I was chest bumping her back away from me.

Q.    And then in paragraph 31, you alleged:  Ms. Taylor poked me in the head multiple times and said, Yeah, because you know better.  I backed up and she continued to bump me in the chest.  I told her to stop, and I

Page 271

D. BROADNAX

tried to walk away, but she kept poking me, so I poked her back.

You see that?

A.    I didn't write this, so it was worded from my complaint.  The poking only occurred the one time, so it wasn't like she poked me, I poked her, then she bumped me, and I poked her.  That didn't happen.  But it sounds like they kind of worded it a little bit different.

Q.    Okay.  So -- but you did testify earlier today about Ms. Taylor poking you, and you poking her back?

A.    Yes, ma'am.

Q.    And that's accurate, the way you described it today during your deposition, that's accurate?

A.    Yes, ma'am.

Q.    Okay.  And then in paragraph 35 of the complaint, D-7, it says:  I immediately walked to the STAT lab, and Security was now all over the first floor.  I went to Ms. Zagacki and told her what happened.

Do you see that?

Page 272

D. BROADNAX

A.    Yes.

Q.    Is that accurate, that you went to Ms. Zagacki and told her what happened?

A.    Immediately, as soon as I got up off the floor.  I didn't stop to talk or look around.  I got up and started walking to the management location, the STAT lab.

Q.    Right.  But maybe I missed something.  I thought Ms. Zagacki looked for her, and you weren't able to find her?

A.    Immediately after I got off the floor, I started walking in the direction of the STAT lab.  The first office you see is George, then Joyce, then the phlebotomy room, and then the STAT lab.

Joyce was -- George was not in his office.  His door is always open.  Joyce was not in her office.  When I got to the STAT lab, she wasn't in there because she was in Microbiology.

The technician saw me first, which was Michelle Favano.  When I first walked up to the glass window, she was the first technician that saw me.  And she was the one that I -- she saw me so disheveled, What happened?  And I blurted

Page 273

D. BROADNAX

out crying, Crystal just attacked me.

At this -- during this moment, I'm in there with management and the techs. Security is on the first floor by the outpatient lab with Crystal.

Q. And who is management that you're with?

A. Linda Dutch. Donna Lemon. When I mean "management," these are -- this is the chemistry supervisor and the hematology supervisor that worked in the immediate STAT lab.

Q. Okay. Linda Dutch and who else?

A. Donna Lemon was in there. And our evening supervisor, Danny, he had just come in because he works from, like, 3 to 11.

Q. Okay. So that's not accurate that you went to Ms. Zagacki and told her what happened?

A. The first person I saw was Michelle Favano.

Q. Okay. Is that accurate that you went to Ms. Zagacki and told her what happened?

A. That is accurate, what I went to do, but the first person I came in contact with was

Page 274

D. BROADNAX

not Ms. Zagacki.  But, yes, I got up and left the hallway to go find Joyce.  Yes.

Q.    I understand you went to find her. This says:  I went to Ms. Zagacki and told her what happened.  You didn't find Ms. Zagacki, right?

A.    She was not in her office, no.

Q.    Right.  You didn't find her before you went to the emergency room, right?

A.    No.  You're wrong.

Q.    Okay.  When did you see Ms. Zagacki?

A.    While I was in the STAT lab with the other tech.  She came out of Microbiology because she heard the commotion, and she saw me disheveled.

Q.    Okay.  And did you communicate with Ms. Zagacki at that time?

A.    That Crystal had just attacked me, and she started screaming and crying.

Q.    Ms. Zagacki started screaming and crying?

A.    Yes.  Oh, my God.  Because now Crystal went to the ultimate extreme.  Tears. I'm so sorry, Dywan -- oh, my God.  Not knowing

Page 275

D. BROADNAX

what to do.  Frantic.

Q.   Okay.  Anything else said between you and Ms. Zagacki?

A.   Ms. Erica had just walked in at two o'clock, and she saw me so disheveled, it made her start screaming and crying, because Crystal had attacked me.  So it was too much chaos for me to understand each person's side conversation and what was being said.

Things calmed down for me when Security walked me to the emergency room.  And that's when Joyce came to the ER.

Q.   Okay.  So nothing else was said between you and Joyce Zagacki, other than what you said?

A.   Besides Crystal just attacked me, no.

(Gmail dated 11/23/19 is received and marked as Exhibit D-14 for identification, as of this date.)

Q.   Okay.  This is D-14.  Okay.  Take the time you need, but my question is:  Do you recognize D-14?

A.   I do recognize the email.

Page 276

D. BROADNAX

Q.   Okay.  And who did you write this to, if anyone?

MS. COHEN:  I'm not sure who wrote this.  I'll start with that.

A.   It says that it's to me --

Q.   Yeah, let me take a step back. Yeah.

A.   Okay.

Q.   Do you recall writing this email?

A.   Yes.  I do recall writing the email.

Q.   Okay.  And did you send it to anyone?

A.   I don't see an address on who I could have sent it to, so -- what I do know is I sent an email to any contact that I had in Jefferson.  I was so distraught, I wanted to share my story with anybody that would hear me, so I really didn't understand the dynamics of the administration at the time, so I sent it to Administration, if I'm not mistaken.

Q.   Do you see it says:  Hello, I spoke with you earlier this year in reference to the above case number?  I mean, you can tell me if you --

Page 277

D. BROADNAX

MS. COHEN:  Refers to a Mr. Bethia?

A.    Okay.  So that means this went to the PHRC.  Okay.

Q.    Okay.  So you think you wrote this email and sent it to the PHRC?

A.    Yes.  Mr. Bethia was my second -- was the second person assigned to my second claim with the PHRC.

Q.    Okay.  All right.  So the third paragraph down that starts with:  So, as I returned from my stroke recovery.

You see that?

A.    Yes, ma'am.

Q.    All right.  And then you say:  I even went to the boss and cried about it because I thought we were friends.  At that point I realized she's treating me mean, because I'm friends with Naeemah.

So what you're saying there is, you realize that Crystal was treating you mean because you were friends with Naeemah Gadson; is that right?

A.    Yes.

Page 278

D. BROADNAX

Q.   And then in the next paragraph down that starts with:  I am a second-shift phlebotomist.

Do you see that paragraph?

A.   Yes.

Q.   About three lines up from the bottom of that paragraph, there's a sentence that starts with:  This duty I do causes tension.

Do you see that?

A.   Yes.

Q.   So it says:  This duty I do causes tension with the other phlebotomists, because I'm exposing their errors.

A.   Yes.

Q.   Okay.  So what you're talking about is what we talked about before, that there's tension with your coworkers because you show -- you expose their errors to Joyce Zagacki, right?

A.   Yes, ma'am.

Q.   Okay.  So -- and that's not just Crystal as a coworker who you have tension with because of that, right?

A.   So I don't want you to confuse and say I have tension with Crystal because I expose

D. BROADNAX

her errors.  I didn't have tension with Crystal. Crystal had tension with me because I was friends with Naeemah.

So to answer the second part of your question, I didn't have the liberty to check on who made the mistake.  That was not a function that I had access to.  So I can't say that this is the reason, because I don't know who makes the mistakes.  That's not my job.  My job is to correct them, get them, and turn them in.  So I can't say that this is the reason, because I'm not there for these meetings.  When they go down and these girls get reprimanded for whatever mistakes they made, you know, I'm not there. I'm only being -- I get the minutes, as we call it, from my supervisor who kind of generalizes the whole meeting.  And, D, you're fine, and Don't worry about it.  This is what happens. But she never tell me the complaints of my coworkers.

And I was deprived that my entire -- from 2011 to termination, maybe I would have gotten better had I known that they felt this way about me.

Page 280

D. BROADNAX

Q.   Well, we saw in the June 2019 email that you wrote to Joyce, with the cc to George Morrone, that you're acknowledging that your coworkers are annoyed with you or angry with you because you correct their mistakes, or you point out their mistakes.

A.   That's correct.  But, again, I can't tell you to what extent Ms. Joyce will reprimand them or even bring it to their attention, because I was never there for those meetings --

Q.   Right, I understand.

A.   -- but everybody else was there.

Q.   Okay.  And then -- then you say:  I have never been liked in my department by my phlebotomist coworkers.  So them being angry with me about scrip check is normal.

That's what you wrote to Mr. Bethia, right?

A.   That's how I felt, yes.

Q.   Okay.  Then in the bottom paragraph that starts with:  On 11/18/19?

A.   Yes.

Q.   You see that?  The third sentence where it starts:  Tynesha had just started

Page 281

D. BROADNAX

working there.

Do you see that?

A.    Yes.

Q.    Tynesha just started working there when I returned 4/6/19 from stroke recovery. Crystal turned her against me immediately, which caused instant tension between Tynesha and I.

What is your basis for contending that Crystal turned Tynesha against you?

A.    No different than when I first came back, there was already an alliance about the narrative of my case that I didn't share with anybody but Joyce.  So why do I feel that way about Crystal and Tynesha?  Because I didn't know Tynesha's underlying issue of already knowing me, at this moment Crystal would recruit her.  And Crystal's sarcasm to me in front of Tynesha was funny, which in turn, I felt -- it would make me humiliated again because you have a new hire who does -- who I think knows nothing about the department, but then you have an aggressive employee who always wants to subliminally say comments or sarcastic things in reference to a new employee -- I mean, in front

Page 282

D. BROADNAX

of a new employee, and this new employee already

knows who I am, and I don't know who she is, it

started to exude through me training her.

Q.   How do you know that -- what do you

mean, Tynesha already knew who you were?

A.   As I said earlier, that Ms. Joyce --

Q.   Oh, the boyfriend --

A.   -- alluded to --

Q.   Yeah.

A.   -- I knew a guy that she's currently

dating.

Q.   Right, right.  Okay.  Sorry.  Sorry

about that.

Okay.  And then on the second page, page 2

of 3, there's a paragraph that starts with:

Joyce told me one employee -- the second full

paragraph:  Joyce told me one employee took the

constructive criticism with no problem.

Do you see that?

MS. COHEN:  Third paragraph.

A.   All stuck together.

Q.   No, no.  Second page, third

paragraph.  Joyce told me --

A.   Okay, yes.

Page 283

D. BROADNAX

Q.    You see that?  Joyce told me one employee took the constructive criticism with no problem.  But Crystal was upset.

You see that?

A.    Yes.

Q.    And when did Joyce tell you that? And I'm just asking when she told you that.

A.    The day of the altercation, when she came to see me in the emergency room.

Q.    And up until that point, Crystal had not been treating you well, as it was, right?

A.    Correct.

Q.    Is it your belief that Ms. Zagacki deliberately didn't tell you Crystal was mad at you, in some hope that Crystal would start some altercation with you?

A.    I do believe that she deliberately did not tell me that she was angry earlier that day, because she probably wanted Crystal -- wanted me to feel more of Crystal's wrath. Joyce had a way of always making things -- if I ever voiced an opinion or a complaint to Ms. Joyce about whatever is going on, instead of telling the girls, Okay, Dywanna is correct,

Page 284

D. BROADNAX

she's been doing this a while, or whatever the case is, she will make it seem as though whatever they did was okay. And it's okay, it's not a problem. It's okay, as long as it's getting done. She would never stand up for me when she knows that I know exactly whatever the situation is. I know what I'm doing.

So do I think that she told me that with hopes that Crystal would start treating me a different kind of way; is that your question?

Q. No. My question to you was: Is it your belief that Joyce Zagacki knew Crystal was upset at you, and deliberately didn't tell you that Crystal was upset with you, in some hope that Crystal would start a confrontation with you?

A. I would say, I do believe that.

Q. Okay. And is that because somebody told you that?

A. No. It's because she called a staff meeting that morning to talk about the 30 errors that I turned in two days before, and she knew the reaction that she got from her staff, and she knew that I was scheduled to come in that

Page 285

D. BROADNAX

afternoon.  She should have prepared me to walk into a hostile work environment, because the girls were angry since the morning.

Q.   Okay.  The girls were angry.  Okay.

And how do you contend she should have prepared you?

A.   When I got in at one o'clock, let me know, Hey, D, I called a meeting this morning to talk about the errors you put under the door -- as she said in the ER.  She said it to me in the emergency room.

Q.   Yeah, we will talk about that conversation, but how do you know -- do you know if Ms. Zagacki knew when you came to work?

A.   Did I know what?

Q.   Did Ms. Zagacki see you when you came to work?

A.   No.  She did not see me when I got to work that day.

Q.   And you came in early, right?

A.   Yes, I did.

Q.   So you were there before your scheduled shift?

A.   Correct.

Page 286

D. BROADNAX

Q.    As far as you know, Ms. Zagacki didn't know you were on the premises, when you were on the premises yet, right?

A.    No.  But she texts me all the time.

Q.    Okay.  So now you're saying that she should have texted you?

A.    Ms. Joyce texts us all the time.

Q.    Do you have any texts from Ms. Joyce?

A.    No, I don't.  I don't even have that phone anymore, or a phone number.

Q.    When did you get rid of that phone?

A.    I would say June of 2020, or after I got my new job, I was able to buy a new phone.

Q.    Okay.  And on that phone you had texts with Ms. Zagacki?

A.    Oh, yeah.  Coworkers.  Yeah. Uh-huh.

Q.    And now that you've gotten rid of that phone, you don't have those texts anymore?

A.    Ms. Joyce would text us about what time to come in, or she's going to be out, or she's running late, or we have to call out -- those type of text messages.  So it was nothing

Page 287

D. BROADNAX

to hold onto because I couldn't foresee the future that they'd maybe need it down the line.

Q. Okay. But yet -- so Ms. Zagacki texted you about those mundane things, but yet you expected her to text you about Crystal?

A. Well, I didn't expect her to do anything, because I didn't know anything had happened. However, she knows her staff, and she knows the problems that I have been complaining about. So if she had this type of meeting that morning, I should have been made aware, before I arrived to work, to be prepared for a certain energy from my peers.

Q. But when you heard Crystal making a subliminal comment to Tynesha --

A. Yeah.

Q. -- about making sure you check --

A. Magnesium and phosphorus.

Q. Right. You knew then that she wasn't happy with you about the correct -- because you had pointed out errors, right?

A. Well, no. Don't speak for me.

When she made that comment that day, I thought she was doing her regular antagonistic

Page 288

D. BROADNAX

behaviors that she had been doing for months.  I had no idea about a meeting earlier that day.  I had no idea who got addressed about the errors or who got called out about them.  I didn't know anything.

Q.  Well -- but she was mimicking you --

A.  Yes, ma'am.

Q.  -- right?

A.  Uh-huh.

Q.  And it was about errors that you found on the scrips, right?

MS. COHEN:  No, I don't think so.  That was --

MS. MOYLAN:  I'm asking her a question.

MS. COHEN:  Well, I'm going to object.  That wasn't --

MS. MOYLAN:  You're not objecting.  You're testifying for her.  Faye, please.

MS. COHEN:  That wasn't the testimony.  Just rephrase the question.

MS. MOYLAN:  Then she can testify

Page 289

D. BROADNAX

to that.  She can tell me that's not what I said, Faye.

A.    Okay.  So, no.  First --

Q.    Can I stop you for a second?

A.    Finish.  Sure.

Q.    I don't even remember what my question was right now, so I would like the court reporter to read it back, and I would like you to answer it.

A.    Okay.

(The requested portion of the transcript was read back.)

A.    What was about errors that I found on the scrip?

Q.    Crystal mocking you.

A.    Okay.  So if I'm walking in, I don't know Crystal mocking me, yes, it was about errors:  Don't forget to order your magnesiums and your phosphorus.  That's relative to me checking scrips, realizing that somebody forgot to order these main two tests that go along with a panel.  And so -- it's a comprehensive panel, but you always have to add these two tests.

They were ordering a comp panel, but

Page 290

D. BROADNAX

forget to add the mag and the phos.  So when I walked in, there was no patient getting an order entry, so that was just a blatant lie.  This whole thing about a patient being there, the patient was exiting as I was coming in.  The only people that were there was Tynesha, the student, and Ms. Joyce -- mind you, the student was crying because I had been training the student for about two weeks, and she would work with me in the evenings, and she really liked me a lot.  And so to see me so disheveled and irate and upset, she even cried.

Q.    Who lied about a patient being there?

A.    In all of these documents.  It says that Crystal -- in Crystal's statement, she said that there was a patient there, right?

Q.    Okay.  And what was the student's name?

A.    That, I don't know.  And I seriously doubt --

Q.    Do you remember the first name?

A.    No, I don't know that.  I seriously doubt that Ms. Joyce got her information to be a

Page 291

D. BROADNAX

part of this just to slight me, because the young lady would be honest.

And that bothers me, as well, because if you really wanted to do a full investigation, you would have also gotten a statement from the young lady who witnessed it from the moment I walked in the lab. She was nowhere on none of this paperwork.

Q. Are you aware of anyone telling Jefferson that there was a student present for this confrontation?

A. I have been talking about the student the whole time.

Q. Did you report that to Jefferson at any time before your termination, that there was a student present at the confrontation?

A. I believe I said it in my report -- when I wrote it for Security -- who was in the office at the time.

Q. Okay. So you believe that in your handwritten statement, that we saw, you wrote that?

A. Yes.

Q. And that was a student present in the office, right?

Page 292

D. BROADNAX

A.    Correct.  Yes.

Q.    And you don't believe that the student witnessed the actual physical fistfight with Crystal Taylor, right?

A.    That's correct.  She did not see it. She didn't even run in the hallway like Tynesha did in the end.  I saw the student when I came back to the office, very teary-eyed because she saw me so upset, and she just kind of, like, took her place in the corner because there was so much commotion.

Q.    And in this -- going back to this email that -- D-14 that you wrote to Mr. Bethia, the second page, the paragraph -- first full paragraph from the bottom starts with:  Joyce allowed me to walk.

A.    Yes.

Q.    Do you see that?  Okay.

And you say:  Joyce allowed me to walk into a hostile environment 11/18/19, with two employees that didn't like me.  They were angry with me, and I had no idea.

Who were the two employees?  Crystal was one.

Page 293

D. BROADNAX

A.    Tynesha Jenkins.

Q.    Okay.  And Tynesha did not get into a physical altercation with you, right?

A.    She did not get into a physical altercation with me.  She was being very protective of Crystal.

Q.    Then you say:  Had I known a meeting was held that morning, I would have ignored Crystal's subliminal comment because I knew she was mad.

A.    Yes, ma'am.

Q.    Okay.  So from her subliminal comment, you were telling Mr. Bethia that you knew that she was mad?

A.    That's not what that says.

Q.    Okay.

A.    It says:  Had I known a meeting was held that morning, I would have ignored Crystal's comment because I would have known that she was mad about the errors.  Because I didn't know that she was mad, I didn't ignore her subliminal comment because it was piggybacking off of months of antagonistic behavior to me.  So this particular day, I

Page 294

D. BROADNAX

finally responded.

Q.    Okay.  Tell me about the conversation that you had with Joyce Zagacki in the emergency room.

A.    Security walked me over to the ER. They asked me, did I want to be checked, and I said yes.  I'm sitting in the ER for an hour or two.  Then finally Ms. Joyce came there.  My reaction was as if like I just saw Jesus or God, because I had been waiting for her this whole time, not knowing what she was about to deliver to me.  So when I saw her, she came in, and she said:  How you doing D?  And, well, nice soft-spoken like she always is, comforting me and, like, asking me what injuries I have.  And she said -- her exact words was:  I kind of think I know why this happened.

And I looked at her, and I was crying, and I said, Why?

And she said, I had a meeting this morning about the errors.  She said one person took the constructive criticism, but Crystal was really angry.  And then she said -- her next sentence was:  I'm going have to take your badge until

Page 295

D. BROADNAX

the investigation is over.  And that broke my heart.

Q.    Was anything else said?

A.    Nope.  That I would be contacted for the investigation.  That was it.

Q.    And as of the time that you had that conversation with Ms. Zagacki, do you know whether or not Ms. Zagacki knew what you said happened before you went out into the hallway?

A.    Does she know what happened in the office before I went into the hallway, when she came and talked to me in the ER?

Q.    Right.  Do you have any reason to believe that Ms. Zagacki knew how the conversation started?

A.    At this point, I'm pretty sure because she would have had to go talk to Tynesha and the student.  I'm sure she spoke them before she came and talked to me.

Q.    Do you know whether she spoke to anybody?

A.    I don't know that, because I was in the ER.

Q.    Right.  And Ms. Zagacki didn't say

Page 296

D. BROADNAX

anything to you before your termination, that she was aware of how the confrontation started with Crystal, right?

A.   No.  The only thing she said in the ER is, I know -- I believe I know why this happened.  She told me why she thought it happened.  She asked about my injuries.  She told me she needed to take my badge during the time of the investigation, and she said Crystal was immediately terminated, Crystal is not coming back.

Q.   Did you have any conversations after that with -- or communications with Ms. Zagacki before you were terminated?

A.   I think this happened on a Monday, so I may have called Joyce Wednesday to find out why had nobody called me in for a meeting, whatever.  And she said, It's still the investigation process.  And the next day, that Thursday, is when I talked to Aaron, and he told me that I was terminated.

Q.   Okay.  So other than the conversation where you said, Why have I not heard, and she said, The investigation is still

Page 297

D. BROADNAX

going, any other communications with Joyce Zagacki?

A.    No, not that I can remember.

Q.    And anything else said during that conversation?

A.    No.

Q.    What's the next time you hear from Jefferson after the fight?

A.    Never heard from them until this day.

Q.    When's the next time you spoke with anyone from Jefferson, after the fight?  Was it the conversation with Joyce Zagacki?

A.    No, it was with Aaron Sniderman, on that Thursday that he fired me.

Q.    Okay.  You just testified that you talked to Joyce Zagacki after the fight.

A.    In the emergency room.

Q.    Right.  And then you called her a couple of days later?

A.    To ask her about why -- okay, I'm sorry.  Yes, to ask her why hadn't I heard anything about the investigation; nobody came and talked to me about my side.

Page 298

D. BROADNAX

Q.    You had written a statement with Security, right?

A.    Yes.

Q.    And you also spoke to Security, right?

A.    Yeah, I told them what happened, and someone gave me a pencil and paper and told me to write it down.

Q.    And other than writing your statement, you talked to Security and explained what happened.  We saw that in the Security report?

A.    I explained that before he gave me a pencil to write it down.

Q.    Okay.  So you talked -- you called Ms. Zagacki after the fistfight, talked to her. And then you called Mr. Sniderman?

A.    Thursday, yes.

Q.    How did you know to get ahold of Mr. Sniderman?

A.    Naeemah.

Q.    So you talked to Naeemah after the fistfight?

A.    Yes.

Page 299

D. BROADNAX

Q.    Did you call Naeemah?

A.    Yes.

Q.    What was said during that conversation?

A.    Crystal attacked me.

Q.    And what did Naeemah say?

A.    She got upset because she felt like, Crystal should have been let go when she almost got into an assault with her months prior.  And she just kept saying, you know, This is messed up, this is messed up.  It got to the point where, you know, she finally assaulted somebody after years and years of all of the things she does.  And that was primarily it.  And Naeemah told me, You have to call Aaron, talk to Aaron. And he's the one who let me know that Suzana is -- Aaron is now in Suzana's position.

Q.    Okay.  So you called Aaron, and he answered?

A.    He did answer.

Q.    Okay.  And tell me about that conversation.

A.    I let him know who I was.  I asked him why hadn't I been called in yet for my side

Page 300

D. BROADNAX

of the story, or a meeting, or an investigation. And that's when he informed me that I was terminated. And I asked him why was I terminated. And his exact words was: You should have known that Crystal wanted to fight.

And then I proceeded to tell him, you know, about our health screens that we did every six months, about the escalation techniques in the workplace. And he said, You know, you should -- his basis was -- and I didn't find this professional for a termination or anything like that, it was just so, like, basic, yeah, you should have known she wanted to fight.

Q. Okay. Mr. Sniderman didn't tell you that you were being terminated because you were involved in a fistfight?

A. His exact words to me: You're being terminated because you should have known that Crystal wanted to fight. That's what he said to me. And I wanted to know, what about the workplace violence health streams that we do? I did exactly what you guys expect of us to do in a situation like this. And by no way, shape, form or fashion did I think Crystal would ever

Page 301

D. BROADNAX

chance to lose -- risk her livelihood on putting her hands on me, anyway, because I was the only person that Crystal really liked all these years before Tynesha came, before her altercation with Naeemah.

Q.    I'm asking what you talked about with Mr. Sniderman.  So when you go into other topics, I don't know whether that's something that you talked about with Mr. Sniderman.  So now I'm confused.

A.    The only thing I said to Mr. Sniderman, Why am I being terminated?  He said, Because you should have known Crystal wanted to fight.

I brought up our health streams where are things that we do every six months to stay abreast of all of the rules throughout the institution, and one of them is called Violence in the Workplace and De-escalation Techniques.

There are techniques you can take when you have a disagreement before it reaches your supervisor.  And both -- Crystal know this, because she takes the health streams just like I do, and I asked Mr. Sniderman about that, and he

Page 302

D. BROADNAX

may have said, You participated in a fistfight.
But I verbatim remember him saying it, You
should have known Crystal wanted to fight.

Q.   Okay.  I understand that you
remember him saying that.  I just wanted to know
if there was anything else he said.  And you
said he may have said, You participated in a
fistfight.

A.   You participated in a fistfight.

Q.   Anything else said during that
conversation?

A.   No.

Q.   Let's look at this, it's D-15.

          (Jefferson letter dated 11/21/19
          is received and marked as Exhibit
          D-15 for identification, as of this
          date.)

Q.   Do you recognize what's been marked
as D-15?

A.   No.

Q.   You've never seen this letter to
you?

A.   No.

Q.   Do you have any reason to doubt that

Page 303

D. BROADNAX

it was mailed to your -- to Dywanna Broadnax, PO Box 5335, Philadelphia, PA 19153?

A.   Is it certified?  If it's not certified I can't tell you that it was sent.  I never got it.

Q.   Okay.  Was that your mailing address as of December 21st, 2019?

A.   Yes.  It was.

Q.   Do you agree that fighting -- fistfighting with a coworker at work violates Jefferson's code of conduct policy?

A.   It does.

Q.   And do you believe that fistfighting with a coworker at work violates Jefferson's employee disruptive conduct policy?

A.   Yes.

Q.   And do you agree that fist-fighting with a coworker at work violates Jefferson's no-violence policy?

A.   Yes.

Q.   Let's look at another document I'll mark as D-16.

(Screenshot is received and marked as Exhibit D-16 for

Page 304

D. BROADNAX

identification, as of this date.)

Q.   Do you realize -- do you recognize the text string that's been marked as D-16?

A.   I recognize it.

Q.   And do you see there's a Tuesday December 24, 1:12 p.m., there's a text that starts with, Hello.

Do you see that?

A.   Yes.

Q.   And it says:  Hello, I just wanted to say thank you for speaking with the detective.  And I now know the decision to terminate came from HR.  I believe if it was up to you, you would have tried to save my job. Thank you for everything all these years.  I'm very sorry I ashamed the lab.  Merry Christmas. Please tell George and Linda, Sorry, as well.

Do you see that?

A.   Yes.

Q.   And that's the text that you wrote to Ms. Zagacki on December 24, 2019?

A.   Yes.  Who did she [sic] write it to?

Q.   Joyce Zagacki.

And the response is:  Thank you, Dywanna.

Page 305

D. BROADNAX

My hope for you is that you recover both mentally and -- and then we don't have the remainder.  That's in part what she responded, right, thanking you?

A.    Yes.

Q.    Okay.  So you apologized to Ms. Zagacki for shaming the lab?

A.    Yes.

Q.    And what was it that made you think that the decision to terminate you came from HR?

A.    Because I thought Ms. Joyce would have fought for my job, letting them know the difference between Crystal and me, the type of employee she was, the honest employee I am.  I thought -- I assumed that it had to come from them because she would have stood up for me and tried to fight for me in the way of saving my job, verifying that Crystal has this history, and that's what I thought.  That was my thought process.

Q.    But did anybody tell you that decision came from HR?

A.    I want to say Ms. Joyce told me this herself.  I want to say -- and I can't remember

Page 306

D. BROADNAX

verbatim, but I want to say that she's the one that told me, If it was up to me, she's the one that -- that I spoke to after the termination. I feel like I can't -- unless you have proof, she's saying that I reached out to her after that, I want to feel like it was Ms. Joyce that said that to me, if it was up to me, it was a decision from HR.

Q.   Okay.  So you -- I'm confused.  Do you have a specific memory of Ms. Zagacki telling you that if it was up to her, she would have fought for your job?

A.   I don't have a specific memory, but I did have to apply for a new job shortly after that.  So I did reach out to her for records and stuff like that.  I can't remember.  I can't remember.  But I just feel like she may have -- she maybe was the one that told me that, that the decision came from HR.  I can't make that up out of thin air.  I can't just say, Oh, Ms. Joyce didn't have anything to do with me getting terminated.  It was all HR.  It had to have been fed to me in some type of way, because this is my first time having to deal with HR and

Page 307

D. BROADNAX

supervision in this type of way.  So I just can't recall exactly when the conversation happened, or if.  I apologize.

Q.   That's okay.  And your claim in this lawsuit is that Jefferson retaliated against you by terminating you?

A.   Again, that's the way I feel because I have sent numerous emails over the years about different things, and when I had to -- when I got assaulted by a very vicious person with a history of it, and I defended myself, and I had to lose my job behind it, I just didn't feel like -- I didn't feel valued in any kind of way because I can see, if it was somebody nice like, Shannon or something, this happened, because she didn't have a history.  But we are talking about somebody who just doesn't have a problem in the lab, but across the hospital.

Q.   Ms. Broadnax, is there anything that you feel was your mistake or that you did something wrong associated with the altercation with Ms. Taylor?

A.   Yes.  I don't believe that I should have said what I said to her initially, about

Page 308

D. BROADNAX

"I'm not for your shit today."  Knowing what I know of her now, that probably fueled her antagonistic behavior towards me.  I shouldn't have probably said that.  Because my way of avoiding her before was stepping out.  Stepping out, waiting until she left the area, to come back inside.  I would just get away and go sit in the nurse's station where Loretta sits, and talk to the girls.  So she only sits about 3 o'clock.

Q.    Is there any anything else that you feel you did wrong associated with the altercation with Ms. Taylor on November 18, 2019?

A.    Me saying, Crystal, I'm not for your shit today, probably fueled her.  Going outside to talk to her in the hallway, I thought it was an honest conversation because she didn't want to -- since I said, Why are you always showing off?  I guess she didn't want to talk to me in front of Tynesha to come off like she was showing off.  That's why she wanted to talk outside.

Q.    How about when she came back in the

Page 309

D. BROADNAX

room and didn't say anything to you, and you spoke to her again and told her she makes errors, and why are you always showing off?  How about that?  Is that wrong?

A.    So when she came into the office, she looked at me with the most angry face and, like, stared at me and just like walked off. And I'm just like, Crystal -- again, the underlying context is Crystal and I were friendly.  So it wasn't like I can't say anything to her because it's so fragile, we are going to fight.  So me saying to her, Crystal, like, you don't even know this area.  Why are you always, like, making sarcastic remarks, whatever it was that I worded and said, it was okay -- in my mind, it was okay to say that to her because, one, I was like the only one she liked.  Keep that in mind.  And, yeah, we had been having problems, but I can still talk to you about work.  So I didn't think me saying that to her would make her want to assault me, at all.

Q.    Okay.  And how about poking her back when she poked you?

D. BROADNAX

A.    Well, that's a defense mechanism that I think anybody would take when somebody takes their two fingers and doinks you in the head with nails on.  You know.  I think any normal reaction would be for somebody to defend themselves.  Keep in mind, after she poked me and I poked her back, I did turn around to leave and that's when I got pulled down by my hair.

Q.    Yes.  After you poked her?  Right.

A.    After she poked me.

Q.    Right.  She pokes you, then you poke her back.  And that's what you're referring to.

A.    Well, she poked me before she [sic] poked me as well.

Q.    Understood.

A.    And she threatened me, walking out of the office.

Q.    And when she threatened you, there was nothing obstructing your ability to leave her presence, correct?

A.    So, again, I'll demonstrate.  She's walking to the door.  She's walking to the side. Yeah, because I'm going to F you up.

I:  Crystal, you're not going to do

D. BROADNAX

anything to me. This is my step (phonetic). You're not going to do anything to me. So what you coming around here for?

Q. Let me ask you this. When you took a step back --

A. Yes.

Q. -- was there anything obstructing your ability to leave her presence?

A. This was the attempt to leave her presence -- because she used a threatening term to me by stepping back. She stepped forward.

Q. Was there anything obstructing your ability to leave her presence, meaning, do more than take one step back from her?

A. In a split second I stepped back and told her she's not going to do anything to me. In a split second she's bumping me in my chest.

Q. Was there anything preventing you from leaving her presence other than taking one step back?

A. It happened in one or two seconds. What was preventing me was her bumping me in my chest.

Q. Okay. You can sit down.

Page 312

D. BROADNAX

Q.   Are you aware that in this lawsuit that you're claiming that you're entitled to damages related to emotional distress?

A.   Yes, ma'am.

Q.   Arising from your termination?

A.   Yes, ma'am.

Q.   Is there anything that has occurred in your life, since your termination, that's affected your emotional state?

A.   Has anything in my life occurred since my termination that has affected my emotional state?

Q.   Let me ask it in a different way.

Is there anything since your termination that has given you emotional distress, other than your termination?

