IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DYWANNA BROADNAX, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | CIVIL ACTION NO. 21-CV-04662-JMY |
| HOSPITAL, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
MATERIAL FACTS**

In support of its motion to deny summary judgment, and in accordance with the Honorable John Milton Younge's Policies and Procedures, Plaintiff Dywanna Broadnax hereby submits the following statement in response to Defendant's Statement of Material Facts ("Defendant's SOFs"), wherein Plaintiff either admits Defendant's facts as undisputed, or contends that they are disputed.

1.      **From 2005 until in or about December 2008, plaintiff, Dywanna Broadnax, worked as a phlebotomist/lab assistant at the Methodist Hospital Division ("MHD") of Thomas Jefferson University Hospitals, Inc. ("Jefferson"). Exh. 3,[2] Complaint (ECF No. 1), ¶¶ 13, 16-20; Exh. 4, EEOC Complaint, EEOC No. 17F201161112 ("2011 Charge"), ¶ 4; Exh. 5, Deposition Transcript of Dywanna Broadnax ("Broadnax Dep."), 125:25-126:11.**

Reply: Undisputed.

2.      **Starting in March 2007 and throughout the rest of Broadnax's employment with Jefferson, Broadnax reported to Joyce Zagacki, Laboratory Outpatient Supervisor. Exh. 6, Affidavit of Joyce Zagacki ("Zagacki Aff."), ¶¶ 3-4, 7-9; Exh. 5, Broadnax Dep.,125:25-126:5.**

Reply: Undisputed.

1

3.      **Starting in or about 2011, Zagacki began reporting to George Marrone, who was Laboratory Manager and who, in 2017, became the Laboratory Operations Director. Exh. 5, Broadnax Dep., 12:25-13:2, 129:4-130:6; Exh. 6, Zagacki Aff., ¶¶ 5-6; Exh. 15, Affidavit of George Marrone ("Marrone Aff."), ¶¶ 3-4.**

Reply: Undisputed.

4.      **When he became the Laboratory Operations Director, Marrone began reporting to Steven Gudowski, who is the Administrator for the Clinical Laboratories at Jefferson. Exh. 19, Affidavit of Steven Gudowski ("Gudowski Aff."), ¶¶ 3-4; Exh. 15, Marrone Aff., ¶ 4.**

Reply: Undisputed.

5.      **According to Broadnax, she was diagnosed with, among other things, Lupus and Raynaud's disease in 2006. Exh. 1, Plaintiff's Responses to First Set of Interrogatories ("Interrogatory Responses"), Interrogatory no. 9.**

Reply: Undisputed. By way of further answer, Broadnax's diagnoses substantially impacted her ability to walk, think, concentrate, write, and hold objects. Broadnax's lupus also caused her to develop Reynaud's syndrome, which reduces blood flow to limbs and other external body parts. Broadnax also suffers from anxiety. (See Exhibit 1, Interrogatory No. 9 and Exhibit 3 attached to Jefferson's Motion for Summary Judgment).

6.      **In or about December 2008, Broadnax resigned from MHD because she "was in treatment for medical reasons" but had no more FMLA or other medical leave available to her.Exh. 4, 2011 Charge, ¶ 5; Exh. 20, Affidavit of Joyce Zagacki Dated March 1, 2018 ("2018 Zagacki Aff."), ¶ 4.**

Reply: Undisputed for the purposes of the Motion.

7.      **In or about March 2011, Broadnax filed the 2011 Charge, which was a Complaint with the**

**Pennsylvania Human Relations Commission ("PHRC") and Equal Employment Opportunity Commission ("EEOC"), asserting Jefferson discriminated against her under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act ("Title VII") by not rehiring her because of her Lupus and her race (African American). Exh. 4, 2011 Charge.**

Reply: Undisputed.

8.    **Broadnax and Jefferson settled the 2011 Charge pursuant to which Broadnax would withdraw the charge in exchange for Jefferson considering her for an open position. Exh. 21, Complaint, PHRC No. 201701645 ("2017 Charge"), ¶ 7; Exh. 20, 2018 Zagacki Aff., ¶ 12.**

Reply: Undisputed for the purposes of the Motion.

**Jefferson Rehires Broadnax**

9.    **In or about October 2011, Jefferson rehired Broadnax as a per diem Clinical Lab Assistant at MHD reporting again to Zagacki.[3] Exh. 22, New Hire Paperwork; Exh. 21, 2017 Charge, ¶ 7; Exh. 20, 2018 Zagacki Aff., ¶ 13; Exh. 5, Broadnax Dep., 126:12-14; Exh. 6, Zagacki Aff., ¶ 9.**

Reply: Undisputed.

10.    **Throughout Broadnax's tenure as a per diem Lab Assistant, there were "many factors why [her] schedule would get altered," including to accommodate her schooling, to limit the number of hours and/or compensation she received to enable her to continue to be paid Social Security benefits, to accommodate her medical restrictions, and to care for her mother when she was terminally ill. Exh. 5, Broadnax Dep., 115:17-23, 116:8-118:14, 123:4-125:8, 172:4-25; *see also* Exh. 50, Handwritten notes from Broadnax to Zagacki concerning Broadnax's schedule restrictions; Exh. 1, Interrogatory Responses, Interrogatory no. 14.**

Reply: Undisputed for the purposes of the Motion.

11.    **Zagacki altered Broadnax's schedule pursuant to Broadnax's requests. Exh. 5, Broadnax**

3

Dep., 116 :8-118:14, 124:18-125:8, 172:4-25; Exh. 8, Broadnax's November 26, 2019 PHRC Questionnaire ("PHRC Questionnaire"), TJUH0374.

Reply: Undisputed for the purposes of the Motion.

12.   None of Broadnax's coworkers imposed as many restrictions on their schedules as Broadnax. Exh. 6, Zagacki Aff., ¶¶ 33-34; *accord* Exh. 5, Broadnax Dep., 170:16-23.

Reply: Undisputed for the purposes of the Motion.

13.   As a Lab Assistant, Broadnax, among other things, collected specimens from patients for laboratory testing pursuant to scripts. Exh. 6, Zagacki Aff., ¶ 11.

Reply: Undisputed.

14.   Also, Broadnax checked scripts against blood draws her coworkers performed to determine if they had missed any tests on the script. Broadnax would note any errors that her coworkers had made and "slid[e] them under [Zagacki's] door" so Zagacki could address them with the pertinent coworker. Exh. 5, Broadnax Dep., 95:12-16, 199:6-23.

Reply: Undisputed for the purposes of the Motion.

15.   Broadnax felt she had "never been liked in [her] department by [her] phlebotomist coworkers."  Broadnax acknowledges her coworkers would be annoyed or angry with her because she checked their scripts for errors they had made. *Id.* at 203:21-25; 275:19-278:20, 280:2-20.

Reply: Undisputed.

16.   As Broadnax explained, Zagacki had a "tendency to go over whatever it [was] [Broadnax] slid under [Zagacki's] door" so "by the time [Broadnax] [came] in, [she was] the villain." Exh. 5, Broadnax Dep., 198:41-199:23.

4

Reply: Undisputed.

17. **On or about December 20, 2017, Broadnax filed the 2017 Charge, which was the second complaint she had filed with the PHRC and EEOC against Jefferson. This time, she alleged disability discrimination and a failure to accommodate under the ADA and the PHRA and retaliation under the ADA, PHRA and Title VII for filing the 2011 Charge. Exh. 21, 2017 Charge.**

Reply: Undisputed.

18. **More specifically, in the 2017 Charge, Broadnax alleged: (a) Zagacki denied Broadnax the accommodation she requested in May 2017 to use a portable mini heater during her shift to help deal with her Raynaud's Syndrome; (b) Defendant denied her request for a reasonable accommodation to have a broken keyboard slide under one of the desks in Broadnax's work area removed because Broadnax had cut herself on the broken slide; (c) Zagacki refused to train Broadnax in "other areas such as Accessioning, Send Outs, Microbiology, and the Infusion Center" due to her disability (Lupus) and in retaliation for Broadnax filing the 2011 Charge; and (d) also in retaliation for filing the 2011 Charge, Defendant failed to inform Broadnax upon her rehire in 2011 that she needed to register for a retirement account. *Id.***

Reply: Undisputed.

19. **Jefferson responded to the 2017 Charge by denying all of Broadnax's claims. *Id.***

Reply: Undisputed.

20. **On or about April 2, 2019, the EEOC informed Broadnax that the agency was dismissing the 2017 Charge ("April 2019 RTS Letter"). Exh. 3, Complaint, ¶ 40; Exh. 24, Right to Sue Letter ("RTS Letter").**

Reply: Undisputed.

21. **There is no evidence Broadnax instituted litigation within 90 days of receiving the April 2019**

5

**RTS Letter to assert the claims in the 2017 Charge.**

Reply: Undisputed.

22.    **At all pertinent times, Jefferson had a Code of Conduct that applied to all employees. Exh. 25, Code of Conduct, TJUH000644.**

Reply: Undisputed.