A.   Yes.

Q.   What?

A.   Being denied jobs, because I was terminated.

Not having sufficient funds to take care of my bills.

The pain that I tolerate from the knee injury that I have.

Page 313

D. BROADNAX

The months and months of physical therapy, trying to heal from my knees.

The anxiety that I get interacting with my new coworkers because, in my mind, I did nothing wrong.  I got assaulted and fired.  So at my new job, I'm not the same confident employee that I used to be, because I don't want to piss anybody off and get attacked.  So that's caused me a lot of emotional stress.

Just knowing that I'm back at the bottom of the employee totem pole, when I was so far in a growth factor at Jefferson, and now I'm back to beginning phlebotomy.  That's affected my stress factor, stress level.

I don't know what else to say.  I don't know.  It's just so much.  Me having to take medication for anxiety.  Because I don't like anything that has to, like, control my mood or what it is that I'm feeling.  So the fact that I had to go on medication just to be able to work or deal with the thoughts that I have of losing such a long job, it's just the whole, like, fear of it happening again.

MS. COHEN:  Excuse me one minute.

Page 314

D. BROADNAX

THE VIDEOGRAPHER:  The time is now 5:17.  Going off the record.

(A break was taken.)

THE VIDEOGRAPHER:  The time is now 5:18.  We are back on the video record.

Q.    After your termination from Jefferson, tell me about the jobs that you obtained?

A.    I began working at University of Penn on April 6, 2020.

Q.    And you make more in that position than you did at Jefferson, right?

A.    I do.

Q.    What's your hourly rate at UPenn?

A.    21.98.

MS. COHEN:  Keep your voice up.

A.    21.98.

Q.    And do you have the same benefits or as good benefits at UPenn that you had at Jefferson?

A.    I didn't have any benefits at Jefferson.

Q.    Okay.

Page 315

D. BROADNAX

A.    At Penn, I do have sick time, vacation time, and personal.

Q.    What is your position at UPenn?

A.    I am a phlebotomist, third-shift phlebotomist.

Q.    Are you happy in that position?

A.    No.

Q.    Why are you not happy in that position?

A.    Because I work at 9 at night, until 8 a.m. in the morning.  It's a very long, hard job.

Q.    Did you have any say in the shift that you were given at UPenn?

A.    No, ma'am.

Q.    Okay.  And you've been working at UPenn since April 6, 2020?

A.    Yes, ma'am.

Q.    And how many hours a week do you work?

A.    I work 20 hours biweekly.  I work Friday night and Saturday night.

            MS. COHEN:  I didn't hear you.

            You work Friday?

Page 316

D. BROADNAX

THE WITNESS:  Friday night from 9:30 to 8 a.m.  Saturday night from 9:30 to 8 a.m.

Q.   Are those the only hours you work?

A.   Yes, ma'am.

Q.   Is there a reason you don't work during the weekday?

A.   The position I was hired for was a weekend third-shift phlebotomy position.

Q.   And as of your termination date at Jefferson, you were working 13 hours a week; is that right?

A.   Yes.  12 to 16, depending if it's my week to work that Saturday.

Q.   Did you have a motor vehicle accident in January '21?

A.   No.

Q.   No, you weren't involved in a motor vehicle accident in January 2021?

A.   January 2021?

Q.   Yes.

A.   No.

Q.   Okay.  I have to find that in your medical records.

Page 317

D. BROADNAX

Have you been involved in any altercations with anyone since you were in the fistfight with Crystal Taylor?

A.   No, ma'am.

Q.   Were you pushed by someone, causing you to fall and seriously injure your back in October of 2020?

A.   I feel like you're asking me about my personal business that has nothing to do with this case.

Q.   Well, actually, you have asked for damages related to your emotional state, and you've asked for damages related to physical issues that you say were caused by the fight. So you have made your emotional state, your physical state after your termination, relevant.

A.   So your question about my back injury is?

Q.   Well, let me take a step back.  I just want to make sure that you answered me accurately and truthfully.

Were you involved in a motor vehicle accident in January of 2021?

A.   No, I wasn't.  If you're talking

Page 318

D. BROADNAX

about when my car sideswiped a car on the street, their car was parked. It wasn't a motor vehicle accident. That's the only time that I had to get work done to my car. And that was last year. It was a neighbor on the street that lives behind me. Ms. Carrie.

Q. Okay. And when did that occur?

A. I would say -- I don't even think it was in January of 2021. I can look at my phone. I would have to look at my phone to give you the exact date.

Q. Why? What's on your phone?

A. I take pictures, so a lot of times that helps me remember the day. And if it's anything relevant to an accident or injury or somewhere that it involves somebody else, I'll have video or a picture.

Q. Okay. I'd ask you to send those pictures to your counsel. Not now.

A. I would just have to find them, because I don't know what you're referring to.

Q. Okay. Well, you're referring to a sideswiping, and you said you may have pictures. So if you have any information about sideswiping

Page 319

D. BROADNAX

of another vehicle while you were in the car --

correct?

A.    Yes.  My Yorkie jumped in my lap.

However, that did not happen in January.  That's

why I'm a little confused.

Q.    If you have information about that,

I would ask that you send that to your attorney.

A.    You want me to send you information

about me sideswiping Ms. Carrie's car in the

spring of 2021.  You want pictures of that?

Q.    I want you to send to your lawyer,

not to me, to your lawyer --

A.    Okay.

Q.    -- any information about the

sideswiping of another vehicle that you're

testifying about.

A.    Okay.  But you asked me about

something from January 2021.  And what happened

with my neighbor wasn't in January.  Okay?

MS. COHEN:  That's fine.

Q.    I would still like you to send me

the information.

Okay.  Now, let's talk about you being

pushed by someone and causing you to fall and

Page 320

D. BROADNAX

seriously injure your back.  When did that
happen?

A.     October 5, 2020.

Q.     Okay.  Tell me about that.

A.     I injured my back.  I fractured the
lower portion of my back.

MS. COHEN:  Which year was that?

THE WITNESS:  2020.

Q.     Who was the person that pushed you?

THE WITNESS:  I just need to
understand why she's asking me this.
Because nothing in my lawsuit talks
about back injury.

MS. COHEN:  Can you ask if she
was injured --

MS. MOYLAN:  She said she was
injured.

MS. COHEN:  -- anytime after her
employment?  That might be a better
way to get --

Q.     No, just tell me who pushed you, if
you know.

A.     Of course, I know, but I don't
understand why I have to say that and bring in

Page 321

D. BROADNAX

another situation into my job situation.

Q.    I will give you the benefit of explaining this to you.

A.    Thank you.

Q.    The reason I'm asking, and your lawyer is not telling you not to answer, so you have to answer unless she tells you not to answer.

A.    Okay.

MS. COHEN:  I would like to talk with her outside.

MS. MOYLAN:  Not while a question is pending.

MS. COHEN:  Okay.  If you are alleging you have other injuries to the current date, okay, because your injuries, you're saying, are ongoing from Jefferson, then I think that you should respond.

A.    Okay.  So the incident that occurred on October 5th, 2020 was with an ex-boyfriend who, as I was getting into his truck, he was reaching -- he took his arm, this portion of his forearm, and blocked me.  And as you get into a

Page 322

D. BROADNAX

pickup truck, there's normally two steps, once -- until you step into the truck.  Him blocking me pushed me back.  I fell.  I hit the ground.  I hit my bottom.  And the pain radiated to my lower back.  The first 24 hours I stayed home and tried to soak in hot water, but then I went to the doctor, and they told me that I had a fracture.

Q.    So it's your ex-boyfriend who pushed you?

A.    Yes.

Q.    And you missed work because of that, right?

A.    Did I miss work because of it?

Q.    Yes.

A.    I wasn't able to work, yes.

Q.    And you were not able to work from when to when?

A.    I returned back to work February 26, from the date that I was pushed.

Q.    And what was the date that you were pushed?

A.    October 5th, 2020.

Q.    Is it true that your -- a

Page 323

D. BROADNAX

boyfriend -- I don't know whether it's the same boyfriend or not -- but that a boyfriend has grabbed your wrist in the past and injured your wrist?

A.    When he took my cell phone out of my hand and yanked my wrist, but I already had preexisting problems with my wrist.

Q.    When did he grab your wrist?

A.    Maybe June -- June of 2020.  It was the summer of 2020.

Q.    And when he grabbed your wrist, is that the only time he grabbed your wrist?

A.    From what I recall, yes.  He tried to take my cell phone out of my hand, which yanked this wrist, which is the bad wrist.

Q.    Okay.  And when he grabbed your wrist, did he injure your wrist?

A.    A push-up will injure my wrist, so I will say, yes, it got sore after he grabbed the cell phone.

Q.    Did you go to the doctor for that?

A.    I always get my joints checked whenever I have an injury, because I have lupus, yes.

Page 324

D. BROADNAX

Q.   Is that the same boyfriend who pushed you in October of 2020?

A.   Yes.

Q.   And you referred to him as your ex-boyfriend?

A.   Correct.

Q.   Are you still together then?

A.   He's an ex-boyfriend.  No.

Q.   When did you stop dating him?

A.   November of 2020, December of 2020.

Q.   Was he abusive to you?

MS. COHEN:  I'm going to object. I don't want this on a record, accusing someone else of some possible crime.

MS. MOYLAN:  I don't understand that.  We can mark this part "confidential" if you want, so we don't file it in a public filing.

MS. COHEN:  First, I tried to ask for relevance.  I don't see the relevance.  It's an invasion of privacy, to a certain extent.  And, third, I don't want her to mention

D. BROADNAX

someone if there is a record, who may see that she mentioned his name as a result of some possible -- if there is abuse.  So I don't want him to get ahold of any of these records.  But, mainly, I just don't feel it's relevant to this situation.

THE WITNESS:  Neither do I.

MS. MOYLAN:  Well, I mean, she's asking for emotional distress damages, and you explained it to her that I'm entitled to ask about her emotional distress.  Are you instructing her not to answer then?

MS. COHEN:  Yes.

MS. MOYLAN:  Okay.  Then I'm going to reserve my right to --

MS. COHEN:  All right.

MS. MOYLAN:  -- file a motion with the judge.

MS. COHEN:  All right.

Q.   Is it accurate that your son was arrested for homicide in 2018?

Page 326

D. BROADNAX

MS. COHEN:  Okay.  I'm going to object to this question and I'm instructing her not to answer.  I think we have some attorney/client privilege issues here.

MS. MOYLAN:  That her son was arrested for homicide?

MS. COHEN:  Because she has -- I think that whatever the situation was, I think there might have been correspondence and communication between her and some attorney.

MS. MOYLAN:  Okay.  I'm asking for her knowledge, was he arrested for homicide.

MS. COHEN:  I'm going instruct her not to answer.  I don't feel it's relevant to the situation.

Q.    Was he recently sentenced for that crime?

MS. COHEN:  Continuing objection.

A.    Is he serving a prison term for that crime?

MS. COHEN:  Continuing objection.

Page 327

D. BROADNAX

Q.    Was that upsetting to you, at all?

MS. COHEN:  Continuing objection.

MS. MOYLAN:  Okay.  So your objection is instructing her not to answer?

MS. COHEN:  Yes.

MS. MOYLAN:  Okay.  I'm going to file a motion with the judge.

MS. COHEN:  Okay.

MS. MOYLAN:  Let's mark that. I'm finishing up.

(Transcribe is received and marked as Exhibit D-17 for identification, as of this date.)

Q.    This is D-17.  Do you recall that earlier today you testified here that you testified in a criminal case associated with the fistfight that you had with Crystal Taylor?

A.    Yes.

Q.    Okay.  And you testified on March 3rd, 2022, right?

A.    Yes.

Q.    I'd like you to look at page -- it's the second page of this, but do you see that

Page 328

D. BROADNAX

there are four pages of transcript on each page?

A.   I do.

Q.   Okay.  So I'm going to -- when I'm referring to a page, I'm going to be referring to the page number in the upper right corner of the quadrant, okay?

A.   Sure.

Q.   So I would like you to look at page 6.

A.   I see five and I see nine.

Q.   Right here, page 6.  When you see 5, 6 is right underneath it.

A.   Okay.  Thank you.

Q.   I'd like you to read -- and do you see the numbers on the left there?

A.   Yes.

Q.   Okay.  I'd like you to read in this square here, with -- says 6 up at the top, from line 3, all the way down to line 24.  I'd like you to read that to yourself, and let me know when you're done.

A.   I'm done.

Q.   Is that what you testified on March 3rd, 2022?

Page 329

D. BROADNAX

A.    Yes.

Q.    And then read from the bottom line there, 25, all the way on page 7, to line 12. And let me know when you're done.

A.    Okay.

Q.    Is that what you testified on March 3rd, 2022?

A.    Yes.

Q.    Okay.  And so you testified that you said to Crystal:  Please, Crystal, not today.

A.    Okay.  Yes.

Q.    Right?  So you did not testify to the judge that you said to Crystal, use the word "F'ing" or "shit," right?

A.    I see a lot of things switched up. I know this is a transcript, like you said, so I guess they take my exact words.  I have a problem with cursing in public when I'm in an entity like this, so I may have worded it in a way that I didn't have to use the vulgar language in the courtroom.  But it was the same context.

Q.    So that's why you didn't say specifically what you said to Crystal?

Page 330

D. BROADNAX

A.    More than likely I didn't want to use the vulgar language that was used at the moment, out of respect of the courtroom and the people that were in there, no different than what I did with you earlier.

Q.    Okay.  Look at page 8, and read to yourself lines 13 through 25.  Starts with:  The witness Crystal walked into.  And let me know what you're done.

A.    Yes.  I finished.

Q.    Okay.  And is that what you testified on March 3rd, 2022?

A.    Yes, ma'am.

Q.    Okay.  And then -- then you finished up at the top of page 9:  Crystal poked in the head -- poked me in the head like this, and said, You know better.  Right?  You testified to that?

A.    Yes.

Q.    Okay.  And you did not testify about Crystal chest bumping you.  Right?

A.    That was my first time taking the stand.  Once I got off, I realized there were certain -- some things that I did not say.

Page 331

D. BROADNAX

Q.   Okay.   Look at page 9, read it to yourself, lines 13 through 22, starting with: Once she did it to me.

A.   Okay.

Q.   Is that what you testified on March 3rd, 2022?

A.   Yes.

Q.   Okay.   Look at page 19.

A.   Okay.

Q.   Do you see -- I'm sorry, not page 19.   Page 20, do you see, in the middle of page 20, it says, Cross-Examination, and then it says:   By Mr. Whitney?

A.   Quadrant 20 or page 20?

Q.   Quadrant 20.

A.   Yes.

Q.   Okay.   Do you see in the middle it says "Cross-Examination by Mr. Whitney"?

A.   Yes.

Q.   Okay.   And then start with line 24 on page 20.   And please read all the way to line -- to page 22, line 19.

A.   16 is wrong.   It says:   Because I turned her in to the supervisor.   That's not

Page 332

D. BROADNAX

what happened.  I was turning to go get the supervisor.

Q.    Okay.

A.    Okay.

Q.    Okay.  Other than the correction that you articulated, is that what you testified on March 3rd, 2022 --

A.    Yes, ma'am.

Q.    And then look at page 23, lines 6 through 8.  Read that to yourself.

And ask you to read:  Okay, and you can't tell us exactly what you did to defend yourself?

And you said:  I hit back.

A.    Yes.

Q.    Is that what you testified?

A.    Yes.

Q.    And then on page 24, lines 5 through 8, it says:  When he walked in on the scene -- no, scratch that.  Scratch that.  I don't want to ask you about that.  It's confusing.

Page 26, lines 7 through 12, says:  You specifically said to the detective that you were told that Loretta saw the actual fight and was interviewed by the hospital in reference to it,

Page 333

D. BROADNAX

right?

And you said:  Right.  I was told Loretta saw the fight.

You testified to that, right?

A.    Yes.

Q.    And you were testifying under oath, right?

A.    Yes.

Q.    You understood that, and you understood that you needed to tell the truth as best you could, right?

A.    Yes.

Q.    Okay.  All right.  Page 27, line 8: All right.  You were told that you should not come back to work until an investigation was completed, right?

And you say:  Correct.

That's what you testified?

A.    Yes.

Q.    Then you're asked:  So your understanding was that there was an investigation that took place at the hospital, right?

And you answered:  Yes.

Page 334

D. BROADNAX

The question:  And were informed when that investigation was complete?

You answered:  Yes.

And the question:  But you were told that you were terminated, that you lost your job, right?

And you answered:  I was told that, yes.

Is that what you testified?

A.    Yes.

Q.    And then page 28, lines 5 through 13:  Ms. Broadnax, are you familiar with the phone number (484)470-6427?

Answer:  Yes, that was my old -- that was an old phone of mine.

Question:  So it's your phone number.  Do you recall sending a text to Ms. Taylor?

Answer:  I do.

Question:  Would you recognize that text if I were showing it to you?

Answer:  I would.

Is that what you testified?

A.    Yes.

Q.    And then line 24, on page 28.

Question:  Ms. Broadnax, is that the text

Page 335

D. BROADNAX

message that you sent to Ms. Taylor after this incident took place?

Answer:  Yes, it is.

Question:  And you sent it the same day that this happened, right?

Answer:  Yes.  I did.

Question:  And what you said is what -- is that you whupped Ms. Taylor's ass.

Answer:  I did.

Is that what you testified?

A.    Yes.

Q.    So you sent Ms. Taylor a text after the fistfight that you had with her on November 18th, 2019, when you said that you whupped her ass?

A.    Correct.

Q.    Was there anything else in the text?

A.    Yes, there was.  I called her an "ugly bitch."

Q.    Anything else?

A.    I told her she put her hands on the wrong one.

Q.    Anything else?

A.    Specifically, I don't -- I can't

Page 336

D. BROADNAX

tell you in which way it was worded, but I know I said something, You put your hands on the wrong one.  I think I said -- I called her an ugly B.  And that's why I whupped your ass, yes.

Q.   Okay.  Do you have a copy of that text?

A.   Her lawyer did, but I didn't take it.

Q.   Do you know how her lawyer got a copy of that text?

A.   He got it from her.

Q.   Okay.  So you did not provide a copy of the text to anyone?

A.   No.

Q.   Was there any response from Ms. Taylor?

A.   I immediately blocked her.

Q.   So there was no response, as far as you know?

A.   No.

Q.   Page 29, line 23 through page 30, line 5, question:  Ms. Broadnax, approximately from the moment that this altercation turned physical, until the moment it get broken up, how

Page 338

D. BROADNAX

thought that was a camera in there for security.

MS. MOYLAN:  All right.  I'm just going to take a five-minute break, check my notes, and make sure that there isn't anything else that I have.

THE VIDEOGRAPHER:  The time is now 5:45.  Going off the video record.

(A break was taken.)

THE VIDEOGRAPHER:  The time is now 5:51.  We are back on the video record.

Q.   As far as you know -- well, let me ask you this:  Do you have any personal knowledge as to whether or not, if you had been trained in the areas that you're contending you should have been trained in, that you would have received higher compensation?

A.   I don't have any knowledge of that because I was never offered the elevation in my position to know about what the [unintelligible], so I don't know.

Q.   What do you mean, the elevation in

Page 339

D. BROADNAX

your position?

A.    Going from just phlebotomy in outpatient lab to doing dual, both the main lab and the outpatient area.  I was never offered that opportunity to do dual when I returned, so I can't tell you if I would have gotten more money.

Q.    Do you know whether your title would have changed?

A.    No.  What would have changed is my experience on my resume.

Q.    Do you know whether you would have had more opportunity for advancement?

A.    With adding that experience?

Q.    Yes.  With the training that you're saying you should have gotten?

A.    Yes.

Q.    What is your basis for thinking that you would have been -- you would have had an opportunity for advancement with the training?

A.    Because I will be able to apply to another hospital specifically for that role.

Q.    But I mean, within Jefferson.  Would you have had an opportunity for advancement with

Page 340

D. BROADNAX

the training, that you would not have had but

for the training?

A.    It was not really much advancement

you can get at Methodist.  The next thing would

probably be leadership or supervisor, or she

would have recreated a coordinator position.

But other than being a lab assistant, it's not

much growth to go higher.

Q.    All right.  And I marked an email

D-18.

(Email dated 9/1/13 is received

and marked as D-18 for

identification, as of this date.)

MS. MOYLAN:  I put that in front

of you there, Faye.

MS. COHEN:  Sure.

Q.    Do you see this is an email that you

sent to Joyce Zagacki on September 1st, 2013,

apologizing for being the cause and creating the

altercation on Saturday with Lisa, Geniece, and

the new lady?

A.    Yes.

Q.    Okay.  And you said:  Although I had

no idea after asking a question referencing the

D. BROADNAX

undeceived list --

    A.    Unreceived.

    Q.    I'm sorry?

    A.    Unreceived.

    Q.    Unreceived is what it should say -- list could cause such a disruption.

    Going forward, I will not offer any of my knowledge referring to phlebotomy.  I would direct any questions asked to me by coworkers to you and Lindsey.  I will also abide by the revised collection times, as well as be mindful of my verbal deliveries to my coworkers.

    Do you see that?

    A.    Yes.

    Q.    Were you not mindful of your verbal delivery to your coworkers in this instance?

    A.    In terms of, I may say -- I may have said, This is the same mistake you made last week, instead of saying it differently.  It was never anything to -- nothing aggressive, but maybe the way I would critique the mistake or the error, I could have reworded it.

    But in this instance right here, it turned -- it -- I was asking about

Page 342

D. BROADNAX

an unreceived list, and the two people that got upset about it, it turned into a -- a verbal going-back-and-forth moment with us three.  And that's why I said, I apologize for -- I was apologizing for asking a question that created that.  I wasn't apologizing for being the culprit of aggression.  I was apologizing for asking the question that led to the conversation following.

Q.    Okay.  And do you see on the next page, Joyce Zagacki says:  Thank you so much for the apology, it means a lot?

A.    Yes.

Q.    And is that the response to your email on Sunday, September 1st, 2019, as far as you recall?

A.    Yes.

Q.    And she says, All is well, let's forget and move forward.  Thank you for all your hard work.

Do you see that?

A.    Yes.

Q.    And that's what Ms. Joyce said to you after you apologized, right?

Page 343

D. BROADNAX

A.   Yes.

MS. MOYLAN:   Okay.   I have no further questions.

EXAMINATION

BY MS. RIVA COHEN:

Q.   I have a few.   I'm going to take these out of order.   I'm sorry, but it's late and I'm just going to throw a few things out.

You stated -- and I'm going to paraphrase -- in response to Exhibit D-15, that you agree that certain policies at Jefferson were violated?

A.   Yes.

Q.   Now, if you feel certain policies were violated, why do you feel that you were terminated inappropriately?

MS. MOYLAN:   Objection to form.

A.   Although there is a code-of-conduct policy in place for every employee, I did not understand that the first time that I am in a situation that requires management leadership security, anything administration to be involved, and it came from a person who has a history of volatile behavior, that I got

Page 344

D. BROADNAX

assaulted, and defended myself after being there 14 years and nine months, got me fired, I just didn't understand that. Because I have complained for years about them not standing up for me, or me feeling judged or discriminated against.

But now, the most volatile employee of the hospital attacked me. I defend myself, and I lose everything that I worked hard for, for the last -- I already fought once to get my job back. I respected the job. I loved being a Jefferson employee. And I just couldn't understand why I was shunned the way I did, when I thought that I was exactly following our de-escalation technique, that we take those tests every six month.

Q.    So what do you mean by "de-escalation techniques"?

A.    Because we get these tests that we need to go through OSHA and biohazard and everything that you should know, working in a hospital. And, as we know, it's always workplace violence. And during one of the skits with the workplace violence, they give you levels or options of how to deescalate a

Page 348

D. BROADNAX

Q.    -- with regard to this incident?

A.    That's correct.  I was not notified by Jefferson.  I wasn't asked to be brought in by a meeting.  That's kind of why I went around to anybody that I have personal relationships with administration, different positions in the hospital, telling them what happened to me, and seeing what direction they can point me in so I can talk to somebody physically.  Because nobody reached out to me to hear my side of the story.

Q.    Exhibit D-18, did you receive a write-up from Joyce as a result of this issue which occurred around September 2013, for which you issued an apology?

A.    No, ma'am.

Q.    Did you receive performance evaluations in your job?

A.    Yes, ma'am.

Q.    And what is the last evaluation you received; do you recall?

A.    It would have been June or July of 2019.

Q.    And how was that evaluation?

A.    I always get good evaluations, and

Page 349

D. BROADNAX

so to go back to our earlier conversation about the Five Star, the highest level that you can get on our evaluations are a four.  I would -- please don't hold me to the numbers if I'm wrong, but I believe it's the highest number you can get is a four.  Ms. Joyce told me that nobody ever gets a four.  And when she was doing my evaluation she said, I want to give you a four, but nobody gets a four.  She doesn't even get a four.  So I would always get threes and great comments that coincide with my evaluation.

In addition to her verbalizing in the evaluation that I am due to be trained, will schedule training for send-out session and receiving, which never happened.

Q.    Could you look at D-16?

A.    Yes.

Q.    D-16 is the email that Dywanna thanked --

A.    The text.

Q.    -- what she sent to Joyce, thanking her for speaking to that detective -- to the detective.

At the time you sent the email, which was

Page 359

D. BROADNAX

anything that other people experienced from her, until I came back from my stroke recovery.

I sent a text message because her history throughout the hospital, doing this to people, is abundant.  She just did the same thing to Naeemah six months prior, which was completely wrong.  And her and I had a friendly relationship where I had her personal phone number.  I knew her address and her home.  So me sending her this after a fight, I didn't find anything wrong because at one point we were friendly, we were cordial.  So it wasn't a threatening text to her.  It was just my final words to her responding to attacking me earlier that day.

Why did I say that I whupped her?  I said that because I know I defended myself to my full extent.  But when I got a CAT scan and was told I had a concussion, and when I got in the ER, I had lumps and bruises and abrasions and everything like that, I saw -- I fought back hard, but I saw that, okay, and then my hair ripped out of my head and everything.  My glasses broken.  I saw that, okay, clearly, it

D. BROADNAX

said, How long did the fight go on, while you were reading the docket -- that's what I didn't understand why she was attacking me.  I'm like, Where is Security?  Where is help for me?  Because we are under this big mirror, which I always thought -- and there's a time clock there, and it's an exit door.  So I'm thinking this is protected by a camera, because in the front, when you check in, Security has screens where they can see all over the hospital.  So, as we were fighting on the floor, I'm just waiting like, when is somebody going come break this up?

So she chose that blind spot, now that I call it.  Maybe she knew it was a blind spot.  I definitely didn't know that.

Q.    Did you lose any jobs because of the termination?

MS. MOYLAN:  Objection to form.

A.    I was denied a job at Christiana Hospital, which I applied to shortly after I was fired.  I made it through the application.  I made it through the online interview -- I'm sorry, phone interview.  I made it to the online

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| DYWANNA BROADNAX, | : | |
| Plaintiff, | : | |
| v. | : | |
| THOMAS JEFFERSON UNIVERSITY HOSPITAL, INC., | : | CIVIL ACTION NO. 21-CV-04662-JMY |
| Defendant. | : | |

**AFFIDAVIT OF JOYCE ZAGACKI**

COMMONWEALTH OF PENNSYLVANIA

:SS

COUNTY OF PHILADELPHIA

I, Joyce Zagacki, declare the following to be true and correct under penalty of perjury and pursuant to 18 U.S.C. Sections 1623 and 1621:

1.     My name is Joyce Zagacki.  I am more than eighteen (18) years of age, am competent to testify in a court of law, and have personal knowledge of the facts stated herein.

2.     I provide this Affidavit in Support of Defendant's Motion for Summary Judgment and the accompanying Brief ("Brief").

3.     I was hired by Thomas Jefferson University Hospitals, Inc., Methodist Hospital Division ("MHD"), on June 15, 2004, as a Laboratory Assistant.

4.     On March 28, 2007, I was promoted to the position of Supervisor Lab Outpatient/Histology at MHD.

5.     Starting in or about 2011, I began reporting to George Marrone.

10156746.v1

6. Starting in 2017, Mr. Marrone became the Laboratory Operations Director and started reporting to Steven Gudowski, the Administrator for the Clinical Laboratories at Thomas Jefferson University Hospitals, Inc. I still reported to Mr. Marrone.

7. At the time of my promotion in 2007, Dywanna Broadnax was one of the people I began supervising.

8. Ms. Broadnax resigned from Jefferson in 2008.

9. In late 2011, Ms. Broadnax was rehired by Jefferson as a per diem Lab Assistant reporting to me. She reported to me until her termination in November 2019.

10. In addition to Ms. Broadnax, other Lab Assistants also reported to me. Some of those individuals were Naeemah Gadson, Crystal Taylor, Blondzell Skinner, Margarita Robles, Chryshenda Bradley, Janice Nasuti, Kyla Chau, Julia Laramore, Tracey Shavers, and Guadalupe Astimbay-Sasa.

11. As a Lab Assistant, Ms. Broadnax, among other things, collected specimens from patients for laboratory testing pursuant to scripts.

12. On November 18, 2019, I learned that Ms. Broadnax and Ms. Taylor were involved in a physical altercation at work.

13. I emailed Security asking for a copy of any statements taken about the incident so that I could forward the statements to Human Resources. A true and correct copy of that email is attached to the Statement of Facts ("SOFs") as Exhibit 32.

14. Thereafter, I visited Ms. Broadnax in the emergency room. I asked her how she was doing. I told Ms. Broadnax that she was being suspended pending an investigation into the altercation she had with Ms. Taylor.

10156746.v1

15. By the time of this conversation between Ms. Broadnax and myself, I had not read any security report or any statement from a witness about the altercation.

16. The next morning, I received Ms. Broadnax's, Ms. Taylor's and Loretta Ward's statements from Security. Ms. Ward is a nurse at the hospital.

17. I forwarded those statements to Aaron Sniderman – the Human Resources Business Partner ("HRBP") – with a copy to my manager, Mr. Marrone. A true and correct copy of that email is attached to the SOFs as Exhibit 49.

18. Later that morning, Dennis Delisle – Vice President, Operations – emailed Mr. Marrone, Mr. Gudowski, Mr. Sniderman, and me a copy of the Security Case Report. That email is attached to the SOFs as Exhibit 48.

19. Mr. Delisle recommended that Ms. Taylor be terminated pursuant to the Enterprise Policy on Campus/Workplace Violence (131.03) because she was on a final written warning and there should be zero tolerance. *Id.* Mr. Delisle asked Mr. Sniderman to confirm Mr. Delisle's recommendation about Ms. Taylor and to follow up with Security and me to investigate Ms. Broadnax's role to determine the appropriate course of action. *Id.*

20. To keep Mr. Delisle informed, I emailed him separately to tell him that I decided I would recommend that Ms. Broadnax be terminated along with Ms. Taylor. I particularly noted in the email that I had read Loretta Ward's statement that Ms. Broadnax and Ms. Taylor were "fist fighting." I also wrote that the altercation was "wrong on so many levels." A true and correct copy of this email is attached to the SOFs as Exhibit 33.[1]

---

[1] In this email, I told Mr. Delisle that I was waiting to speak to Mr. Sniderman. *Id.* I did not ever wind up speaking to him before Ms. Broadnax and Ms. Taylor were terminated. As explained below, however, we did exchange emails.

10156746.v1

21.   Indeed, in addition to Ms. Ward's statement, I had read the Security Case Report and Ms. Taylor's and Ms. Broadnax's statements. To me, they showed that both employees were responsible for the fistfight. Their conduct was just plain "wrong."

22.   On November 20, 2019, Mr. Sniderman emailed Mr. Gudowski, with a copy to Mr. Marrone, Mr. Delisle, and me informing us, "We take a zero-tolerance approach to violence in the workplace. Due to the physical evidence that is known Crystal should definitely be terminated. Based off of Dywanna's statement my initial recommendation is to terminate her as well." Mr. Sniderman asked us if anyone had additional information or a different view of the proposed discipline. A true and correct copy of this email is attached to the SOFs as Exhibit 34.

23.   I did not provide further information or have a different view of the proposed discipline.

24.   It is my understanding that Mr. Sniderman consulted in-house legal counsel and thereafter informed Mr. Gudowski, Mr. Marrone and me that he (Mr. Sniderman) planned to go forward with his recommendation to terminate both Ms. Taylor and Ms. Broadnax. A true and correct copy of this email is attached to the SOFs as Exhibit 35.

25.   I supported the termination decision.

26.   I am aware that Ms. Broadnax has alleged in this lawsuit that her termination was in retaliation for filing charges of discrimination and/or retaliation in 2011 and 2017. I deny those allegations. Ms. Broadnax was terminated for the altercation she had with Ms. Taylor resulting in a fistfight at work during work hours.

27.   It is my understanding that Ms. Broadnax has made various contentions to try to support her claims, including those I addressed in an affidavit to respond to her 2017 Charge, as well as those in the following paragraphs.

10156746.v1

28.    Ms. Broadnax contends Ms. Taylor "had a documented history of engaging in threats of violence, whether express or implied, which . . . violated Defendant's zero tolerance policy." Ms. Taylor, however, had never been in a fistfight before her fight with Ms. Broadnax. In fact, no employee about whom I am aware other than Ms. Taylor and Ms. Broadnax had been in a physical altercation at work.