23.    **Among other things, the Code of Conduct requires employees to "[p]romote a culture of fairness, trust, and respect;" "treat all members of the Jefferson community with respect and fairness;" "[b]ehave in a manner that encourages the spirit of cooperation, respect, and dignity among all members of the community;" "promote and support an environment free from disruptive behavior and poor working relationships;" "[b]e professional and respectful in all communications," and "foster a safe and healthy environment." *Id.*; Exh. 26, Affidavit of Aaron Sniderman ("Sniderman Aff."), ¶¶ 10-11.**

Reply: Undisputed.

24.    **"Violation of [the] Code may result in disciplinary action up to and including termination or dismissal." Exh. 25, Code of Conduct, TJUH000647; Exh. 26, Sniderman Aff., ¶ 11.**

Reply: Undisputed.

25.    **Consistent with the foregoing, Jefferson's Employee Disruptive Conduct policy prohibits conduct that is "abusive" and "disrupts the smooth and efficient operations of Jefferson and negatively impacts the "morale and productivity of other employees." Exh. 27, Disruptive Conduct Policy; Exh. 26, Sniderman Aff., ¶ 12.**

Reply: Undisputed.

26.    **Under that policy, disruptive conduct includes, but is not limited to, "engaging in offensive, intimidating, harassing or threatening conduct," and willfully violating . . . Jefferson's Code of Conduct." Exh. 27, Disruptive Conduct Policy; Exh. 26, Sniderman Aff., ¶ 13.**

6

Reply: Undisputed.

27.    **The Disruptive Conduct policy is administered pursuant to the Employee Disciplinary Procedures policy, which states, among other things, "Some violations of Jefferson's guiding principles and policies will result in termination," and an example of such a violation is a willful violation of the Code of Conduct. Exh. 28, Disciplinary Procedures Policy.**

Reply: Undisputed.

28.    **Further, Jefferson's Campus/Workplace Violence Policy states, among other things:**

**Jefferson strictly prohibits campus violence. Acts of violence and/or threats of violence, whether expressed or implied toward any individual(s) at the Jefferson campuses, are prohibited and will not be tolerated. All reports of such incidents will be taken seriously and will be addressed appropriately . . . . Campus violence is any conduct that is severe, offensive or intimidating enough to cause an individual to reasonably fear for his/her personal safety or the safety of others or property . . . . All Jefferson personnel . . . who commit campus violence will be subject to disciplinary action up to and including termination of employment or dismissal and will be directed to stay away from Jefferson . . . . Jefferson will decide whether its campus violence policy has been violated and whether preventative or corrective action is appropriate.**

**Exh. 29, Campus/Workplace Violence Policy ("No Violence Policy"); Exh. 26, Sniderman Aff., ¶ 9.**

Reply: Undisputed.

29.    **From February 2019 until April 6, 2019, Broadnax was out of work on medical leave. Exh. 3, Complaint, ¶ 41.**

Reply: Undisputed.

7

30.  Upon Broadnax's return to work in April 2019, she heard that a coworker, Naeemah Gadson, had taken FMLA leave after being "verbally assaulted" by another coworker, Crystal Taylor, in early April 2019. *Id.*; Exh. 5, Broadnax Dep., 59:5-20.

Reply: Undisputed.

31.  Gadson and Taylor were Lab Assistants who, like Broadnax, reported to directly to Zagacki. Exh. 6, Zagacki Aff., ¶ 10.

Reply: Undisputed for the purposes of the Motion.

32.  According to Broadnax, after she returned from leave, Taylor began directing "antagonistic" behavior towards Broadnax that she believes was prompted by the fact that she was friends with Gadson. Exh. 3, Complaint, ¶¶ 42-43.

1.  Reply: Undisputed for the purposes of the Motion. By way of further answer, In June 2019, Broadnax confronted Taylor about why she was being so mean towards her since she returned from her stroke in 2019, which ultimately resulted in a brief verbal altercation See Exhibit 46 attached to Defendant's Motion for Summary Judgment. Broadnax reported Taylor's antagonistic conduct towards her to Zagacki multiple times. (See Exhibit 5, 98:21-99:19 attached to Defendant's Motion for Summary Judgment), and Broadnax states that Zagacki failed to properly address her concerns about Taylor, See Exhibit 5, 99:22- 100:11 attached to Defendant's Motion for Summary Judgment.

33.  Broadnax and Taylor worked different shifts and would see each other only "in passing." Exh. 5, Broadnax Dep., 71:6-24.

Reply: Undisputed for the purposes of the Motion. Broadnax does note that she often came to work earlier and was in the same space as Taylor for at least. However, these facts do not raise a genuine question of material fact.

8

34.    **On November 18, 2019, Broadnax and Taylor had a fistfight in a Jefferson hospital hallway during work hours.** *Id.* **at 226:14-19.**

Reply: Broadnax disputes that she "had a fistfight." Rather, she was physically attacked by Taylor after a verbal altercation and fought back only out of self-defense. On or about November 18, 2019, Broadnax was physically attacked by Taylor. See Exhibit 5, 226:14-19, Exhibit 1, and Exhibit 3 attached to Defendant's Motion for Summary Judgment.

35.    **Broadnax, Taylor, a new employee named Tynesha Jenkins, and a student were in an employee room at the hospital together.** *Id.* **at 227:4-11.**

Reply: Undisputed.

36.    **Broadnax heard what she thought was Taylor imitating Broadnax's demeanor and mocking Broadnax to Jenkins. Exh. 3, Complaint, ¶ 45; Exh. 5, Broadnax Dep., 227:21-228:21. Broadnax contends this was "piggybacking off of six months of [Taylor's] antagonistic behavior." Exh. 5, Broadnax Dep., 228:22-24.**

Reply: Undisputed.

37.    **Broadnax said to Taylor, "[N]ot today, Crystal. You're too fucking old for that shit" and "I'm not for your shit today." Exh. 3, Complaint, ¶ 45.**

Reply: Undisputed.

38.    **Taylor "jump[ed] up and said, 'You cursed?'" and she "threw her hand" and said to Broadnax, "You're done. And [Taylor] stormed out of the office." Exh. 5, Broadnax Dep., 230:8-18.**

Reply: Undisputed.

39.    **Broadnax thought Taylor had left the office to report Broadnax's cursing to Zagacki.** *Id.* **at**

9

**263:2-22.**

Reply: Undisputed.

40.    **Taylor came back into the office alone without Zagacki, looked at Broadnax "with an evil face," and "sat back down at the computer."** *Id.* **at 230:19-21, 260:22-25.**

Reply: Undisputed.

41.    **Taylor did not speak to Broadnax.** *Id.* **at 260:21-261:5.**

Reply: Undisputed.

42.    **Nevertheless, Broadnax, in front of Jenkins and the student, said to Taylor words to the effect, "[W]hy are you always showing off for the new hires? You do not work this area, but you're the main person making the mistakes."** *Id.* **at 230:21-231:5, 261:13-21.**

Reply: Undisputed.

43.    **Taylor pushed back her chair, stood up, and approached Broadnax.  Taylor was "being aggressive" with Broadnax.  Taylor asked Broadnax, "You want to talk about this outside?" Broadnax said, "Sure."** *Id.* **at 231:6-9, 262:24-263:8.**

Reply: Undisputed.

44.    **Broadnax contends she accepted Taylor's invitation to "talk about this outside" because Broadnax thought Taylor was asking Broadnax to have a civil side conversation about their dispute in accordance with Jefferson's policies.** *Id.* **at 231:7-233:24.**

Reply: Undisputed, but by way of further answer, Broadnax also contends that she had been told by Zagacki to try to talk through conflicts before reporting them to management. See Exhibit 5, 231:7-233:24 attached to Defendant's Motion for Summary Judgment.

45.    **That said, Broadnax admits she had never heard of anyone at Jefferson asking a coworker to**

10

**talk about a disagreement with the coworker "outside" and have that result in a civil conversation. *Id.***

Reply: Undisputed, although Broadnax questions the relevance of this numbered paragraph as the fact that Broadnax had never heard anyone use this phrase before does not mean she still did not think she and Taylor were going to have a conversation. Nevertheless, the contentions in this paragraph do not raise a genuine question or involve a material fact.

46. **Taylor and Broadnax left the room and went into the hallway.  Taylor "started to become belligerent [and] loud."  Broadnax responded, "Wait a second, Crystal, not right here.  The physicians' offices are right here, and this is a unit."  Taylor replied, "Yeah, because I'm going to whup your ass." *Id.* at 234:3-236:4.**

Reply: Undisputed.

47. **Broadnax took a step back and said, "Crystal, you're not going to do anything to me." Taylor said, "Why? What are you going to do about it?"  Taylor was bumping Broadnax in the chest as she said this.  Broadnax responded by bumping Taylor away and saying, "I'm going to get Joyce [Zagacki]." *Id.* at 236:2-12, 270:5-20.**

Reply: Undisputed.

48. **Broadnax turned her body to get Zagacki and Taylor poked Broadnax in the head while saying "Yeah, because you know better." *Id.* at 236:13-24.**

Reply: Undisputed.