29.    Also, although Ms. Broadnax references in her Complaint a confrontation between Ms. Gadson and Ms. Taylor in April 2019, Ms. Broadnax did not witness that confrontation, but I did. I reported to Mr. Marrone and Human Resources shortly after the confrontation that both Ms. Gadson and Ms. Taylor were being "aggressive" and were at fault.

30.    That said, to me, the fistfight between Ms. Broadnax and Ms. Taylor was very different from the argument between Ms. Gadson and Ms. Taylor. Ms. Broadnax and Ms. Taylor had a heated argument that it appeared Ms. Broadnax primarily started and escalated. Ms. Broadnax accepted Ms. Taylor's invitation to go outside and thereafter both ladies were "fist fighting." In contrast, Ms. Gadson and Ms. Taylor had a heated disagreement during which both were verbally aggressive, but it did not result in them striking each other.

31.    Although Ms. Broadnax has contended in her 2017 Charge and again in her Complaint in this action that some of her coworkers were trained in "other areas," Ms. Broadnax was not the only direct report of mine who was trained only in phlebotomy. For example, Blondzell Skinner, Margarita Robles, Chryshenda Bradley, Janice Nasuti, Kyla Chau, Julia Laramore, Tracey Shavers, and Guadalupe Astimabay-Sasa were not trained in anything but phlebotomy. I am not aware of any of these employees complaining of discrimination or retaliation.

32. I understand further that Ms. Broadnax has alleged that I placed her on a reduced schedule pursuant to which she did not work the same hours as other lab assistants, "was afforded minimal to no interactions at work[,]" and missed staff meetings.

33. I always tried to schedule Ms. Broadnax as she requested. I altered her schedule on many occasions at her request based on her requests that I accommodate her schooling, limit the number of hours and/or compensation she received to enable her to continue to be paid Social Security benefits, accommodate her medical restrictions, and/or enable her to care for her mother when she was terminally ill. Ms. Broadnax requested that she not be required to work in the mornings. I granted that request.

34. None of Ms. Broadnax's coworkers imposed as many restrictions on their schedules as Ms. Broadnax.

35. In any event, Ms. Broadnax was not the only employee who missed staff meetings due to his/her schedule. And, for Ms. Broadnax and other employees who missed staff meetings, I had a practice of telling them I would review with them individually the items discussed at the meetings. *See e.g.,* Emails Regarding Staff Meetings, which are attached to the SOFs as Exhibit 43.

36. *Similarly,* I included Ms. Broadnax and all my other direct reports in communications about events planned in the lab, including those in the few months before her termination. *See e.g.,* Emails Regarding Lab Events, which are attached to the SOFs as Exhibit 44.

37. Moreover, I understand Ms. Broadnax asserts I retaliated against her by not addressing complaints she had about Ms. Taylor at some point between April 2019 and November 18, 2019.

38.    I do not recall Ms. Broadnax making any complaints to me about Ms. Taylor during that time,[2] but, in any event, when Ms. Broadnax complained about other coworkers, I addressed those complaints.

39.    Among other things, around the same time Ms. Broadnax says she complained to me about Ms. Taylor, Ms. Broadnax complained to me that Tynesha Jenkins was being hostile towards Ms. Broadnax and threatened her by asking her to meet Ms. Jenkins outside after she clocks out. Ms. Broadnax said she took Ms. Jenkins' question as a threat for Ms. Broadnax to fight.

40.    I investigated Ms. Broadnax's complaint about Ms. Jenkins, met with Ms. Broadnax and Ms. Jenkins, and helped them resolve their differences. *See* my handwritten notes regarding this situation, which are attached to the SOFs as Exhibit 45, TJUH000638-000639.

41.    Indeed, typically, when an employee complained about another employee, whether the complaint was from Ms. Broadnax or someone else, rather than issue discipline, I first tried instead to resolve the issue with a conversation with the complainant and a private conversation with the other party.

42.    In fact, this is the way I tried to handle complaints that were made about Ms. Broadnax's behavior as well (and there were many), even when employees complained to me that Ms. Broadnax was "confrontational" and constantly questioned them. *See e.g.,* Emails Concerning Complaints/Issues with Broadnax, which are attached to the SOFs as Exhibit 45. I tried to smooth things over by speaking to Ms. Broadnax and/or the complainants.

---

[2] I do recall receiving an email from another manager, Linda Dutch, informing me that, on June 7, 2019, Ms. Broadnax and Ms. Taylor "had words" during which Ms. Broadnax expressed that she felt Ms. Taylor had been "ignoring" and not "talking" to Ms. Broadnax, Ms. Taylor asked Ms. Broadnax to "leave [Ms. Taylor] alone," and, after Ms. Taylor left the room, Ms. Broadnax told Ms. Dutch that, now that Ms. Broadnax saw the way Ms. Taylor acted, Ms. Broadnax would "just forget about it." Ms. Dutch told both employees that they needed to act professional towards each other.

43.     I affirm under the penalties of perjury that I have read the foregoing and the facts and representations contained therein are true.


Dated: _9-1-2022_                    _Joyce Zagacki_

Joyce Zagacki

# Exhibit 7



Received

MAY 1 9 2020

PA Human Relations Commission
Philadelphia Regional Office

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

|  |  |  |
|---|---|---|
| Dywanna Broadnax, | : | |
| Complainant | : | |
| | : | |
| v. | : | PHRC Case No. 201903983 |
| | : | |
| Thomas Jefferson University Hospitals, Inc., | : | EEOC No. 17F202060544 |
| Respondent | : | |
| | : | |

### AMENDED COMPLAINT

### JURISDICTION

1.   Jurisdiction is pursuant to the Pennsylvania Human Relations Act 43 P.S. §§ 951-963.

### PARTIES

2.   The Complainant herein is:

Dywanna Broadnax
72 Memorial Drive
New Castle, DE 19720

3.   The Respondent herein is:

Thomas Jefferson University Hospitals, Inc.
Methodist Hospital
2301 S. Broad Street
Philadelphia, PA 19148



PLAINTIFF'S
EXHIBIT
D-7

Thomas Jefferson University Hospitals, Inc.
111 S. 11th Street, Suite 2210
Philadelphia, PA 19107

## UNDERLYING FACTS

4.  The Respondent, on information and belief, employed four or more persons when the unlawful conduct alleged in this complaint occurred.

5.  In or about September 2005, I was hired by Respondent for the position of Lab Assistant.

6.  In or about November 2008, I was forced to resign due to having no time remaining in my FMLA bank. I took FMLA leave due to having severe medical issues beginning in October 2008.

7.  On or about October 24, 2011, I was rehired by Respondent for the position of Lab Assistant.

8.  My work location was Methodist Hospital, a Thomas Jefferson University Hospital, located at 2301 South Broad Street, Philadelphia, PA 19148.

9.  Respondent is a regional health system whose hospitals serve as the teaching hospitals of Thomas Jefferson University.

### Count 1

**Discharge**                    **Retaliation - Discrimination**

10.  Paragraphs 1 through 9 are incorporated herein by reference as though set forth in full.

11.  On December 20, 2017, I engaged in protected activity when I filed a Pennsylvania Human Relations Commission ("PHRC") complaint # 201701645 alleging discriminatory actions committed by Respondent.

12.  On February 6, 2018, Respondent was served with my complaint # 201701645 alleging discriminatory actions committed by Respondent.

13.  On or about February 11, 2019, I had a mild stroke and remained out of work until April 6, 2019.

3

14. On or about April 6, 2019, when I returned to work, I was informed that my coworker, Naheemah Gadson, took a leave of absence due to another coworker, Crystal Taylor, verbally assaulting her.

15. The verbal assault almost resulted in a physical assault in front of Respondent's Clinical Lab Supervisor, Joyce Zagacki.

16. Ms. Taylor was not disciplined for assaulting a coworker.

17. Upon my return to work, Ms. Taylor began to treat me differently because she knew I was friends with Ms. Gadson.

18. I cried about our lack of friendship to Ms. Zagacki because before my medical leave of absence, Ms. Taylor and I were friendly.

19. On or about November 18, 2019, when I arrived to work, Ms. Taylor and another coworker, Tynesha Jenkins, were present. Ms. Jenkins had just started her employment when I returned on April 6, 2019.

20. Ms. Taylor turned Ms. Jenkins against me, which caused instant tension between us.

21. Within the first month of Ms. Jenkins being employed, she invited me outside to fight. After other numerous tension-filled incidents, I had a meeting with Ms. Zagacki and Ms. Jenkins and Ms. Jenkins apologized to me.

22. I believed Ms. Jenkins and I were cordial until an incident happened on November 18, 2019.

23. On or about November 18, 2019, as soon as I walked in the OP lab, Ms. Taylor mentioned "script check" to Ms. Jenkins. As reference, I had just worked on November 16, 2019 and found more than twenty errors for the week while doing script checks. I left the errors on Ms. Zagacki's desk for Monday morning, which was November 18, 2019.

24. In response to Ms. Taylor's comment I said, "Not today Crystal. You're too fucking old for that shit."

25. Ms. Taylor jumped in my face and said, "What did u just say? Did you just curse at me? You're done!" Then she walked out to speak to my supervisor I assumed.

4

26. Two minutes later, Ms. Taylor returned and I asked, "Crystal, what is the problem you have with me? Why do you keep showing off for Tynesha like you know this area when you know you're normally in the stat lab and you get mad at me about errors?" She asked, "You want to talk about this outside?"

27. I said yes because Respondent encourages us as employees to have side conversations to try to work out our differences amicably. Because of the may possible witnesses, I believed she honestly wanted to have a civil conversation about why we were having issues.

28. As we stepped out of the OP lab door into the main hallway, Ms. Taylor raised her voice. I said, "No Crystal, I'm not doing this right here in front of physician offices and a patient unit."

29. Ms. Taylor responded, "Yeah because I'm going to hurt you!" I stepped back and said, "Crystal, you're not going to put your hands on me!"

30. Ms. Taylor began bumping my chest and said, "Then what you come around here for?" I bumped her away from me and told her to back up, that I was not Naheemah. I turned around and said I was going to get Ms. Zagacki because this was crazy.

31. Ms. Taylor poked me in my head multiple times and said, "Yeah because you know better!" I backed up and she continued to bump me in the chest. I told her to stop and I tried to walk away but she kept poking me so I poked her back.

32. Ms. Taylor grabbed a handful of my hair, pulled me down to the floor and started hitting me in my head.

33. I attempted to defend myself as she had on sneakers and I had Dansko shoes that immediately slipped off. I was in socks, which caused me to slip around as she hit my head on the floor.

34. Not one person walked by as we fought in the hallway. The first person I saw on the scene was a Registered Nurse, "Igidia", then a Patient Transporter, James LNU, and then a Certified Nursing Assistant, Loretta LNU. Ms. Jenkins came out eventually and ran to Ms. Taylor's aid laughing.

35. I immediately walked to the stat lab and security was now all over the first floor. I went to Ms. Zagacki and told her what happened. My badge was taken and I went to the hospital emergency room to have my knee checked.

5

36. While in the emergency room, Ms. Zagacki told me that I was not able to return until an investigation was completes. She also told me that Ms. Taylor was gone and she was not coming back.

37. Ms. Zagacki said she thought she knew why Ms. Taylor attacked me. That morning, she had a meeting with some employees about the errors I found that Saturday, the 16th.

38. Ms. Zagacki said one employee took the constructive criticism with no problem but Ms. Taylor was pretty upset.

39. The morning of November 18, 2019 when I walked into work, the environment was already hostile and I had no idea.

40. As I waited in the emergency room, I filed a police report. The police responded to me around 7:30pm and the fight occurred at 2:00pm. I was then escorted to my car by security.

41. Ms. Taylor should have been disciplined in March 2019 when she verbally assaulted Ms. Gadson in front of Joyce. Instead, Respondent permitted her to work and it resulted in her attacking me eight months later.

42. On or about November 21, 2019, I contacted Respondent's Human Resources Department and spoke to Erin Shreiderman. Ms. Shreiderman informed me that my employment was terminated because there was a zero tolerance policy in the code of conduct for fighting.

43. I responded to Shreiderman that I was the one who was assaulted and attacked. I asked since this was my first time ever in a negative situation in over 14 years with Respondent, why wasn't a transfer considered and why wasn't I brought in to share my side of the story.

44. Respondent told me that I was terminated because of my participation in walking out of the office with her when she asked if I wanted to talk outside. Respondent said I should have known Ms. Taylor wanted to physically fight based off the verbal commentary we shared before the altercation.

45. On or about November 20, 2019, I had a cat scan of my head was diagnosed with a concussion. I was already in therapy from my stroke and now I have a concussion.

6

46. Ms. Gadson was not disciplined or terminated for her involvement in an altercation with Ms. Taylor.

47. Upon information and belief, Ms. Gadson had never filed a discrimination complaint against Respondent.

48. Ms. Taylor was not disciplined or terminated for verbally assaulting Ms. Gadson or for physically assaulting me.

49. Upon information and belief, Ms. Taylor had never filed a discrimination complaint against Respondent.

50. Respondent's action in terminating my employment was retaliation for filing a PHRC discrimination complaint.

51. Based upon the foregoing, I allege that the Respondent violated Section 5(d) of the Pennsylvania Human Relations Act 43 P.S. 951-963.

52. The Complainant prays that the Respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

## DUAL FILING

53. This charge has been filed with the U.S. Equal Employment Opportunity Commission.

7

## VERIFICATION

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 P.A.C.S. § 4904, relating to unsworn falsification to authorities.

May 18, 2020
(Date Signed)

Dywanna Michelle Broadnax
Dywanna Michelle Broadnax

8

# Exhibit 8



**pennsylvania** 201903983
HUMAN RELATIONS COMMISSION

Received

NOV 25 2019

PA Human Relations Commission
Philadelphia Regional Office

PLAINTIFF'S
EXHIBIT
D-8
PENGAD 800-631-6989

**PENNSYLVANIA HUMAN RELATIONS COMMISSION**
**EMPLOYMENT DISCRIMINATION QUESTIONNAIRE**

## 1. YOUR CONTACT INFORMATION

Name ___Dywanna Broadnax___

Address ___72 Memorial Drive___

___New Castle___,  ___DE___  ___19720___
    City / Street        State        Zip Code / Apt.

Phone Number: (H) _____  (Cell) ___302-983-0909___

Work: ___215-952-9070 or 9115___  E-mail address: ___Dywannab@Gmail.Com___

Name, address and phone number of a person, who does **NOT** live with you and will know how to contact you:

Name ___Kristen Gauthney___  Phone Number ___267-824-3500___

Address ___5518 ELLiot St___  ___Phila___  ___PA___  ___19143___
    Street        City      State    Zip Code

## 2. AGAINST WHAT EMPLOYER DO YOU WANT TO FILE YOUR COMPLAINT?

Employer Name ___Thomas Jefferson Hospital Methodist Campus___
    (Please use your employer's name as indicated on your paycheck or W-2 form)

Address in PA ___2301 S. Broad St___  ___Phila___  ___PA___  ___19148___
    Street       City      State    Zip Code

Phone Number ___215-952-9070 or 9115___  E-mail address: ___n/A___

Pennsylvania county where you were harmed: ___Philadelphia___

**NUMBER OF INDIVIDUALS WHO WORK FOR THE EMPLOYER:**

☐ Fewer than 4   ☒ 4 to 14   ☐ 15-20   ☐ 20+

**Type of Business** ___Hospital___

**Is the employer a federal agency?**   ☐ Yes   ☐ No  unknown

## 3. DESCRIBE HOW YOU WERE HARMED, AND WHEN, SO WE CAN DETERMINE IF WE CAN ASSIST YOU.  Check all that apply.

<u>Write the date(s)</u> you were harmed beside the discriminatory event or action:

☒ Discharge ___terminated___   ☒ Lay-Off ___fired___   ☐ Failure to Recall_____

☐ Forced Transfer_____   ☐ Denied Transfer_____   ☐ Demotion _____

☒ Forced Leave ___escorted off___   ☐ Leave Denied _____   ☐ Unequal Wages _____

☒ Unequal Benefits _____    ☐ Failure to Hire _____    ☐ Failure to Promote_____

☐ Discipline (Suspension, Warning, etc.) _____    ☒ Harassment* _____
*Complete question #7 if you were harassed

☐ Forced to Quit _____
Not accommodated because of your: ☒ Disability _____    ☐ Religion _____

**OTHER**, please be specific: _____ Assaulted _____

## 4. DO YOU FEEL YOU WERE TREATED DIFFERENTLY (DISCRIMINATED AGAINST) BECAUSE OF ANY OF THE CHARACTERISTICS BELOW?

The commission can investigate your complaint only if you believe you were treated differently and harmed because of your race, color, religion, ancestry, age, sex, national origin, non-job related disability or the use of a guide or support animal for blindness, deafness or physical disability. For example, if you feel you were treated worse than someone else because of your race, please indicate race as the reason. If you feel you were treated differently because of your race and sex, please check both race and sex. **Only check reasons which explain why you were harmed**. Also, please identify your race, color, religion, national origin or ancestry, etc. **if** you were discriminated against based on those factors.

☐ Male    ☒ Female    ☐ Pregnant

☐ Age (40 or older only): Date of Birth _____ 11-30-78 _____

☐ Race _____ BLACK _____    ☐ Color _____

☐ Religion _____    ☐ Ancestry _____

☐ National Origin (country in which you were born) _____

☐ Association with a person of a different race than your own:

Your race _____ the other person's race _____

☒ Use of a guide or support animal _____ Support Pbbmw _____

☐ Refusal to perform, participate in, or cooperate in abortion or sterilization services

☐ GED    ☐ Other _____

☒ I have a disability. (please complete #8)    ☐ The employer treats me as if I am disabled.

☒ I had a disability in the past. (please complete #8)

☐ I have a relationship or association with someone who has a disability. (please complete #8)

## ☐ RETALIATION
If you believe you were **harmed** because you complained about what you believed to be unlawful discrimination, because you **filed** a complaint about unlawful discrimination, or because you assisted someone else in complaining about discrimination, please complete the following information.

Date you filed a complaint with the PA Human Relations Commission _____ 11-23-19 _____

If you filed a complaint with another agency, list the agency's name and date of filing:

PHRC in 2017 file#

Date you complained about discrimination to a manager ___many times,___

Date you assisted someone in complaining about discrimination ___n/A___

## 5. WHEN WERE YOU HIRED OR WHEN DID YOU APPLY FOR A JOB WITH THE EMPLOYER?

Date you became an employee: ___3|5|2005___

Position for which you were hired: ___Phlebotomist /Lab Assistant___

What was your position at the time you were harmed? ___Phlebotomist___

If you were seeking to be hired by an employer:

When did you apply? ___n|A___   When did you learn you were not hired? ___n|A___

## 6. STATE THE REASONS THE EMPLOYER GAVE YOU FOR ACTIONS THAT HARMED YOU.

My participation in fist fight. I was told I should have known she wanted to fight when she asked me outside

Who told you about the employer's reasoning for the action? Include his or her job title.

ERIN Shreiderman from HR (215) 503-5588

When were you told about the action taken against you? (Date or Dates)

I was terminated for violating Code of Conduct

If you were given no reason, please check here. ☐

Regarding how you were harmed, please identify a person or persons who were treated better than you. For example, as a **male employee** you were disciplined for a work violation, but a **female employee** who committed the same work violation was not disciplined.

Name of employee - First and Last (if known)

Crystal Taylor

How is this person _different_ from you? For example, what is his or her race, age, religion, etc.?

She is the lady who assaulted me, she was told to return next week

Please explain **exactly** how this person was treated better or differently than you. Include dates.

Never repremanded for violent behavior.

If you cannot identify someone who was treated better or differently than you, you need to describe an incident, statement, _etc._ which can be investigated, and which directly relates to why you were treated differently than someone else.

I attatched past

**7. IF YOU CHECKED ONE OF THE FOUR DISABILITY CATEGORIES IN #4, ANSWER THE FOLLOWING QUESTIONS.**

What is your disability? _Lupus since 2006. Stroke february 2019_

How long have you had this disability and when did it start? _14 years ago  06/2006._

Do you still have this disability? ☒ yes  ☐ no

If yes, how much longer do you expect to have the disability? _life long_

What major life activities do **you have great difficulty performing** because of your disability (Check all that apply.) _My balance has been effected since my stroke_

☒ Seeing  ☐ Hearing  ☒ Bending  ☒ Walking  ☒ Lifting  ☒ Stooping  ☒ Turning

☐ Climbing  ☒ Running  ☒ Talking  ☐ Standing for long periods

☐ Sitting for long periods  ☐ Caring for yourself  ☒ Thinking  ☒ Concentrating

☐ Relating to Others

Other Major Life Activities (**Be specific**) _Driving,_

If you have had a disability in the past, when did it start, and what date did it end? _Still have it. Started 06/2006_

If your employer treats you as if you are disabled:  What disability do they think or believe you have? _Joyce Zagacki is my Supervisor She knows I have Lupus_

Who are the people that are treating you as disabled (names and positions or titles)? _Joyce refuses to retrain me in other areas I should be working in. Such as Recieving and Send Outs._

Why do you think that these people think or believe you have a disability? _Unknown_

How did your employer learn about your disability? _me, Doctor letters._

On what date did they learn about your disability? _06/2006_

Which specific manager/official/agent) learned about your disability? (include title or position) _Joyce Zagacki Lab Supervisor._

If you are related to someone who has a disability, what is your relationship to this person? _n/A_

What is this person's disability? _n/A_

How and on what date did the employer learn about this person's disability? _n/A_

Did you ask for an accommodation or assistance in order to do your job? ☒ yes    ☐ no

IF YES,

(1) To whom did you make your request? _Joyce Zagacki_

(2) What date was the request made? _Not come in early hours_

(3) Explain what the accommodation or assistance was that you requested, and why.
_Getting up early is hard for me because of my joint pain. So I asked to work 2nd shift._

Did the employer provide your requested accommodation or assistance? ☒ yes    ☐ no

If so, on what date? _10|20 11_

Did the employer provide some other accommodation or assistance instead?    ☐ yes    ☒ no

If yes, please explain. _n|A_

Did the employer deny your request for an accommodation or assistance?    ☐ yes    ☒ no

if so, who denied your request?

_n|A_

What date was the request denied? _n|A_

What reason was given to you for the denial? _n|A_

## 8. IF YOU CHECKED THAT YOU WERE HARASSED UNDER #3, ANSWER THE FOLLOWING QUESTIONS AS COMPLETELY AS POSSIBLE.

Name the person(s) who harassed you: _Tynesha Jenkins, Crystal Taylor_

His or her position or job title _Clinical Lab Assistant/Phlebotomist_

When were you harassed? Starting date _April 2019_ Ending date _November 2019_

Is the harassment still continuing? ☐ yes    ☒ no _I was terminated 11/22/19_

How often did the harassment occur? As well as possible, please indicate **date, month and year** of each incident and how often the harassing actions occurred.

☐ One time only _____    ☐ Once a day _____

☐ Several times daily _____

☒ multiple times/week _____

☐ multiple times/month _____

Please provide two or three examples of the harassment you experienced.

_____ I attatched proof. _____

_____

_____

Did you consider any of the above acts of harassment to be especially severe and/or offensive?

☒ Yes ☐ No    If so, please explain why. ___ Tynesha asked me outside to a fight back in June. I tolt Joyce, she didn't do anything. I attatched Proof.

Did the harassment have a negative or harmful effect on your work environment, health or personal life?  If so, please explain:

Yes. Tense enviroment for me when I worked with Tynrsha & Crystal.

Did you complain to anyone about the harassment? ☒ Yes ☐ No

To whom did you complain?

Joyce Zagacki                    Lab Supervisor
Name                             Position or job title

What date did you complain? ___ 06-2019 ___

Did the harassment stop after you complained about it? ☐ Yes ☒ No

If it ended, on what date did it stop? ___ Tynesha eased up, but Crystal didn't.

After you complained, were any other actions taken against you? (for example – discipline, discharge, etc.) ☒ Yes ☐ No

What were the actions? ___ Told to let them do their work their way.

On what dates did they occur? ___ n/a

Who took the action against you? ___ Joyce

Did this person know that you complained about the harassment? ☒ Yes ☐ No

Please identify someone who is different than you and who was treated better:

Lauren                           Phlebotmist
Name                             Position or job title

Reason they were treated better than you as discussed in #4 above: Crystal was repremanded

How were they treated better regarding the harassment?
___ Crystal use to give Lauren a hard time. Lauren is white. Crystal was disciplined.

PA Employment Discrimination Questionnaire, Rev. 8-13

for bothering or harrasing white girls in the lab.

**9. HAVE YOU BEEN INVOLVED IN ANY COURT ACTION REGARDING THIS MATTER? (COURT ACTION INITIATED BY YOU OR ANYONE ELSE.) IF SO, PLEASE SPECIFY THE COURT AND THE DATE FILED, TO THE BEST OF YOUR MEMORY.**

☐ Yes  ☒ No    Court          City              County      State       Date filed

**10. IF YOU HAVE FILED THIS COMPLAINT WITH ANY OTHER LOCAL, STATE OR FEDERAL AGENCY, PLEASE ANSWER THE FOLLOWING:**

Name of the agency with which you filed  I filed a police report 11/18/19 for the assault.

Date of filing                          Inquiry or Complaint number

**11. IF YOU WILL HAVE AN ATTORNEY REPRESENTING YOU ON THIS MATTER, PLEASE HAVE YOUR ATTORNEY SEND US A LETTER THAT CONFIRMS THIS. (YOU DO NOT NEED AN ATTORNEY TO FILE A COMPLAINT.)**

<u>**YOU MUST SIGN AND DATE THIS FORM BEFORE RETURNING IT.**</u>

☒ *I hereby verify that the statements contained in·this form are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. Section 4904, relating to unsworn falsification to authorities.*

**Signature** Dywanna Broadram

**Date** November 23, 2019

**IF YOU HAVE OTHER INFORMATION YOU BELIEVE WE NEED TO KNOW TO HELP US UNDERSTAND YOUR COMPLAINT, PLEASE PROVIDE IT BELOW. FEEL FREE TO ATTACH ADDITIONAL PAGES TO DESCRIBE WHAT HAPPENED TO YOU AS COMPLETELY AS POSSIBLE.**

I am providing additional proof
① Proof of my stroke in February 2019
② Letter from my Dr. that I have a concussion from flight.
③ Email that I complained to Joyce about Tynesha and other issues.
④ Email from Joyce to staff, okaying staff to falsify records.

# Exhibit 9

| | |
|---|---|
| **From:** | Joyce Zagacki |
| **To:** | Dywanna Broadnax |
| **Cc:** | George Marrone |
| **Subject:** | RE: Out Patients |
| **Date:** | Monday, June 24, 2019 7:29:00 AM |

Dywanna,

We need to meet and talk. This email is completely out of line. I have addressed any concern that you have had and have spoken to each employee individually. As far as the student is concerned I did have a conversation with her and she was very upset at the accusations and denied them. The script did say only one blood culture. It did not say x 2. As far as the scripts go they are scanned in to the chart at registration therefore they are not legal documents. Most patients come in without a script. I feel that I have given you the utmost respect and I expect the same from you. I find this email not only hurtful but insulting. I would like to talk to resolve some of these issues. As a supervisor when I address a concern with an employee it is between that employee and myself so to say that I did not address these concerns is untrue because I have. I have sat with each person in outpatient however you would not know that. We can set up a time to meet and discuss your concerns.

Joyce

**From:** Dywanna Broadnax <Dywanna.Broadnax@jefferson.edu>
**Sent:** Thursday, June 20, 2019 3:46 PM
**To:** Joyce Zagacki <Joyce.Zagacki@jefferson.edu>
**Cc:** George Marrone <George.Marrone@jefferson.edu>; Joyce Zagacki <Joyce.Zagacki@jefferson.edu>
**Subject:** Out Patients

Hi. I am sending this email because I have many concerns about how things are being done in the out patient laboratory. I know that I am a per diem employee and my opinion may not matter but, I have been working here for many years and I have always followed all instructions & rules. I have never been written up nor suspended. If this job went on senority, I would be the lead phlebotomist here because I am considered a 5star employee even if I am not/never recognized for it thru out the year by my department heads or on my yearly evaluation. There has never been a complaint about me from Methodist staff nor patients in 14 years, other than my co workers. And my co workers complain about me because I do my job accurately, efficiently, and professionally at all times. My professional/accurate job skills here @Methodist came from the training by lab professionals and supervisors that were with Methodist for 20years or more when I started here in 2005. I say that to give a understanding why my work ethics and skills may differ from my co workers.

In the most recent months I have felt under minded many times by both my supervisor and co



PLAINTIFF'S
EXHIBIT
D-9
PENGAD 800-631-6989

workers. I come in work during 2nd shift, which means the ladies on 1st shift have different methods than I do in terms of how they run the out patient area. So when I come in and I see a co worker doing something 'different' than the way I was trained many years ago, I try to show them the right way and there is always a problem. I take it to my supervisor, and instead of telling them I am doing it correctly, she will give us a option of doing it how we feel comfortable. I would like to share examples that bothered me very bad recently.

We have a new employee, she had not been signed off on order entry, I tried to help her and let her know she was ordering the test incorrectly. Her reaction to me was very defensive, and she said this is how they did it in the morning. I was trained by EPIC on 4/1/2016 on how to order labs. We were instructed to order the test, go draw the patient, then come back to the computer and collect and receive the specimen in. Well, the new employee, ordered the test, then pressed collect, then receive then she went to stick the patient. I let her know that was wrong and she argued with me so bad, she told me to meet her outside when she clocks out. (That was a threat for me to meet her outside to fight). I plainly said that, wen you order, collect and receive, before sticking the patient, that's falsifying time. The next day instead of my supervisor telling them I was correct, she told us via email to do it either way. Had I trained the new girl on order entry that would've never happened.

Another time, the new employee had a script that said "blood cultures", I told her to order 2 sets. Janet told her only order one set, so she deleted the 2nd set I told her to order. Janet called Ron, he said 1 set, she told Joyce she said 1 set. (Iknow I have been drawing this test for 20 years, and a physician never orders 1 set unless, the 1st set has been collected by someone else. Other than that, 2 sets are always ordered from 2 different sites). I decided to call the physician office to confirm what I already knew, and they said draw 2 sets. Joyce said ok, just document who I spoke with (I always do). Then 1 minute later Joyce called back and asked me did I know I had to stick the patient two times. At that moment I felt so humiliated because she knows I knew that but I felt she needed to embarrass me because everyone else was wrong and I was right. So the new girl had to order the second set again. Had the new girl not been told that my opinion doesn't matter that would've never happened.

I witnessed the student from CCP labeling specimens after the patient had already left. I asked Janet what was the student doing. She should have been trained to label the specimens in front of the patient while the patient holds pressure. Janet proceeded to tell the student. I sad at that moment 'its no point telling her now, she is done her 100 sticks already". Had I trained the student, that would've never happened.

Another new girl who started a few months ago, had to work the infusion center one day. She called me and told me she was sending a patient to me. When the patient arrived they had two tubes of blood in their hand that our phlebotomist drew. I am unclear why she sent the patient across the street with blood specimens in his hand , but she said another co worker

taught her to do that.  So I took the blood from the patient, ordered it and properly labeled it. I told the phlebotomist regardless of who told you to do that, never do that again.  Patients should never handle their own specimens unless they are bringing them from home. I told Joyce and she said she would look in to it.

Now to my most recent concern.  Because of all the things I have been witnessing with the new staff.  I decided to start checking script orders again.  I had taken a break from it because I had a medical scare some months back.  Now I feel cognitively confident enough to do this job duty again.  I felt it was necessary.  And since I have started checking scripts again, there are at least 3-6 mistakes a day.   The phlebotomist are missing test which means patients have to be called back if we don't have enough blood to add the test that was missed on.  Not only are they missing test, but they are also writing on the scripts.  They are using a highlighter to highlight the test to make sure they ordered it, or sometime they write check marks to make sure they ordered the test.  I graduated as a certified MA in 1999, been working every since.  I was taught in school that scripts are legal documents and no writing should be on them other than a error with the initials of the person who corrected the error.  Because the phlebotomist are writing on them for order verification, it confuses me when I have to look for errors because of so much writing. (They can point with a pen when ordering like I was taught here by Carol Delaney the supervisor proceeding Joyce).  I checked four days of scripts yesterday and there were more than 10 errors.  So I kindly made a small note for the girls regarding order entry and writing on scripts.  When I got here today the note was gone, there was no email from Joyce explaining anything I said pertaining to out patients, and all the scripts today are covered in highlighter and check marks.

At this point I am honestly fed up.  I have shown dedication to Methodist and the care I truly have for patient care.  But it has become so draining being a good employee that's never recognized, get thrown under the bus for trying to do my job right, and I am never defended by my boss.  In fact, I feel my boss makes them feel its ok to not adhere to my help.  I understand that I am not supervisor, however my supervisor wears many hats and can't focus on the out patient area at all times.  Without me things would be terrible and ran how the ladies want to do it, which is all wrong.