49. **Broadnax did not continue to turn away from Taylor.  Instead, Broadnax said, "Don't put your hands on me," turned back towards Taylor, and poked Taylor back in the head. *Id.* at 236:20-237:14.**

Reply: Undisputed except that Broadnax contends she had not fully turned away when Taylor poked her in the head, and in that moment, she felt the need to defend herself. See Exhibit 5,

11

236:12-239:20 attached to Defendant's Motion for Summary Judgment.

50.     **Broadnax admits there was nothing obstructing her way that prevented her from walking away from Taylor after she poked Broadnax in the head.** *Id.* **at 237:8-238:2.**

Reply: Undisputed, except that Broadnax contends in that moment she felt the need to defend herself. *Id.*

51.     **After poking Taylor, Broadnax proceeded to turn away to get Zagacki when Taylor hit Broadnax in the back of the head causing her to fall to the floor.  This is "when the fight began."** *Id.* **at 238:3-11.**

Reply: Broadnax does not dispute she proceeded to turn away to get Zagacki when Taylor her in the back of the head causing her to fall to the floor but does dispute the characterization of the ensuing altercation as a "fight," because Broadnax was not a willing participant in Taylor's physical aggression.

52.     **Taylor was hitting Broadnax and Broadnax was "swinging and punching" Taylor "to defend" herself.** *Id.* **at 242:7-11.  Broadnax pulled Taylor to the floor and "hit her back," not knowing where her "hits landed."** *Id.* **at 327:16-23, 331:11-332:17; Exh. 17, Criminal Hearing Testimony, 20:24-22:19, 23:6-8.[4]**

Reply: Undisputed.

53.     **Broadnax admits no one witnessed how the fistfight started.** *Id.* **at 243:12-14.**

Reply: Broadnax disputes the characterization of the altercation with Taylor, in which Taylor was the aggressor, as a "fistfight."

54.     **After Broadnax and Taylor were separated, Broadnax walked to Marrone's office and then to Zagacki's office, but neither were present.  Security was speaking to Taylor and taking her statement.** *Id.* **at 268:9-19.**

Reply: Undisputed.

55.    As more specifically explained below, Security then spoke to Broadnax during which conversation she handwrote a statement. *Id.* at 268:20-23, 298:2-15.

Reply: Undisputed for the purposes of the Motion.

56.    Broadnax eventually saw Zagacki and told her Taylor had attacked Broadnax. *Id.* at 274:4-275:18.

Reply: Undisputed for the purposes of the Motion.

57.    According to Broadnax, per a text she sent Taylor shortly after the fistfight, Taylor was an "ugly bitch," she "put her hands on the wrong one" and Broadnax "whupped [Taylor's] ass." *Id.* at 327:16-23, 334:11-336:21; Exh. 17, Criminal Hearing Testimony, 28:5-29:9.

58.    Broadnax went to the emergency room and Zagacki came to see Broadnax one to two hours later. *Id.* at 294:3-9.

Reply: Undisputed for the purposes of the Motion.

59.    In the "nice soft-spoken" voice Zagacki always used, she asked Broadnax how she was doing and tried to comfort her.  According to Broadnax, Zagacki said, "I think I know why this happened;" i.e., because she had a meeting that morning about the errors Broadnax had found the weekend before and Taylor was angry or upset. *Id.* at 294:3-295:3; Exh. 7, Amended Complaint, EEOC No. 17F202060544 ("2020 Charge"), ¶ 37.

Reply: Undisputed for the purposes of the Motion.

60.    Broadnax had left for Zagacki on Monday, November 18, 2019, what Broadnax  believed to be errors made by her coworkers. Exh. 7, 2020 Charge, ¶ 37.

Reply: Undisputed for the purposes of the Motion.

61.    Zagacki told Broadnax that Zagacki would have to take Broadnax's badge until the investigation into the fistfight was over. Exh. 5, Broadnax Dep., 294:25-295:2.

13

Reply: Undisputed for the purposes of the Motion.

62. **By the time of this conversation between Zagacki and Broadnax, Zagacki had not read any security report or any statement from a witness about the fistfight. Exh. 6, Zagacki Aff., ¶¶ 14-15; *accord* Exh. 5, Broadnax Dep., 295:21-23.**

Reply: Undisputed for the purposes of the Motion.

63. **The Security office at Jefferson created a Security Case Report about the fistfight. *See* Exh. 10, Security Case Report.**

Reply: Broadnax does not dispute that the Security office at Jefferson created a Security Report, but does dispute the characterization of the altercation with Taylor, in which was physically attacked and had to defend herself, as a "fistfight".

64. **In the Security Case Report, Security Officer Sergeant William White reported that he had spoken to Taylor about the altercation, and she reported that it was a "verbal dispute that turned physical after Ms. Broadnax invaded [Taylor's] personal space" and "pushed [Taylor] twice." Sergeant White further wrote that a witness, Loretta Ward, "saw two employees fighting in the hallway" and could not "break them up by yelling at them to stop."**

Reply: Broadnax disputes that she pushed Taylor twice. Broadnax does not dispute that Taylor reported this version of events to Security Officer Sergeant William White, or that Loretta Ward reported she saw two employees fighting and could not break them up. By way of further answer, Broadnax asserts that Loretta Ward does not state that she saw how the altercation started.

65. **Sergeant White also wrote in the Security Case Report that he spoke to Broadnax who said that Taylor "started a verbal confrontation in [the] lab." *Id.* Broadnax reportedly told Sergeant White that Taylor "then asked [Broadnax] to come out in [the] hallway where [Taylor] became physical by bumping [Broadnax], punching her, pulling her hair and pulled her to the ground." *Id.***

14

Reply: Undisputed for the purposes of the Motion.

66.     **Sergeant White accurately described his conversation with Broadnax. Exh. 5, Broadnax Dep., 256:7-16.**

Reply: Undisputed for the purposes of the Motion.

67.     **Dennis Delisle (Vice President, Operations) with oversight responsibilities for the MHD campus, received a copy of the Security Case Report via email. Exh. 30, Affidavit of Dennis Delisle ("Delisle Aff."), ¶¶ 3-6.  He received the Security Care Report because, generally, given his position as Vice President of Operations, when more serious events occurred involving Security, that office would notify Delisle. *Id.*

Reply: Undisputed for the purposes of the Motion.

68.     **Delisle then emailed the Security Case Report about the fistfight to Broadnax's and Taylor's supervisors - Gudowski, Marrone and Zagacki – as well as to Aaron Sniderman, who was the HRBP who had taken over responsibility from Hamza for Broadnax's and Taylor's department in or about May 2019. Exh. 30, Delisle Aff. ¶ 7; Exh. 15, Marrone Aff., ¶ 7; Exh. 26, Sniderman Aff., ¶¶ 4-5, 7; Exh. 19, Gudowski Aff., ¶ 6; Exh. 6, Zagacki Aff., ¶ 18; Exh. 48, November 19, 2019 Delisle Email ("Nov. 19, 2019 Email").**

Reply: Undisputed for the purposes of the Motion.

69.     **Even though Delisle did not have any authority to determine the discipline that should be imposed for the altercation, he, after reading the Security Case Report, shared his opinion on that discipline, as this incident implicated the safety of the workplace.  Delisle informed Gudowski, Marrone, Zagacki, and Sniderman that Delisle recommended Taylor be terminated pursuant to the No Violence Policy because Delisle knew that Taylor already was on a final written warning and that Jefferson has a zero tolerance for violations of that policy. Exh. 30, Delisle Aff. ¶ 7; Exh. 26, Sniderman Aff., ¶ 8; Exh. 15, Marrone Aff., ¶ 7; Exh. 6,**

15

**Zagacki Aff., ¶ 19; Exh. 48, Nov. 19, 2019 Email; Exh. 29, No Violence Policy.**

Reply: Undisputed for the purposes of the Motion.

70.    **Taylor was on a final written warning because, on January 30, 2019, she told a patient that she "got [Taylor] in trouble for wearing perfume." This statement made the patient "feel uneasy." Exh. 31, Taylor Final Written Warning.**

Reply: Undisputed for the purposes of the Motion.

71.    **In recommending Taylor's termination, Delisle understood the Security Case Report to include Taylor's admission that she was involved in a verbal dispute that resulted in a physical fight in a hospital hallway during work hours. Because Taylor already was on a final written warning, Delisle felt she should be terminated for her involvement in this dispute if Sniderman verified the incident occurred and Taylor had any culpability for it. Therefore, Delisle asked Sniderman to confirm that Delisle's recommendation was the right course of action for Taylor. Delisle also asked Sniderman to follow-up with Security and Zagacki about Broadnax's role to determine her culpability so the appropriate action could be taken against her as well. Exh. 30, Delisle Aff. ¶ 9; Exh. 48, Nov. 19, 2019 Email.**

Reply: Undisputed for the purposes of the Motion.

72.    **Zagacki emailed Security requesting a copy of any statements obtained so she could send them to Human Resources. Zagacki received and emailed those statements to Sniderman, with a copy to Marrone, early in the morning on November 19, 2019. Exh. 32, November 18, 2019 Zagacki Email ("Nov. 18, 2019 Zagacki Email"); Exh. 49, Nov. 19, 2019 Zagacki Email; Exh. 6, Zagacki Aff., ¶¶ 13, 16-17.**

Reply: Undisputed for the purposes of the Motion.