Sorry for being so straight forward, but I have had enough.  I am the only Phlebotomist here that has a associates degree in science.  Any test that needs collection in out patients on the floor I have drawn before, and if I haven't, I know how to look up collection requirements or call the dr for test verification.  Something that the other ladies won't do.  They send patients back to their doctors when they can't understand the script or if they don't have diagnosis codes.  I never send patients home.  They also tell patients we close at 4:00 instead of 4:30 mon thru Friday, then they tell themwe close on Saturdays at 11:30 instead of 12:00 when they call.

At this point I don't know what else I should do.  If we were still being scored by the Service and Operational Committee, we would fail monthly with this staff. Unlike in the years of 2007 and 2008 when we were awarded plaques for our high scores, when it was myself and 3other ladies that left over 10years ago.  And here I am still abiding by the service excellence standards, but creating enemies with my co workers and being continuously under minded by my supervisor for doing so.  I have been feeling this way for years.

# Exhibit 10

Case Number          2019-11-002767

Thomas Jefferson University
METHODIST CAMPUS



PLAINTIFF'S
EXHIBIT
D-10

PENGAD 800-631-6989

Case Report
Reported by:    WHITE, WILLIAM

| Incident Types Label | | Offender | Incident Disposition |
|---|---|---|---|
| CALLS FOR SERVICE : INVESTIGATION : PERSON | | | |
| CALLS FOR SERVICE : DISTURBANCE : DISORDERLY PERSON | | | |

| Report Disposition | Method of Reporting | |
|---|---|---|
| CLOSED | | |

| Report Recorder | Manager/Supervisor On Duty | Manager/Supervisor Notified |
|---|---|---|
| WHITE, WILLIAM | WHITE, WILLIAM | YES |

| Incident Occurred Date | Incident Occurred End Date | Incident Discovered / Called In |
|---|---|---|
| 11/18/2019 at 1:49 PM | 11/18/2019 at 1:54 PM | 11/18/2019 at 1:51 PM |

| Location | Specific Location |
|---|---|
| METHODIST : MAIN : 1 : HALLWAY | EAST WEST HALLWAY BETWEEN OUTPATIENT LAB AND OLD SURGICAL WAITING AREA |

Report Synopsis/Overview
Reported to Outpatient lab due to report of staff fighting

### Contact # 1    (PERSON OF INTEREST)

Full Name
CRYSTAL HUNTER

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | FEMALE | |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| 50-60 | | | |

Notes
OUTPATIENT LAB EMPLOYEE

### Addresses

| Street Number | Street Direction | Street Name | Street Type | Apt./Suite |
|---|---|---|---|---|
| 2301 | SOUTH | BROAD | STREET | |

| City | State | Zip | Country | Address Type |
|---|---|---|---|---|
| PHILA. | PA | 19148 | | WORK |

### Contact # 2    (PERSON OF INTEREST)

Full Name
DYWANNA MICHELLE BROADNAX

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | FEMALE | |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| 30-40 | | | |

| Prepared By: | Submitted Date |
|---|---|
| WHITE, WILLIAM(wiw001) | 11/18/2019 5:47 PM |
| Signature | Reviewed By/Date |

Page 1 of 3

Case Number　　2019-11-002767

**Notes**

OUTPATIENT LAB STAFF

## Contact # 3 (WITNESS)

**Full Name**

LORETTA WARD

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | MALE | |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| 30-40 | | | |

**Department**
NURSING

**Title**
NURSING ASSISTANT

**Notes**

NURSING ASSISTANT

## Contact # 4 (WITNESS)

**Full Name**

MARQUAN TRIPPETT

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | MALE | |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| 18-25 | | | |

**Notes**

EVS STAFF MEMBER

### Addresses

| Street Number | Street Direction | Street Name | | | Street Type | Apt./Suite |
|---|---|---|---|---|---|---|
| 2301 | SOUTH | BROAD | | | STREET | |
| City | State | Zip | Country | | | Address Type |
| PHILA. | PA | 19148 | | | | WORK |

## Contact # 5 (OTHER RESPONDER)

**Full Name**

BENJIMAN SEABREEZE

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | MALE | |

**Department**
SECURITY

**Title**
SECURITY OFFICER

### Addresses

| Street Number | Street Direction | Street Name | | | Street Type | Apt./Suite |
|---|---|---|---|---|---|---|
| 2301 | SOUTH | BROAD | | | | |
| City | State | Zip | Country | | | Address Type |
| PHILA | PA | 19148 | USA | | | WORK |

| Prepared By: | Submitted Date |
|---|---|
| WHITE, WILLIAM(wiw001) | 11/18/2019 5:47 PM |
| Signature | Reviewed By/Date |

Case Number          2019-11-002767

## Contact # 6    (OTHER RESPONDER)

Full Name

JODIE MOFFITT

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | FEMALE | |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| 40-50 | | | |

| Department | | | Title |
|---|---|---|---|
| SECURITY | | | SECURITY OFFICER |

## Contact # 7    (REPORTING PERSON)

Full Name

WILLIAM L WHITE SR.

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| | | MALE | BLACK |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| 50-60 | | | |

| Department | | | Title |
|---|---|---|---|
| CAMPUS POLICE | | | SERGENT |

Notes

RESPONDING OFFICER

### Addresses

| Street Number | Street Direction | Street Name | | | | Street Type | Apt./Suite |
|---|---|---|---|---|---|---|---|
| 2301 | SOUTH | BROAD | | | | STREET | |
| City | | State | Zip | | Country | | Address Type |
| PHILA | | PA | 19148 | | | | |

### Phones :

(WORK) 2159529238

Narrative text

Sgt white responded to radio call from post 102 for assistance in B-1 hallway .
I arrived on scene to find multiple staff members including S/O J. Moffitt , S/O B. Seabreeze and nursing assistant Loretta Ward in hallway outside Outpatient lab. Ms. Dywanna Broadnax was in hallway outside outpatient lab I asked S/O Seabreeze to escort her to seating area outside Pharmacy and remain with her. I entered lab area and spoke to Ms. Hunter: Ms. hunter stated that this was a verbal dispute that turned physical after Ms. Broadnax invaded her Personal space. Ms. Hunter stated that Ms. Broadnax Pushed her twice. I then took Ms. Hunter to inpatient physical therapy to write a statement. I then
spoke to Ms. Broadnax in Main lab and she Stated that Ms. Hunter started a verbal confrontation in lab and then asked her to come out in hallway where she became physical
by bumping her, Punching her ,pulling her hair and pulled her to the ground. Ms. Ward stated that she saw two employees fighting in hallway and tried to break them up by yelling at them to stop before calling for Security. I took both staff members ID's and gave them to their manager, along with their keys. I also had statements written By Ms. Hunter Ms. Broadnax, Ms. Ward and Mr.Trippett . Ms. Broadnax wanted to press charges against Ms. Hunter and I informed her that she would need to file a private criminal complaint with Phila. Police Dept. 3rd District she was given address to police station while She was escorted to ED to be checked out for possible injury.

| Prepared By: | Submitted Date |
|---|---|
| WHITE, WILLIAM(wiw001) | 11/18/2019 5:47 PM |
| Signature | Reviewed By/Date |

# Exhibit 11

I clocked in and walked in the O.P Lab.
After I put my things in my locker, I came near the other Phlebotomist. Crystal said to Tynesha "Don't forget to add your mag & phos" a subliminal comment. So I said "Crystal I'm not for ya stuff today, your too f'ing old for that". She got up and got in my face and said "did you just curse at me"? Then she said "Your Done!" She left O.P lab and when she came back I said why are you always so sarcastic. She said do you wanna talk about this outside, I said yes because we had students & pt's. She got infront of the Lab door and proceeded to get loud, I said I'm not doing this right here infront of the Dr's office's and administration, So she come on then turned the hall near the time clock, she said "because I'm going to hurt you", I said your not going to put your hand on me, she said "Then why you come outside, I said to talk, you not going to touch me. She then started bumping my chest, all in my face because I said, I'm going to tell Joyce this is crazy. As I turned around she grabbed my hair on the right side, hit me, and pulled me to the floor. At that point I began defending myself.

PLAINTIFF'S
EXHIBIT
D-11
PENGAD 800-631-6989

# Exhibit 12

11-13-19

On the Day of New Years 2019 about 2:15 PM me and coworker putting in pt. I simply told my coworker that if your putting in Chem-7 make sure you add MG8 · Plus. Dwanna Imes said to me out loud infront of pt. that I always doing this and Causing infront of pt. so to take the excitement out of our pt I said to her if she want to speak to me privatly so we went in the hallway where she became Cursing and yelling.

(signature)

PLAINTIFF'S EXHIBIT
D-12
PENGAD 800-631-6989

# Exhibit 13

I Loretta Ward, was walking Down ~~Toward Inpatient Lab, before getting to~~ The lab I heard Noise like punching and breathing heaving and I Look to The Corner by The Time clock. and There are Two ~~girls~~ girl fist fighting and I said Stop Twice Then I yelled Security and When Security tore Them apart from each other, The short girl said out loud she put me in this corner to fight with me cause there No camera, The short girl has Long hair. Tall girl with very short hair.

Loretta Ward
CNA
ACE Unit

Loretta Ward



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
D-13

# Exhibit 14

EXHIBIT
D-14

 Gmail

Dywanna Broadnax <dywannab@gmail.com>

---

**(no subject)**
1 message

**Dywanna Broadnax** <dywannab@icloud.com>
To: Dywanna Broadnax <Dywannab@gmail.com>

Sat, Nov 23, 2019 at 12:36 PM

Hello. I spoke with you earlier this year in reference to the above case number. As of this past Monday things have gotten worse. I was physically & brutally assaulted by a co worker who has a known history of work aggression & volatile behavior a paper trail for years. The name of the co worker that assaulted me is Crystal Taylor. (You will see her name on my previous complaint). She is a phlebotomist that began in 2012or2013. I began 3/5/05. Took a medical break from 10/2008-10/2011. (That's when I filed my first discrimination complaint on the same supervisor I have now & that's on the previous discrimination/retaliation complaint. Her name is Joyce Zagacki.

I'm going to start from the beginning since I've last spoke to you Mr.Bethea. February 11, 2019 I had a mild stroke. I returned back to work on 4/6/19. When I returned back to work a coworker by the name of Naheemah Gadson had taken a leave of absence because Crystal Taylor had verbally assaulted Naheemah which almost lead to a physical assault in front of Joyce, & Joyce still didn't fire Crystal. This caused Naheemah fear of working with Crystal & severe anxiety and she has been out six months being treated because she refuses to return to work if Crystal is there.

So as I returned from my stroke recovery, I learned of this incident between Naheemah Gadson & Crystal Taylor. (I didn't even know that they had a on going issue going on for months). Crystal automatically started treating me mean & aggressively. I even went to the boss & cried about it because I thought we were friends. At that point I realized she's treating me mean because I'm friends with naheemah. Crystal & I never even had a disagreement before. In fact, I drove her home from our holiday party at the end of December 2018. (Crystal basically played the "big sister" role to me because we are both Sagittarius).

I'm a 2nd shift phlebotomist 1pm-7pm, I am in the Out Patient Lab until 4:30, then I cover the floors until 7. For years, Crystal was a 1st shift phlebotomist 4:30am to 1pm. Crystal & I never worked together, 1 reason because of the time, 2nd reason because she was primarily in the STAT lab doing receiving & send-outs. I am always in Out Patients & the floors. But we both work in the lab. Part of my job is, I check the out patient prescriptions after the AM phlebotomists. Out Patient scripts are the orders that patients come in with to have their lab work done. If the scripts aren't checked, theres a good chance that errors will go un noticed & patients test results will be compromised & need to be re collected. I catch the error while the blood is still good to add the test on to avoid recollection. This duty I do causes tension with the other Phlebotomists because I am exposing their errors. I have never been liked in my department by my phlebotomist corkers (my prior complainants will show that), so them being angry with me about script check is normal.

On 11/18/19, when I arrived to work Crystal Taylor and Tynesha Jenkins (Tynesha is the new hire that I had my 1st threat from. I told Joyce & Joyce swept it under the rug as she always did). Tynesha had just started working there when I returned 4/6/19 from stroke recovery. Crystal turned her against me immediately, which caused instant tension between Tynesha & I. This was the first time in my work history I ever felt threatened by a employee. Tynesha actually verbally invited me outside to fight, she said "you can meet me out side after work" & then told Joyce she didn't say that after I told on her. She wasn't even there a month when she said that to me, I was shocked. She also said "I don't like you, I never met anyone with your personality". Tension remained high between us, I demanded a meeting one day when Tynesha created a argument with me in the OP Lab after I tried to help her while she was still in training. I demanded a instant meeting because I couldn't understand her mean energy considering she had just

started there & I was told by Joyce to train her. Joyce allowed the instant meeting & Tynesha apologized to me in front of both supervisors Linda Dutch & Joyce Zagacki. She apologized for not taking the time to get to know me herself, & for saying she didn't like me. From that point we became cordial, at least that's what she made me think.

Soon as I walked in the OP Lab 11/18, Crystal said a subliminal comment to Tynesha referring to "script check". I had just worked Saturday 11/16 & found more than 20 errors for the week. On Saturday's I always leave the errors on Joyce's desk for Monday morning. Well, on 11/18 Joyce held a meeting and discussed the many errors that I have been finding. I had no idea of this meeting when I got to work later this day.

(Joyce told me one employee took the constructive criticism with no problem but Crystal was upset. (So when I walked into the lab, the environment was already a hostile environment that I didn't know.

So when crystal said the subliminal comment, I said "not today crystal, your too f'ing old for that shit". (Now I've never been in trouble for cursing or anything. So since I said that, she jumped in my face & said "what did u just say! Did u just curse at me! Your done!". then she walked out I guess to go tell my supervisor. Tynesha was in there & so was 2 phlebotomy students from CCP that come on Monday's to train. I proceeded to wipe the area down. Two minutes later crystal returns. I said "crystal what is the problem with u with me, why do u keep showing off for Tynesha like you know this area when you know your normally in the stat lab, and you get mad at me about errors"? She said "you wanna talk about this outside"? (Now, keep in mind, I don't work with Crystal, I only hear about her aggressive antics, I see her in passing. I don't mnow that she's know a for asking ppl to meet her in the parking lot to fight Never did I think she would be inviting me in the hallway infront of patients, staff & doctors to fight). so I said yes, because the hospital encourages us employees to have side conversation to try & work out our differences. So because the CCP students & Tynesha was there, I thought she honestly wanted to have a conversation about why we are having all this tension. As we stepped out the OP Lab door in to the main hall way, she proceeds to get loud. I said "no crystal I'm not doing this right here infront of physician offices & a patient unit". So she takes a few steps to the right behind a wall in a well lit exposed hall area where there is a time clock & large security mirror. She then says "Yeah because I'm going to hurt you"! I stepped back & said, "Crystal your not going to put your hands on me"! She starts bumping my chest saying "then what u come around here for"? I bumped her away from me & told her back up I'm not naheemah. I then proceed to turn around and I said "I'm going to get Joyce this is crazy"! She then took her finger & poked me in my for head multiple times & said "yeah because you kno better"! At this point, she threatened me by saying "I'm going to hurt you", I backed up, she then bumped me in the chest continuously, I told her stop, I tried walking away and she poked me in the head, so I then poked her back. She grabbed a handful of my hair, pulled me down to the floor & started beating me in my head. I began defending myself. She had on sneakers, I had in danskos that came off, which left me in slippery socks, which caused me to slip as she was hitting me and I hit my head on the floor. Not one person walked passed as we fought. No one saw anything. The first person I saw on the scene was a RN by the name of "Igidia", then a patient transporter name James then a CNA name Loretta. Tynesha then came running out of OP Lab & quickly ran to Crystal aide laughing. This day, Crystal was angry about the meeting I knew nothing about, & she didn't have on a lab coat. She knew she was going to hit me in the hallway. I had no idea.

I then immediately walked to the stat lab and now security was all over the first floor. I went to Joyce, I was beyond upset. My badge was taken, I went to the hospital ER to have my knee checked. While in the ER, I was told by Joyce I wasn't able to return until the investigation was complete. Joyce also told me that crystal was "gone she wasn't coming back" later when she finally came to the ER to check on me. That's when Joyce also said "I think I know why this happened", & told me about the meeting she had that morning about the errors I found over the weekend.

Joyce allowed me to walk in to a hostile environment 11/18/19 with two employees that didn't like me that were angry with me and I had no idea. Had I known a meeting was held that morning, I would have ignored Crystals "subliminal comment", because I knew she was mad. The only reason I said "not today crystal your too f'ing old for that shit" was because I had just walked to begin my shift and she was starting with me.

Immediately after the fight, I contacted my sons attorney, infront of staff, security and Jefferson police, he instructed me to call the cops to the hospital and make a police report. I did that as I waited in the ER. They

got to me around 7:30 that evening. The fight was 2pm. I was then escorted off the property to my car by security. I was so humiliated on all levels. Crystal should have been fired years ago, but she really should have been gone in March when she did what she did to Naheemah infront of Joyce. Now this happened to me.

On Thursday 11/21/19 I contacted HR. I was told by Erin Shreiderman I was terminated because there is a zero tolerance policy in the code of conduct for fighting. I said, but I was assaulted, & attacked. I asked since this is my first time ever in any situation in 14+ years, why wasn't it considered for me to be transferred to a different location? Why wasn't I brought in for my side of the story? I was told I was terminated for my participation, by me walking out the office with her when she asked did I want to talk outside. HR said I should have known she wanted to physically fight based off the commentary we shared before the fight became physical.

I said, " I did exactly what the code of conduct says, I accepted her offer to talk privately, I backed away when she verbally threatened me, saying "yeah because I'm going to hurt you", I tried walking away when she chest bumped me. I tried walking away two times before I poked her back in the head. She poked me saying "yeah because you know better!", because I was backing away.

I had a cat scan of me head on Wednesday 11/20/19. I was diagnosed with a concussion. I'm already in therapy from my stroke now I have a concussion. I'm so upset about this. Because I have made many complaints to HR & PHRC over the years trying to tell how Joyce does malicious things to me, and in this situation I complained about crystal behavior to me for months. I feel like Joyce has been retaliating against me since my first discrimination claim in 2010.
Pleas help me get justice from this discriminatory Institution.

Sent from my iPhone

Sent from my iPhone

# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

:
DYWANNA BROADNAX,                     :
                                      :
    Plaintiff,                        :
                                      :
    v.                                :
                                      :
THOMAS JEFFERSON UNIVERSITY      :    CIVIL
ACTION NO. 21-CV-04662-JMY
HOSPITAL, INC.,                       :
                                      :
    Defendant.                        :
_____:

## AFFIDAVIT OF GEORGE MARRONE

COMMONWEALTH OF PENNSYLVANIA
                              :SS
COUNTY OF PHILADELPHIA

I, George Marrone, declare the following to be true and correct under penalty of perjury and pursuant to 18 U.S.C. Sections 1623 and 1621:

1. My name is George Marrone. I am more than eighteen (18) years of age, am competent to testify in a court of law, and have personal knowledge of the facts stated herein.

2. I provide this Affidavit in Support of Defendant's Motion for Summary Judgment and the accompanying Brief ("Brief").

3. As a Lab Manager for Jefferson, I had oversight responsibilities for the labs in Center City. In 2011, I assumed additional oversight responsibilities for the labs at Jefferson's Methodist Hospital Division ("MHD"). At that time, Joyce Zagacki, Laboratory Outpatient Supervisor, began reporting to me.

4. In 2017, I became the Laboratory Operations Director reporting to Steven Gudowski, who was then and remains today the Administrator for the Clinical Laboratories at Thomas Jefferson University Hospitals, Inc. Ms. Zagacki continued to report to me.

5. I learned that two Lab Assistants who reported to Ms. Zagacki – Dywanna Broadnax and Crystal Taylor – were involved in a physical altercation in a hospital hallway during working hours. The altercation happened on November 18, 2019.

6. The morning after the altercation, Ms. Zagacki emailed Aaron Sniderman (the Human Resources Business Partner), with a copy to me, statements written by Ms. Taylor, Ms. Broadnax and a witness - Loretta Ward – about the altercation. A true and correct copy of that email is attached to the Statement of Facts ("SOFs") as Exhibit 49.

7. Later that same morning, Dennis Delisle – Vice President, Operations - emailed the Security Case Report about the altercation to Mr. Gudowski, Ms. Zagacki, Mr. Sniderman, and me. A true and correct copy of that email is attached to the SOFs as Exhibit 48.

8. I read both the Security Case Report and the statements and concluded that Ms. Taylor and Ms. Broadnax should be terminated for their mutual involvement in the altercation.

9. I knew Ms. Taylor and Ms. Broadnax had violated Jefferson's policies and that fist fighting at work during working hours cannot be tolerated. I felt the totality of the altercation was serious enough that it warranted both employees' terminations.

10. On November 20, 2019, Mr. Sniderman emailed Mr. Gudowski, with a copy to Mr. Delisle, Ms. Zagacki, and me, that Jefferson takes a zero-tolerance approach to violence in the workplace, that Ms. Taylor should be terminated, and that, based on Ms. Broadnax's statement, he initially recommended she be terminated as well. *See* Exhibit 34 to the SOFs. Mr. Sniderman asked Mr. Gudowski, Mr. Delisle, Ms. Zagacki, and me if we had more information or a different view of the discipline.

11. I did not have more information or express a different view.

12. It is my understanding that Mr. Sniderman consulted Jefferson's in-house legal counsel and, thereafter, informed Mr. Gudowski, Ms. Zagacki and me that he (Mr. Sniderman) intended to follow through on his recommendation to terminate both Ms. Broadnax and Ms. Taylor for the altercation.

13. I informed Mr. Sniderman that Ms. Zagacki and I supported the terminations.

14. I affirm under the penalties of perjury that I have read the foregoing and the facts and representations contained therein are true.

Dated: _8/3/22_

George Marrone

10146626.v1
10157306.v1

# Exhibit 16

◄ Ph one ..ll LTE          12:10 PM          @ 75% ▭

<
Dywanna New >

 New name and photo available      ⊗
Dee Michelle Update Contact...

Tue, Dec 24, 1:12 PM

Hello. I just wanted to say thank you for speaking with the detective. And I now know the decision to terminate me came from HR. I believe if it was up to you, you would have tried to save my job. Thank you for everything all these years. I'm very sorry I ashamed the lab. Merry Christmas. Please tell George & Linda sorry as well.


Thank you Dywanna. My hope for you is that you recover both mentally and

  iMessage

      


PLAINTIFF'S
EXHIBIT
D-16
PENGAD 800-631-6989



Sent from my iPhone

3

# Exhibit 17

PLAINTIFF'S EXHIBIT
D-17
PENGAD 800-631-6989

IN THE FIRST JUDICIAL DISTRICT

COMMONWEALTH OF PENNSYLVANIA

MUNICIPAL COURT DIVISION

PHILADELPHIA, PENNSYLVANIA

IN THE MATTER OF

MC-51-CR-0004502-2020

TO WIT:

THE COMMONWEALTH OF PENNSYLVANIA

    Complainant,

v.

CRYSTAL TAYLOR,

    Defendant.

_____

RE:   TRIAL PROCEEDINGS:  HELD UNDER ADVISEMENT

BEFORE THE HONORABLE GEORGE TWARDY, JR.

    Courtroom 405

    March 3, 2022

    12:19 p.m.

APPEARANCES

FOR THE COMMONWEALTH:

    Brian Maguire, Esq.

    Office of the District Attorney

    Three South Penn Center

    Philadelphia, PA  19107

    215.686.8000

FOR THE DEFENDANT:

    David Whitney, Esq.

    Defender Assn. of Philadelphia

    1441 Sansom Street

    Philadelphia, PA  19102

    215.568.3190

DIGITALLY RECORDED PROCEEDINGS

TRANSCRIBER/EDITOR:

    Michael W. Ammann, RPR

    100 Broad Street, 2nd Floor

    Philadelphia, PA  19110

    215.683.8000

PROCEEDINGS

THE COURT:  Next matter, please.

THE CRIER:  Yes, Your Honor, at the bar of the court is Commonwealth v. Crystal Taylor.  This is here for trial, Your Honor.

Would counsel please identify themselves for the record?

MR. WHITNEY:  Good afternoon, Your Honor, David Whitney for the Defender Association on behalf of Crystal Taylor.

MR. MAGUIRE:  Good afternoon, Your Honor, Brian MaGuire for the Commonwealth.

THE COURT:  Good afternoon to you both.

MR. WHITNEY:  I move for sequestration, Your Honor.  We have no witnesses in the courtroom.

MR. MAGUIRE:  Sequestration is in effect for the Commonwealth, Your Honor.

THE COURT:  Very well.

Defense, do you waive arraignment and enter a plea of not guilty to all charges on behalf of your client?

MR. WHITNEY:  Yes, Your Honor.

In that case, Commonwealth, call your first witness.

MR. WHITNEY:  At this time, Your Honor, the Commonwealth calls Dywanna Broadnax to the stand.

THE COURT:  Swear the witness, please.

THE CRIER:  Do you solemnly swear or affirm that you will tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE CRIER:  Please state your full name for the record and spell your last name.

THE WITNESS:  Dywanna, D-Y-W-A-N-N-A, Broadnax, B-R-O-A-D-N-A-X.

MR. MAGUIRE:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. MAGUIRE:

Q.  Good afternoon, Ms. Broadnax.

A.  Good afternoon.

Q.  I want to direct your attention back to the date of November 18, 2019, around 2:00 p.m.

Where were you that day around that time?

A. I had just arrived at my job at Methodist Hospital.

Q. What do you do there?

A. I was a clinical analyst, a phlebotomist.

Q. Do you see anybody here in the courtroom today that you saw at your job at 2:00 p.m.?

A. Yes.

Q. Can you identify that person?

A. Crystal Taylor.

Q. Do you see Crystal Taylor in the courtroom?

A. Yes.

Q. Can you point that person out?

A. (witness complies.)

MR. MAGUIRE: For the record, Your Honor, the witness has identified the defendant by name and point of finger.

THE COURT: So noted.

BY MR. MAGUIRE:

Q. Ma'am, your job, is that in the City and County of Philadelphia?

A. Yes, it is.

Q. And what happened at your job that day involving you and the defendant that brings you to court today?

A. A verbal altercation started initially while walking up to work. Crystal left the office to go report it to the supervisor. When she returned to the office, I kindly asked her a question. The question I asked her was relative to the comments she made that made her go to the supervisor, which was something about a comment where she was giving another co-worker an instruction in reference to an error that she was continuously making that I had to report to my supervisor. And quote unquote she basically said -- in my voice -- imitating to the new hire, "Please don't forget to order your magnesium and phosphorous for the two chemistry tests" that are normally done, and those two tests Crystal continuously forgot to order many times, and it was my job to correct the errors and report them to my supervisor.

Once she said that, I wasn't even in the office five minutes, and I had to interrupt her and say, "Please, Crystal, not today." She walked out of the office. She went to go get the supervisor. The supervisor did not return with her, and when she returned, I asked her, "Why do you always have to cause chaos in front of new hires," when this area, particularly because this is an outpatient lab, Crystal's primary job was in the back lab. For about six months Crystal would stay in the office, and when I arrived she would turmoil or just --

MR. WHITNEY: -- Objection, Your Honor.

THE COURT: What's your objection based on?

MR. WHITNEY: The witness is speculating as to why --

THE COURT: -- What I like to here is the date and time. What happened? Not a whole history. What happened? There's a charge here of simple assault, recklessly endangering another person. I want to hear what happened there.

MR. MAGUIRE: Yes, Your Honor.

THE COURT: What date this is happen on? I have November of 2019; is that right?

MR. MAGUIRE: Yes, Your Honor.

THE COURT: What time of day was this?

MR. MAGUIRE: Again Your Honor, 2:00 p.m.

THE COURT: Okay, 2:00 p.m. so let's get to November 18, 2019, at 2:00 p.m. What happened then.

THE WITNESS: Crystal walked into the office after I said what I said to her and she asked me did I want to step outside to talk about it. Our job is for us to try to have a conversation to work any issues before reporting it to management. That's not what Crystal wanted. I walked out of the office and she started to shout, and I said, "Not right here." She turned to the right and went towards an isolated area and said, "I'm going to hurt you." I stepped back and said, "Crystal, you're not going to put your hands on me." I turned around to get the supervisor.

9

Crystal poked me in the head, like this, and said, "You know better."

MR. MAGUIRE:  Indicating for the record the witness took two fingers and put them to the right side of her head, twice.

THE COURT:  Of whose head?

MR. MAGUIRE:  The witness.

THE COURT:  Two fingers?

MR. MAGUIRE:  Yes, Your Honor.

BY MR. MAGUIRE:

Q.  Please continue.

A.  Once she did it tome, I did it back to her, and I turned my back again to go get the supervisor, and that's when she attacked me from the behind.  She pulled my by my hair, pulled me to the floor, and I crashed directly onto the hard floor onto my knees. I had on Dansko shoes and that's when the fight continued.  She continued to hit me in my head while we were on the floor until the fight stopped.

Q.  I want to ask a few specific questions about what happened this day.

A.  Okay.

10

Q.  So, first of all, you said it was a hard floor.  Do you remember what the floor was made of?

A.  Hospital floors are strong tile.  I don't know the name of it.

Q.  After she dragged you by your hair, pulled you by your hair, approximately how many times were you struck?

A.  It's hard to say because when I landed on the floor, I landed on both knees and my hand, and during that time she had time to come behind me, hit me, I know, a few times.

Q.  More than ten times?

A.  I would say between ten and fifteen times.

Q.  Approximately where on your body were you being hit?

A.  My face, my head, the back of my neck, my upper body.  We were on the floor and I don't think much kicking was going on.

Q.  Do you know what she was using to hit you?

A.  Her fists.

Q.  Was it with a closed hand?

11

A.  Yes.

Q.  How did this situation end, actually end?

A.  So, a patient transporter began to walk in the corridor where we were and he saw what was going on, and I told him she attacked me and another nurse came over running.

MR. WHITNEY:  Your Honor, if the witness could repeat her answer.  I didn't catch who came in.

THE WITNESS:  It was a patient transporter, and he was he first one to walk up on the scene and he immediately separated her, first of all, from me, and at the same time another co-worker who was in our office came in running out of the office, and a nurse from the nurse's station came as well.  This is after the fight.

BY MR. MAGUIRE:

Q.  Is it fair to say that those co-workers ended the situation?

A.  Yes, because the one particular CNA and RN kept telling us to stop.

Q.  After your hair was pulled, at any

12

point did you put your hands on the defendant?

A.  My hands were on the floor from being knocked down.

Q.  I'm sorry, ma'am.  Yes or no, at any point after she pulled your hair --

A.  -- Yes, I did not.

Q.  After this sort of gets broken up, did you sustain any injuries?

A.  Immediately, yes.  I noticed where we were, it's, like, when we pushed the door back, there is a little metal piece of the floor that helps to hold the door, I had a laceration on my left ankle, and that's what I noticed instantly?  After that I went to the ER for my injuries.

Q.  What ER did you go to?

A.  Methodist.

Q.  Other than the injury on your ankle, did you have any other noticeable injuries on your body?

A.  Okay. Yes, the blue bag went directly to my face and I had a swollen cheek.  I had instant bruises on my knee from crashing to the floor.

Q. Were your knees the only part of your body that were bruised?

A. No.

Q. Where else?

A. I had a swollen cheek here. It was red. I had an abrasion on my wrist from fighting back. That's all I can think was bruised.

Q. Do you remember how you were feeling physically in the immediate aftermath of this altercation?

A. Yes. I had just returned back from having a stroke, and so I was already weak. I felt weak and very sore from hitting the floor. I really couldn't walk very much from my knees hitting the floor. I was very dizzy from the hickeys.

Q. I'm sorry. From what?

A. The hickeys that I have. I'm not sure if my head hit the floor or if it was from her fist hitting me.

MR. MAGUIRE: Indicating for the record the witness was pointing to the right side of her head.

THE WITNESS: Yes.

BY MR. MAGUIRE:

Q. Can you describe what you mean by "hickeys;" I believe is what you said?

A. A hickey is like a swelling or a lump from after being hit on the head, pounded on the head.

Q. Do you remember about how many were on your head?

A. I don't know how many there were.

Q. Now, how did you get to the ER?

A. I was walked over by security.

Q. What happened once you got over there?

A. I got to the ER and told them what happened, and they evaluated me and told me follow up with my primary doctor.

Q. Do you remember what the diagnosis was, in your own words?

A. Particularly I know it was trauma.

MR. WHITNEY: Your Honor, objection.

THE COURT: It calls for a medical conclusion. She's testifying to what she knows. Unless, of course, she's a doctor.

MR. MAGUIRE: Your Honor, that's why I said in her own words if she can explain.

THE COURT: Well, what happened? Why can't she just tell us? She already told us about hickeys and her head and scratches and bruises. What else do you have?

MR. MAGUIRE: Your Honor, I just have some paperwork from the hospital, but I can continue, Your Honor.

BY MR. MAGUIRE:

Q. You went to the ER. I believe you answered this, but what ER did you go to that night?

A. Methodist Hospital ER.

Q. And did you receive discharge papers that day?

A. I did.

Q. Would you recognize those discharge papers from Methodist Hospital if I were to show them to you?

A. Yes.

MR. MAGUIRE: Your Honor, I have here Commonwealth Exhibit 1, discharge papers from the Jefferson Health Systems, Methodist Hospital, and I am showing them to defense counsel as I speak.

MR. WHITNEY: Thank you.

(defense reviewing exhibit)

THE COURT: Had you seen those before, Counsel?