73.    **Broadnax's statement read as follows:**

16

I clocked in and walked in the O.P Lab.  After I put my things in my locker, I came near the other Phlebotomist. Crystal said to Tynesha 'Don't forget to add your mag & Phos' a subliminal comment. So I said 'Crystal I'm not for ya stuff today, yu too f'ing old for that.' She got up and got in my face and said 'did you just curse @ me?' Then she said 'Your Done!" She left O.P. lab, and when she came back I said why are you always so sarcastic, she said do you wanna talk about this outside, I said yes because we had students & pts. She got in front of the Lab door and proceeded to get loud. I said I'm not doing this right here in front of the Dr's office's and adminsitration. So she come on then turned the hall near the time clock, she said 'because I'm going to hurt you.' I said your not going to put your hands on me, she said 'Then why you come outside,' I said to talk, you not going to touch me. She then started bumping my chest all in my face. I said, I'm going to tell Joyce this is crazy, as I turned around she grabbed my hair on the right side, hit me, and pulled me to the floor. At that point I began defending myself. Dywanna Broadnax.

Exh. 11, Broadnax Statement; Exh. 5, Broadnax Dep., 258:3-260:8.

Reply: Undisputed for the purposes of the Motion.

74.    Broadnax admits she said in her statement that she had used profanity when speaking to Taylor, Taylor left the room in response to that profanity, Broadnax was the first person to speak again when Taylor returned to the room and - in so doing - Broadnax asked Taylor "why are you always so sarcastic?", Taylor responded by asking Broadnax if she wanted to "talk about this outside," Broadnax accepted that invitation, and Broadnax "defend[ed] herself" in the hallway. Exh. 5, Broadnax Dep., 260:10-261:8, 264:15-265:3.

Reply: Undisputed for the purposes of the Motion.

75.    Taylor's statement read as follows:

On the day of Nov 18 2018 about 245 PM me and cowork putting in pt. I simply told my

17

coworkers that if your putting in chem make sure you add mas & phos. Dywanna imed said to me out loud in front of pt. that I always Doing this and crusing in front of pt.  So to take the excitement out of out pt. I said to her if she want to speak to me privately.  So we went in the hallway where she became cursing and fighting. Crystal Taylor.

**Exh. 12, Taylor's Statement.**

Reply: Broadnax disputes the entire content of Taylor's statement, but does not dispute that Taylor made this statement.

76.    **Ward's statement read:**

**I, Loretta Ward, was walking down toward inpatient lab before getting to the lab I heard noise like punching and breathing heaving and I look to the corner by the time clock and there are two girls fist fighting and I said stop twice then I yelled Security and when Security tore them apart from each other, the short girl said out loud she put me in this corner to fight with me cause there no camera, the short girl has long hair. Tall girl with very short hair. Loretta Ward. CNA ACE Unit.**

**Exh. 13, Ward's Statement.**

Reply: Undisputed for the purposes of the Motion.

77.    **The statements of Broadnax, Taylor and Ward shall hereinafter collectively be referred to as the "Statements."**

Reply: Undisputed for the purposes of the Motion.

78.    **In response to Delisle asking Sniderman to determine Broadnax's role, Zagacki emailed Delisle separately to inform him that, after reading the witness statement from security that Broadnax and Taylor were "fist fighting," Zagacki was going to recommend that Broadnax also be terminated (along with Taylor).  Zagacki reported that she felt the incident was "wrong on so many levels."[6] Exh. 30, Delisle Aff. ¶ 10; Exh. 33, November 19, 2019 Zagacki**

18

**Email to Delisle ("Zagacki Email to Delisle"); Exh. 6, Zagacki Aff., ¶ 20.**

Reply: Broadnax does not dispute the content of the emails exchanged between Delisle, Sniderman, and Zagacki. Broadnax does dispute that she was "fistfighting."

79.    **Indeed, in addition to Ms. Ward's statement, Zagacki had read the Security Case Report and Taylor's and Broadnax's statements. They showed, to Zagacki, that both employees were responsible for the fistfight. Their conduct was just plain "wrong." Exh. 33, Zagacki Email to Delisle; Exh. 6, Zagacki Aff., ¶ 21.**

Reply: Broadnax disputes that she was responsible or was an active participant in any fight, but Zagacki's interpretation of the Security Case Report and Taylor and Broadnax's statements are undisputed.

80.    **Delisle responded to Zagacki's email, "Thanks, I fully support that" based on the witness' statement that Taylor and Broadnax were "fist fighting." Exh. 33, Zagacki Email to Delisle; Exh. 30, Delisle Aff. ¶ 10.**

Reply: Broadnax disputes that she was "fist fighting" but otherwise does not dispute the contents of Delise's email to Zagacki.

81.    **Marrone, like Zagacki, had reviewed the Security Case Report and Statements. Exh. 15, Marrone Aff., ¶ 8; Exh. 6, Zagacki Aff., ¶ 21.**

Reply: Undisputed for the purposes of the Motion.

82.    **Based on the Security Case Report and the Statements, Marrone felt Broadnax and Taylor should be terminated for their mutual involvement in the altercation. Exh. 15, Marrone Aff., ¶ 8.**

Reply: Undisputed for the purposes of the Motion.

83.    **Marrone knew Taylor and Broadnax had violated Jefferson's policies and that fist fighting at work during working hours cannot be tolerated. He felt the totality of the altercation was**

19

**serious enough that it warranted both employees' terminations. Exh. 15, Marrone Aff., ¶ 10.**

Reply: Broadnax disputes that she violated Jefferson's policies and that she engaged in a fist fight. However, she does not dispute Marrone's interpretation of the altercation, that he believed fist fighting at work during working hours cannot be tolerated, or that he felt that altercation was serious enough to warrant both employees' terminations.

84.    **As for Gudowski, he read the Security Case Report and noted that it stated Taylor and Broadnax were fighting in the hallway during work hours.  He expressed to Marrone, Zagacki, Delisle, and Sniderman that he Gudowski did not want Taylor or Broadnax back on campus. He asked Sniderman about the protocol for termination and for the next steps. Exh. 34, November 19- 20, 2019 Email String; Exh. 19, Gudowski Aff., ¶ 7; Exh. 26, Sniderman Aff., ¶ 14.**

Reply: Undisputed for the purposes of the Motion.

85.    **Sniderman reviewed the Security Case Report, as well as the Statements.  From the Security Case Report, Sniderman concluded that Taylor and Broadnax blamed each other for starting the altercation and that the witness – Ward – reported that "two employees [were] fighting in the hallway" and did not stop when Ward yelled for them to do so. Exh. 26, Sniderman Aff., ¶¶ 15-16; Exh. 10, Security Case Report; Exhs. 11-13, Statements.**

Reply: Undisputed for the purposes of the Motion.

86.    **From Broadnax's statement, Sniderman noted that: (a) Broadnax instigated a confrontation with Taylor by cursing at her; (b) Taylor responded to Broadnax in an obviously angry fashion (by getting in Broadnax's face, asking Broadnax if she had just sworn at Taylor, telling Broadnax she was "Done," and abruptly leaving the room); (c) Taylor came back into the room and Broadnax escalated the conflict between herself and Taylor by asking Taylor why she was always "sarcastic;" (d) Taylor responded to that comment by asking Broadnax if she wanted to "talk about this outside," which Sniderman understood as a commonly-used**

20

**euphemism for asking someone to fight; (e) Broadnax accepted that invitation (to fight) and left the room with Taylor; (f) when Mr. Taylor "got loud" in the hallway, Ms. Broadnax responded, "I'm not doing this right here;" and (g) although Broadnax blamed Taylor for making the first physical contact, Broadnax admitted to fighting – as Ward reported - when Broadnax wrote that she "defend[ed] herself." Exh. 26, Sniderman Aff., ¶ 17; *accord* Exh. 11, Broadnax Statement.**

Reply: Broadnax disputes any indication that she perceived Taylor asking if she wanted to "talk about this outside" as an invitation to fight. Sniderman's belief that the phrase "talk about this outside" is a euphemism for fighting should not be associated with Broadnax's decision making process in any way, and should not have been used as a basis to terminate Broadnax from employment. Broadnax otherwise does not dispute this paragraph for the purposes of the Motion.

87.   **In other words, to Sniderman, Broadnax's statement made it clear she was an active participant in the altercation with Taylor that resulted in a fistfight.  As such, Broadnax should be terminated along with Taylor. Exh. 26, Sniderman Aff., ¶ 18; *accord* Exh. 11, Broadnax Statement.**

Reply: Broadnax disputes that her statement made it clear she was an active participant in the altercation with Taylor. Broadnax disputes the characterization that she was a participant in a fistfight. Broadnax does not dispute that this paragraph includes Sniderman's interpretation of the altercation and accompanying disciplinary recommendation,

88.   **Following his review of the Security Incident Report and the Statements, Sniderman informed Gudowski, Marrone, Zagacki, and Delisle, "We take a zero-tolerance approach to violence in the workplace. Due to the physical evidence that is known Crystal should definitely be terminated. Based off of Dywanna's statement my initial recommendation is to terminate her as well."  Sniderman asked Gudowski, Zagacki, Marrone, and Delisle if anyone had additional information or a different view of the proposed discipline.[7] Exh. 34,**

**November 19-20, 2019 Email String; Exh. 26, Sniderman Aff., ¶ 19; Exh. 30, Delisle Aff. ¶¶ 11-12; Exh. 15, Marrone Aff., ¶ 10; Exh. 19, Gudowski Aff., ¶ 8; Exh. 6, Zagacki Aff., ¶ 22.**

Reply: Undisputed for the purposes of the Motion.