MR. WHITNEY: Your Honor, I believe that --

THE COURT: -- Yes or no?

MR. WHITNEY: No, I haven't.

THE COURT: What's the purpose in introducing this?

MR. MAGUIRE: It coroborates testimony for the injuries, Your Honor. She was diagnosed at the ER, and it goes to the injuries that she --

THE COURT: You want the diagnosis to come in?

MR. MAGUIRE: Yes, Your Honor.

THE COURT: Okay. Isn't that hearsay?

MR. MAGUIRE: Well, Your Honor, the medical records would be self authenticating.

THE COURT: Counsel.

17

MR. WHITNEY: Your Honor, I would object to the admission. I don't believe these fall under the business records exception. It appears to be a printout. These aren't actually medical records.

THE COURT: They're discharge papers.

MR. MAGUIRE: Yes, Your Honor.

THE COURT: Are there any medical bills?

MR. MAGUIRE: The Commonwealth does not have medical bills, Your Honor. Again, it's the discharge papers that we have here. Again, I would argue that they do come in as business records.

THE COURT: Yeah, but see, in order to have a business record, you have to have somebody to say that those are records that are normally kept in the course of conducting that business.

Do you have a witness here?

MR. MAGUIRE: No, Your Honor; but, again, I would just argue that what these records are, they are self authenticating as

18

they are the medical records. It's not like -- I'm blanking out. It's my understanding that medical records are typically self authenticating, these discharge papers.

MR. WHITNEY: Your Honor, obviously we would have to defer to your judgment.

THE COURT: Not only do we have a problem with it, but, your know, I do have a problem with it, and so I'm going to sustain his objection.

MR. MAGUIRE: Understood, Your Honor.

THE COURT: I mean, I think this is something that you can kid of work out. I don't want you fighting over it.

BY MR. MAGUIRE:

Q. Ma'am, after you left Jefferson Hospital that night, did you seek medical attention again?

A. I was told to follow up with my primary care doctor, and that's what I did the next day.

Q. And did you do that?

A. Yes.

19

Q. Did you receive more information about your injuries?

A. Yes. I received a CAT scan which confirmed I had a concussion.

Q. Did you continue following up on your injuries?

A. Yes.

Q. What more did you learn about them?

A. I had soft tissue damage to my knees. Also, I had to attend physical therapy because of the contusion as well as me being six weeks close to a stroke. I just had rehabilitation for walking and coordination.

Q. Are you still suffering in any way today?

A. My hands.

Q. How so?

A. I had anxieties, mental anxieties in reference to the court case at this point. I did physical therapy for about eight months. I stopped because I developed some pain, and that's why I stopped because we thought we were going through too much vigorous exercises. I developed PTST because of the position that I

20

held at Methodist. Part of my job was correcting errors of my co-workers, and because this happened, my co-workers that I had to report, in terms of having to give and take, and so the new job that I have now, I was going for a leadership position but --

MR. WHITNEY: -- Your Honor, I'm going to object on the basis of relevance.

THE COURT: Sustained.

MR. MAGUIRE: Nothing further, Your Honor.

THE COURT: Cross-examine.

CROSS-EXAMINATION

BY MR. WHITNEY:

Q. Good afternoon, Ms. Broadnax.

A. Good afternoon.

Q. So, first I want to follow up on your narrative about what happened -- strike that. I just want to start by asking you a few questions about this incident once it turned physical. Okay?

A. Okay.

Q. So, you mentioned on direct examination that you defended yourself; right?

21

A. Correct.

Q. Can you tell me how you defended yourself? Did you hit Ms. Taylor?

A. Yes, I did.

Q. Can you tell me where you hit her on her body?

A. I did exactly as she did to me.

Q. So you hit her in the head.

A. I didn't hit her. She poked me with two fingers and I poked her with two fingers back.

Q. So, after the poking was over, and I believe you said your hair was grabbed; right?

A. BecauseI turned her in to the supervisor.

Q. I just want to be really clear. After your hair was grabbed, did you hit Ms. Taylor?

A. When my hair was grabbed, I was pulled to the floor, and I was on my hands and knees, and so once I got my balance, I did the attempt to defend myself. I hit her back.

Q. Okay. And where did you hit Ms. Taylor on her body?

22

A. I'm on the floor and she's behind me, and she's hitting me in my head, and I'm doing everything I can to force her to the floor with me. When she got to the floor, I can't tell you where my hits made it.

Q. So now I understand that after you got onto the floor, you pulled her down to the floor, too; right?

A. She was hitting me in the back of my head, yes.

Q. Okay. When she was on the floor, were you facing each other?

A. At some point we were, yes.

Q. And you were hitting her in the Rhea?

A. I can't tell you where my hits landed.

Q. So you don't know where you hit her at al?

A. I don't know.

MR. MAGUIRE: Objection. Asked and answered.

THE COURT: Overruled.

BY MR. WHITNEY:

Q. Did you ever kick Ms. Taylor?

A. I can't answer that. I was fighting.

23

Q. So you don't rememBer exactly how you defended yourself.

A. Maybe because I was hit in the head I don't remember.

Q. Okay, and you can't tell us exactly what you did to defend yourself.

A. I hit back.

Q. You were asked how this sort of ended, and you mentioned that a specific person came in; right?

A. Walked by.

Q. And who was that?

A. He's a patient transporter employee.

Q. Do you know what his name is?

A. I do.

Q. What's his name?

MR. MAGUIRE: I'm going to object to the relevance.

THE COURT: What's the relevance?

MR. WHITNEY: Your Honor, I guess I'm trying to understand the witness' --

THE COURT: -- What's his name got to do with it?

MR. WHITNEY: That's fine, Your

24

Honor. Withdrawn.

THE COURT: Sustained.

BY MR. WHITNEY:

Q. When he walked in on this scene, you're saying that you guys were still going at it; right?

A. Yes.

Q. Now, Ms. Taylor, I assume you remember giving a statement to the police--

A. -- I'm Ms. Broadnax.

Q. I'm apologize, Ms. Broadnax. I misspoke. Ms. Broadnax, I assume that you remember giving a statement to the police in this case; right?

A. Yes.

Q. And do you remember stating to the police that Loretta saw the actual fight between you and Ms. Taylor.

A. I never said she saw the actual fight. I said Loretta saw the end of the fight. What Loretta saw was when Crystal and I first walked out of the office, Crystal immediately got violent.

Q. I just want to slow this down a little.

25

Would seeing the interview that you gave to the detective kind of jog your memory a little bit?

A. Perhaps.

MR. MAGUIRE: I'm going to object. There is no indication for refreshing her recollection. There is no indication that she doesn't remember the events that we're talking about right now, the events that led to the fight that she previously testified to.

THE COURT: I'm going to overrule the objection.

MR. WHITNEY: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MR. WHITNEY:

Q. Ms. Broadnax, I'm going to ask that you just read this highlighted portion of the interview to yourself, and then let me know when you're done?

A. (Witness complies.)

Q. May I have that back, please?

THE COURT: Do you have a question?

MR. WHITNEY: Yes, Your Honor.

BY MR. WHITNEY:

26

Q. Ms. Broadnax, we can agree that you told the detective that your understanding was Loretta actually saw the fight; right?

A. Did you read the second part of the sentence?

Q. You specifically said to the detective that you were told that Loretta saw the actual fight and was interviewed by the hospital in reference to it; right?

A. Right. I was told Loretta saw the fight.

Q. All right.

A. I didn't give a statement that says Loretta saw the fight.

MR. WHITNEY: I object to that on the basis of hearsay that she was told that somebody else saw the fight.

THE COURT: I'm going to overrule that.

BY MR. WHITNEY:

Q. So, I want to ask you about the investigation that took place after this incident. So, immediately after this happened, you were basically suspended from work;

27

right?

MR. MAGUIRE: Objection. Relevance of suspension from work.

THE WITNESS: Actually, no. I wasn't suspended.

BY MR. WHITNEY:

Q. All right. You were told that you should not come back to work until an investigation was completed; right?

A. Correct.

Q. So, your understanding was that there was an investigation that took place at the hospital; right?

A. Yes.

Q. And were informed when that investigation was complete?

A. Yes.

Q. But you were told that you were terminated, that you lost your job; right?

A. I was told that, yes.

Q. And were you interviewed as part of the investigation at the hospital?

A. No.

Q. Ms. Broadax, I understand that before

28

this incident you had been working at Methodist Hospital for like about fifteen years; right?

A. Right.

Q. Ms. Broadnax, are you familiar with the phone number 484.470.6427?

A. Yes, that was an old phone of mine.

Q. So it's your phone number. Do you recall sending a text to Ms. Taylor?

A. I do.

Q. Would you recognize that text if I were to show it to you?

A. I would.

MR. WHITNEY: Your Honor, I am marking for the record a text message as Defense Exhibit Number 1.

THE COURT: Okay. Do you have a copy for the court?

MR. WHITNEY: Yes, Your Honor.

May I approach the witness, Your Honor.

THE COURT: Yes.

BY MR. WHITNEY:

Q. Ms. Broadnax, is that the text message that you sent to Ms. Taylor after this incident

29

tool place?

A. Yes, it is.

Q. And you sent it the same day that this happened; right?

A. Yes, I did.

Q. And what you said is that you whooped Ms. Taylor's ass.

A. I did.

Q. Ms. Broadnax, you mentioned a variety of injuries. You had bruises in different places on your body; is that right?

A. Yes.

Q. Did you take any pictures of those injuries?

A. I did, yes.

MR. WHITNEY: I have nothing further for this witness.

THE COURT: Anything further?

MR. MAGUIRE: Briefly, Your Honor.

RE-DIRECT EXAMINATION

BY MR. MAGUIRE

Q. Ms. Broadnax, approximately from the moment that this altercation turned physical until the moment it get broken up, how long was

30

that?

A. It was longer than it should have been. I would say three to five minutes, because while we were fighting, we were under a camera --

THE COURT: DA, next question.

BY MR. MAGUIRE:

Q. Ms. Broadnax, from the time this altercation turned physical to the time --

MR. WHITNEY: -- Your Honor, I am going to object to this. It's outside the scope of cross.

THE COURT: I didn't even hear the question. Go ahead.

BY MR. MAGUIRE:

Q. From the time this altercation turned physical until the time that you struck the defendant in this matter, how much time elapsed there?

A. From the time of the first hit until the end.

Q. From the time that she poked you in the head until the time that you first swing, how much time is that?

31

A. Two seconds, three seconds.

MR. MAGUIRE: Nothing further, Your Honor.

THE COURT: All right, ma'am, you can step down and step outside, please.

(witness stands down)?

THE COURT: Do you have any other witnesses, Commonwealth?

MR. MAGUIRE: No, Your Honor.

THE COURT: Do you rest?

MR. MAGUIRE: Your Honor, the Commonwealth rests for the purpose of this trial.

THE COURT: Defense, do you have any witnesses?

MR. WHITNEY: Yes, Your Honor. I'm going to call my client, Ms. Taylor.

THE COURT: Swear the defendant, please.

THE CRIER: Do you solemnly swear or affirm that you will tell the truth, the whole truth, and nothing but the truth?

THE DEFENDANT: I do.

THE CRIER: Please state your full

32

name for the record and spell your last name.

THE DEFENDANT: Crystal A. Taylor, T-A-Y-L-O-R.

MR. WHITNEY: May I proceed, Your Honor?

THE COURT: Please.

DIRECT EXAMINATION

BY MR. WHITNEY

Q. Ms. Taylor, on the day in question what is your recollection of your first interaction with Ms. Broadnax?

A. At the time of the altercation there was another employee there and I was servicing two patients at the time.

THE COURT: Pull that microphone closer to you.

(defendant complies)?

What happened, ma'am, on this date.

THE WITNESS: On this date Dywanna came into work about an hour and a half early. She was very angry and upset at the fact that mistakes were made prior to the week. I asked her if she wanted to speak about it outside and have a conversation about it and not in front

33

of the patients. She was cursing. She was very angry. She was throwing things. We did go outside. I was going to ask her what is the problem. She was very angry.

MR. MAGUIRE: Objection.

THE COURT: Basis?

MR. MAGUIRE: The emotional state of the complaining witness, she doesn't have any personal knowledge of that.

THE COURT: That's overruled.

BY MR. WHITNEY:

Q. Please continue.

A. We began to talk about the situation. Prior to us going outside to have a conversation, Dywanna came in. I was at the computer with another employee. She pushed my chair and physically, literally moved me out of the way when I was typing on the computer, and that's when I asked her if we could go outside to have a conversation. I could see there was a problem. The first hit was, she used her shoulder to go against my body, and that's when the fight, the altercation, started.

Q. So, she sort of slammed you with her

34

shoulder?

A. She slammed me with her shoulder.

MR. MAGUIRE: I object to the term slam. That's not what the testimony was.

THE COURT: Sustained.

C'mon. I hear it. You don't have to augment it.

MR. WHITNEY: Understood, Your Honor.

BY MR. WHITNEY:

Q. What happened next?

A. We began to fight. We both were pulling hair. There's a small corridor where we were, where the time clock is. The walls are really close together. We were up against the walls with each other until she threw me on the floor, on my right shoulder. She had my wrist. We were tussling on the floor. We were. There was a young lady who came down the hallway. She was saying, "Ladies, ladies, stop!" I immediately got up, and I went into the locker room where a security guard came to m.

Q. Did you talk to a security guard?

35

A. I did talk to security guards. Security came to me with body cameras on, two of them. They asked me if I was okay. I was very shaken up, trying to get my breath. He gave me a pencil and a paper at the same time and told me to immediately write down everything that happened while it was fresh in my mind. He gave it to me and he gave it to the other employee who was there.

Q. What did you do after you finished giving them that statement about what had just happened?

A. I gave it back to security. They told me to go home. I asked them, "Are you sure?" I said, "I want the police here," or something, and they said, "No, Crystal, we'll handle it. Go home."

MR. MAGUIRE: Objection to the hearsay.

THE COURT: Sustained. You can't tell us what other people told you.

THE WITNESS: Sorry.

BY MR. WHITNEY

Q. When you went home, did you have any

36

injuries?

A. Yes, I did. My right shoulder was dislocated, fractured. The right wrist. I went to urgent care, and from there I went to my primary, and from there an MRI and CAT scan, and all of that.

Q. Are you still suffering from any injuries relating to this incident? Do you still have any problems?

A. Yes, I have.

Q. What would those be?

A. The right shoulder, I cannot move my arm all the way back behind my head. There is numbness.

MR. WHITNEY: I have nothing further, Your Honor.

THE COURT: Cross-examine.

CROSS-EXAMINATION.

BY MR. MAGUIRE:

Q. Good afternoon, Ms. Taylor.

A. Good afternoon.

Q. Ms. Taylor, your shift ended at 1:00 p.m. that day; right?

A. Supposed to, yes.

37

Q. And you were still there at 2:00 p.m.

A. Yes, I was.

Q. You were waiting for Ms. Broadnax to get there?

A. No. Actually, Ms. Broadnax came in before 2:00 p.m.

Q. And you knew when Ms. Broadnax' shift started.

A. Yes, I do.

Q. Now, when Ms. Broadnax gets there, you testified you said to her, "Do you want to go outside," and at that point you intended to take this physical.

A. Absolutely not.

Q. By saying, "Do you want to take this outside," you did not intend this to get physical?

A. No. I tried to de-escalate the situation in front of the patients.

Q. And you did not want to de-escalate the situation with a supervisor there?

A. I did try to get a supervisor. Unavailable.

Q. Now you testified that Ms. Broadnax

38

shouldered you. Was this after you poked her in the head?

A. This was before the altercation even took place and became physical.

MR. MAGUIRE: Nothing further, Your Honor.

THE COURT: I have one question, ma'am. Do you still work there?

THE WITNESS: I do not, sir.

THE COURT: Were you terminated?

THE WITNESS: I was, sir.

THE COURT: You can step down, ma'am.

THE WITNESS: Thank you.

(defendant stands down)

THE COURT: Do you have any other evidence to present?

MR. WHITNEY: Your Honor, I do have a stipulation by and between counsel.

THE COURT: As to what?

MR. WHITNEY: As to character, Your Honor.

THE COURT: Good character?

MR. MAGUIRE: Yes, Your Honor.

39

MR. WHITNEY: Your Honor, if I may, for the record, there has been a stipulation by and between counsel that if Mr. Michael Gordon were called to the stand to testify today, he would testify that he has known Ms. Taylor for fifteen years, that they know people in the community who know Ms. Taylor, and that Ms. Taylor has an excellent reputation among those people in the community for following the law, for honesty, and for peacefulness.

With that, the defense rests, Your Honor.

THE COURT: All right. What's your argument, Defense?

MR. WHITNEY: Your Honor, we have a situation here where there is a fight that was supposedly witnessed by --

THE COURT: -- Simple assault means a person is guilty of simple assault if attempts to cause or intentionally, knowingly, or recklessly causes bodily injury to another.

If you punch somebody, it's bodily injury; isn't it?

MR. WHITNEY: Absolutely, Your

40

Honor.

THE COURT: She engaged in a fight; right?

MR. WHITNEY: Yes, Your Honor.

THE COURT: So why should I find her not guilty of simple assault?

MR. WHITNEY: Your Honor, I believe that based on my client's testimony, self defense has been raised. The Commonwealth's burden after it has been raised is to prove to you beyond a reasonable doubt that this was not an instance of self defense. But what my client testified to is that this fight started when she was attacked by the complainant. The complainant testified that m client is the person who started the fight. We have a situation here where there are no witnesses provided by the Commonwealth as to who started the fight. We have a situation where there was an investigation done by the hospital, and apparently they couldn't figure out who started the fight because they fired both of them. We have a situation where both women suffered injuries. That's in evidence. Additionally,

under Pennsylvania case law, good character in and of itself can create a reasonable doubt as to a defendant's guilt. The way that would apply here, in particular, is, it created significant doubt as to whether my client is the person who started this fight, or is it just a person who was drawn into a fight and was attacked by that other person, and that other person has a motivation to try to get back at my client because that complainant had worked at this place for fifteen years and lost her job over this. She has every reason in the world to want to get back at my client. So we have motivation, and we have reasonable doubt coming from both my client's character and --

THE COURT: -- That happened after this when she lost her job.

MR. WHITNEY: Yes, Your Honor.

THE COURT: After this fight.

MR. WHITNEY: Yes.

THE COURT: So I don't necessarily buy that, but go ahead. Anything else?

MR. WHITNEY: The testimony was that she was --

THE COURT: -- What about recklessly endangering another person? The woman had had a stroke.

MR. WHITNEY: Yes, Your Honor, and it's my contention that I am submitting to you is that there is reasonable doubt here as to whether the complainant started this fight or my client did. Specifically, Your Honor, we have a situation here where the only thing that's alleged would be punching, hair pulling, and I believe that the testimony between both witnesses agrees on the fact that at some point both were dragged or pushed to the ground, although the testimonies diverged as to who was pushed to the ground first, and I would argue to you, Your Honor, that under Witherspoon, in a case involving battery, no deadly weapon, the force in self defense --

THE COURT: -- What does Witherspoon say?

MR. WHITNEY: Witherspoon says --

THE COURT: -- Short version.

MR. WHITNEY: In self defense you can hit back if that's all you need to repel

the attack.

THE COURT: Commonwealth.

MR. MAGUIRE: Your Honor, this is not a mutual fight. It ends up being the complainant defending herself after the fight is initiated by the defendant here. What we heard testimony of is the defendant hanging out at work after her shift ended, waiting for the complainant to come in, and we heard testimony of mocking when the complainant testified. We have testimony which the defendant admitted to saying, "Do you want to step outside?" Your Honor, I think everybody here in the courtroom knows what "do you want to step outside" means. So they go outside, out of the view of supervisors, out of the view of everybody else, under the defendant's own idea, not the complaining witness's, at which point then the complaining witness testifies that it turns physical as a result of the defendant's actions. She starts poking her in the head. When she goes to turn, there's a pulling of the hair. AT this point -- let me back up. There's poking in the head, and the complaining

witness does a poke back. I do understand that. However, when the complaining witness turns to sort of de-escalate the situation is when the hair gets pulled. She falls to the ground suffering bruises on her knees. She hits her hands, and that's when she's sort of in that vulnerable position that the striking to the head starts. We heard testimony of the bruises along the side of the head, the swelling of the face. At some point, anybody would need to defend themselves, and when you're on your hands and knees, after you tried to walk away fro an altercation which somebody else initiated and isolated you from, yeah, you're going to start hitting back to try to defend yourself. So while this maybe at some point turns into two people fighting with each other, that is not how it started, and it's not the reason it started. This started with a simple assault by the defendant.

THE COURT: That's almost the same day when the complaining witness is all beat up and hurt and has to go to the hospital to treat, she's is texting the defendant, "You're

45

psychotic. That's why I whooped your ass. You put your hands on the wrong one, you ugly broke ass bitch,"

MR. MAGUIRE:  Your Honor, I would say --

THE COURT:  -- That's some -- let me tell you something. Here's how I see it. I'm going to hold the matter under advisement. I'm going to order the notes of testimony. I'm going to review it.  In the meantime, what I want to know is, I would like to see your client coming to some sort of -- providing this court at the next listing your client -- some notification, some documentation that this is not the right way to deal with stuff.  There should be some better way to de-escalate this. Two grown women at their job entering into a fist fight.  Okay?

MR. WHITNEY:  Your Honor, just to clarify --

THE COURT:  -- We're going to get a date.

THE CRIER:  Your Honor, you're in Courtroom 506 the week of 4-4, and you're in

46

Courtroom 405 on 4-25.

THE COURT:  4-25. I'm going to hold my decision on this case.  In the meantime I want you to provide this court with proof that your client has learned from this incident, and come up with different alternatives to de-escalate a tense situation short of physical altercation.  You don't have to do that, but it might help me in my decision.

MR. WHITNEY:  Would you like me to show you some sort of documentation of some sort of program?

THE COURT:  I want you to paint a picture, but I want you to show me what your client's undergone rather than coming in and paying lip service.  Whatever that is.  Use your creative mind.  You're representing a client.

MR. MAGUIRE:  In the meantime, can I request a mutual stay-away order for these two individuals?

THE COURT:  Well, they don't work together anymore, but if you're concerned that they're around one another, I don't have a

47

problem with it.

MR. MAGUIRE:  It can't hurt, Your Honor, and so I would just ask for a mutual stay-away order.

THE CRIER:  Your Honor, what time on 4-25 in 506?

THE COURT:  10 o'clock.

MR. WHITNEY:  Your Honor, my client has some concern that the entry of a stay-away order will affect the custody of her grandchildren for whom she is currently the sole care giver.  They're both infants.

THE COURT:  It won't have any effect on that. It's not going to have any effect on that.  Her concern is misplaced.

MR. WHITNEY:  Understood, Your Honor.

THE COURT:  Her concern should be about achieving what I asked for, what I would like to see by 4-25 in Courtroom 506 at 10:00 a.m.  The complaining witness does need not be present.

MR. MAGUIRE:  Thank you, Your Honor.
(end of proceedings)

48

COMMONWEALTH OF PENNSYLVANIA      )
CITY AND COUNTY OF PHILADELPHIA )

TRANSCRIBER'S CERTIFICATION

I, hereby certify that the foregoing proceedings and evidence contained in the official electronic sound recording taken on the matter of the above cause were transcribed and edited by me to the best of my ability.  I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action, and that this copy is a true and correct transcript of the same.

*Michael W. Ammann, RPR*

Michael W. Ammann, RPR,
Official Court Reporter

Date:    May 3, 2022
         Philadelphia

# Exhibit 18

| | |
|---|---|
| **From:** | Dywanna Broadnax |
| **To:** | Joyce Zagacki |
| **Subject:** | Re: |
| **Date:** | Sunday, September 1, 2013 2:49:00 PM |

Mrs. Joyce I apologize for being the cause & creating the altercation on Saturday we/Lisa, Geneice, & the new lady. Although, I had no idea after asking a question referencing the undeceived list could cause such a disruption. Going forward I will not offer any of my knowledge referring to Phlebotomy, I will direct any questions asked to me by coworkers to you & Lindsay. I will also abide by the revised collection times, as well as be mindful of my verbal deliveries to my coworkers. I want to remain an employee here as well as keeping my professional demeanor @ all times. My professional reputation to me means alot.

In addition, can you please check my evaluation to make sure I did my self appraisal correct? thank you.

-----Joyce Zagacki/TJUH wrote: -----

> To: Dywanna Broadnax/TJUH@TJUH
> From: Joyce Zagacki/TJUH
> Date: 09/01/2013 07:07AM
> Cc: Lindsey D'Elia/TJUH@TJUH
> Subject: (Untitled)
>
> Dywanna,
>   If possible on Friday I would like to meet with you at 2:30PM to discuss what took place on Saturday, August 31,2013 as well as the lengthy note that you left me. If you cannot be in by 2:30 we will meet at 3PM. Thank you
> Joyce Zagacki
> Outpatient and Histology Supervisor
> Methodist Division, Thomas Jefferson University Hospital
> 2301 South Broad Street
> Philadelphia, PA 19148
> 215 952 9115 (office)
> 215 952 1298 (fax)



PLAINTIFF'S EXHIBIT D-18
PENGAD 800-631-6989

**From:**    Joyce Zagacki
**To:**    Dywanna Broadnax
**Date:**    Thursday, September 5, 2013 6:57:00 AM

Dywanna,

   Thank you so much for the apology. It means alot. I am glad we had the chance to speak. All is well. Lets forget and move forward. Thank you for all of your hard work.

Joyce Zagacki
Outpatient and Histology Supervisor
Methodist Division, Thomas Jefferson University Hospital
2301 South Broad Street
Philadelphia, PA 19148
215 952 9115 (office)
215 952 1298 (fax)

**From:** Dywanna Broadnax
**To:** Joyce Zagacki
**Subject:** Re:
**Date:** Saturday, September 7, 2013 6:11:00 PM

Ok thanks again Mrs.Joyce.  Oh yea today is Saturday I stopped in the office to get my ear phones I left lastnite, that's why I'm replying on Saturday.

-----Joyce Zagacki/TJUH wrote: -----
To: Dywanna Broadnax/TJUH@TJUH
From: Joyce Zagacki/TJUH
Date: 09/05/2013 06:57AM
Subject: (Untitled)

Dywanna,
    Thank you so much for the apology.  It means alot.  I am glad we had the chance to speak.  All is well.  Lets forget and move forward.  Thank you for all of your hard work.

Joyce Zagacki
Outpatient and Histology Supervisor
Methodist Division, Thomas Jefferson University Hospital
2301 South Broad Street
Philadelphia, PA 19148
215 952 9115 (office)
215 952 1298 (fax)

# Exhibit 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| DYWANNA BROADNAX, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | CIVIL ACTION NO. 21-CV-04662-JMY |
| HOSPITAL, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**AFFIDAVIT OF STEVEN GUDOWSKI**

COMMONWEALTH OF PENNSYLVANIA

:SS

COUNTY OF PHILADELPHIA

I, Steven Gudowski, declare the following to be true and correct under penalty of perjury and pursuant to 18 U.S.C. Sections 1623 and 1621:

1.      My name is Steven Gudowski.  I am more than eighteen (18) years of age, am competent to testify in a court of law, and have personal knowledge of the facts stated herein.

2.      I provide this Affidavit in Support of Defendant's Motion for Summary Judgment and the accompanying Brief ("Brief").

3.      Since October 25, 2017, I have been the Administrator for the Clinical Laboratories at Thomas Jefferson University Hospitals, Inc.

4.      George Marrone – Laboratory Operations Director – reported to me, Joyce Zagacki – Laboratory Outpatient Supervisor – reported to Mr. Marrone, and Lab Assistants reported to Ms. Zagacki.

5.    I learned that two Lab Assistants who reported to Ms. Zagacki – Dywanna Broadnax and Crystal Taylor – were involved in a physical altercation in a hospital hallway during working hours.

6.    On November 19, 2019, Dennis Delisle – Vice President, Operations – emailed a Security Case Report about the altercation to Mr. Marrone, Ms. Zagacki, Aaron Sniderman (the Human Resources Business Partner), and me.  A true and correct copy of that email is attached to the Statement of Facts ("SOFs") as Exhibit 48.

7.    I read the Security Case Report and responded to Mr. Delisle's email by asking Mr. Sniderman about the protocol to follow for termination and expressing to him and to Mr. Marrone, Ms. Zagacki and Mr. Delisle that I did not want Ms. Broadnax and Ms. Taylor back on campus. I asked Mr. Sniderman for the next steps. *Id.*

8.    The next day, Mr. Sniderman emailed me, with a copy to Mr. Marrone, Mr. Delisle and Ms. Zagacki, stating that he felt Ms. Taylor should be terminated, and based on Ms. Broadnax's statement, Mr. Sniderman initially recommended Ms. Broadnax's termination as well. *See* Exhibit 34 attached to the SOFs.  Mr. Sniderman asked if we had any additional information or had a different view of the discipline. *Id.*

9.    I did not share any additional information or express a different view.

10.    In my view, Ms. Taylor and Ms. Broadnax were active participants in a physical altercation at work during working hours.  I knew this violated Jefferson's policies and felt it was serious enough to warrant the immediate termination of both employees.

11.    It is my understanding that Mr. Sniderman consulted Jefferson's in-house legal counsel and, thereafter, let Mr. Marrone, Ms. Zagacki and me know that he intended to follow

through on his recommendation to terminate both Ms. Broadnax and Ms. Taylor for the altercation.

12.    I told Mr. Sniderman I approved of the decision to terminate both Ms. Broadnax and Ms. Taylor.

13.    I affirm under the penalties of perjury that I have read the foregoing and the facts and representations contained therein are true.

Dated: 09/01/2022 _____        _____

Steven Gudowski

# Exhibit 20

## AFFIDAVIT OF JOYCE ZAGACKI

I am Joyce Zagacki, Supervisor Lab Outpatient/Histology for Methodist Hospital Division of Thomas Jefferson University Hospitals, Inc. ("Methodist" or "MHD"). I am aware that Dywanna Broadnax recently filed a Complaint of Discrimination with the Pennsylvania Human Relations Commission. I can affirm the facts set forth in the numbered paragraphs that follow.

1. I was hired by Thomas Jefferson University Hospitals, Inc., Methodist Hospital Division on June 15, 2004 as a Laboratory Assistant.

2. On March 28, 2007, I was promoted to the position I currently hold.

3. At the time of my promotion, Dywanna Broadnax was one of the persons I began supervising. I was not her supervisor before then.

4. On December 9, 2008, Ms. Broadnax resigned her position after exhausting her FMLA leave time for serious health conditions. Consistent with the Family and Medical Leave Act ("FMLA"), at that time at Methodist provided eligible employees up to the twelve weeks available under the FMLA for serious health conditions If the employee had sick or vacation time available, the FMLA would be a paid leave. If the employee had exhausted his/her vacation and sick leave time, the FMLA would be a non-paid leave. No other medical leave was available for Methodist employees for serious health conditions.

5. MHD allowed employees to donate a portion of their accrued vacation time to another employee for a personal illness. On November 18, 2008, I donated eight (8) hours of my accrued vacation to Dywanna Broadnax because she had run out of available paid time for absences. Two other employees also donated time to Ms. Broadnax so she could receive pay when she was out on FMLA.

1

6. Ms. Broadnax exhausted her available FMLA leave around December 9, 2009. Joe Micucci, the Director of Human Resources at that time, requested that he and I meet with Ms. Broadnax to discuss her options.

7. Specifically, Mr. Micucci informed Ms. Broadnax that she had exhausted her available paid leave time and had exhausted her FMLA time. She, thus, had no medical leave time available.

8. Mr. Micucci, then, explained to her that either she could resign her position voluntarily and then apply for a new position once she was able to return to work or she would be involuntarily terminated.  Mr. Micucci further explained that if she were terminated involuntarily, she would not be eligible for hire if she applied for another position at a later date. With a voluntary resignation, she would be eligible.

9. Ms. Broadnax chose to resign her position so that she could apply for a position when she felt better.

10. On March 10, 2011, Ms. Broadnax filed a discrimination complaint with the Pennsylvania Human Relations Commission ("Commission") saying that Methodist had failed to rehire her due to her disability and race.

11. I was surprised that she filed the complaint because Ms. Broadnax had never applied for an open position.  She had spoken with me on the phone about wanting to return to work and I had told her that she needed to complete an application for any open position for which she was interested. To my knowledge, she had not applied for a position.

12. The Commission held a Fact Finding Session where Methodist agreed to allow Ms. Broadnax to compete for any open position provided she went through Methodist's application process like any other applicant.

2

TJUH001324

13. Ms. Broadnax then applied for an open per diem position that was open and was hired. A per diem position is similar to a 0-hour employee with other employers. Essentially, the employee does not have a regular schedule, but works when she is called in to work and is available.

14. Ms. Broadnax informed me that she did not want to work a regular Part Time or regular Full Time position because she was limited in the number of hours that she could work. She also identified issues she had that would affect the time of day that she could work.

15. First, she informed me that she could receive Social Security Disability payments as long as her hours did not exceed thirteen (13) hours a week during the months that she received two paychecks. For the months that she received three paychecks, she could only work ten (10) hours a week. Since Jefferson issues its paychecks every other week, there are two months in each fiscal year that employees receive three pay checks. Ms. Broadnax would remind me of her limitations periodically. Copies of two of those reminders are attached herewith as Exhibit A and incorporated as though fully stated herein.