89.    **None of these individuals added more information or expressed a different view than that Broadnax and Taylor should be terminated. Exh. 30, Delisle Aff. ¶ 12; Exh, 15, Marrone Aff., ¶ 11; Exh. 19, Gudowski Aff., ¶¶ 9-10; Exh. 26, Sniderman Aff., ¶ 20; Exh. 6, Zagacki Aff., ¶ 23.**

Reply: Undisputed for the purposes of the Motion.

90.    **Sniderman also spoke to Security and Ward who confirmed the information in Security Incident Report and Ward's statement, respectively. Exh. 26, Sniderman Aff., ¶ 21.**

Reply: Undisputed for the purposes of the Motion.

91.    **Further, when Sniderman spoke to Ward, Ward explained that she saw Broadnax and Taylor entangled with each other on the floor fighting.** *Id.* **at ¶ 22;** *accord* **Exh. 5, Broadnax Dep., 361:11-12 ("[W]e were fighting on the floor").**

Reply: Undisputed for the purposes of the Motion.

92.    **Finally, Sniderman consulted Jefferson's in-house counsel and thereafter informed Gudowski, Marrone and Zagacki that he intended to follow through on his recommendation to terminate both Broadnax and Taylor for violating Jefferson's policies. Exh. 35, Sniderman Email; Exh. 26, Sniderman Aff., ¶ 23; Exh. 15, Marrone Aff., ¶ 12; Exh. 6, Zagacki Aff., ¶ 24; Exh. 19, Gudowski Aff., ¶ 11.**

Reply: Undisputed for the purposes of the Motion.

93.    **All three managers supported this action. Exh. 19, Gudowski Aff., ¶¶ 10, 12; Exh. 15,**

**Marrone Aff., ¶ 13; Exh. 26, Sniderman Aff., ¶ 24; Exh. 6, Zagacki Aff., ¶ 25.**

Reply: Undisputed for the purposes of the Motion.

94. **On November 21, 2019, Broadnax spoke to Sniderman who told her she was terminated because she engaged in a fistfight with a coworker. Exh. 5, Broadnax Dep., 299:19- 300:4, 9:12-14, 301:25-302:13; *accord* Exh. 8, TJUH0372 (Broadnax admitting she was told she was being terminated for her participation in a fist fight which violated the Code of Conduct).**

Reply: Broadnax does not dispute that she was told by Sniderman she was being terminated because she engaged in a fistfight with a coworker and that participation in fist fight violated the Code of Conduct, however for the purpose of clarity, Broadnax disputes that she was a willing participant in a fight and contends that Jeffersons's actual reason for terminating her was retaliation for her prior protected activity.

95. **Broadnax asked Sniderman why she had not been asked to provide her side of the story. Exh. 5, Broadnax Dep., 299:19-300:4.[8]**

Reply: Undisputed for the purposes of the Motion.

96. **To Sniderman, Broadnax already had provided her side of the story in her handwritten statement. Exh. 26, Sniderman Aff., ¶¶ 25-26.**

Reply: Undisputed for the purposes of the Motion.

97. **Broadnax told Sniderman she was "the one assaulted and attacked," to which Sniderman responded with words to the effect that Broadnax should have known Taylor wanted to fight when Broadnax agreed to "talk outside." Exh. 5, Broadnax Dep., 299:19-302:19; Exh. 7, May 2020 Charge, ¶¶ 43-44.**

Reply: Undisputed for the purposes of the Motion.

98. **During the termination call, Broadnax referenced workplace violence health stream courses Jefferson requires its employees to take, including one called "Workplace and De-**

23

escalation Techniques" that Broadnax claimed she was following when she accepted Taylor's invitation to "talk about this outside." Exh. 5, Broadnax Dep., 301:12-25.

Reply: Undisputed. By way of further answer, Broadnax also contends that she had been told by Zagacki to try to talk through conflicts before reporting them to management. See Exhibit 5, 231:7-233:24, attached to Defendant's Motion for Summary Judgment.

99.   Sniderman responded by saying "You participated in a fistfight." *Id.* at 301:25- 302:2.

Reply: Undisputed for the purposes of the Motion.

100.   Neither at the time of the decision to terminate Broadnax nor any other time has Sniderman been aware of any employee training Jefferson provides that suggests to employees that, during a heated discussion, they should speak about the discussion "outside." Exh. 26, Sniderman Aff., ¶¶ 27-28.

Reply: Undisputed for the purposes of the Motion.

101.   In fact, although Broadnax may have taken "Workplace and De-escalation Techniques" training at Jefferson, the training does not instruct employees to accept an invitation from an employee during a contentious interaction to "talk about this outside." Exh. 36, Workplace Training.

Reply: Broadnax disputes that her decision to talk with Taylor in the hallway was not in line with Jefferson's "Workplace and De-escalation Techniques." In their wording of this paragraph, Jefferson appears to presume that Broadnax should have known to interpret Taylor's offer to talk outside as something different than the plan language of Taylor's own words.

102.   In any event, Sniderman was not and still is not aware of that or any other training with such an instruction to employees. Exh. 26, Sniderman Aff., ¶ 29.

Reply: Undisputed for the purposes of the Motion.

103.   After her termination, Broadnax sent a text to Zagacki apologizing for "asham[ing] the lab"

24

**and asking Zagacki to "[p]lease tell George & Linda sorry as well." Exh. 16, Broadnax Text Apologizing; Exh. 5, Broadnax Dep., 304:3-24, 305:7-9; *see also* SOFs ¶ 57, *supra*.  Linda refers to Linda Dutch, chemistry supervisor. *Id.* at 87:17-19.**

Reply: Broadnax does not dispute that she sent this text Zagacki, but does dispute that this text constituted an admission of guilt. Broadnax was ashamed by the overall situation with Taylor, but that does not mean she was a willing participant in a fistfight or intended to provoke Taylor into fighting. Broadnax also asserts that at the time she sent this text, she she was actively looking for new employment and may need a reference letter. See, Exhibit 1, Interrogatory No. 5 attached to Defendant's Motion for Summary Judgement.  Broadnax thought it necessary to try to look remorseful to Zagacki in case Zagacki was contacted for a reference letter. This is evidenced by Broadnax's next text message to Zagaki in January 2020, where she directly asks for a reference letter. See, Exhibit 47 attached to Defendant's Motion for Summary Judgment.

104.    **Broadnax concedes the conduct for which Jefferson told her she was terminated violated Jefferson's Code of Conduct policy, its Employee Disruptive Conduct Policy and its No-Violence policy. Exh. 5, Broadnax Dep., 303:10-21.**

Reply: Undisputed for the purposes of the Motion. By way of further answer, Broadnax disputes that she engaged in conduct in violation of Jefferson's No-Violence Policy.

105.    **Broadnax admits she believes the fistfight was the real reason she was terminated. Exh. 5, Broadnax Dep., 10:11-11:2.**

Reply: Broadnax disputes this numbered paragraph. Broadnax interpreted Jefferson's question in the referenced deposition page to mean that the fistfight was Jefferson's stated reason for her termination. Broadnax even stated that she did not understand that the question being asked of her. See, Exhibit 5, 10:6-19 attached to Defendant's Motion for Summary Judgment. Broadnax has consistently stated that she was not a willing participant in a fight. Broadnax alleges that the real reason for her termination was retaliation based on her prior protected activity. See, Exhibit 3

attached to Defendant's Motion for Summary Judgment).

106.    **Indeed, when Broadnax applied for unemployment, she stated the reason she was terminated was because she "assaulted at work and got into a fistfight."** *Id.* **at 114:23-115:7.**

Reply: Undisputed for the purposes of the Motion. Broadnax is a lay person who believed that she needed to state given reason for her termination on unemployment compensation forms, however Broadnax does not see this as material.

107.    **Also, when her attorney asked Broadnax in her deposition why Broadnax sued Jefferson, Broadnax explained, "Although there is a code of conduct policy in place for every employee, I did not understand that the first time that I am in a situation that requires management leadership security, anything administration to be involved, and it came from a person who has a history of volatile behavior, that I got assaulted and defended myself after being there 14 years and nine months, got me fired, I just did not understand that."** *Id.* **at 343:19-344:4.**

Reply: Undisputed for the purposes of the Motion.

108.    **Along with Broadnax, Taylor was terminated for the same reason Broadnax was terminated, the fistfight.** *Id.* **at 14:25-15:9; Exh. 37, Termination Letters.**

Reply: Undisputed.