16. In addition, Ms. Broadnax requested to work afternoons rather than mornings because of medication that made it hard for her to be ready for work in the morning. This also helped her during the time that she was taking care of her mother who was sick.

17. I agreed to both of her requests. I did not require her to submit a Request for Accommodation because she told me she had Lupus. In addition, when her mother became ill, Ms. Broadnax stated that the start time would serve to meet both her needs. *Id.*

3

TJUH001325

18. Although Ms. Broadnax told me and others that she had Lupus, I did not know all the symptoms associated with the diagnosis. For instance, I did not know and do not know the effect that Lupus has on a person's ability to walk, think, concentrate, write, as well as hold objects. I also had never heard of the condition called Raynaud's Syndrome prior to seeing the Complaint filed by Ms. Broadnax. Nor did she ever tell me that she suffered from that condition.

19. During October 2017, Ms. Broadnax requested a portable heater to use when she came to work because it was cold in the area. She did not say that it had anything to do with her Lupus or any other conditions associated with Lupus. Notwithstanding, I told her that she could use the portable heater in the histology lab because it was not used when Ms. Broadnax was at work. The only request that I made was that she return it to the histology lab at the conclusion of her shift so that it would be available for use.

20. Ms. Broadnax questioned whether the employee who owned the heater would mind. I told her that the portable heater came from maintenance and belong to Methodist and not to the employee. She, therefore, could use it.

21. I also told Ms. Broadnax that if the portable heater in histology was not available for some reason, she could use another portable heater that is kept in the outpatient lab in the cabinet above the work station.

22. At no point did I deny Ms. Broadnax the ability to use the portable heater. Nor did she ever complain to me that a portable heater was not available.

23. If Ms. Broadnax printed any article or information and posted it in the locker room, I would not have seen it because I do not go to the locker room as a normal practice.

4

TJUH001326

24. Consistent with good infection control practice and the requirements of the Commonwealth and the Joint Commission, employees are not allowed to have food and drink in the clinical areas of the hospital. Consequently, if she had hot tea or cocoa in the lab, Ms. Broadnax was in violation of our protocols and practices and would have been potentially subject to disciplinary action. I never saw Ms. Broadnax in the lab holding either hot tea or cocoa. Nor did she ever tell me that the cold limited her ability to draw blood.

25. If she had requested, as a reasonable accommodation, the ability to have hot tea or cocoa in the lab, I would have explained that her solution was not reasonable and would have explored other options with her that would be consistent with safe practice in the clinical areas. For instance, we could have discussed the use of gloves that do not have finger tips so that it would not interfere with her ability to take blood.

26. The area of the laboratory where Ms. Broadnax works has two built in desks. One of the desks has a large monitor on it and is off to the side. Patients do not see that desk when they come to the lab for services. The other desk is visible to patients. I tell all the employees that when they are the only one in the lab, they need to work at the desk visible to patients. This allows patients see them and them to see patients when they arrive. Each of the desks has a keyboard holder that slides under the desks out of the way when the computer is not being used.

27. In what I believe was to be late Fall of 2017, the keyboard holder at the desk with the large monitor broke. Specifically the flat surface on which the keyboard sits had a hinge that allowed the keyboard to be lowered when using it and then lifted to slide under the desk. The hinge broke causing the flat surface to get hung up. I noticed this and removed

5

TJUH001327

the flat surface. The keyboard was placed on the desk for use. I did not remove the metal slides that slid back under the desk.

28. Not long after that, Ms. Broadnax showed me a small cut on her leg which she said that she got from the metal slides under the desk. I observed that it was not bleeding or inflamed. I told her that it looked ok to me, but if she wanted to have it looked at, she certainly should. I also told Ms. Broadnax that she would need to complete the workplace injury report and have Workers' Compensation examine the injury.

29. To my knowledge, Ms. Broadnax did not go to Workers' Compensation or complete a work injury report. I have no knowledge that Ms. Broadnax had a tetanus shot as a result of the cut on her leg.

30. After learning from Ms. Broadnax that she cut her leg, I called Facilities and requested that they remove the slides. I did not hear anything else from Ms. Broadnax. I mistakenly assumed that the slides were removed. After learning that they had not been removed, I found a screw driver and removed them.

31. In a note from Jefferson Rheumatology Associates, dated December 30, 2011, Ms. Broadnax submitted a request from Dr. Johnson to excuse Ms. Broadnax from work. Specifically, the physician stated, "I do believe that the inflammation and pain in her finger is too severe for her to perform her duties as a phlebotomist now. She may return to work within the next few days whenever she believes she is able to perform her duties. A copy of the request and its attachment is attached herewith as Exhibit B and incorporated as though fully stated herein. The attachment is a copy of Aftercare Instructions after receiving emergency care on December 29, 2011.

6

TJUH001328

32. I am unaware of any infection that Ms. Broadnax suffered in December 2013. I certainly was not informed by her or anyone else that she suffered a simple cut in her finger at work. Nor did Ms. Broadnax submit a work place injury report for the cut.

33. I am not aware of Complainant sustaining any other cut in 2017other than those described above.

34. Employees at Methodist receive performance evaluations once a year. The evaluations cover the following sections: Performance Evaluation, Values, Performance of Job Duties/Performance Expectations, Annual Competency Assessment, Progress Toward Previous Goals, Overall Performance Summary, Improvement Action Plan (if overall score in Unsatisfactory), and Career/Professional Development Plan. At the end of the evaluation, both the Evaluator and the Employee are able to make any comments regarding the evaluation.

35. The process for completing the Performance Evaluations is that the employee completes a Self Evaluation of her assessment of how she performed her job and to identify specific goals she has for the next year. The supervisor then provides her assessment. The two then meet and finalize the evaluation.

36. Since Ms. Broadnax was a per diem employee, she was paid an hourly rate that was a higher rate than regular full time and part time employees. The hourly rate was somewhat higher than regular full time and part time employees because per diem were not guaranteed a specific number of hours to work and would be supplementing the staff on an irregular time period. As per diem employees, they did not always receive annual increases in their salaries. Ms. Broadnax, therefore, did not believe that she should have to complete the Self Evaluation because she was not going to get a raise anyway.

7

TJUH001329

37. I would have to remind her that I could not complete the evaluation until she completed her portion.

38. With regard to the Career/Professional Development Plan, once the plan was determined, Ms. Broadnax, like all employees, was responsible for taking the steps to complete the plan in that year.

39. I explained to Ms. Broadnax that since she was severely limited in the amount of time that she could work, she would need to let me know when she was available for training. I would be happy to provide training if she were available. In addition, I also suggested that she should take advantage of any slow time in her schedule to observe persons who were working in the areas of training she wanted. To my knowledge, she never availed herself of the opportunity to observe others working in the areas of training she wanted.

40. Although all employees were expected to receive training in collection manager, that specific training was cancelled when it was learned that collection manager at MHD did not work. We were not able to use collection manager at MHD making the training unnecessary.

41. If an employee's overall score were Unsatisfactory, an Improvement Action Plan was required. Specifically, the employee would be provided a Performance Improvement Plan with deadlines for meeting each step in the plan. Failure to meet those deadlines could lead to demotion or termination. I never found it necessary to provide an Improvement Action Plan for Ms. Broadnax because she never had an overall score of Unsatisfactory.

42. In some years, the employees were evaluated as Exceeds Expectations, Meet Expectations and Opportunity for Improvement. Opportunity for Improvement is defined as "Performance falls below expectations". I have no idea why Ms. Broadnax claims that

8

TJUH001330

she requested to be so evaluated. She never told me that she wanted to be so evaluated and certainly would not have been happy to be told that she was not meeting expectations.

43. I have never refused to provide Ms. Broadnax with any type of training because she has a disability. Nor have I implied or stated that she is unable to keep up with others because of her disability.

44. In 2017, Ms. Broadnax asked me about her retirement plan. I informed her that I have no information about her retirement plan and that she should speak with Human Resources regarding that.

45. At no time have I discriminated against Ms. Broadnax on account of a disability.

46. I am unaware of any adverse action taken against Ms. Broadnax on account of a disability.

The foregoing is true and correct to the best of my knowledge, information or belief and made pursuant to 42 Pa.C.S. Section 4209(a) regarding providing governmental agencies false information.

Joyce Zagacki

Joyce Zagacki

Date: 3-1-18

9

TJUH001331

# Exhibit 21

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

Dywanna Michelle Broadnax,           :
          Complainant                :
                                     :
                                     :
     v.                              : PHRC Case No. 201701645
                                     :
                                     :
Thomas Jefferson University Hospitals, Inc. : EEOC No. 17F201860232
          Respondent                 :

### RESPONSE OF RESPONDENT, THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. TO COMPLAINT

Respondent, Thomas Jefferson University Hospitals, Inc. ("TJUH" or "Respondent"), by and through its undersigned Counsel, responds to the Complaint filed by Complainant, Dywanna Michelle Broadnax ("Complainant" or "Broadnax") by providing answers to each of her numbered paragraphs in the Complainant as set forth below.

1. Jurisdiction is pursuant to the Pennsylvania Human Relations Act 43 P.S. Sections 951 – 963.

   **Response: Denied. The allegation set forth in Paragraph 1 of the Complaint is a legal conclusion to which no affirmative response is required. It, therefore, is deemed denied.**

2. The Complainant herein is: Dywanna Michelle Broadnax, 7701 Lindbergh Blvd. #2222, Philadelphia, PA 19153.

   **Response: Admitted and Denied. It is admitted that Dywanna Michelle Broadnax is the Complainant in this matter. With regard to the remaining allegations in the paragraph, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation. It, therefore, is deemed denied. Respondent can state that the address set forth in Paragraph 2 of the Complaint is not the most current address that Complainant has provided to Respondent.**

1

TJUH001745

3. The Respondent herein is: Thomas Jefferson University Hospitals, Inc. Methodist Hospital, 2301 S. Broad Street, Philadelphia, PA 19148 and Thomas Jefferson University Hospitals, Inc., 111 S. 11th Street, Suite 2210, Philadelphia, PA 19107.

   **Response: Admitted and Denied. It is admitted that Complainant has named Thomas Jefferson University Hospitals, Inc. as a Respondent to the Complaint and that the address set forth for TJUH is correct. With regard to the allegation that Methodist Hospital is a Respondent, Complainant has not named it as a Respondent in the caption. Respondent does admit that Methodist Hospital ("MHD") is a Division of TJUH and the address set forth in Paragraph 3 of the Complaint is the address of MHD.**

4. The Respondent, on information and belief, employed four or more persons when the unlawful conduct alleged in this complaint occurred.

   **Response: Admitted and Denied. With regard to Complainant's information and belief, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of Respondent's information or belief. The allegation, therefore, is deemed denied. With regard to the allegation that Respondent employed four or more persons when the unlawful conduct alleged in this complaint occurred, it is denied that any unlawful conduct occurred. Although Complainant does not identify to which Respondent she is referring, the allegation regarding number of employees is a legal conclusion to which no affirmative response is required. It, therefore, is deemed denied.**

5. In or about September 2005, I was hired by Respondent for the position of Lab Assistant.

   **Response: Admitted and Denied. By way of further answer, Complainant was hired by MHD as a Phlebotomy Clerk on September 19, 2005 where she worked until her resignation on December 9, 2008. *See* Letter from Cassandra Wright to Dywanna**

2

TJUH001746

Broadnax, September 13, 2005, attached herewith as Exhibit 1 and incorporate as though fully stated herein.

6. In or about November 2008, I was forced to resign due to having no time remaining in my FMLA bank. I took FMLA leave due to have severe medical issues beginning in October 2008.

**Response: Admitted and Denied. By way of further answer, Complainant resigned from her position on December 9, 2008. With regard to the allegation that she was forced to resign, the allegation is denied. It is admitted that at that time she had exhausted her FMLA time for serious health conditions. She chose to resign her position rather than be terminated so that she could be rehired for a position in the future. *See* Affidavit of Joyce Zagacki, attached herewith as Exhibit 2 and incorporated as though fully stated herein.**

7. On or about October 24, 2011, I was rehired by Respondent for the position of Lab Assistant.

**Response: Admitted.**

8. My current work location is Methodist Hospital, a Thomas Jefferson University Hospital, located at 2301 South Broad Street, Philadelphia, PA 19148.

**Response: Admitted and Denied. With regard to the allegation that Complainant's current work location is MHD, the allegation is admitted. With regard to the allegation that Methodist Hospital is a Thomas Jefferson University Hospital located at 2301 South Broad Street, it is admitted that MHD is located at the address set forth in Paragraph 8 of the Complainant. With regard to the remaining allegations, Complainant does not define what she means by "a Thomas Jefferson University Hospital" and Respondent does not have sufficient knowledge information or belief to confirm or deny the veracity of the allegation. It, therefore, is deemed denied.**

3

Respondent incorporates by reference its Response to Paragraph 3 of the Complaint as though fully stated herein.

9. Respondent is a regional health system whose hospitals serve as the teaching hospitals of Thomas Jefferson University.

Response: Denied. By way of further answer, TJUH, including MHD, is one of the hospitals that are known as Jefferson Health.

10. Paragraphs 1 through 9 are incorporated herein by reference as though set forth in full.

Response: Respondent incorporates herein, as though fully stated its responses to Paragraphs 1 through 9.

11. My protected class is disability – Lupus and Raynaud's Syndrome stemming from my Lupus SLE.

Response: Denied. By way of further answer, the allegations set forth in Paragraph 11 of the Complaint are legal conclusions to which no affirmative response is required. They, therefore, are deemed denied.

12. In or about June 2006, I was diagnosed with Lupus and I informed Respondent's Clinical Lab Supervisor, Ms. Joyce Zagacki, of my diagnosis because she was my supervisor at the time.

Response: Denied. By way of further answer, Joyce Zagacki was promoted to the Laboratory Outpatient Supervisor on March 28, 2007. *See* Exh. 2. She, therefore, was not Complainant's supervisor in June 2006. With regard to the allegation that in or about June 2006, Complainant was diagnosed with Lupus, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation. It, therefore, is deemed denied.

13. My disabilities substantially limit my ability to walk, think, concentrate, write, as well as hold objects.

4

TJUH001748

**Response: Denied.  By way of further answer, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegations set forth in Paragraph 13. They, therefore, are deemed denied.**

14. A reasonable accommodation of having a portable mini heater was needed for my shift on my scheduled Saturday winter mornings.

**Response: Denied.  By way of further answer, Complainant does not identify the time period to which she refers.  Moreover, Complainant previously specifically denied the need for a reasonable accommodation. For instance, on August 23, 2011, Complainant stated that she was able to perform the functions of her job without accommodations and that she did not need accommodations. *See* Application Details for Dywanna Broadnax, attached herewith as Exhibit 3 and incorporated as though fully stated herein. Likewise, in a previous Complaint of Discrimination filed by Complainant on April 22, 2011, Complainant specifically stated, "I do not need any reasonable accommodations." *See* Paragraph 12 of the Complaint of Discrimination filed by Complainant, attached herewith as Exhibit 4 and incorporated as though fully stated herein.**

15. In or about May 2017, I asked Ms. Zagacki if I can be provided with a portable mini heater due to my Raynaud's Syndrome.

**Response: Denied.  By way of further answer, it is specifically denied that Complainant requested a portable mini-heater in or about May 2017. In addition, Respondent denies Complainant ever requested a portable mini-heated as a reasonable accommodation. In fact, Complainant has never submitted a written request for a reasonable accommodation. Notwithstanding, Ms. Zagacki did arrange for Complainant to use a portable heater when she was cold. *See* Exh. 2. Moreover,**

5

TJUH001749

it is denied that Ms. Zagacki had knowledge regarding Complainant's suffering from Raynaud's Syndrome. *Id.* Respondent admits that in the fall of 2017, Complainant informed her supervisor that it was cold in the area where she worked and asked for a portable heater. Ms. Zagacki suggested to her that she use the portable heater that was used by another employee in the histology laboratory. Complainant and the other employee did not have the same schedule so when Complainant came to work, the portable heater was available for Complainant's use. Ms. Zagacki did request that Complainant return the heater to histology when she completed her shift. In addition, Ms. Zagacki informed her that she could use another portable heater that was in the outpatient lab if it was needed. *Id.*

16. I informed Ms. Zagacki that my Raynaud's Syndrome stemmed from my Lupus diagnosis. I printed it out and put it in the locker room. My hands get blue, numb and stiff when the office is cold which made it difficult to draw blood.

Response: Denied. By way of further answer, Ms. Zagacki did not know that Complainant had Raynaud's Syndrome or that it was associated with Lupus until she read this Complaint. *Id.* With regard to the allegation that Complainant printed something and put it in the locker room, Respondent is unable to determine what was allegedly printed and put in the locker room. Without more information, Respondent cannot adequately respond to the allegation and it, therefore, is deemed denied. With regard to the allegation regarding what happens to Complainant's hands when it is cold, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation. It, therefore, is deemed denied.

17. Ms. Zagacki stated that I could get a portable heater but one was needed at that time because it was May and the weather was hot outside.

6

TJUH001750

**Response: Denied. It is specifically denied that Ms. Zagacki stated what is alleged in Paragraph 17 of the Complaint. By way of further answer, Respondent incorporates by reference, as though fully stated herein, its Response to Paragraphs 15 and 16 of the Complaint.**

18. Since May 2017, Respondent has denied my request for a reasonable accommodation of a portable heater.

**Response: Denied. By way of further answer, Respondent incorporates by reference, as though fully stated herein, its Response to Paragraphs 15, 16, and 17 of the Complaint.**

19. My ability to draw blood, which is an essential job function is substantially limited without this reasonable accommodation so I hold hot tea or cocoa.

**Response: Denied. By way of further answer, the allegation that drawing blood is an essential job function is a legal conclusion to which no affirmative response is required. Respondent does admit that one of the requirements of her position is to draw blood. With regard to the allegation that her ability to draw blood is substantially limited without the reasonable accommodation, Respondent has never been informed that Complainant's ability to draw blood is substantially limited. Finally, Complainant has not been observed holding hot tea or cocoa in the laboratory in order to warm her hands. The allegation, therefore, is deemed denied. Furthermore, if she were so observed, she would be reminded that, consistent with infection control precaution, she was not and is not allowed to have food or drink in the patient area where blood is drawn. *See* Exh. 2. Finally, if Complainant had informed her supervisor of the problems with her hands being cold, they could have and would have explored reasonable accommodations, such as wearing gloves, to**

7

TJUH001751

address her concern.  Complainant never informed her supervisor that the cold limited her ability to draw blood. *Id.*

20. An additional reasonable accommodation of having two metal keyboard slides removed from under a work bench was needed.

**Response: Admitted and Denied.  By way of further answer, it is admitted that two metal slides that allowed a keyboard to be stored under the desk was removed from under the desk when Ms. Zagacki discovered that the hinge was broken. *Id.*  The allegation that an additional reasonable accommodation of having the two metal slides removed was needed is denied as stated.  Specifically, Complainant never stated that she needed the slides removed as an accommodation. *Id.* Rather, Complainant told Ms. Zagacki that she sustained a small cut on her leg from the metal slide. When Ms. Zagacki learned of the cut,  she called Facilities and requested that the two metal slides be removed. *Id.* After the request was made abd Ms. Zagacki heard nothing more from Complainant, she mistakenly presumed they had been removed. *Id.* When she learned that the slides had not been removed, she removed them. *Id.***

21. In or about August 2017, the keyboard tray under one of two benches in my work area broke.

**Response: Respondent incorporates by reference its Response to Paragraphs 15 through 20 as though fully stated herein.**

22. Ms. Zagacki removed the broken keyboard tray, but left the metal keyboard slides in place under the bench.

**Response: Respondent incorporates its Response to Paragraphs 15 through 20 as though fully stated herein.**

8

23. In or about the end of September 2017, while sitting at the bench, I was cut on my leg by one of the metal keyboard slides.

**Response: Admitted that Complainant informed her supervisor that she cut her leg on one of the metal slides and showed her a small cut on her leg. Ms. Zagacki looked at the cut and observed that it was a small cut and not bleeding or inflamed. Ms. Zagacki told Complainant that it looked like she was ok, but if she believed she should have it treated, she should complete the required form to report a workplace injury and report to the Workers' Compensation clinic. Complainant did not go to Workers' Compensation or complete the form. *Id.***

24. Ms. Zagacki stated that I should be fine.

**Response: Respondent incorporates by reference its Response to Paragraph 23 of the Complaint.**

25. Knowing that my Lupus diagnosis makes skin tears more severe than normal, I received a tetanus shot from Respondent to deter any possible infection.

**Response: Denied. By way of further answer, Respondent has no information, knowledge or belief regarding Complainant receiving a tetanus shot to deter any possible infection. In fact, Complainant declined the suggestion that she have the cut treated or to report the injury as a workplace injury. *Id.* Respondent has no information regarding Complainant requesting Workers' Compensation for a workplace injury. The allegation, therefore, is deemed denied.**

26. Ms. Zagacki is aware that my Lupus diagnosis makes skin tears more severe than normal and I am prone to infections if my skin opens.

**Response: Denied. By way of further answer, Ms. Zagacki has no information regarding the allegation that Lupus makes skin tears more severe than normal,**

9

making Complainant prone to infections if her skin opens. *Id.* The, allegation, therefore, is deemed denied.

27. In or about December 2013, while at work with Respondent, I received a simple cut in my finger that ultimately got infected down to my bone due to my Lupus diagnosis. Ms. Zagacki was informed of this incident because she was my supervisor at that time.

**Response: Denied. By way of further answer, Respondent has no record of Complainant experiencing a simple cut that got infected down to her bone in December 2013. Respondent, however, was provided a note dated December 30, 2011 requesting that Complainant be excused from work because "the inflammation and pain in her finger is too severe for her to perform her duties as a phlebotomist now." *See* Exhibit B of Exhibit 2. It appears from the attachment provided that a hang nail had become infected. The allegation, therefore, is deemed denied. If, in fact, Complainant had a cut in December 2013, she does not explain how she got the cut. Nor did Complainant complete a workplace injury report stating that she was injured at work.**

28. Ms. Zagacki advised me to sit at the other bench in my work areas. There are only two benches total in my work area. (this happened in September 2017 when the keyboard cut me.)

**Responses: Admitted and Denied. It is admitted that Ms. Zagacki advised Complainant, as she advised all employees that when they are the only employee in the area, they should use the other desk because they are visible to patients who come to the Lab. Patients who enter the lab cannot see someone sitting at the other desk. *See* Exhibit 2. With regard to the allegation that this occurred in September 2017, when she cut herself on the keyboard, the allegation is denied. First, according**

10

TJUH001754

to Complainant, she cut herself on the slides – not the keyboard. Second, Ms.

Zagacki gave this instruction to all employees and at various times. *See* Exh. 2.

29. Due to Ms. Zagacki's refusal to remove the metal keyboard slides, I covered the slides with tape to prevent being cut a second time.

Response: Denied. By way of further answer, Ms. Zagacki did not refuse to remove

the metal slides. In fact, she requested Facilities to remove the slides. With regard to

the allegation that Complainant covered the slides with tape to prevent being cut a

second time, Respondent has insufficient knowledge, information or belief to

confirm or deny the reason that she allegedly covered the slides with tape. The

allegation, therefore, is deemed denied.

30. On or about October 13, 2017, while sitting at the bench with tape, I was cut a second time by the metal keyboard slides because someone had removed the tape from the slides.

Response: Denied. By way of further answer, according to Complainant's own

admission, *supra* at Paragraph 27 of her Complaint, she sustained a simple cut in

her finger which was the second cut she sustained in December 2013. In addition,

Respondent has no information regarding a cut she sustained on October 13, 2017.

Nor did Complaint submit a report of such injury. With regard to the allegation

that someone had removed the tape from the slides, Respondent is without

knowledge, information or belief to confirm or deny the veracity of the allegation. It,

therefore, is deemed denied. *Id.*

31. Respondent continues to deny my request for a reasonable accommodation of removing the metal keyboard slides.

Response: Denied. By way of further answer, after Respondent requested Facilities

to remove the keyboard slides, Complainant did not tell her supervisor that the

metal keyboard slides had not been removed. Ms. Zagacki assumed that they had

11

TJUH001755

been removed since she heard nothing more from Complainant. The keyboard slides

have now been removed. It is specifically denied that Complainant ever asked for

the metal keyboard slides to be removed as a reasonable accommodation.

32. Based upon the foregoing, I allege that the Respondent violated Section 5(a) of the Pennsylvania Human Relations Act 43 P.S. 951 – 963.

Response: Denied. By way of further answer, the allegation set forth in Paragraph

32 of the Complaint is a legal conclusion to which no affirmative response is

required. The allegation, therefore, is deemed denied.

33. The Complainant prays that the Respondent be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

Response: Denied. By way of further answer, Respondent is without sufficient

knowledge, information or belief to confirm or deny the veracity of the allegation

regarding what Complainant prays. The allegation, therefore, is deemed denied.

Furthermore, Respondent denied that any remedies are due to Complainant.

34. Paragraphs 1 through 33 are incorporated herein by reference as though set forth in full.

Response: Respondent incorporates as though fully set forth herein its responses to

Paragraphs 1 through 33.

35. My protected class is disability – Lupus.

Response: Denied. The allegation set forth in Paragraph 35 of the Complaint is a

legal conclusion to which no affirmative response is required. The allegation,

therefore, is deemed denied.

36. Beginning in or about 2012, I have asked Ms. Zagacki on numerous occasions that I be trained on other areas such as Accessing, Send Outs, Microbiology and the Infusion Center.

TJUH001756

**Response: Denied. By way of further answer, Ms. Zagacki has informed Complainant that if she wants to learn other areas, she should let Ms. Zagacki know when she has time to be trained. However, because Complainant wants to continue receiving Disability Payments from the Social Security Administration, she has voluntarily limited the number of hours she will work in a given week. Specifically, if she gets paid twice a month, she will work no more than thirteen (thirteen) hours a week and if she gets paid three times a week, she will work no more than ten (10) hours a week. *See* Exhibit A of Exhibit 2. Therefore, Complainant has very little if any time available for training. Also, training Complainant on the Infusion Center would not be helpful for either her or Respondent because she would be unavailable to work in the area since she has requested not to work in the mornings because of the effects of her medication. *Id.***

37. Ms. Zagacki has advised me that she will train me on all areas.

**Response: Respondent incorporates by reference its Response to Paragraph 36 of the Complaint. Furthermore, it is admitted that Ms. Zagacki has advised Complainant that she is willing to train her when Complainant has time to be trained. Due to the limited number of hours that she has chosen to work, however, Complainant is limited in the time she has available for training. She, therefore, has been told to inform Ms. Zagacki when she has time during her shifts to be trained. In addition, she has informed Complainant that if she has time at the end of or during a scheduled shift, she should observe the work of those performing the tasks for which she would like to be trained. Complainant has never informed Ms. Zagacki that she has time to be trained. Nor, to Ms. Zagacki's knowledge, has**

13

TJUH001757

**Complainant observed others performing the tasks for which she would like training during available time on her shift.** *See* **Exhibit 2.**

38. Ms. Zagacki has not trained me on any additional areas of Lab Assistant work.

**Response: Respondent incorporates by reference its Response to Paragraph 37 of the Complaint.**

39. On my Performance Evaluation for period July 1, 2011 to June 30, 2012, my Overall Performance Summary (OPS) was Highly Valued and listed under "Career Professional Development Plan", Ms. Zagacki wrote, "Going forward Dywanna will have more receiving training so she is able to cover in that area when needed."

**Response: Admitted and Denied. It is admitted that for the period July 1, 2011 to June 30, 2012, Complainant's overall rating was Highly Valued. With regard to the "Career Professional Development Plan", this section of the Performance Evaluation is for employees to identify areas where they want to develop their skills. The employee and the supervisor discuss what should be included in the plan. It is expected that the employee will take responsibility to pursue his/her Professional Development Plan. It appears that Complainant did not accept responsibility for her own growth.** *Id.*

40. On my Performance Evaluation for period July 1, 2012 to June 30, 2013, my OPS was Highly Valued and listed under "Career/Professional Development Plan", Ms. Zagacki wrote, "Dywanna will train in collection manager, Due 3/03/2014.".

**Response: Respondent incorporates by reference its Response to Paragraph 39 as though fully stated herein. Furthermore, as Complainant is fully aware, the collection management training was discontinued for all MHD employees because the system could not be used at MHD.** *Id.*

41. On my Performance Evaluation for period July 1, 2013 to June 30, 2014, my OPS was Achieves and listed under "Career/Professional Development Plan", Ms. Zagacki wrote,"Collection manager, Due 9/30/2014.".

14

TJUH001758

**Response: Respondent incorporates by reference its Response to Paragraphs 39 and 40 as though fully stated herein, with the exception that she did not receive a Highly Valued rating for the time period referred to in Paragraph 41.**

42. On my Performance Evaluation for period July 1, 2013 to June 30, 2014, my OPS was Achieves and listed under "Career/Professional Development Plan", Ms. Zagacki wrote, "Microbiology, Due 01/04/2016.".

**Response: Respondent incorporates by reference its Response to Paragraph 39 as though fully stated herein with the exception that she did not receive a Highly Valued rating for the time period referred to in Paragraph 42.**

43. On my Performance Evaluation for period July 1, 2015 to June 30, 2016, my OPS was Exceeds and nothing was listed under "Career/Professional Development Plan".

**Response: Respondent incorporates by reference its Response to Paragraph 39 as though fully stated herein with the exception that she did not receive a rating of Highly Valued for the time period referred to in Paragraph 43. .**

44. On my Performance Evaluation for period July 1, 2015 to June 30, 2016, my OPS was Exceeds and nothing was listed under "Career/Professional Development Plan".

**Response: Respondent incorporates by reference its Response to Paragraph 39 as though fully stated herein with the exception that she did not receive a Highly Valued for the time period covered in Paragraph 44 of the Complaint.**

45. I have been asking for an "Opportunity for Improvement" by receiving additional training since approximately 2012.

**Response: Denied. By way of further answer, the term "Opportunity for Improvement" is used on the Performance Evaluation forms for those employees whose performance does not meet the expectations of the position. Performance is rated as "Excels", "Meets Expectations" or "Opportunity for Improvement". When**

15

TJUH001759

an employee receives an "Opportunity for Improvement" on his/her Performance Evaluation, the supervisor is required to prepare a Performance Improvement Plan ("PIP) to inform the employee the performance required to maintain at an acceptable level going forward. If the employee does not meet the requirements on the PIP, he/she will be subject to demotion or termination. Consequently, receiving an "Opportunity for Improvement" is not a positive thing to receive.  It was not necessary to create a PIP for Complainant because she was performing at an acceptable level. Nor did Complainant ever request such. *See* Exhibit 2.

46. In my numerous performance evaluations, Ms. Zagacki stated that I will be trained in multiple areas.

**Response:  Respondent incorporates by reference its Response to Paragraph 39 as though fully stated herein.**

47. I have not yet been trained in these other areas.

**Response: Respondent incorporates by reference its Responses to Paragraphs 39 through 45 as though fully stated herein.**

48. Respondent's other Lab Assistants, who were all hired after me, have been trained in other areas.

**Response: Denied.  By way of further answer, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation set forth in Paragraph 48 of the Complaint. Complainant fails to identify to whom she is referring and the training to which she is referring. The allegation, therefore, is deemed denied.**

49. Respondents other Lab Assistants who were trained in other areas include Mr. Ron LNU, Ms. Victoria LNU, Ms. Crystal LNU, Ms. Alma LNU, Ms. Naimah LNU, Ms. Alonda LNU, Mr. Hugh LNU, Ms. Dixie Patel, and Ms. Janet LNU.

16

TJUH001760

**Response: With regard to the allegations that nine other persons listed by their first name only were trained in other areas, the allegation is denied. By way of further answer, Complainant fails to state what "other areas" Complainant means. Without more information, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation. It, therefore, is deemed denied.**

50. I have more Lab Assistant experience than Mr. Ron, Ms. Victoria, Ms. Crystal, Ms. Alma, Ms. Naimah, Ms. Alonda, Mr. Hugh, Ms. Patel, and Ms. Janet.

**Response: Denied. By way of further answer, Complainant fails to define what she means by experience. Without more information, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation. It, therefore, is deemed denied. Respondent can state that other Lab Assistants have been employed by Respondent for more years than Complainant. In addition, many of them work full time or part time rather than per diem.**

51. Mr. Ron, Ms. Victoria, Ms. Alma, Ms. Naimah, Ms. Alonda, Mr. Hugh, Ms. Pastel, and Ms. Janet are all non-disabled.

**Response: Denied. Since Complainant has not fully identified the persons to whom she is referring, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation regarding the disability status of the individuals named. The allegation, therefore, is deemed denied. Furthermore, the allegation set forth in Paragraph 51 of the Complaint is a legal conclusion to which no affirmative response is required. It, therefore, is denied on that basis. By way of further answer, the term "non-disabled" is not defined, precluding Respondent's ability to respond to the allegation. It, therefore, is deemed denied.**

52. Ms. Crystal has been newly diagnosed with Lupus but she was already trained in other areas before her diagnosis.

TJUH001761

**Response: Denied.  Without more information, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation regarding the diagnosis.  It, therefore, is deemed denied.  Respondent is aware that Complainant has intermittent FMLA, but is not privy to a diagnosis or when she received the diagnosis.  To the extent that Complainant has any information regarding any employee's diagnosis, Respondent cannot confirm or deny the veracity of the allegation. It, therefore, is deemed denied.**

53. Upon information and belief, Respondent believes that I can not keep up with the newly hired Lab Assistants due to having a disability.