109.    **There is no evidence Taylor ever complained of discrimination or retaliation. Exh. 5, Broadnax Dep., 15:10-13.**

Reply: Undisputed for the purposes of the Motion.

110.    **Also, although Broadnax contends "Taylor has a documented history of engaging in threats of violence, whether express or implied, which . . . violated Defendant's zero tolerance policy," Exh. 3, Complaint, ¶ 59, there is no evidence Taylor had been in a physical altercation before the fistfight with Broadnax. Exh. 5, Broadnax Dep., 14:9-24;** *accord* **Exh. 5, Broadnax Dep., 72:16-73:8, 64:2-65:5; Exh. 6, Zagacki Aff., ¶ 28; Exh. 26, Sniderman Aff., ¶**

26

**30.**

Reply: Undisputed.

111.    **In fact, even when Broadnax complained about Taylor, Broadnax did not report Taylor was violent towards Broadnax.    She complained she was receiving "wrath from Taylor in that Taylor was "being antagonistic," imitating Broadnax's voice and/or making sarcastic remarks and "[s]ubliminal references." Exh. 5, Broadnax Dep., 91:3-92:13, 94:2-97:24; *accord* Exh. 46, Email Regarding Broadnax and Taylor (Broadnax complaining Taylor was "ignoring" Broadnax).**

Reply: Undisputed.

112.    **Similarly, although Broadnax contends Taylor should have been terminated for her confrontation with Gadson in April 2019, Broadnax concedes that confrontation did not result in a physical assault and, in that way, was "different" than the fistfight between Broadnax and Taylor. Exh. 5, Broadnax Dep. 58:5-59:4**

Reply: Broadnax does not dispute that Taylor's confrontation with Gadson was not a fistfight, however this altercation still involved a threat of violence, which is still a violation of Jefferson's No Violence Policy See, Exh. 26 attached to Defendant's Motion for Summary Judgment; See, Broadnax Exhibit 16. Broadnax therefore disputes that the confrontation between Taylor and Gadson was "different," as both involved alleged violations of the same rules.

113.    **Zagacki agrees the Gadson/Taylor incident in April 2019 was materially different than the Broadnax/Taylor fistfight on November 18, 2019. Exh. 6, Zagacki Aff., ¶ 30.**

Reply: Broadnax does not dispute that Zagacki believes the incidents on April 2019 and November 2019 were materially different.

114.    **Broadnax did not witness the alleged "verbal assault" between Gadson and Taylor, Exh. 5, Broadnax Dep. 58:5-11, but Zagacki did. Exh. 6, Zagacki Aff., ¶ 29.**

27

Reply: Undisputed.

115.    **There is no evidence Zagacki or any other decisionmaker characterized Taylor's conduct towards Gadson in words or effect as an "assault" or thought Taylor should be disciplined for the altercation with Gadson. Exh. 5, Broadnax Dep., 64:2-65:5, 66:7-11.**

Reply: Undisputed, which, in part, is why Broadnax alleges disparate treatment by Jefferson.

116.    **In fact, Zagacki reported to Marrone and Human Resources shortly after the confrontation between Gadson and Taylor that they both were "aggressive" and at fault.[9] Exh. 6, Zagacki Aff., ¶ 29.**

Reply: Undisputed.

117.    **To Zagacki, the fistfight between Broadnax and Taylor was not the same as the argument between Gadson and Taylor.  Broadnax and Taylor had a heated argument that it appeared Broadnax primarily started and escalated.  Broadnax accepted Taylor's invitation to go outside and then both "girls were fist fighting."  In contrast, Gadson and Taylor had a heated disagreement during which both were verbally aggressive, but it did not result in them striking  each other. *Id.* at ¶ 30.**

Reply: Undisputed that Zagacki states she viewed these altercations as different.

118.    **Broadnax claims Marrone, Zagacki and the HRBP who Sniderman replaced – Hamza - harbored retaliatory animus against Broadnax for filing the 2011 Charge and the 2017 Charge. Exh. 5, Broadnax Dep., 12:9-14:8.**

Reply: Undisputed.

119.    **Broadnax contends Hamza and Marrone harbored retaliatory animus because they did not do anything in response to Broadnax's purported complaints about Zagacki. *Id.* at 13:22-14:8.**

28

Reply: Undisputed.

120.   **Regarding Hamza, she was Broadnax's HRBP from 2017 until in or about May  2019. Exh. 38, Affidavit of Suzana Hamza ("Hamza Aff."), ¶ 2; Exh. 26, Sniderman Aff., ¶ 4.**

Reply: Undisputed.

121.   **The record evidence during that time period includes only the following:**

   a.   **an August 2017 email exchange between Hamza and Broadnax wherein Hamza timely addressed the questions and concerns Broadnax raised and welcomed Broadnax to meet with her about any other issues. Exh. 39, August 2017 Email String; and**

   b.   **a June 20, 2019, email ("June 20, 2019 Email") that Broadnax sent to Hamza wherein Broadnax wrote to Zagacki, with a copy to Marrone, complaining about a number of issues with Broadnax's coworkers and Zagacki. Exh. 9, June 20, 2019 Email; *see also* SOFs 126-132.  Broadnax has no evidence Hamza – who was no longer Broadnax's HRBP - would have addressed Broadnax's complaints in the  June 20, 2019, but for Broadnax filing the 2011 Charge and 2017 Charge.**

Reply: Broadnax does not dispute that these two incidents on August 2017 and June 20, 2019, occurred. Broadnax does dispute that these are the only incidents suggesting retaliatory animus. Broadnax contends that she reached out to both Hamza and Marrone about issues with Zagacki, which went unresolved See, Exhibit 5 12:9-14:8 attached to Defendant's Motion for Summary Judgment. Broadnax contends that she communicated with Hamza in September 2017 regarding the failure to inform her that she had to re-enroll in her retirement fund, and that Jefferson's Human Resources, where Hamza was an HR rep along with Zagaki and D'Elia all pointed fingers at one another and shifted blame Id. at 145:11- 22.

122.   **In sum, Broadnax has insufficient evidence Hamza harbored retaliatory animus against Broadnax.**

Reply: Disputed that Broadnax has not met her burden of showing Hamza harbored retaliatory animus against her.

123.    **Regardless, there is zero evidence Hamza was involved in the investigation into the fistfight or in the decision to terminate Broadnax.**

Reply: Undisputed for the purposes of the Motion.

124.    **Broadnax has insufficient evidence Marrone harbored retaliatory animus against Broadnax.**

Reply: Disputed that Broadnax's evidence is "insufficient."

125.    **Regarding complaints Broadnax allegedly made to Marrone, <u>first</u>, Broadnax emailed Marrone in August 2017 to inquire about her eligibility for a 5-year service certificate. Exh. 40, Broadnax Email to Marrone. Marrone followed up on this inquiry and, as a result, Hamza addressed the issue with Broadnax shortly thereafter. *Id.*; Exh. 39, August 2017 Email String.**

Reply: Undisputed for the purposes of the Motion.

126.    **<u>Second</u>, Broadnax copied Marrone on the June 20, 2019 Email wherein Broadnax complained that: (a) she is a "5star employee" whose coworkers never complained about her and who was never recognized for her stellar performance throughout the year by her "department heads" or on her "yearly evaluations;" (b) she felt undermined by Zagacki because she does not side with or defend Broadnax when she corrects her coworkers' way of doing their job that differs from the way Broadnax was trained "many years" before; (c) Zagacki purportedly embarrassed Broadnax by confirming she understood a script; and (d) Zagacki allows Broadnax's coworkers to write on scripts. Exh. 9, June 20, 2019 Email; *see also* Exh. 41, Email from Broadnax re: Out patient. Broadnax griped further that her coworker had been told Broadnax's opinion "doesn't matter." Exh. 9, June 20, 2019 Email.**

Reply: Undisputed for the purposes of the Motion.

127.    **Broadnax neither has evidence regarding how and whether Marrone responded to**

30

**Broadnax's complaints in the June 20, 2019 Email nor how that response differed from any comparable complaints any other employees may have made to Marrone.**

Reply: Broadnax contends that both Hamza and Marrone repeatedly failed to address her complaints about issues with Zagacki, to the point that she began to believe they were aware of Zagacki's mistreatment of Broadnax and also harbored retaliatory animus. See, Exhibit 5 12:9-14:8 attached to Defendant's Motion for Summary Judgment

128. **In any event, Zagacki responded to Broadnax's long list of complaints in the June 20, 2019 Email. Zagacki asked Broadnax to meet with Zagacki. Although Zagacki informed Broadnax that Zagacki felt Broadnax's email was "completely out of line," hurtful and insulting, Zagacki explained why she felt that way. In the email, Zagacki explained that she, in fact, did speak to each employee about whom Broadnax complained, addressed the misunderstanding regarding the script Broadnax referenced, and provided her (Zagacki's) reasoning why she believes it is permissible to write on scripts.** *Id.*

Reply: Undisputed for the purposes of the Motion.