**Response:  Denied.  Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of any information and belief that Complainant may have regarding Respondent's beliefs.  The allegation, therefore, is deemed denied. It is specifically denied that Respondent believes that Complainant cannot keep up with newly hired Lab Assistants due to a disability. *See* Exh. 2.**

54. Respondent's action in denying me further training in Lab Assistant work is due to my disability.

**Response: Denied. Respondent incorporates by reference its Response to Paragraphs 39 through 42 as though fully stated herein.**

55. Based upon the foregoing, I allege that Respondent violated Section 5(a) of the Pennsylvania Human Relations Act 43 P.S. 951 – 973.

**Response:  Denied. By way of further answer, the allegation set forth in Paragraph 55 of the Complaint is a legal conclusion to which no affirmative response is required. It, therefore, is deemed denied.  Furthermore, Respondent is without**

18

TJUH001762

**sufficient knowledge, information or belief to confirm or deny the veracity of what**

**Complainant alleges. It, therefore, is deemed denied.**

56. The Complainant prays that the Respondent be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

**Response: Denied. By way of further answer, Respondent is without sufficient**

**knowledge, information or belief to confirm or deny the veracity of Complainant's**

**prayer. The allegation, therefore, is denied. Furthermore, Respondent denies that**

**any remedy under Section 9 of the Pennsylvania Human Relations Act is**

**appropriate.**

57. Paragraphs 1 through 56 are incorporated herein by reference as though set forth in full.

**Respondent incorporates herewith its responses to Paragraphs 1 through 56 of the**

**Complaint as though fully stated herein.**

58. On March 10, 2011, I filed a discrimination complaint with the Pennsylvania Human Relations Commission (PHRC), case number 201003477, alleging that Respondent failed to rehire me due to my disability and race.

**Response: Admitted that Complainant filed a discrimination complaint.** *See* **Exhibit**

**4.**

59. Ms. Zagacki was involved in my previous complaint as she was present during the PHRC Fact Finding Conference held on August 18, 2011.

**Response: Admitted that Ms. Zagacki attended the Fact Finding Conference held**

**regarding the complaint that Complainant filed in 2011. With regard to the**

**allegation that she was involved in her previous complaint, Complainant does not**

**describe what she means by "involved in my previous complaint". Without an**

**understanding of what Complainant is referring to, the allegation is denied.**

19

TJUH001763

**Respondent specifically denies that Ms. Zagacki was involved with Complainant's drafting of the Complaint.**

60. Respondent and I chose to settle the case by Respondent agreeing to rehire me as Lab Assistant.

**Response: Admitted and Denied. It is admitted that the parties agreed to settle the matter. It is denied that the agreement was to rehire Complainant. To the contrary, the agreement was to allow Complainant to apply for a Lab Assistant position in the normal course of business and to compete for the position. She was rehired after she appropriately applied for the position. Specifically, Complainant was hired as a per diem employee and requested specific limits to the number of hours she would work. Her request was granted.** *See* **Respondent's Response to Paragraph 36 of the Complaint which is incorporated herein as though fully stated.**

61. Since my rehire date on or about October 24, 2011, Ms. Zagacki has been my supervisor.

**Response: Admitted.**

62. Ms. Zagacki has not trained me in other areas of Lab Assistant work but has trained other Lab Assistants who were hired after me such as Mr. Ron, Ms. Victoria, Ms. Alma, Ms. Naimah, Ms. Alonda, Mr. Hugh, Ms. Patel, Ms. Lisa LNU and Ms. Shannon LNU.

**Response: Respondent incorporates by reference, as though fully stated herein, its Response to Paragraph 49 of the Complaint.**

63. Ms. Zagacki has not trained me in other areas of Lab Assistant work but has trained other Lab Assistants who have not filed a discrimination complaint against Respondent such as Mr. Ron, Ms. Victoria, Ms. Alma, Ms. Naimah, Ms. Alonda, Mr. Hugh, Ms. Lisa and Ms. Shannon.

**Response: Respondent incorporates by reference, as though fully stated herein, its Response to Paragraph 49 of the Complaint.**

64. Respondent's action in denying me further training in Lab Assistant work is retaliation for filing a PHRC discrimination complaint against Respondent on March 10, 2011.

20

TJUH001764

**Response: Denied. By way of further answer, the allegation set forth in Paragraph 64 of the Complaint is a legal conclusion to which no affirmative response is required. It, therefore, is deemed denied.**

65. Based upon the foregoing I alleged that the Respondent violated Section 5(d) of the Pennsylvania Human Relations Act 43 P.S. 951-963.

**Response: Respondent incorporates as though fully stated herein its response to Paragraph 55 of the Complaint.**

66. The Complainant prays that the Respondent be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

**Response: Respondent incorporates as though fully stated herein it response to Paragraph 56 of the Complaint.**

67. Paragraphs 1 through 66 are incorporated herein by reference as though set forth in full.

**Respondent incorporates as though fully stated herein its responses to Paragraphs 1 through 66 of the Complaint.**

68. On March 10, 2011, I filed a discrimination complaint with the Pennsylvania Human Relations Commission (PHRC), case number 201003477, alleging that Respondent failed to rehire me due to my disability and race.

**Response: Respondent incorporates as though fully stated herein its response to Paragraph 58 of the Complaint.**

69. Ms. Zagacki was involved in my previous complaint as she was present during the PHRC Fact Finding Conference held on August 18, 2011.

**Response: Respondent incorporates as though fully stated herein its response to Paragraph 59 of the Complaint.**

70. The Respondent and I chose to settle the case by Respondent agreeing to rehire me as Lab Assistant.

21

**Response: Respondent incorporates as though fully stated herein its response to Paragraph 60 of the Complaint.**

71. Since my rehire date on or about October 24, 2011, Ms. Zagacki has been my supervisor.

**Response: Respondent incorporates as though fully stated herein its response to paragraph 61 of the Complaint.**

72. On September12, 2017, I emailed Respondent's Human Resources Business Partner, Ms. Suzana Hamza, asking if I had funds available in my retirement account because I was not seeing any retirement deduction on my pay statements.

**Response: Admitted and Denied. By way of further answer, on September 12, 2017, Complainant did send an email to Ms. Hamza inquiring regarding a "401K". This email is a part of a string of emails that Complainant sent to Ms. Hamza elaborating many issues she had. A copy of the string of emails is attached herewith as Exhibit 5 and incorporated as though fully stated herein. Although Complainant referred to a 401K plan, Respondent does not have a 401K plan. To the contrary, it has a Defined Contribution Plan called a 403(b) plan because Respondent is a non-profit organization. Ms. Hamza appropriately referred her to the administrator for the plan, TIAA.** *Id.*

73. On September 14, 2017, Ms. Hamza emailed me back asking if I remembered signing up for the retirement account the second time I was hired. If I did not remember, she directed me to contact TIAA.

**Response: Admitted.** *Id.*

74. On or about September 15, 2017, I asked Ms. Zagacki why I was not registered for a retirement account when I was rehired.

**Response: Admitted that Complainant asked Ms. Zagacki about her retirement account in 2017. In response, Ms. Zagaski referred Complainant to Human**

22

Resources because she did not have information regarding her retirement account.

*See* Exh. 2.

75. Ms. Zagacki stated that informing of the retirement registration was the responsibility of the Human Resources Department.

**Response: Denied as stated. By way of further answer, Ms. Zagacki informed**

**Complainant that she did not have any information regarding the retirement plan**

**and directed her to speak with Human Resources who could assist her. *Id.***

76. I contacted Ms. Hamza and informed her of what Ms. Zagacki stated regarding my retirement registration and Ms. Hamza stated that it was my supervisor's responsibility to inform me.

**Response: Admitted and Denied.  It is admitted that Complainant contacted Ms.**

**Hamza. *See* Response to Paragraph 72 of Complaint.  It is denied that Ms. Hamza**

**told Ms. Zagacki that it was her supervisor's responsibility to inform her. To the**

**contrary, as stated in the emails, she referred Complainant to TIAA the**

**administrator and specifically to financial advisor at TIAA who was assigned to**

**Respondent's account. *See* Exhibit 5.**

77. From about October 24, 2011 to present day, I have not been accruing retirement funds.

**Response: Denied. By way of further answer, according to TIAA, contributions for**

**2017 to Complainant's account have been made on October 19, 2017, November 3,**

**2017, November 17, 2017, December 1, 2017, December 14, 2017, and December 29,**

**2017. *See* Participant Account Contributions: Last Calendar Year: 01/01/2017 –**

**12/31/2017, attached herewith as Exhibit 6 and incorporated as though fully stated**

**herein.**

78. In or about January 2017, Respondent hired a new Lab Assistant, Mr. Hugh.

23

**Response: Denied. It is specifically denied that any Lab Assistant was hired in January 2017. Nor was one hired in December 2016 or February 2017.**

79. Mr. Hugh attended a 30 day orientation session and received a new-hire welcome packet, which detailed the retirement plan and how to register.

**Response: Admitted and Denied. It is specifically denied that any new employee attended a 30-day orientation session. It is admitted that new employees receive a new-hire welcome packet which includes, *inter alia,* information regarding retirement plans. Moreover, information regarding retirement plans are included on the Human Resources website as well as the Employee Handbook which is also on the Human Resources website.**

80. In or about May 2017, Respondent hired a new Lab Assistant, Ms. Patel.

**Response: Admitted that Dixitaben Patel, a per diem employee was hired as a Lab Assistant in May 2017.**

81. Ms. Patel attended a 30 day orientation session and received a new-hire welcome packet. She was automatically enrolled into the retirement plan which the welcome packet described.

**Response: Respondent incorporates by reference, as though fully stated herein, its Response to Paragraph 79 of the Complaint.**

82. Upon my rehire, I did not receive a 30 day orientation session and I was not provided with a new-hire welcome packet, which would have informed me that I needed to register for a retirement account again.

**Response: Admitted and Denied. It is admitted that Complainant, like all new employees did not receive a 30 day orientation session. It is denied that Complainant did not receive a new-hire welcome packet.**

83. Respondent failed to inform me upon my rehire that I had to register again for my retirement account again.

24

**Response: Denied.  By way of further answer, Complainant fails to explain what he means by "register again for my retirement account again".  Without more information, Respondent is without sufficient knowledge, information or belief to confirm or deny the veracity of the allegation.  Complainant was aware that before any deduction other than taxes or required deductions, could be made from her paycheck, she had to authorize the deduction.**

84. On September 14, 2017, I was informed by Ms. Hamza that I was not accruing retirement funds.

**Response: Denied.  By way of further answer, on September 14, 2017, Ms. Hamza asked Complainant if she remembered signing up for her retirement plan. *See* Exhibit 6.  The email is the only communication that Ms. Hamza had with Complainant concerning the retirement funds. Furthermore, by her own admission, Complainant was hired on October 24, 2011, almost seven (7) years from the date that she made any inquiry regarding a retirement plan.**

85. Respondent's action in not informing me that I had to register again for a retirement account is retaliation for filing a PHRC discrimination complaint against Respondent on March 10, 2011.

**Response: Denied. By way of further response, the allegation set forth in Paragraph 85 of the Complaint is a legal conclusion to which no affirmative response is required. It, therefore, is deemed denied. Furthermore, Complainant fails to provide any supporting basis for her allegation that Respondent retaliated against her.  It is insufficient to allege that Respondent did not inform her about the retirement and without more simply allege it was retaliatory.**

86. Based upon the foregoing, I allege that the Respondent violated Section 5(d) of the Pennsylvania Human Relations Act 43 P.S. 951 – 963.

25

TJUH001769

**Response: Respondent incorporates as though fully stated herein its response to Paragraph 10 of the Complaint.**

87. The Complainant prays that the Respondent be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

**Response: Respondent incorporates as though fully stated herein its response to Paragraph 33 of the Complaint.**

88. This charge has been filed with the U.S. Equal Employment Opportunity Commission.

**Response: Respondent admits only that Complainant has said that the charge has been filed with the EEOC.**

**WHEREFORE,** Respondent respectfully requests that the Complaint be **Dismissed** as **Charge Not Substantiated.**

## RESPONDENT, THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.'S, ADDITIONAL INFORMATION AND AFFIRMATIVE DEFENSES TO COMPLAINT

Respondent, Thomas Jefferson University Hospitals, Inc., by and through its undersigned Counsel provides additional information and its affirmative Defenses to the Complaint in the numbered paragraphs below.

1. Complainant has failed to state a cause of action for which affirmative relief must be granted.

2. Complainant has failed to state a *prima facia* case in this matter.

3. Complainant failed to timely file a complaint of discrimination under Title VII of the Civil Rights Act for any allegations of wrongdoing she makes that occurred more than three hundred (300) days from the date that she filed her complaint of discrimination.

26

TJUH001770

4. Complainant failed to timely file a complaint of discrimination under the Pennsylvania Human Relations Act for any allegations of wrongdoing she makes that occurred more than two years prior to the date she filed her complaint of discrimination.

5. Respondent has a policy against discrimination, including on account of a disability, or retaliation. *See* Exhibit 7, attached herewith as though fully stated herein.

6. Complainant did not request a reasonable accommodation to perform the essential functions of her job for any disability that she may have had.

7. Complainant did request accommodations related the times that she would be available to work in order to continue to be eligible for Social Security Disability payments and Respondent granted her request.

8. Complainant also requested accommodations related to the times that she would be available to work so that she could take care of her mother who was ill. Respondent granted the request.

9. Ms. Zagacki voluntarily gave eight (8) hours of her vacation time to Complainant when she had exhausted her vacation and sick time so that she could receive pay during her FMLA leave in 2011. That is not the behavior of a person who is retaliating against a person on account of a disability.

10. Complainant has failed to provide a specific basis for her claim the she was retaliated against. It is insufficient to simply allege that she has a disability and, therefore, she was the victim of retaliation. She must identify a specific incident that demonstrates that Respondent retaliated against her.

11. Respondent has failed to identify specific damages she has incurred.

27

TJUH001771

12. Respondent's allegation that Respondent failed to inform her of the need to "register" in order to have deductions from her paycheck the voluntary Defined Contribution Plan constitutes retaliation was filed much more than the three hundred (300) days allowed under Title VII or two years under the Pennsylvania Human Relations Act. Her complaint, therefore, is untimely.

**WHEREFORE,** Respondent, Thomas Jefferson University Hospitals, Inc., by and through its undersigned Counsel, respectfully requests that the Complaint of Discrimination filed by Dywanna Broadnax be **DISMISSED** as **CHARGE NOT SUBSTANTIATED.**

Respectfully submitted,

E. Jane Hix

E. Jane Hix, Senior Legal Counsel
PA Identification No. 52833
Office of Legal Affairs
Thomas Jefferson University Hospitals, Inc.
834 Chestnut Street, Suite 400
Philadelphia, PA 19108

Date: 3|6|18

28

TJUH001772

# Exhibit 22


**Jefferson.**
University Hospitals
Methodist

September 7, 2011

Dywanna Broadnax
2254 BRYN MAWR AVE
APT 2-C
Philadelphia, PA 19131

Dear Miss Broadnax,

I am pleased to confirm the offer of employment as a **Lab Assistant** with Jefferson University Hospitals –
Methodist Division. As required by regulatory agencies, all offers are contingent upon passage of a
pre-employment physical and completion of the required paperwork and physical process. Your scheduled
start date is **September 26, 2011.**

This position is **Per Diem(as needed), Nonexempt**, and has an Hourly base rate of **$18.00**.

Your pre-employment physical examination will be done at Healthmark, Inc. The following titers will be drawn
during your physical exam: HbsAB, HbsAG, Hep C AB, Mumps, Rubella, Rubeola, and Varicella. If you have
had titers drawn previously and/or had a PPD placed during the past three months and/or have had a respirator
fit test done, please bring this documentation to Healthmark on the day of your exam. This will help speed the
physical. If documentation is unavailable, the appropriate test will then be performed. **The physical process
must be successfully completed prior to starting employment.**

After your scheduled physical please report to the Human Resources Department located in the Eisenlohr
Building to complete new hire paperwork. Please bring with you two forms of identification, a voided check or
deposit slip (direct deposit is mandatory), and any certifications or licenses required for your position. **The
paperwork and physical process must be successfully completed prior to starting employment.**

Also as part of orientation, you are required to attend Service Excellence training and complete any
assigned Health Stream Learning courses within your first 30 days of employment.
You are scheduled to attend Service Excellence training on **September 28, 2011 from 10:00am to
11:00am** in the Doctor's Dining Room located on the basement level of Methodist Hospital.

If you have any questions, please feel free to contact me at (215) 952-9583. Congratulations and welcome to
Methodist!

Sincerely,


Tina Semethy
Human Resources Generalist
CC: Employee File

TJUH000283

 **Jefferson**™
**University Hospitals
Methodist**

Rehire

## AUDIT SHEET - JCAHO

EMPLOYEE NAME: _Dywanna Broadnax_
TITLE
DATE OF HIRE _10/24/11_

Degree Verified
Job Description/Job Performance
Criminal Background Complete
Primary Source Verified
Cetifications
New Hire Orientation Checklist
Unit Based Competencies - Ongoing
30-Day Department Orientation

| | |
|---|---|
| ✓ | |
| ✓ | |
| ✓ | |
| | |
| ✓ | JeffNotes (pool) |
| ✓ | |
| | |

CD OK

AUDITED BY:

TJUH000273

# Exhibit 23

**pennsylvania** 201903983
HUMAN RELATIONS COMMISSION

Received

NOV 25 2019

PA Human Relations Commission
Philadelphia Regional Office

## PENNSYLVANIA HUMAN RELATIONS COMMISSION
## EMPLOYMENT DISCRIMINATION QUESTIONNAIRE

### 1. YOUR CONTACT INFORMATION

Name _Dywanna Broadnax_

Address _72 Memorial Drive_
Street

_New Castle_    _DE_    _19720_
City            State   Zip Code

Phone Number: (H) _____  (Cell) _302-983-0909_

Work: _215-952-9070 or 9115_  E-mail address: _Dywannab@Gmail.Com_

Name, address and phone number of a person, who does **NOT** live with you and will know how to contact you:

Name _Kristen Gauthney_    Phone Number _267-824-3500_

Address _5518 Elliot St_    _Phila_    _PA_    _19143_
Street                       City        State   Zip Code

### 2. AGAINST WHAT EMPLOYER DO YOU WANT TO FILE YOUR COMPLAINT?

Employer Name _Thomas Jefferson Hospital Methodist Campus_
(Please use your employer's name as indicated on your paycheck or W-2 form)

Address in PA _2301 S. Broad St_    _Phila_    _PA_    _19148_
Street                                City        State   Zip Code

Phone Number _215-952-9070 or 9115_  E-mail address: _n/a_

Pennsylvania county where you were harmed: _Philadelphia_

### NUMBER OF INDIVIDUALS WHO WORK FOR THE EMPLOYER:

☐ Fewer than 4   ☒ 4 to 14   ☐ 15-20   ☐ 20+

**Type of Business** _Hospital_

**Is the employer a federal agency?**   ☐ Yes   ☐ No _unknown_

### 3. DESCRIBE HOW YOU WERE HARMED, AND WHEN, SO WE CAN DETERMINE IF WE CAN ASSIST YOU.   Check all that apply.

<u>Write the date(s)</u> you were harmed beside the discriminatory event or action:

☒ Discharge _terminated_    ☒ Lay-Off _fired_    ☐ Failure to Recall _____

☐ Forced Transfer _____    ☐ Denied Transfer _____    ☐ Demotion _____

☒ Forced Leave _escorted out_    ☐ Leave Denied _____    ☐ Unequal Wages _____

- 1 -    PA Employment Discrimination Questionnaire, Rev. 8-13

TJUH000370

☒ Unequal Benefits _____ ☐ Failure to Hire _____ ☐ Failure to Promote _____

☐ Discipline (Suspension, Warning, etc.) _____ ☒ Harassment* _____

*Complete question #7 if you were harassed

☐ Forced to Quit _____

Not accommodated because of your: ☒ Disability _____ ☐ Religion _____

**OTHER**, please be specific: _____ Assaulted _____

## 4. DO YOU FEEL YOU WERE TREATED DIFFERENTLY (DISCRIMINATED AGAINST) BECAUSE OF ANY OF THE CHARACTERISTICS BELOW?

The commission can investigate your complaint only if you believe you were treated differently and harmed because of your race, color, religion, ancestry, age, sex, national origin, non-job related disability or the use of a guide or support animal for blindness, deafness or physical disability. For example, if you feel you were treated worse than someone else because of your race, please indicate race as the reason. If you feel you were treated differently because of your race and sex, please check both race and sex. **Only check reasons which explain why you were harmed**. Also, please identify your race, color, religion, national origin or ancestry, etc. **if** you were discriminated against based on those factors.

☐ Male    ☒ Female    ☐ Pregnant

☐ Age (40 or older only): Date of Birth _____ 11-30-78 _____

☐ Race _____ BLACK _____    ☐ Color _____

☐ Religion _____    ☐ Ancestry _____

☐ National Origin (country in which you were born) _____

☐ Association with a person of a different race than your own:

Your race _____ the other person's race _____

☒ Use of a guide or support animal _____ Support Dobram _____

☐ Refusal to perform, participate in, or cooperate in abortion or sterilization services

☐ GED    ☐ Other _____

☒ I have a disability. (please complete #8)    ☐ The employer treats me as if I am disabled.

☒ I had a disability in the past. (please complete #8)

☐ I have a relationship or association with someone who has a disability. (please complete #8)

☐ **RETALIATION**

If you believe you were **harmed** because you complained about what you believed to be unlawful discrimination, because you **filed** a complaint about unlawful discrimination, or because you assisted someone else in complaining about discrimination, please complete the following information.

Date you filed a complaint with the PA Human Relations Commission _____ 11-23-19 _____

- 2 -    PA Employment Discrimination Questionnaire, Rev. 8-13

TJUH000371

If you filed a complaint with another agency, list the agency's name and date of filing:

PHRC in 2017 file#

Date you complained about discrimination to a manager _Many times,_

Date you assisted someone in complaining about discrimination _n|A_

## 5. WHEN WERE YOU HIRED OR WHEN DID YOU APPLY FOR A JOB WITH THE EMPLOYER?

Date you became an employee: _3|5|2005_

Position for which you were hired: _Phlebotomist/Lab Assistant_

What was your position at the time you were harmed? _Phlebotomist_

If you were seeking to be hired by an employer:

When did you apply? _n|A_   When did you learn you were not hired? _n|A_

## 6. STATE THE REASONS THE EMPLOYER GAVE YOU FOR ACTIONS THAT HARMED YOU.

_My participation in fist fight. I was told I should have known she wanted to fight when she asked me outside_

Who told you about the employer's reasoning for the action? Include his or her job title.

_ERIN Shreiderman from HR (215) 503-5588_

When were you told about the action taken against you? (Date or Dates)

_I was terminated for violating Code of Conduct_

If you were given no reason, please check here. ☐

Regarding how you were harmed, please identify a person or persons who were treated better than you. For example, as a **male employee** you were disciplined for a work violation, but a **female employee** who committed the same work violation was not disciplined.

Name of employee - First and Last (if known)

_Crystal Taylor_

How is this person _different_ from you? For example, what is his or her race, age, religion, etc.?

_She is the lady who assaulted me, she was told to return next week_

Please explain **exactly** how this person was treated better or differently than you. Include dates.

_Never repremanded for violent behavior._

If you cannot identify someone who was treated better or differently than you, you need to describe an incident, statement, etc. which can be investigated, and which directly relates to why you were treated differently than someone else.

_I Attached Post_

TJUH000372

**7. IF YOU CHECKED ONE OF THE FOUR DISABILITY CATEGORIES IN #4, ANSWER THE FOLLOWING QUESTIONS.**

What is your disability? _Lupus since 2006. Stroke February 2019_

How long have you had this disability and when did it start? _14 years ago 06/2006._

Do you still have this disability? ☒ yes   ☐ no

If yes, how much longer do you expect to have the disability? _life long_

What major life activities do **you have great difficulty performing** because of your disability (Check all that apply.) _My balance has been effected since my stroke_

☒ Seeing   ☐ Hearing   ☒ Bending   ☒ Walking   ☒ Lifting   ☒ Stooping   ☒ Turning

☐ Climbing   ☒ Running   ☒ Talking   ☐ Standing for long periods

☐ Sitting for long periods   ☐ Caring for yourself   ☒ Thinking   ☒ Concentrating

☐ Relating to Others

Other Major Life Activities (**Be specific**) _Driving,_

If you have had a disability in the past, when did it start, and what date did it end? _Still have it. Started 06/2006_

If your employer treats you as if you are disabled:  What disability do they think or believe you have? _Joyce Zagacki is my Supervisor She knows I have Lupus_

Who are the people that are treating you as disabled (names and positions or titles)? _Joyce refuses to retrain me in other areas I should be working in. Such as Recieving and Send Outs._

Why do you think that these people think or believe you have a disability? _Unknown_

How did your employer learn about your disability? _me, Doctor letters._

On what date did they learn about your disability? _06/2006_

Which specific manager/official/agent) learned about your disability? (include title or position) _Joyce Zagacki Lab Supervisor._

If you are related to someone who has a disability, what is your relationship to this person? _n/A_

What is this person's disability? _n/A_

How and on what date did the employer learn about this person's disability? _n/A_

TJUH000373

Did you ask for an accommodation or assistance in order to do your job? ☒ yes  ☐ no

IF YES,

(1) To whom did you make your request? _Joyce Zagacki_

(2) What date was the request made? _Not come in early hours_

(3) Explain what the accommodation or assistance was that you requested, and why.
_Getting up early is hard for me because of my joint pain. So I asked to work 2nd shift._

Did the employer provide your requested accommodation or assistance? ☒ yes  ☐ no

If so, on what date? _10|20 11_

Did the employer provide some other accommodation or assistance instead? ☐ yes  ☒ no

If yes, please explain. _n/A_

Did the employer deny your request for an accommodation or assistance?  ☐ yes  ☒ no

if so, who denied your request?

_n/A_

What date was the request denied? _n/A_

What reason was given to you for the denial? _n/A_

## 8. IF YOU CHECKED THAT YOU WERE HARASSED UNDER #3, ANSWER THE FOLLOWING QUESTIONS AS COMPLETELY AS POSSIBLE.

Name the person(s) who harassed you: _Tyvesha Jenkins, Crystal Taylor_

His or her position or job title _Clinical Lab Assistant/Phlebotomist_

When were you harassed?  Starting date _April 2019_  Ending date _November 2019_

Is the harassment still continuing? ☐ yes  ☒ no _I was terminated 11/22/19_

How often did the harassment occur?  As well as possible, please indicate **date, month and year** of each incident and how often the harassing actions occurred.

☐ One time only _____   ☐ Once a day _____

☐ Several times daily _____

☒ multiple times/week _____

TJUH000374

☐ multiple times/month _____

Please provide two or three examples of the harassment you experienced.

_____ I attatched at proof. _____

_____

_____

Did you consider any of the above acts of harassment to be especially severe and/or offensive?

☒ Yes ☐ No   If so, please explain why. _ Tynesha asked me outside to a fight back in June. I told Joyce, she didn't do anything. I attatched Proof.

Did the harassment have a negative or harmful effect on your work environment, health or personal life? If so, please explain: Yes. Tense enviroment for me when I worked with Tynrsha & Crystal.

Did you complain to anyone about the harassment? ☒ Yes ☐ No

To whom did you complain?

Joyce Zagacki            Lab Supervisor
Name                     Position or job title

What date did you complain? ____ 06 - 2019

Did the harassment stop after you complained about it? ☐ Yes ☒ No
If it ended, on what date did it stop? _ Tynesha eased up, but Crystal didn't.

After you complained, were any other actions taken against you? (for example – discipline, discharge, etc.) ☒ Yes ☐ No
What were the actions? _ Told to let them do their work their way.

On what dates did they occur? _____ n/A

Who took the action against you? _____ Joyce

Did this person know that you complained about the harassment? ☒ Yes ☐ No
Please identify someone who is different than you and who was treated better:

Lauren                   Phlebotmist.
Name                     Position or job title

Reason they were treated better than you as discussed in #4 above: Crystal was repremanded

How were they treated better regarding the harassment? _ Crystal use to give Lauren a hard time. Lauren is white. Crystal was disiplined.

PA Employment Discrimination Questionnaire, Rev. 8-13

TJUH000375

*for bothering or harrasing white girls in the lab.*

**9. HAVE YOU BEEN INVOLVED IN ANY COURT ACTION REGARDING THIS MATTER? (COURT ACTION INITIATED BY YOU OR ANYONE ELSE.) IF SO, PLEASE SPECIFY THE COURT AND THE DATE FILED, TO THE BEST OF YOUR MEMORY.**

☐ Yes ☒ No    Court        City        County    State    Date filed

**10. IF YOU HAVE FILED THIS COMPLAINT WITH ANY OTHER LOCAL, STATE OR FEDERAL AGENCY, PLEASE ANSWER THE FOLLOWING:**

Name of the agency with which you filed ___I filed a police report 11/18/19 for the assault.___

Date of filing                          Inquiry or Complaint number

**11. IF YOU WILL HAVE AN ATTORNEY REPRESENTING YOU ON THIS MATTER, PLEASE HAVE YOUR ATTORNEY SEND US A LETTER THAT CONFIRMS THIS. (YOU DO NOT NEED AN ATTORNEY TO FILE A COMPLAINT.)**

<u>**YOU MUST SIGN AND DATE THIS FORM BEFORE RETURNING IT.**</u>

☒ *I hereby verify that the statements contained in·this form are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. Section 4904, relating to unsworn falsification to authorities.*

**Signature** _Dynittrua Broadway_

**Date** _November 23, 2019_

**IF YOU HAVE OTHER INFORMATION YOU BELIEVE WE NEED TO KNOW TO HELP US UNDERSTAND YOUR COMPLAINT, PLEASE PROVIDE IT BELOW. FEEL FREE TO ATTACH ADDITIONAL PAGES TO DESCRIBE WHAT HAPPENED TO YOU AS COMPLETELY AS POSSIBLE.**

I am providing additional proof
1. Proof of my stroke in February 2019
2. Letter from my Dr. that I have a concussion from flight.
3. Email that I complained to Joyce about Tynesha and other issues.
4. Email from Joyce to staff, okaying staff to falsify records.

TJUH000376

# Exhibit 24

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Dywanna M. Broadnax
7701 Lindberg Boulevard, #2222
Philadelphia, PA 19153

From: Philadelphia District Office
801 Market Street
Suite 1300
Philadelphia, PA 19107

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | . | EEOC Representative | Telephone No. |
|---|---|---|---|
| 17F-2018-60232 | | Kurt Jung,<br>State & Local Program Manager | (267) 589-9749 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

*Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):* This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ *The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.*

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Jamie R. Williamson* (signature)

4/2/2019

Enclosures(s)

Jamie R. Williamson,
District Director

*(Date Mailed)*

cc: Dywanna M. Broadnax

Brian M. Doyle Esq.
(Charging Party Attorney)

Thomas Jefferson University Hospitals, Inc.
E. Jane Hix Esq.
(Respondent Attorney)

TJUH000384

# Exhibit 25



# ONE JEFFERSON.
# ONE CODE.

## Code of Conduct & Ethical Behavior










HOME OF SIDNEY KIMMEL MEDICAL COLLEGE

TJUH000640

# Contents

Page  **INTRODUCTION**

1    A Message from Leadership

2    Mission, Vision, and Values

3    Responsibilities of All Members of the Jefferson Community

4    Reporting Concerns

5    Ethical Decisions Guide

6    Upholding Our Code of Conduct


**PRINCIPLES OF OUR CODE**

7    [ Principle 1 ]  Treat all Members of the Jefferson Community with Respect and Fairness

8    [ Principle 2 ]  Exercise Honesty and Integrity

9    [ Principle 3 ]  Maintain the Highest Standards of Patient Care

10   [ Principle 4 ]  Maintain Confidentiality of Information and Records

11   [ Principle 5 ]  Avoid Conflicts of Interest and Maintain the Highest Standards of Business Ethics and Integrity

12   [ Principle 6 ]  Uphold the Highest Standards of Academic and Research Integrity

13   [ Principle 7 ]  Maintain a Relationship of Integrity with Each Payer

14   [ Principle 8 ]  Conduct Political Activity and Governmental Activity in Accordance with the Law

15   [ Principle 9 ]  Foster a Safe and Healthy Environment


16   Index

17   Jefferson Alertline

TJUH000641

# A Message from Leadership

Members of the Thomas Jefferson University and Jefferson Health* community (collectively referred to as "Jefferson") share responsibility to maintain excellence and integrity in all we do. This shared responsibility forms the foundation of our *Code of Conduct and Ethical Behavior* (the "Code").

As we reimagine and revolutionize healthcare and education, our commitment to integrity will intensify. Jefferson enjoys an unparalleled reputation for excellence because members of our community remain committed to the principles and standards embedded in this Code.

As Jefferson expands to include more organizations, our commitment to excellence and integrity will remain intact. We will update our Code to ensure its continuing relevance to everyone within our organization.