129. **Indeed, despite her statements in the June 20, 2019 Email, Broadnax admits: (a) Zagacki (and Marrone) gave Broadnax very favorable yearly evaluations throughout her employment, Exh. 5, Broadnax Dep., 348:17-349:12; (b) her coworkers, in fact, had complained about her,** *id.* **at 203:3-25, and (c) only assumed someone said Broadnax's "opinion doesn't matter."** *Id.* **at 213:17-214:8.**

Reply: Undisputed for the purposes of the Motion.

130. **Also, regarding Broadnax's view that Zagacki undermined Broadnax, Broadnax agrees: she was trained by a different supervisor than Zagacki; does not know what Zagacki was told when she was trained; and Zagacki had emailed Broadnax and her coworkers a few months before Broadnax's June 20, 2019 Email to explain that the Lab Assistants were permitted to write on the scripts because the originals are scanned in.** *Id.* **at 204:2-209:12, 215:21-218:7.**

Reply: Undisputed for the purposes of the Motion.

131.    **Regardless, Broadnax concedes Zagacki was handling this situation the way she always did – i.e., by "smooth[ing] things over," "never correct[ing] things," and "tr[ying] to make things across the board easy."** *Id.*

Reply: Broadnax does not dispute Zagacki's general method for handling workplace situations, but does dispute that Zagacki treated Broadnax and Broadnax's workplace issues in the same way she treated her coworkers, as Broadnax contends that Zagacki engaged in a repeated pattern of disparate treatment from 2011- 2019 that included failing to properly train her and failing to address her repeated complaints about Taylor.

132.    **Broadnax does not even have any evidence to refute that Zagacki responded to Broadnax's complaints by speaking to the employees about whom Broadnax complained. Exh. 9, June 20, 2019 Email; Exh. 6, Zagacki Aff., ¶ 41.**

Reply: Broadnax does not dispute this for the purpose of this motion.

133.    **<u>Third</u>, Broadnax complained to Marrone in November 2014 that Broadnax's coworker – Lisa Hall – threatened Broadnax, but Marrone <u>and Zagacki</u> investigated that allegation and learned no witness could corroborate Broadnax's complaint. Exh. 42, Broadnax Email re Lisa Hall.**

Reply: Undisputed for the purposes of the Motion.

134.    **Broadnax lists a number of ways she contends Zagacki evidenced retaliatory animus over Broadnax's eight years at Jefferson.**

Reply: Undisputed for the purposes of the Motion.

135.    **<u>First</u>, Broadnax claims Zagacki created a "narrative" that Broadnax was a "troublemaker" and that she had sued her supervisor, which led to Broadnax's coworkers**

**ostracizing her. Exh. 1, Interrogatory Responses, Interrogatory no. 11; Exh. 5, Broadnax Dep., 15:214-16:6.**

Reply: Undisputed for the purposes of the Motion.

136. **Broadnax concedes she never heard Zagacki or any decision maker here make any derogatory comments about Broadnax or anyone else for their disability, race, or complaining of discrimination or retaliation. Exh. 5, Broadnax Dep., 16:21-17:4, 45:21-46:12, 53:23-54:12, 162:18-163:14.**

Reply: Undisputed for the purposes of the Motion.

137. **Broadnax also admits she does not have personal knowledge of how her coworkers may have learned she had filed the 2011 Charge and concedes she is the one who told several coworkers about her 2017 Charge. *Id.* at 49:2-51:11.**

Reply: Undisputed, but by way of further answer, Broadnax contends that the only people who should have known about her 2011 Charge were the individuals it directly involves, primarily Zagacki, and it was Zagaki's employees who had knowledge of the 2011 Charge that they should not have had.

138. **To try to support Broadnax's claim that Zagacki was responsible for a "narrative" about Broadnax, she relies on statements from three coworkers. Broadnax contends: (a) her coworker – Lisa Hall - told Broadnax in 2015 that Zagacki told Hall in 2011 or 2012 that Broadnax was a "troublemaker" and had filed a complaint against Zagacki; (b) coworker Geniece Carroll told Broadnax in 2012, "No one likes you. Why would you want to come back after you sued your supervisor?"; and (c) Lindsey D'Elia - the Phlebotomy Coordinator - told Broadnax that D'Elia was "limited with training [Broadnax] in certain areas because [Zagacki] prefers for [Broadnax] to be in the outpatient area, to keep [Broadnax] away from .**

. . other coworkers" and that, in 2011, Zagacki "referenced something about [Broadnax] suing [Zagacki]." *Id.* at 16:15-20:23, 24:4- 25:24, 30:6-12, 39:9-40:25.

Reply: Undisputed for the purposes of the Motion.

139.    Broadnax did not report these conversations with Hall, Carroll and D'Elia to anyone at Jefferson. *Id.* at 22:17-23:14, 25:25-26:10, 41:8-42:4.

Reply: Undisputed for the purposes of the Motion.

140.    Broadnax concedes Carroll made her comment to Broadnax immediately after she told Carroll she was doing something incorrectly. *Id.* at 40:5-10.

Reply: Undisputed for the purposes of the Motion.

141.    Second, Broadnax asserts Zagacki did not train Broadnax in areas beyond phlebotomy, such as receiving and send-outs, despite Broadnax repeatedly asking Zagacki to provide that training after Broadnax returned to Jefferson in 2011. Exh. 1, Responses to Interrogatories, Interrogatory no. 10; Exh., 21, 2017 Charge, ¶ 36.

Reply: Undisputed for the purposes of the Motion.

142.    Broadnax points to D'Elia's comments above and to her performance evaluations wherein Zagacki noted she would train Broadnax in "receiving," "microbiology," and "collection manager." Exh. 5, Broadnax Dep., 19:12-20:23; Exh. 21, 2017 Charge, ¶¶ 36-42.

Reply: Undisputed for the purposes of the Motion.

143.    Many other coworkers of Broadnax's, like Broadnax, were not trained in areas other than phlebotomy. Those individuals include Blondzell Skinner, Margarita Robles, Chryshenda Bradley, Janice Nasuti, Kyla Chau, Julia Laramore, Tracey Shavers, and Guadalupe Astimbay-Sasa. Exh. 6, Zagacki Aff., ¶ 31.

Reply: Broadnax does not dispute that some of her coworkers were not trained in areas other than phlebotomy. However, Broadnax does not know whether any of these employees were specifically told by Zagacki that they would receive trainings in other areas, or had performance reviews where Zagacki had written that they would be trained in other areas. Both of these things existed for Broadnax. See Exhibit 1, nos. 10 and 11, Exhibit 3, Exhibit 5 338:15- 340:9, and Exhibit 21 attached to Defendant's Motion for Summary Judgment; See also Broadnax Exhibit 2.

144. **Zagacki is not aware of any of these employees complaining of discrimination or retaliation.** *Id.*

Reply: Undisputed for the purposes of the Motion.

145. **In any event, Broadnax concedes neither her title, her compensation nor any opportunity for advancement at MHD would have been impacted if she were trained in other areas. Exh. 5, Broadnax Dep., 127:4-128:15, 338:15-340:9.**

Reply: Undisputed, however Broadnax notes that this paragraph does not mean that the decision not to provide her with promised trainings was not done with retaliatory animus.

146. **Third, Broadnax contends Zagacki placed Broadnax on a reduced schedule pursuant to which she did not work the same hours as other lab assistants, was afforded minimal to no interactions at work, and missed staff meetings. Exh. 3, Complaint, ¶ 29; Exh. 1, Interrogatory Responses, Interrogatory no. 11.**

Reply: Undisputed for the purposes of the Motion.

147. **Broadnax's schedule was the way it was because she requested it. Exh. 6, Zagacki Aff., ¶¶ 32-33; *accord* Exh. 8, PHRC Questionnaire, TJUH0374 (admitting her request to not report to work early was granted); *see also* SOFs ¶ 11, *supra*.**

Reply: Undisputed for the purposes of the Motion.

148. **Nevertheless, Broadnax was not the only employee who missed staff meetings due to his/her schedule and there is no evidence those employees who missed staff meetings also complained of discrimination/retaliation like Broadnax.** *See* **Exh. 43, Emails Regarding Staff Meetings; Exh. 6, Zagacki Aff., ¶ 35.**

Reply: Undisputed for the purposes of the Motion.

149. **Zagacki also included Broadnax in employee events planned in the lab. Exh. 6, Zagacki Aff., ¶ 36;** *see e.g.,* **Exh. 44, Emails Regarding Lab Events.**

Reply: Undisputed for the purposes of the Motion.

150. **Fourth, Broadnax asserts she was unaware she had not been registered automatically for a retirement account when she was rehired and that she did not learn of this until 2017.  Broadnax blames this on the fact that she did not receive a "welcome packet" and was not otherwise informed "by Defendant" that she needed to register for an account again. Exh. 3, Complaint, ¶¶ 35-38.**

Reply: Undisputed for the purposes of the Motion.