We are counting on you to make a personal pledge of commitment to integrity and ethics. When you uphold our Code, without exception, you are ensuring that Jefferson remains a center for excellent academic, clinical, innovative, and philanthropic activities.



**Stephen K. Klasko, MD, MBA**
President and CEO



**Stephen P. Crane**
Chair of the Board of Trustees

* *Thomas Jefferson University* includes Philadelphia University and Thomas Jefferson University. *Jefferson Health* includes Abington Health and its affiliates, Aria Health System and its affiliates, TJUH System and its affiliates, Jefferson Health New Jersey and its affiliates, and Magee Rehabilitation Hospital.

TJUH000642





— OUR MISSION —

# WE IMPROVE LIVES.



— OUR VISION —

**Reimagining health, education, and discovery to create unparalleled value.**

— OUR VALUES —



PUT PEOPLE FIRST



BE BOLD & THINK DIFFERENTLY



DO THE RIGHT THING

HOME OF SIDNEY KIMMEL MEDICAL COLLEGE

TJUH000643

# Responsibilities of All Members of the Jefferson Community

The Jefferson community includes members of the Board of Trustees, senior leadership, faculty, clinicians, researchers, administrators, employees, volunteers, contractors, and vendors. Since our Code represents Jefferson's official standards of conduct, we expect all members of the community to review, understand, and abide by it. The Code will not cover every situation you will encounter or every detail of our policies and procedures, but the guidelines on these pages are mandatory. You may use the Ethical Decisions Guide on page 5 to guide your decision-making, as appropriate.

## RESPONSIBILITIES OF ALL MEMBERS OF THE JEFFERSON COMMUNITY

We must:

- Promote a culture of fairness, trust, and respect.

- Follow the Code at all times.

- Ask questions when we are unsure about what to do.

- Participate in training programs designed to help apply the Code in everyday decision-making.

- Speak up and report concerns about things we see or experience at Jefferson.

You can report concerns to your supervisor, a higher-level manager, or your local Compliance Office, Human Resources, or Office of Legal Affairs without fear of punishment or losing your job. At any time, you can use the Jefferson Alertline at 888-5-COMPLY (888-526-6759) or **Jefferson.Alertline.com** to report concerns or ask questions anonymously.

## ADDITIONAL RESPONSIBILITIES OF LEADERS

Jefferson's leaders, including all people in supervisory positions, have an additional responsibility to:

- Respond appropriately when matters are brought to their attention.

- Set a personal example for high ethical standards in the performance of their duties.

- Clearly communicate expectations for high standards of ethical behavior and respect for all members of the Jefferson community.



Methodist Campus

- Apply the guidance set forth in our Code while supporting Jefferson's commitment to a fair and just culture.

- Encourage those they lead to ask questions and raise issues and concerns without fear of punishment.

## ACKNOWLEDGEMENT PROCESS

At least annually, all members of the Jefferson community are required to acknowledge their receipt and review of the *Code of Conduct and Ethical Behavior*, confirm they understand that the Code represents Jefferson's official standards of conduct, and agree to abide by it. Meeting these requirements is a prerequisite to remaining in good standing at Jefferson. New and existing colleagues are required to read and acknowledge the Code as a condition of employment and all are required to participate in training designed to reinforce awareness and understanding of the Code's requirements.

Community members who do not comply with annual certification requirements will be subject to disciplinary action. Support of the Code and participation in related training programs may be considered in decisions regarding hiring, promotion, and performance evaluation for all members of the Jefferson community.

TJUH000644

# Reporting Concerns

## WHEN YOU SEE SOMETHING SAY SOMETHING

You do not have to be sure that you are right in order to raise concerns about potential violations of the Code, Jefferson's policies, laws, or regulations. Jefferson will investigate all good faith reports of possible misconduct.

## WHERE TO FIND HELP

**STEP 1: IMMEDIATE SUPERVISOR**

Speaking with your immediate supervisor is usually the best place to get answers to your questions.

**STEP 2: A HIGHER-LEVEL MANAGER OR LEADER**

If your immediate supervisor cannot handle your concern, raise the issue with a higher-level manager or leader in your department.

**STEP 3: HUMAN RESOURCES**

Your local Human Resources professionals can assist you with workplace issues and concerns.

**STEP 4: OFFICE OF LEGAL AFFAIRS**

Contact your local legal department when you need guidance about legal matters involving Jefferson.

**STEP 5: COMPLIANCE OFFICE**

Your local Compliance Officer is responsible for operation of Jefferson's compliance and integrity program. You can obtain compliance guidance and report concerns in person or through the Jefferson Alertline.

### YOUR LOCAL COMPLIANCE OFFICER

Please visit the Compliance Community online for information about your Compliance Officer.

## LEGAL REQUIREMENTS

Jefferson is committed to integrity and abiding by all laws and regulatory requirements. Violations of the law will not be tolerated. Anyone with knowledge or suspicion of fraud, waste, or abuse or other wrongdoing has a responsibility to report it. Violations of state and federal laws are punishable by imprisonment and carry fines and penalties. You may report any suspected fraud against the government directly to a government agency or to your local Compliance Officer.

### ANONYMOUS REPORTING: KEY FACTS ABOUT THE JEFFERSON ALERTLINE

You may report your concerns by using Jefferson's Alertline.

- An outside company that is not related to Jefferson manages the Alertline 24 hours a day, seven days a week.

- You can call the Alertline at 888-5-COMPLY (888-526-6759) or file a report online at **Jefferson.Alertline.com.** The system does not record calls, trace reports, or use caller ID.

- If you decide not to provide your name and contact information, the system will assign you a report key, password, and a contact date. You can use your report key and password to track the status of your complaint or provide follow-up information.

- Jefferson receives a report of your contact with the Alertline. Your local Compliance Officer will review the report and take appropriate action.

## PROTECTION FOR GOOD FAITH REPORTING

Jefferson has a policy of zero tolerance for any form of retaliation, punishment, or negative action taken against those who report issues and concerns in good faith. You can find specific policies addressing protection for reporting good faith concerns in your local compliance manual and organizational policies.

TJUH000645

# Ethical Decisions Guide

Use this tool to assist you in making ethical decisions consistent with Jefferson's values:



TJUH000646

# Upholding Our Code of Conduct

Jefferson expects all members of the community to be honest and use good judgment.

The following behaviors represent potential violations of the Code:

- Knowingly authorizing or participating in a violation of federal, state, or local laws and/or regulations.

- Leaders, supervisors, or managers failing to provide adequate supervision or display a lack of diligence in assuring compliance with laws, regulations, and policies, including our Code.

- Retaliation against individuals who report issues and concerns in good faith.

- Deliberately filing false reports of Code violations.

- Actions that are discriminatory or rise to the level of harassment.

- Behaviors that put at risk the privacy and security of Protected Health Information, other confidential information, or private business information.

## DISCIPLINARY ACTION

Violation of this Code may result in disciplinary action up to and including termination or dismissal. Jefferson will conduct a fair and reasonable assessment of behavior prior to initiating disciplinary actions. All members of the Jefferson community must cooperate with investigations of alleged violations of this Code and/or other organizational policies.

## ADDITIONAL REPORTING INFORMATION

### PATIENT CONCERNS

Patients have a right to file complaints and/or grievances about their care without fear of unfair treatment. You must direct patients with complaints or concerns to your local Office of Patient and Family Experience and/or the manager of the department from which they received their clinical care. Honor patient requests for contact information to regulatory or other agencies, such as The Joint Commission and the Pennsylvania Department of Health.

### CLINICAL AND PATIENT SAFETY

You must report all concerns about patient safety in clinical care. Utilize your local electronic or telephonic



Abington Campus

reporting systems for real-time reporting to Jefferson's quality and safety departments for handling.

### UNSAFE WORK-RELATED CONDITIONS

Immediately report to your supervisor all work-related injuries and illnesses, injuries to non-employees, damage to property resulting from Jefferson's business activities, and any unsafe conditions that you cannot immediately and safely correct.

### STUDENT SEXUAL MISCONDUCT

The appropriate personnel who have been made aware of instances of student sexual misconduct are required to report the incident under Title IX, a federal law. Contact your local Title IX Coordinator regarding all Title IX-related matters.

### PRIVACY

Contact your local Privacy Officer to report actual and suspected breaches of patient Protected Health Information.

### COMPLIANCE

You may contact your local compliance office directly to report Code of Conduct violations or other potential compliance violations. Visit the Compliance Community online for information about your local compliance office.

TJUH000647

[ **Principle 1** ] CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Treat all Members of the Jefferson Community with Respect and Fairness

Members of the Jefferson community are expected to provide high-quality education, employment, and patient care experiences to all persons, regardless of sex, age, race, color, religion, creed, sexual preference or orientation, gender identity, marital status, pregnancy, national origin, ancestry, citizenship, military status, veteran status, handicap or disability, or other protected characteristics.

Jefferson will not tolerate harassing or discriminatory conduct. We maintain an environment in which all members of our community are free to raise concerns about **discrimination** or **harassment** at the earliest possible time without fear of punishment or negative treatment.

Each person covered under the Code is expected to:

- Behave in a manner that encourages the spirit of cooperation, respect, and dignity among all members of the community;

- Promote and support an environment free from disruptive behavior and poor working relationships;

- Be professional and respectful in all communications; and

- Report discrimination, harassment, and other offensive behavior to your supervisor or other persons immediately.

## GLOSSARY

**DISCRIMINATION** is any prohibited act or failure to act, based in whole or in part on a person's race, color, religion, sex, national origin, age, disability, or other protected characteristics that has a negative impact on privileges, benefits, working conditions, or results in unequal treatment of employees, applicants, students, patients, or other protected members of the Jefferson community.

**HARASSMENT** is unwelcome conduct that is based on race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability, or genetic information. Harassment becomes unlawful when 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or frequent enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

Harassment may include:

- Verbal abuse or hostile behavior, such as insulting, teasing, or mocking another person or group;

- Offensive or inappropriate physical contact, comments, jokes, or advances;

- Physical assault or stalking;

- Displaying or e-mailing derogatory, demeaning, or hostile materials; and/or

- Repeated unreasonable actions intended to intimidate, degrade, or humiliate.



**TEST YOUR UNDERSTANDING**

*Sam and Jeanette work in separate departments but on the same floor. Occasionally they see each other and exchange a few pleasantries. Last week, Sam asked Jeanette to get a drink after work. Jeanette declined, telling Sam she wants to keep their relationship professional. A week later, Sam asked Jeanette out again and squeezed her shoulder while he stood very close to her during the conversation. Jeanette knows Sam is well-liked in his department and is friends with her supervisor. She also wants Sam to stop. What should Jeanette do?*

**GUIDANCE FROM OUR CODE**

Sam's invitations are making Jeanette uncomfortable. Once Jeanette made it clear that his invitation was unwelcome, Sam's actions should no longer continue and may constitute sexual harassment. Jeanette can report Sam's behavior to her supervisor and ask for his assistance in stopping Sam's advances. If she is uncomfortable doing so, she should contact Human Resources for assistance. Jefferson will not tolerate harassment of any member of our community.

TJUH000648

**[ Principle 2 ]** CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Exercise Honesty and Integrity

Honest business practices inspire respect for Jefferson's mission and build foundations of trust with colleagues, patients, students, customers, families, and every other individual and entity with whom Jefferson does business. To uphold Jefferson's reputation for excellence, we must exercise **honesty** and **integrity** in every communication and transaction. Exercising honesty and integrity includes, but is not limited to, honoring commitments, exceeding expectations, and providing quality services.

Jefferson encourages its community members to tell the truth in all situations. In fact, employees are encouraged to take ownership of their successes as well as instances in which they were unable to meet Jefferson's standards of excellence.

Members of Jefferson's community have the opportunity to demonstrate honesty and integrity every day. Exercising honesty and integrity when engaging in enterprise-related activities requires you to:

- Be candid, thorough, timely, and honest in all activities, including, but not limited to, investigations into enterprise-related affairs;

- Follow your local organization's record retention policy, and never destroy, alter, or conceal information related to investigations or litigation;

- Prepare accurate information and documents that represent the facts and true nature of all business transactions;

- Disclose relationships or interactions in accordance with your local organization's policies; and

- Be truthful when required to certify or attest to activities performed in your capacity as a Jefferson employee or agent.

If something does not feel right, then it might not be the right thing to do. Use the Ethical Decisions Guide (page 5) when challenges arise to assist you in acting with integrity. Ask yourself:

- Does it comply with our Code and enterprise policies?

- Does it support our mission, vision, and values?

- Would the decision be perceived as ethical and legal?

- Would you be comfortable if the decision was published in the news?


East Falls Campus

## GLOSSARY

**HONESTY** is about what you say. Honesty is about telling the truth.

**INTEGRITY** is about what you do. Think of it as "doing the right thing when no one is watching."



### TEST YOUR UNDERSTANDING

*Amir has avoided completing his mandatory online training and on the last day to complete it, he is out sick. He asks his co-worker Bill, to complete the training for him using his computer login information, but Bill says no. A few days later, Bill overhears Amir thanking Marisol for doing a "huge favor" for him and Bill suspects the comment relates to the training. Should Bill ignore what he overheard?*

### GUIDANCE FROM OUR CODE

Bill has a duty to report his suspicion that Amir and Marisol provided false information about required training. All members of the Jefferson community must speak up and report concerns about activities that may compromise personal or institutional integrity. If he is uncomfortable making the report to their department leader, Bill can file a confidential, good faith report with Human Resources or through the Jefferson Alertline. Employees and leaders must always perform their duties in an honest and professional manner.

Jefferson Alertline 888-5-COMPLY (888-526-6759) | Jefferson.Alertline.com

TJUH000649

[ **Principle 3** ] CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Maintain the Highest Standards of Patient Care

Jefferson provides high-quality, cost-effective, and compassionate care designed to meet each patient's medical needs. In upholding Jefferson's standards for quality patient care, you must treat every patient with respect and dignity. Jefferson does not tolerate discrimination based on age, race, ethnicity, religion, culture, language, physical or mental disability, socioeconomic status, sex, sexual orientation, gender identity or expression, source of payment for care, or other protected characteristics.

Whether you are directly involved in the delivery of patient care or serve in a supporting role, you are expected to:

- Commit to the safety of every patient, every time. Speak up when you see a quality or safety issue, and discuss mistakes with others so everyone can learn how to prevent future mistakes;

- Ensure patients who come to Jefferson for emergency treatment receive a medical screening examination and, if necessary, stabilizing treatment, regardless of their ability to pay;

- Respect each patient's right to make informed medical decisions about all aspects of his or her care. When you interact with patients, listen carefully, provide clear and complete explanations, and honor their decisions within the limits of the law and Jefferson's mission, vision, and values; and

- Honor each patient's right to complete or provide an **advance directive**. However, patients are not required to have an advance directive in order to receive care and treatment from our organization.



Northeast Campus

## GLOSSARY

An **ADVANCE DIRECTIVE**, such as a living will or durable power of attorney for healthcare, is a document that expresses a patient's choices about the patient's future care or names someone to decide, if the patient cannot speak for himself or herself.



### TEST YOUR UNDERSTANDING

*Jefferson is scheduled for a regulatory site visit. Various medical records are being reviewed by clinical personnel to determine whether appropriate patient care standards have been met. During the review, staff identify test results that may not have been reported to patients. The results would likely play a significant role in the clinical treatment choices of the patients. The team lead on the project wants to make sure that the patients receive their test results, but fears that they may become upset when they learn about the delay. What should he do?*

### GUIDANCE FROM OUR CODE

The Code requires us to speak up when we identify a quality and safety issue. The team lead should quickly gather all of the facts concerning the possible delay in transmission of test results and present them to their immediate supervisor for discussion and development of an action plan. This situation requires review by a number of Jefferson departments and leaders to ensure that patient care takes priority and appropriate steps are followed to address fully the patient care issues that were uncovered.

TJUH000650

## [ **Principle 4** ] CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Maintain Confidentiality of Information and Records

Jefferson expects you to exercise caution and discretion when handling **confidential information**. Jefferson's efforts to maintain confidentiality of information and records are governed by specific laws, such as the **Health Insurance Portability and Accountability Act (HIPAA)** and the **Family Educational Rights and Privacy Act (FERPA)**. It is important to understand what you must do to handle this information correctly.

Please refer to your local organization's relevant policies on confidentiality, HIPAA Privacy and Security, confidential records management, and record retention.

Following specific policy requirements, Jefferson community members must:

- Know who is and is not permitted to access confidential or otherwise protected information;

- Prevent unauthorized disclosures of confidential information;

- Safeguard usernames and passwords;

- Access, use, and share only the minimum amount of patient and/or student information authorized to complete your job duties and responsibilities; and

- Never leave confidential or protected information unattended or place them in unsecured bins.

Members of the Jefferson community will be subject to disciplinary action, up to and including termination of employment or contract for the unauthorized access, use, or disclosure of confidential or protected information.



**TEST YOUR UNDERSTANDING**

*A colleague who works in the hospital told you that a professional athlete came to Jefferson for treatment. Your colleague is not involved in the patient's care but has access to the medical record. He told you that he took a quick look in the athlete's medical records and based on what he saw, believes the athlete's condition will impact the team's performance next year. What should you do next?*

**GUIDANCE FROM OUR CODE**

Your colleague's actions violate HIPAA guidelines and Jefferson policy. You may not want to get him in trouble, but such actions must be reported. You must contact the Privacy Officer directly or through the Jefferson Alertline to report this incident. You must never access patient information unless you are involved in the patient's care or operations related to their care. You should only access the minimum amount necessary to perform the function that relates to your work.

### GLOSSARY

**CONFIDENTIAL INFORMATION** is information that you learn, create, or develop during your employment or other covered relationship with Jefferson. It includes information that is not generally known to the public about Jefferson, our affiliates, employees, patients, students, or other parties with whom Jefferson has a relationship and who have an expectation of confidentiality.

**HEALTH RECORDS:** The **HIPAA** Privacy and Security Rules provide federal protections for "individually identifiable health information" held by "covered entities" and their "business associates," and honors patients' privacy rights with respect to that information. The Privacy Rule permits the disclosure of health information needed for patient care and other purposes.

*Do you need more information? Always refer to your local organization's policies to understand how these rules affect your Jefferson activities. You may also visit the Office for Civil Rights website: http://www.hhs.gov/ocr/privacy/index.html*

**STUDENT RECORDS:** **FERPA** is a federal law that protects the privacy of education records. The law applies to all schools that receive funds under an applicable program of the U.S. Department of Education.

*Do you want to learn more about FERPA? Always refer to your local organization's policies to understand how these rules affect your Jefferson activities. You may also visit the U.S. Department of Education website: http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html*

TJUH000651

**[ Principle 5 ]** CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Avoid Conflicts of Interest and Maintain the Highest Standards of Business Ethics and Integrity

## CONFLICTS OF INTEREST

We must avoid, to the extent possible, conduct that may lead the public to conclude that a member of Jefferson's community is using an official position to further personal or private business interests or the interests of family members.

To avoid actual or perceived **conflicts of interest** that may impact Jefferson's reputation and relationships, community members must follow the general guidelines contained in our Code.

- Fully disclose to the appropriate parties all personal relationships or interests that may affect clinical judgment, academic decisions, business transactions, or other decisions made for Jefferson **before** entering into negotiations or reaching conclusions regarding an actual or potential Jefferson transaction.

- Full disclosure of any real or perceived conflict will enable Jefferson's officials to recommend or take steps to reduce, manage, or eliminate conflicts of interest before they present increased risks to our reputation or not-for-profit status.

Jefferson's policies provide specific guidance on identifying and reporting actual or potential conflicts of interest. Visit your local organization's website and policy manuals to understand your obligations regarding avoidance and reporting of actual or potential conflicts of interest.

## MAINTAINING LEGAL AND ETHICAL STANDARDS IN BUSINESS TRANSACTIONS

You must not improperly use information to which you have access to gain an unfair advantage over Jefferson's

competitors, vendors, or other persons or entities. Keep these general principles in mind when you conduct Jefferson's business:

- You must not accept, offer, or solicit payments, kickbacks, or anything of value as a reward for patient referrals.

- Accept patient referrals and admissions based solely on the patient's clinical needs and Jefferson's ability to provide the needed services.

- If you believe a relationship or interaction will give Jefferson an unfair business advantage, disclose the situation to the appropriate Jefferson representative and obtain guidance before you proceed.

*If you are unsure about the activities in which you plan to engage, disclose the activity to your supervisor and obtain a written decision regarding your ability to participate in the activity while employed by Jefferson.*



### TEST YOUR UNDERSTANDING

*Claire's job is to educate patients on their options for home health care. Her husband recently became regional manager of XYZ Home Health Care and she really wants him to be successful. Claire's husband will receive substantial incentives if he increases the number of patients referred to XYZ this fiscal year. In fact, he promises her an all-expenses paid vacation to Hawaii if she helps him boost referrals to XYZ. Claire does not disclose her husband's relationship with XYZ to Jefferson or to the patients for whom she is arranging home health care, but she refers all of the patients on her home health care referral list to XYZ. Has Claire violated the Code of Conduct?*

### GUIDANCE FROM OUR CODE

Yes. Claire cannot accept anything of value as a reward for patient referrals. Referring patients to XYZ because she desires a financial benefit is a clear violation of the Code. Claire should have disclosed her family relationship to XYZ to her immediate supervisor and obtained guidance regarding making referrals to XYZ before she began to refer patients to the company.

### GLOSSARY

A **CONFLICT OF INTEREST** exists when a person is in a position to receive a personal benefit from an action or decisions made while acting in their official position as a member of the Jefferson community.

Personal benefits may relate to salary, investments, stock ownership, royalties received, or other non-Jefferson activities. Your local organization's conflict of interest policy contains detailed descriptions of interests and benefits that may form the basis of a conflict of interest.

TJUH000652

**[ Principle 6 ]** CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Uphold the Highest Standards of Academic and Research Integrity

## ACADEMIC INTEGRITY

Jefferson expects all community members to maintain integrity in relationships and interactions connected to the educational process. All members of the Jefferson community must maintain respect for the intellectual efforts of others and be honest in their own work, words, and ideas.

## RESEARCH INTEGRITY

All persons conducting research at or on behalf of Jefferson are obligated to:

- Be honest in proposing, conducting, and reporting research;

- Ensure the accuracy of research data and results, and acknowledge all contributors;

- Complete all required training sessions;

- Adhere to all ethical and legal obligations, contractual agreements, and Jefferson's policies;

- Protect the safety, dignity, and rights of subjects involved in research projects and provide full explanations of all services that they receive;

- Identify actual or potential conflicts of interest, and disclose all required relationships according to policy;

- Obtain official approvals for research activities, as required; and

- Follow your local organization's policies regarding integrity of data collection and management, intellectual property rights, and ownership.

You must report all concerns regarding academic and research integrity to your supervisor, an appropriate Jefferson representative, or through the Jefferson Alertline.



Center City Campus



### TEST YOUR UNDERSTANDING

*Jamie is a post-doc working closely with an Assistant Professor. The Assistant Professor recently submitted manuscripts about his research to a few journals for publication. He provided Jamie a list of expert references to use when responding to journal editor inquiries.*

*Several weeks later, the Assistant Professor gave Jamie access to his personal email account to search for an old email. When Jamie looked for the item, he saw emails addressed to the same names that he sent to the journal editors. It appeared that the Assistant Professor made up the names and routed the inquiries to his personal email account. What now?*

### GUIDANCE FROM OUR CODE

The Assistant Professor's actions appear inappropriate and should be investigated. Jamie must report what he observed to his immediate supervisor. If the Assistant Professor is his immediate supervisor, he must report the matter to the next-level supervisor. Alternatively, he may report his observations to the Research Compliance Officer, the Office of Legal Affairs, or through the Jefferson Alertline.

Jefferson Alertline 888-5-COMPLY (888-526-6759) | Jefferson.Alertline.com

TJUH000653



**[ Principle 7 ]** CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Maintain a Relationship of Integrity with Each Payer

You must verify that all requests for payment or reimbursement are for services that are reasonable, necessary, appropriate, and provided by properly qualified persons. Claims must be sent to **payers** in a timely manner, in the correct amount, and supported by appropriate documentation. To ensure compliance with laws and regulations, Jefferson prohibits coding and billing for services that are wrong, false, or fraudulent. All members of the Jefferson community, including vendors and contractors, involved in patient care, clinical trials, and/or revenue cycle activities such as coding and billing, must understand and carefully follow all applicable rules and regulations related to payment for healthcare-related services.

To uphold our principles of honesty and integrity, members of the Jefferson community shall not alter or falsify any information on any record or document. All records must be maintained and kept in accordance with Jefferson's policies and procedures.



New Jersey Campus

### TEST YOUR UNDERSTANDING

*Stephanie thinks her department may be billing a health insurance company incorrectly. She mentions this concern to her manager. Stephanie's manager says they have always submitted claims in this way, the process is fine, and not to make trouble about it. Stephanie reads the insurance company's guidelines for payment for the services in question and realizes the manager is wrong. She does not want to make trouble, but feels this should be corrected and changed for future billings. What can she do?*

### GUIDANCE FROM OUR CODE

Stephanie already attempted to report her concerns to her immediate supervisor, so she should either report the matter to a higher-level manager in her department or directly to her local Compliance Office. If Stephanie is uncomfortable reporting her concern this way, she may choose to report it anonymously through the Jefferson Alertline.

### GLOSSARY

A **PAYER** is any organization, public or private, that pays or insures health or medical expenses on behalf of beneficiaries. Payers include, but are not limited to, commercial insurance companies, Medicare, Medicaid, other federal and state health care programs, individuals, and other third parties. Jefferson is committed to complying with all laws and regulations that apply to our organization in order to receive payment for patient care services.

TJUH000654

# [ **Principle 8** ] CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Conduct Political Activity and Governmental Activity in Accordance with the Law

## PARTICIPATING IN POLITICAL ELECTIONS

As a citizen, you have the right to participate in the political process. However, Jefferson must comply with the requirements of the Internal Revenue Service for tax-exempt status and other federal and state laws that restrict the use of corporate funds and assets in connection with elections.

Jefferson, and individuals acting on behalf of Jefferson, may not:

- Participate or intervene in any political campaign for any candidate for public office;

- Participate in political activities, including making contributions of financial or non-financial resources; and/or

- Donate Jefferson funds, property, services, or other financial or non-financial resources to any political candidate or for any political activity.

## RESPONDING TO GOVERNMENT INQUIRIES

If you receive an inquiry, visit, subpoena, or other legal document or communication from a governmental agency or judicial authority requesting information from, about, or on behalf of Jefferson, you must immediately contact your local Office of Legal Affairs to coordinate and ensure a timely and lawful response.

Members of the Jefferson community will act lawfully when involved in an official government inquiry, investigation, or other legal proceeding.

- Do not alter, destroy, conceal, or falsify documents related to an investigation;

- Do not attempt to influence the decisions of a government representative; and

- Follow the direction of Jefferson's legal counsel when handling documents (including electronic records) in your custody or control relating to a matter under review.



Northeast Campus



### TEST YOUR UNDERSTANDING

*Samantha is a Research Coordinator at Jefferson. She recently launched a website as part of her campaign for a seat on the local school board. She asked her coworker Ray to review the site and tell her what he thinks about it. Ray notices that some of the photos show Samantha in her office and the Jefferson name and logo are visible. He suggested that Samantha replace the photos but she wants people to know that she works for Jefferson. How should Ray proceed?*

### GUIDANCE FROM OUR CODE

Ray should talk to his supervisor, another leader in the Department, or contact his local Compliance Office to report the use of the photos on the site. Samantha may not use her Jefferson relationship or Jefferson's resources in support of her campaign. Use of the Jefferson name or logo may give the appearance that Jefferson supports Samantha's campaign and can place at risk our tax-exempt status.

TJUH000655

## [ Principle 9 ] CODE OF CONDUCT AND ETHICAL BEHAVIOR

# Foster a Safe and Healthy Environment

Jefferson promotes an atmosphere of trust in which people are encouraged to speak up for and promote a culture of safety that benefits patients, staff, and the community.

### PATIENT SAFETY

- Participate in patient safety and quality initiatives and take individual responsibility for identifying and reporting risks.

- Ensure services are provided by properly qualified individuals and are reasonable and necessary for the care of each patient.

- Document fully all patient care as required by law, regulation, payer requirements, and professional standards.

### OCCUPATIONAL SAFETY

- Dispose of all medical waste, hazardous waste, and other products in accordance with applicable environmental laws and regulations.

- Stay informed of known potential hazards in the workplace. Jefferson will provide evaluation and treatment for any reported injury sustained while at work.

- Come to work mentally and physically fit for duty and remain fit while on duty. You may not use, possess, or be under the influence of alcohol or illegal drugs, nor any drugs that impair your ability to perform your work safely.

### PERSONAL SAFETY

- Report expressed or implied threats or acts of violence, harassment, intimidation, and other disruptive or unsafe behavior in and around the workplace.

- Do not keep weapons of any kind on your person, on Jefferson's property, or while conducting Jefferson's business, regardless of whether you are licensed to carry the weapon. Possession of chemical sprays in small quantities for personal protection is not prohibited.

When you see something, say something. Reporting allows Jefferson the opportunity to correct system and process failures for the benefit of the community.



Magee Campus



### TEST YOUR UNDERSTANDING

*Lisa notices that Karl has been acting strange lately. He seems to have excessive energy and not need much sleep. He sends emails at all hours of the night. She notices that he takes pills at work. Karl told her that they are vitamins but Lisa does not believe him. How should she handle her concern?*

### GUIDANCE FROM OUR CODE

It is against policy to use alcohol or prohibited drugs while on duty at work. Lisa is aware of a potentially unsafe situation and is obligated to report it. If you suspect unsafe behaviors or witness unsafe practices by anyone at Jefferson, you must report it to a supervisor, Human Resources, the Security Department, or file a report through the Jefferson Alertline to start an investigation. Jefferson is committed to an environment that encourages members of the community to raise all safety-related issues without fear of punishment for a good faith report.

TJUH000656

# Index

## A

Acknowledgement ........................ 3
Advance Directive .......................... 9
Alcohol ........................................ 15
Alertline ................................ 4, 5, 17

## B

Billing Practices ........................... 13
Bribes ........................................... 11
Business Ethics ............................. 11
Business Information ........ 6, 10, 11

## C

Campaigns, Political .................... 14
Claims .......................................... 13
Competitors .................................. 11
Compliance Office ................. 3, 4, 5
Confidential Information ......... 6, 10
Conflict of Interest ...................... 11
Contributions ............................... 14

## D

Disciplinary Action ........................ 6
Disclosure ........................... 8, 10-11
Discrimination ............................ 7, 9
Drugs ........................................... 15

## E

Educational Records .................... 10
Elections ...................................... 14
Environment and Safety ............. 15
Ethical Decisions Guide ................ 5

## F

Fairness .......................................... 7
FERPA ............................................ 10

## G

Good Faith Reports ........................ 4
Good Judgment .............................. 6
Governmental Activity ................. 14

## H

Harassment ........................... 6, 7, 15
HIPAA ............................................ 10
Honesty .......................................... 8
Human Resources ...................... 3, 4

## I

Integrity ............................ 8, 11-13
  Academic .................................. 12
  Research .................................. 12
Intellectual Property .................... 12
Intimidation ............................. 7, 15
Investigation ............................ 8, 14

## J

Jokes .............................................. 7

## K

Kickbacks ..................................... 11

## L

Leaders, Leadership ............... 1, 3, 6
Legal Counsel ...................... 3, 4, 14
Lobbying ...................................... 14

## M

Mission ........................................... 2

## N

National Origin .............................. 7

## P

Patients ................. 6-7, 9-10, 12, 15
Payers ........................................... 13
Personal Use of Assets ................ 14
Policies and Procedures .......... 3-6, 8, 10-14
Political Activity ........................... 14
Privacy ..................................... 6, 10
Private Information ...................... 10
Protected Health Information ...... 10

## R

Record Retention .............. 8, 10, 14
Referrals ....................................... 11
Reimbursement ........................... 13
Reporting Concerns ............. 4, 6, 17
Research ...................................... 12
Respect ............................... 3-4, 7-9
Responsibilities .............................. 3
Retaliation ..................................... 4

## S

Safety .................................. 9, 12, 15
Sexual Orientation ..................... 7, 9
Students ................................... 7, 10

## T

Tax Exemption .............................. 14

## V

Values ............................................ 2
Vendors .................................. 11, 13
Violations ................................... 4, 6
Vision ............................................. 2

## W

Weapons ....................................... 15

Jefferson Alertline 888-5-COMPLY (888-526-6759) | Jefferson.Alertline.com

TJUH000657



# Together...

Together... we can build a successful organization. Together... we can ensure an outstanding reputation. Together... we can protect our values.

Your role on our team is to speak up if you know of or suspect any unethical behavior. Our role is to listen.



Jefferson
HOME OF SIDNEY KIMMEL MEDICAL COLLEGE

Safely report any violations or get more information by contacting the hotline.

Online:
Jefferson.alertline.com

Phone:
1-888-5COMPLY (1-888-526-6759)

Confidential, Easy-to-Use and Always Available

© 2015 NAVEX Global®. All Rights Reserved  TJU24826  9/15

TJUH000658











**Jefferson Alertline**
888-5-COMPLY (888-526-6759)
Jefferson.Alertline.com

TJUH000659