151. **There is no evidence Zagacki or anyone else who knew about Broadnax's 2011 Charge and/or was involved in the decision to terminate Broadnax was responsible for providing Broadnax with a "welcome packet" or otherwise ensuring she was informed about her eligibility to enroll for retirement savings.** *Accord* **Exh. 5, Broadnax Dep., 147:8-24, 161:2-15, 155:15-24. Indeed, Broadnax cannot identify the person responsible and, ultimately, contends she just does not think "it was handled correctly."** *Id.* **at 146:11-147:3.**

Reply: Broadnax disputes this paragraph. Broadnax contends that prior resigning from Jefferson in 2008, she was enrolled in her retirement fund and had retirement reductions on her paychecks. *Id.* at 151:10- 23 attached to Defendant's Motion for Summary Judgment). New hires are supposed to receive a new hire packet ("Packet") when they begin employment at Jefferson. These Packets

36

contain information about enrolling for retirement. Broadnax states that she never received a Packet with this information when she was hired by Jefferson the second time in 2011. Broadnax also states that other coworkers she spoke with that were hired after 2011 explained to her they received Packets with retirement information, and also attended an orientation which explained to them that they needed to enroll into their retirement fund, with instructions on how to do so *Id.* at 144:20- 147:10. Broadnax contends that when she began asking around about who should have informed her about retirement and provided her new hire information, Zagacki, D'Elia, and HR all pointed fingers at one another and shifted blame *Id.* at 145:11- 22. Broadnax contends that when she was first hired by Jefferson in 2005, her immediate supervisor Carol Delaney sent her to new hire orientation where she was instructed signing up for a retirement fund. Broadnax contends that when she returned to Jefferson in 2011, it was Zagacki's job as her immediate supervisor to ensure she attended orientation and obtained the necessary information for retirement *Id.*, at 160:10-23; See also Exhibit 3 attached to Defendant's Motion for Summary Judgement.

152.    **Fifth, Broadnax contends Zagacki denied her accommodations in the middle of 2017 by not allowing her to have a mini heater to warm her hands and by failing to remove a broken piece of metal under a work desk that had cut Broadnax's skin. Exh. 3, Complaint, ¶¶ 30- 34; Exh. 5, Broadnax Dep., 187:13-18.**

Reply: Undisputed.

153.    **As for the mini heater, Broadnax admits she was able to use an alternate accommodation that enabled Broadnax to perform her job, i.e., holding hot tea or cocoa. Exh. 21, 2017 Charge, ¶ 15-19; Exh. 5, Broadnax Dep., 180:3-181:4, 182:22-183:14, 185:21-185:10.**

Reply: Broadnax disputes that having to hold a cup of hot tea or cocoa in her hands in order to perform her job duties was not a reasonable alternate accommodation to having a mini heater in her work area. Broadnax contends that her request for a mini heater was because her Raynaud's Syndrome caused her hands to be cold and blue, and made it difficult to perform her job duties. See Exhibit 1, Exhibit

3, Exhibit 21 No. 15, and Exhibit 20 attached to Defendant's Motion for Summary Judgment. Broadnax also contends that Jefferson's denial of her request for mini heater was based on retaliatory animus because other employees were allowed to use mini heaters. See Exhibit 5, 184:13-20 attached to Defendant's Motion for Summary Judgment/

154. **Regarding the removal of the broken metal piece, it is undisputed that Zagacki: (a) instructed Broadnax to sit at another desk; (b) put tape over the metal piece; (c) called Facilities to remove the metal piece; and (d) when Facilities did not remove the piece, Zagacki removed it herself. Exh. 21, 2017 Charge, ¶¶ 26-27, 30; Exh. 5, Broadnax Dep., 187:19-188:18; Exh. 20, 2018 Zagacki Aff., ¶ 30.**

Reply: Broadnax disputes this paragraph. Broadnax contends that On or about September 2017, she cut on her leg by a metal keyboard slide that was left under the work bench after a broken keyboard tray was removed. See Exhibit 3 and Exhibit 20 attached to Defendant's Motion for Summary Judgment. Broadnax's Lupus and Raynaud's Syndrome causes her skin to tear and bleed easily, and makes her prone to infections. The cut caused Broadnax to have to take antibiotics for this reason, and Broadnax requested that the metal keyboard trays be removed from under these work areas See Exhibit 21, Exhibit 5 188:16-18, and Exhibit 3 attached to Defendant's Motion for Summary Judgment. Zagacki refused this request and instead covered the sharp edges with tape. See Exhibit 5 187: 19-23, Exhibit 21, Exhibit 20 attached to Defendant's Motion for Summary Judgment. The tape did not sufficiently cover the sharp edges, and Broadnax cut herself on the tray another time. See Exhibit 3, Exhibit 21 attached to Defendant's Motion for Summary Judgment. Broadnax contends that Zagacki did not act accommodate her request in a reasonable amount of time. See Exhibit 3 and Exhibit 21 attached to Defendant's Motion for Summary Judgement. Broadnax contends that Zagacki's actions are indicative of retaliatory animus.

155. **Sixth, Broadnax contends Zagacki retaliated against Broadnax by not addressing Broadnax's complaints about Taylor at some point between April 2019 and November 18, 2019. Ex. 3, Complaint, ¶ 43; Exh. 5, Broadnax Dep., 87:11-25.**

Reply: Undisputed.

156.    As an initial matter, regarding Broadnax's alleged complaints about Taylor, Broadnax admits Zagacki was a "nontraditional supervisor." She responded in her typical way, i.e., by having a side conversation with Broadnax to make her feel better and saying she (Zagacki) would "deal with it" and "talk to [Taylor]." Exh. 5, Broadnax Dep., 99:16-100:7. According to Broadnax, this was the way Zagacki dealt with conflict at work, i.e, by trying to "keep[] things smooth or just letting each one of us know she's going to deal with it separately." *Id.*; *accord* Exh. 6, Zagacki Aff., ¶¶ 37-41.

Reply: Undisputed.

157.    Similarly, when other employees complained about Broadnax, Zagacki acted consistently by trying to handle them with intervention, rather than discipline. Exh. 6, Zagacki Aff., ¶ 42; *see e.g.,* Exh. 45, Documents Concerning Complaints About/Issues with Broadnax; *accord* Exh. 5, Broadnax Dep., 225:20-23, 340:10-343:2, 348:12-16.

Reply: Undisputed.

158.    Even if Zagacki's response to Broadnax's complaints about Taylor's behavior were lacking or ineffective, Broadnax listed several other employees who allegedly complained about Taylor's behavior towards them. There is no evidence any of these employees complained of discrimination or retaliation or that Zagacki responded to their complaints any differently than she responded to Broadnax's complaints. *See* Exh. 5, Broadnax Dep., 79:12-80:7, 110:4-19.

Reply: Broadnax disputes this paragraph. Other employees' complaints about Taylor were addressed by Zagacki in a manner differently than Broadnax's complaints, as Taylor received multiple discplinary warnings as result of complaints by other employees and had documented conversations about her behavior with Zagacki. See Broadnax Exhibits 10, 11, 12, and 13; See Exhibit 31 attached to Defendant's Motion for Summary Judgment).

39

159. Further, Broadnax complained about another coworker –Jenkins - around the same time Broadnax allegedly complained about Taylor (just a few months before Broadnax's termination). Exh. 5, Broadnax Dep., 193:13-197:2, 211:18-24.

Reply: Undisputed.

160. In response, Zagacki investigated Broadnax's complaint about Jenkins, met with Broadnax and Jenkins, and helped them resolve their differences. Exh. 5, Broadnax Dep., 193:13-197:24, 223:10-224:8; Exhibit 45, Documents Concerning Complaints About/Issues with Broadnax, TJUH000638-000639; Exh. 6, Zagacki Aff., ¶¶ 39-40.

Reply: Undisputed.

161. Finally, Broadnax claims Zagacki chose to not warn Broadnax the day of the fistfight that Taylor was angry with Broadnax for the errors Broadnax noted Taylor made. Broadnax speculates Zagacki did this so Broadnax would "feel more of [Taylor's] wrath." Exh. 5, Broadnax Dep., 283:14-21, 284:12-285:4.

Reply: Undisputed.

162. Broadnax has no evidence Zagacki would have warned Broadnax but for her filing the 2011 Charge or 2017 Charge.

Reply: Undisputed.

163. There is no evidence Zagacki knew Broadnax had arrived to work before the fistfight such that Zagacki could have warned Broadnax that Taylor was angry. In fact, Broadnax had reported to work more than an hour early. *Id.* at 285:6-25.

Reply: Undisputed.

164. Also, although Broadnax postulated Zagacki should have texted Broadnax before she arrived at work to warn Broadnax, *Id.* at 286:2-287:3, there is no evidence showing or from which a reasonable inference can be made that Zagacki would have texted Broadnax but for

**some retaliatory animus.  Zagacki would communicate with Broadnax via text on occasion, but the communications from Zagacki were about trivial matters such as the days Broadnax was working and when she would report to work, not about conflicts with coworkers.** *Accord Id.***;** *See e.g.***, Exh. 47, Texts Between Zagacki and Broadnax.**

Reply: Undisputed.

Respectfully submitted,

/s/ Faye Riva Cohen, Esq.
FAYE RIVA COHEN, ESQUIRE
LAW OFFICE OF FAYE RIVA COHEN, P.C.
2047 Locust Street
Philadelphia, PA 19103

41

42

215-563-7776

Dated:  10/18/22